UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN OVERSIGHT )<br><br>Plaintiff, )<br>)<br>v. )<br>)<br>U.S. DEPARTMENT OF HOMELAND )<br>SECURITY, et. al. )<br>)<br>Defendant. )<br>—————————————————— ) | CASE NO. 21-cv-03030<br><br>**DECLARATION OF FERNANDO PINEIRO IN SUPPORT OF THE U. S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am the FOIA Director of the U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act ("FOIA") Office.  I have held this position since August 14, 2022, and am the ICE official immediately responsible for supervising ICE responses to requests for records under the Freedom of Information Act (the FOIA), 5 U.S.C. § 552, the Privacy Act, (the Privacy Act) 5 U.S.C. § 552a, and other applicable records access statutes and regulations.

2.    Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013, to August 13, 2022.  Prior to that I was the FOIA Officer for three years at the Office of Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS").  The ICE FOIA Office mailing address is 500 12th Street, S.W., STOP 5009, Washington, D.C. 20536-5009.

3.    As the FOIA Director, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office regarding the processing of FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE.

4.      In connection with my official duties and responsibilities, I am familiar with ICE's procedure for responding to requests for information pursuant to the FOIA and the Privacy Act.

5.      I make this declaration in support of ICE's Motion for Summary Judgment in the above-captioned action.  The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

6.      This declaration provides a procedural history of how ICE received Plaintiff's seven[1] FOIA requests, how ICE searched for and processed records in response to Plaintiff's FOIA requests, and how ICE disclosed records located in response to Plaintiff's FOIA requests.

7.      Additionally, in accordance with the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration explains the basis for withholding portions of the requested information pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(c), (b)(5), and (b)(7)(E), 5 U.S.C. §§ 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E)..  **A true and complete copy of the *Vaughn* index is attached to this declaration as Exhibit 1.**

II.     **ICE'S SEARCH FOR RESPONSIVE RECORDS**

        A.      **Plaintiff's FOIA Requests**[2]

8.      Plaintiff submitted two separate Requests dated March 8, 2021.  The first Request ("Request One") sought certain Detainee Death Reviews.[3]  The second Request ("Request Two") sought certain Healthcare and Security Analysis reports.

_____

[1] Plaintiff submitted a total of seven FOIA requests.  Two requests were dated March 8, 2021, and the remaining five were dated October 12, 2021.

[2] All of Plaintiff's FOIA requests pertain to records associated with ICE review of detainee deaths.

[3] Plaintiff received all of the final Detainee Death Review Reports requested as it pertains to this Request that exist; however, Plaintiff has not agreed to forgo challenging the search for these records.  Thus, ICE is also including information on this search below.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

9.      Plaintiff submitted five additional Requests, all dated October 12, 2021.  In the third Request ("Request Three") Plaintiff sought certain ICE Health Service Corps Event Reviews, Root Cause Analysis, or Action Plans. In the fourth Request ("Request Four") Plaintiff sought additional Detainee Death Review Reports[4].  In the fifth Request ("Request Five"), Plaintiff sought additional Healthcare and Security Analysis reports.  In the sixth Request ("Request Six") Plaintiff sought certain independent autopsies. The final Request ("Request Seven") sought certain Mortality Review Reports. **A true and complete copy of Requests One, Two, Three, Four, Five, Six and Seven are attached to this declaration as Exhibit 2.**

10.      Plaintiff commenced this litigation on November 16, 2021. Prior to the filing of the litigation, ICE did not provide a final response to Plaintiff's Requests.

11.      On January 19, 2022, Defendants filed an Answer to Plaintiff's Complaint. ICE made its first production of responsive records on April 5, 2022.  In total ICE made nine productions [5]and produced approximately 1,674 pages of responsive records.

**B.      Overview of Search Process**

12.      When the ICE FOIA Office receives a FOIA request, the intake staff evaluates it to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3.  Generally, a FOIA request is considered proper and in compliance with DHS regulations if it reasonably describes the records sought and the records are under the purview of ICE.

13.      If a FOIA request does not reasonably describe the records sought, the ICE FOIA Office will seek clarification from the requester.  If the requested information is under the purview of a DHS

---

[4] Plaintiff received all of the final Detainee Death Review Reports requested pertaining to this Request, however Plaintiff has not agreed to forgo challenging the search for these records.  Thus, ICE is also including information on this search below.

[5] This number includes discretionary re-releases.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

component other than ICE, the ICE FOIA Office will refer the request to the appropriate DHS component for processing and direct response to the requester.  If the FOIA request seeks records under the purview of a government agency other than DHS, ICE FOIA informs the requester to contact the other government agency directly and ICE FOIA administratively closes the FOIA request.

14.     Proper FOIA requests are entered into a database known as FOIAXpress and assigned a case tracking number.  Based upon the requester's description of the records being sought and ICE FOIA's knowledge of the various program offices' missions, the ICE FOIA Office identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches.

15.     ICE records are maintained by leadership offices and/or within ICE directorates, which include Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), Management and Administration (M&A), Office of Principal Legal Advisor (OPLA) and Office of Professional Responsibility (OPR).  Program offices within the leadership offices and the ICE directorates are staffed with a designated point of contact (POC) who is the primary person responsible for communications between that program office and the ICE FOIA Office.  Each POC is a person with detailed knowledge about the operations of his/her particular program office.

16.     When the ICE FOIA Office receives a proper FOIA request, its first step is to determine which program offices within ICE are reasonably likely to possess records responsive to that request, if any, and to initiate searches within those program offices.  This determination is based on the description of the records requested and requires a familiarity with the holdings of ICE's records systems, and the substantive and functional mandates of numerous ICE offices.  Factors such as the nature, scope, and complexity of the request itself are also relevant.

17.     Once the ICE FOIA Office determines the appropriate program offices for a given

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

4

request, it provides the POCs in each of those program offices with a copy of the FOIA request and instructs them to conduct a search for responsive records. The POCs then review the FOIA request, along with any case-specific instructions provided by the ICE FOIA Office and based on their experience and knowledge of their program office's practices and activities, forward the request and instructions to the individual employee(s) or component office(s) within the program office that they believe are reasonably likely to have responsive records, if any.

18.     Per the ICE FOIA Office's instructions, the individuals and component offices are directed to conduct searches of the file systems (including both paper and electronic files) that, based on their knowledge of the manner in which they routinely keep records, would be the most likely systems to contain responsive documents. After those searches are completed, the individuals and component offices provide any potentially responsive records to their program office's POC, who in turn provides the records to the ICE FOIA Office. The ICE FOIA Office then reviews the collected records for responsiveness and application of appropriate FOIA Exemptions.

19.     ICE program offices use various systems to maintain records, such as investigative files, records regarding the operation of ICE programs, and administrative records, among others. Similarly, ICE employees maintain records in several ways, including storing electronic records on their individual computer hard drives, on their program office's shared drive (if the office uses one) or, less commonly, on DVDs, CDs, or USB storage devices. The determination of which locations need to be searched in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the manner in which the employee maintains his/her files.

20.     Additionally, all ICE employees have access to email. ICE uses the Microsoft Outlook email system. ICE employees use various methods to store their Microsoft Outlook email files. Some archive their files monthly, without separating by subject; others archive their email by topic or by

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

program; and still others create PST files of their emails and store them on their hard drive or shared drive.  Like other searches of emails, an employee will complete a search of his email archive when he determines that the archive may contain potentially responsive documents.  This determination is based on his knowledge of the substance of the FOIA request, the FOIA tasking and instructions provided to him by ICE FOIA and/or the program office POC, and his knowledge of the method in which he stores his emails.

21.    Records received by the ICE FOIA Office from the program office POCs are assigned to a FOIA processor who makes a determination whether the records are responsive to the FOIA request or not.  If the records are responsive, the FOIA processor will redact information pursuant to FOIA or the Privacy Act, as appropriate, while simultaneously ensuring that all reasonably segregated non-exempt information is released.

22.    Frequently the ICE FOIA Office must coordinate between multiple program offices to ensure the program office records are properly redacted and information is correctly segregated.  Once the ICE FOIA Office completes its coordination efforts and all responsive records have been processed, the ICE FOIA Office releases the responsive records to the requester.

**C.    Description of Program Offices tasked with Searching for records in response to Plaintiff's FOIA Requests.**

23.    ICE is the principal investigative arm of DHS and the second largest investigative agency in the federal government.  Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Custom Service and the Immigration and Naturalization Service.  ICE now employs more than 20,000 people in more than 400 offices in the United States and around the world.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

24.     Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States.  ERO manages all logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release. ERO upholds U.S. immigration law at, within and beyond the U.S. borders. ERO operations target public safety threats, such as convicted criminal aliens and gang members, as well as individuals who have otherwise violated our nation's immigration laws, including those who illegally re-entered the country after being removed and immigration fugitives ordered removed by federal immigration judges. ERO deportation officers assigned to INTERPOL also assist in targeting and apprehending foreign fugitives or Fugitive Alien Removal (FAR) cases who are wanted for crimes committed abroad and who are now at-large in the U.S.  ERO manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention.  In addition, ERO removes aliens ordered removed from the U.S. to more than 170 countries around the world.

25.     ICE OPR is responsible for upholding the agency's professional standards through a multi-disciplinary approach of security, inspections and investigations. OPR promotes organizational integrity by vigilantly managing ICE's security programs, conducting independent reviews of ICE programs and operations, and impartially investigating allegations of serious employee and contractor misconduct, as well as internal and external threats against ICE personnel and facilities.  OPR assesses pre-employment suitability and continuously evaluates background investigations of the ICE workforce. OPR also manages physical security and classified national security information, which includes administering clearance levels and access to classified information, systems and equipment. OPR provides ICE senior leadership with an independent assessment of their programmatic compliance with

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

requirements of agency policies, procedures, and detention standards. OPR's role in safeguarding the organization permits the agency to focus on its larger mission of promoting homeland security and public safety.

26.     Under agency protocols, when an individual passes away while in ICE custody, the ICE Health Service Corps (IHSC), part of ERO, reviews the case to determine whether the detainee received appropriate health services in relation to nationally recognized standards of detention health care and practices. Additionally, ICE OPR, in coordination with contract subject matter experts in correctional healthcare and security, conducts an objective examination of the facts and circumstances surrounding each individual's passing, to determine whether or not the relevant detention standards were complied with and to identify any other areas of concern regarding the individual's care and custody. Upon their completion, the results of these reports are provided to ICE senior management and the Department of Homeland Security's Office of Civil Rights and Civil Liberties.

27.     Upon receipt and review of the Requests and based on its familiarity with ICE records systems, the applicable records disposition schedules, and the substantive and functional mandates and missions of ICE offices, the ICE FOIA Office determined that ERO and/or OPR should be asked to conduct a search for records responsive to Plaintiff's FOIA Requests, if any[6].  No other offices were tasked because, based on the subject matter of the FOIA request (i.e., records associated with detainee death reviews), no other offices were reasonably likely to have responsive records or would reasonably be expected to have responsive records.  The ICE FOIA Office instructed these specific offices to conduct a comprehensive search for records and to provide all records located during that search to the ICE FOIA Office for review and processing.

---

[6] Specific details pertaining to the searches conducted for each Request will be further outlined below.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

1

2

I.      *Requests One and Four: Detainee Death Review Reports (DDRs)* [7]

3       28.     On May 18, 2021, prior to the filing of the Complaint, based on the subject matter in

4
Request One, the ICE FOIA Office forwarded Request One to OPR, instructing them to search for and

5
provide the ICE FOIA Office with all records responsive to the request.  No other divisions or units

6
were tasked because, based on the subject matter of the FOIA request, no other offices were likely to

7
have responsive records or would reasonably be expected to have responsive records [8].

8       29.     When OPR receives a FOIA tasking from the ICE FOIA Office, the request is

9
submitted to the OPR FOIA Coordinator who reviews the substance of the FOIA request.  Based on

10
their subject matter expertise and knowledge of the program offices' activities within OPR, the OPR

11
FOIA Coordinator forwards the request to specific individuals and/or component offices within OPR to

12
conduct searches of the file systems that in the individuals' judgment, based on their knowledge of the

13
manner in which they routinely keep records, would be reasonably likely to have responsive records, if

14
any.  The employees exercise discretion, based on their operational knowledge and subject matter

15
expertise, in choosing the specific search terms utilized to ascertain whether potentially responsive

16
records exist.  Once searches are completed, the individuals and component offices provide any

17
potentially responsive records to the OPR FOIA Coordinator, who in turn provides the records to the

18
ICE FOIA Office.  The ICE FOIA Office then reviews the collected records for responsiveness and

19

20
applies the appropriate redactions or withholdings.

21      30.     In response to the initial tasking sent by the ICE FOIA Office, OPR conducted a search

22

23
for records responsive to the request.  Specifically, the OPR FOIA Coordinator tasked the OPR External

24

25  _____

[7] Requests One and Four both sought only certain DDRs.

26  [8] Further confirming that OPR would be the unit within ICE most likely to have responsive records should they exist, the DDRs are titled ICE OPR Detainee Death Review.

27  DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

28                                                        9

Reviews and Analysis Unit (ERAU) to search for records responsive to the request.  The OPR ERAU is part of the OPR Programs Inspections & Auditing Division, which is primarily responsible for conducting and overseeing internal inspections, audits, and reviews of each ICE component, program and office.  OPR ERAU, among other things, conducts DDRs, which are independent, objective examinations of the facts and circumstances surrounding the detention and death of an individual in ICE custody to determine whether the agency and detention facility complied with detention standards related to the individual's health, safety, and security.  No other divisions or units were tasked within OPR, because, based on the subject matter of the FOIA request, no other offices were likely to have responsive records or would reasonably be expected to have responsive records.

31.      On May 27, 2021, the Section Chief for OPR ERAU conducted a search for responsive records.  The OPR ERAU Section Chief supports the Unit Chief in overseeing the work of the Unit. The Section Chief is responsible for the continual day-to day operations of their section, to include supervisory responsibilities over all employees assigned to the section and completion of the substantive work of the section. The OPR ERAU Section Chief is the first-line supervisor of the staff conducting the DDRs.   Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which OPR ERAU maintains files the OPR ERAU Section Chief determined that the locations most likely to contain responsive records, if any, were the ERAU SharePoint site, the Unit's shared drive, as well as his computer and Microsoft Outlook.

32.      SharePoint provides a single infrastructure for DHS components to create websites, or team sites from a template designed for team collaboration.  SharePoint is an alternative to the use of shared drives and emails.

33.      Using the names of the detainees listed in Request One, the Section Chief searched the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders

for any Detainee Death Review Reports.  Additionally, the Section Chief searched his Microsoft

Outlook and computer utilizing the detainee names listed in Request One.  Pursuant to these searches,

the Section Chief located records responsive to Request One and provided them to the OPR FOIA

Coordinator.  On June 17, 2021, the OPR FOIA Coordinator provided the responsive records to the ICE

FOIA Office[9].  No other OPR ERAU employees were tasked to conduct a search because, based on the

subject matter of the FOIA request and the way in which OPR ERAU maintains records, no other OPR

ERAU employees were likely to have responsive records or would reasonably be expected to have

responsive records.

      34.     On December 8, 2021, following the filing of the suit in the instant action, the ICE FOIA

Office forwarded Request Four to ERO and OPR instructing them to search for and provide the ICE

FOIA Office with all records responsive to the request.  No other divisions or units were tasked because,

based on the subject matter of the FOIA request, no other offices were likely to have responsive records

or would reasonably be expected to have responsive records.

      35.     When ERO receives a FOIA tasking from the ICE FOIA Office, the request is submitted

to the ERO Information Disclosure Unit (IDU).  POCs in ERO IDU review the substance of the FOIA

request.  Based on their subject matter expertise and knowledge of the program offices' activities within

ERO, ERO IDU forwards the request to specific individuals and/or component offices within ERO to

conduct searches of the file systems that in the individuals' judgment, based on their knowledge of the

manner in which they routinely keep records, would be reasonably likely to have responsive records, if

any.  The employees exercise discretion, based on their operational knowledge and subject matter

---

[9] Twelve of the fifteen requested reports were located.  The Detainee Death Report for Oscar Lopez Acosta that was requested by the Plaintiff does not exists as this detainee died while not in ICE custody.  Thus, only two of the fifteen reports were not located pursuant to this search.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

expertise, in choosing the specific search terms utilized to ascertain whether potentially responsive records exist.  Once searches are completed, the individuals and component offices provide any potentially responsive records to the ERO IDU POC, who in turn provides the records to the ICE FOIA Office.  The ICE FOIA Office then reviews the collected records for responsiveness and applies the appropriate redactions or withholdings.

36.     In response to the FOIA tasking, the ERO IDU POC, based on their subject matter expertise and the subject matter of Request Four, deferred to OPR, as ERO would not be the appropriate directorate to possess or maintain the subject reports, as the reports originate with and are generated by OPR.  Thus, ERO did not conduct a search or provide any records responsive to Request Four.

37.     On December 9, 2021, the OPR Unit Chief conducted a search for responsive records to Request Four. The OPR ERAU Unit Chief oversees the Unit's personnel, policies, operations, budget, and administration.  The Unit Chief is responsible for managing subordinate Section Chiefs, establishing and ensuring adherence to internal policies, coordinating with ICE and other stakeholders on new/revised policies and other issues, and reporting unit metrics to ICE leadership.  The Unit Chief reviews all OPR ERAU work product prior to final distribution. The Unit Chief, based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which OPR ERAU maintains files — determined that the locations most likely to contain responsive records, if any, were the ERAU SharePoint site.

38.     The Unit Chief, utilizing the detainee names listed in Request Four searched the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for any Detainee Death Review Reports.  Pursuant to these searches, the Unit Chief located records responsive to Request Four and provided them to the OPR FOIA Coordinator.  On December 13, 2021,

the OPR FOIA Coordinator, provided the responsive records to ICE FOIA [10].  No other OPR ERAU

employees were tasked to conduct a search because, based on the subject matter of the FOIA request and

the way in which OPR ERAU maintains records, no other OPR ERAU employees were likely to have

responsive records or would reasonably be expected to have responsive records.

39.   On September 20, 2022, based on ongoing discussions with Plaintiff to potentially

resolve any outstanding issues, OPR was re-tasked with a search to locate any reports that were not

located pursuant to initial search conducted for records responsive to Request One.  The OPR FOIA

Coordinator again tasked OPR ERAU with a search for responsive records.  Following the same process

as outlined above, the OPR ERAU Unit Chief conducted a supplemental search of the OPR ERAU

SharePoint site, located each detainee's case folder and then searched within those folders for any

DDRs. OPR ERAU located two additional DDRs responsive to Request Four and provided the records

to the ICE FOIA Office on September 27, 2022 [11].

II.   *Requests Two and Five: Healthcare and Security Compliance Analysis Reports* [12]

40.   On May 18, 2021, prior to the filing of the Complaint, based on the subject matter in

Request Two, the ICE FOIA Office forwarded Request Two to OPR and ERO, instructing them to

search for and provide the ICE FOIA Office with all records responsive to the request.  No other

divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices

were likely to have responsive records or would reasonably be expected to have responsive records.

---

[10] Pursuant to this search OPR located all of the Detainee Death Review Reports requested in Request Four.

[11] Please note that the two additional reports were finalized and published after the initial search and thus would not have been captured during the initial search for records.

[12] Requests Two and Five both sought only Healthcare and Security Compliance Analysis Reports for certain detainees.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

41.     In response to the FOIA tasking, the ERO IDU POC, based on their subject matter expertise and the subject matter of Request Two, deferred to OPR, as ERO would not be the appropriate directorate to possess or maintain the subject reports, as the reports originate with and are generated by OPR.  Thus, ERO did not conduct a search or provide any records responsive to Request Two.

42.     In response to the initial tasking sent by the ICE FOIA Office, OPR [13] conducted a search for records responsive to the request.  Specifically, the OPR FOIA Coordinator tasked OPR ERAU to search for records responsive to the request.  Again, OPR ERAU, among other things, conducts DDRs, which are independent, objective examinations of the facts and circumstances surrounding the detention and death of an individual in ICE custody to determine whether the agency and detention facility complied with detention standards related to the individual's health, safety, and security.  As part of the DDR process, healthcare and security compliance analyses are completed and incorporated into the final DDR Reports, which are completed by OPR ERAU.  No other divisions or units were tasked within OPR, because, based on the subject matter of the FOIA request, no other offices were likely to have responsive records or would reasonably be expected to have responsive records.

43.     On June 3, 2021, the Unit Chief for OPR ERAU conducted a search for responsive records.  Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which OPR ERAU maintains files the OPR ERAU Unit Chief determined that the locations most likely to contain responsive records, if any, were the Unit's SharePoint site and her Microsoft Outlook.

44.     Using the names of the detainees listed in Request Two, the Unit Chief searched the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders

---

[13] Further confirming that OPR would be the appropriate office within ICE to conduct a search for these records, the reports at issue state that they cannot be released without the prior approval of ICE OPR.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

14

for Healthcare and Security Compliance Analysis Reports.  Additionally, the Unit Chief searched her

Microsoft Outlook utilizing the names of each detainee listed in Request Two.  Pursuant to these

searches, the Unit Chief located records responsive to Request Two and provided them to the OPR

FOIA Coordinator.  On June 17, 2021, the OPR FOIA Coordinator provided the responsive records to

the ICE FOIA Office [14].  No other OPR ERAU employees were tasked to conduct a search because,

based on the subject matter of the FOIA request and the way in which OPR ERAU maintains records, no

other OPR ERAU employees were likely to have responsive records or would reasonably be expected to

have responsive records.

45.      On December 8, 2021, following the filing of the suit in the instant action, the ICE FOIA

Office forwarded Request Five to ERO and OPR.  In response to the FOIA tasking, the ERO IDU POC,

based on her subject matter expertise and the subject matter of Request Five, again deferred to OPR, as

ERO would not be the appropriate directorate to possess or maintain the subject reports as the reports

originate with and are generated by OPR.  Thus, ERO did not conduct a search or provide any records

responsive to Request Five.

46.      On December 9, 2021, the OPR Unit Chief conducted a search for responsive records to

Request Five.  Again, the Unit Chief, utilizing the names listed in Request Five searched the OPR

ERAU SharePoint site, located each detainee's case folder and then searched within those folders for

any Healthcare and Security Compliance Analysis Reports.  Additionally, the Unit Chief searched her

Microsoft Outlook archive mailbox pertaining to each detainee.  Pursuant to these searches, the Unit

---

[14] All but one of the requested reports were located pursuant to this search.  The additional report for Oscar Lopez Acosta that was requested by the Plaintiff does not exists as this detainee died while not in ICE custody. Additionally, three of the reports were in draft form and will be addressed in the *Vaughn* Index.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

Chief located records responsive to Request Five and provided them to the OPR FOIA Coordinator.  On December 13, 2021, the OPR FOIA Coordinator, provided the responsive records to ICE FOIA [15].

47.     On September 20, 2022, based on ongoing discussions with Plaintiff to potentially resolve any outstanding issues, OPR was re-tasked with a search to locate any reports that were previously produced as drafts that may have been finalized since the initial search.  The OPR FOIA Coordinator again tasked OPR ERAU with a search for responsive records.  Following the same process as outlined above, the OPR ERAU Unit Chief conducted a supplemental search of the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for any Healthcare and Security Compliance Analysis Reports.  Additionally, the Unit Chief searched her Microsoft Outlook archive mailbox pertaining to each detainee.  No additional records, including any final drafts of the subject reports were located.

### III.     *Request Three-Root Cause Analysis Reports, Event Reviews, or Action Plans* [16]

48.     On December 8, 2021, the ICE FOIA Office forwarded Request Three to ERO.  Upon receipt and based on the ERO IDU POC's subject matter expertise and the subject matter of Request Three, the ERO IDU POC tasked ERO IHSC with a search for responsive records.  Specifically, ERO IHSC is the program office within ICE which would generate these reports, as part of their responsibilities pertaining to detainee death reviews, should they exist [17].

49.     ERO IHSC provides medical, dental and mental health care to persons in ICE custody.  IHSC also oversees compliance with detention standards related to healthcare for detainees housed in

---

[15] All of the reports requested by the Plaintiff were located by this search.  Eight of the reports were drafts and will be addressed in the *Vaughn* Index.

[16] Request Three sought only Root Cause Analysis Reports, Event Reviews, or Action Plans pertaining to certain detainees.  Additionally, as it pertains to detainee Oscar Lopez Acosta, the report requested by the Plaintiff does not exists as this detainee died while not in ICE custody.

[17] Of note, these reports are titled "ICE Health Service Corps Root Cause Analysis and Action Plan."

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

non-IHSC staffed facilities and also directly supports ICE filed office directors on medical issues within their AOR.

50.     Upon receipt of Request Three, the ERO IHSC program coordinator reviewed the request to determine which offices within ERO IHSC would most likely have records responsive to the request, if any.  Pursuant to that review and based on the ERO IHSC program coordinators subject matter expertise and knowledge of program offices' activities within ERO IHSC, the program coordinator tasked the ERO IHSC Medical Quality and Management Unit (MQMU), ERO IHSC Medical Case Management Unit (MCMU), and ERO IHSC Investigations Unit (IIU), as the offices within ERO IHSC most likely to have records responsive to the request should they exist.

51.     ERO IHSC MQMU is responsible for evaluating and reviewing the quality of healthcare delivery to ICE detainees in ICE custody at ICE IHSC facilities.  ERO IHSC MQMU conducts event reviews, root cause analysis and action plans for IHSC staffed facilities.

52.     On January 26, 2022, The Compliance-Healthcare Risk Management Program Manager (HRM) for ERO IHSC MQMU, based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which ERO IHSC MQMU maintains files — searched the MQMU SharePoint site. The responsibilities of the ERO IHSC MQMU HRM, among other things, is to coordinate risk management activities, e.g., root cause analysis of incidents that occurred in the facilities and provide proactive risk reduction strategies.  A search was conducted of every single facility folder, as well as the designated folders that would contain event reviews, root cause analysis or action plans for any root cause analysis that was taking place at any of the facilities.  The ERO IHSC MQMU HRM reviewed the detainee names listed in Request Three and pulled any records responsive to the Request pertaining to these detainees.  Records responsive to the request were located and provided

to the ERO IDU POC.  The records were provided to the ICE FOIA Office on March 2, 2022.[18].

Additionally, IHSC MQMU stated that IHSC does not conduct analyses on all mortalities nor at non-IHSC staffed facilities.

53.     Additionally, based on the subject matter in Request Three, ERO IHSC MCMU was tasked with a search. The ERO IHSC MCMU  coordinates continuity of care and ensures health services for individuals in ICE custody are in accordance with the ICE Performance Based National Detention Standards (PBNDS) and ICE National Detention Standards (NDS).  The FMC is the individual responsible for, among other things, assisting with the evaluation of compliance with the medical portion of the ICE NDS and PBNDS at local and county detention facilities within their area of responsibility and submitting findings to the Regional Field Medical Coordinator.

54.     Pursuant to the tasking, the Eastern Regional FMC conducted a search for responsive records on February 25, 2022. Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which ERO IHSC MCMU Eastern Region maintains its files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive, as well as his Microsoft Outlook folders, utilizing the search terms CAP and UCAP.[19].  The FMC did not locate any records responsive to the request.

---

[18] A total of six reports were located.  Two of the reports were in draft form and will be addressed in the *Vaughn* Index.

[19] IHSC requests Uniform Corrective Action Plans (UCAPS) from detention facilities that house ICE detainees for a variety of reasons, to include addressing deficiencies identified by IHSC during site visits related to health care standards, to substantiate and verify trends in detainee complaints related to health care, or as part of follow-up to a mortality review or clinically significant incidents. CAPS stands for Corrective Action Plans.  IHSC MCMU and IHSC MQMU work collaboratively to ensure that detention facilities that house ICE detainees are in compliance with the health care portion of the ICE National Detention Standards (NDS), Performance-Based NDS, and/or the Family Residential Standards.

55.     On February 24, 2022, the Central Regional FMC conducted a search.  Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which ERO IHSC MCMU Central Region maintains files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders using the terms detainee death, mortality review, death, and the names of the detainees listed in Request Three who were detained within the central region's area of responsibility.   No records responsive to the request were located. The FMC recommended that the IHSC Investigations Unit also be tasked with a search [20].

56.     On January 26, 2022, the Western Regional FMC conducted a search for responsive records.  Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which the ERO IHSC MCMU Western Region maintains files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders using the terms mortality review, detainee death, as well as the names of the detainees listed in Request Three who were detained within the central region's area of responsibility.  No records responsive to the request were located.

57.     Based on the subject matter of the Request Three ERO IHSC IIU was tasked to conduct a search.  The ERO IHSC IIU, among other things, investigates allegations of inappropriate healthcare provided to individuals in ICE custody, investigates incidents of mortality and significant morbidity involving individuals in ICE custody, investigates and monitor high risk/ high profile incidents, and collaborates with other ICE and IHSC programs to mitigate risks identified during reviews and investigations.

---

[20] Please note that ERO IHSC IIU was already tasked prior to this recommendation.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

58.     On February 2, 2022, the ERO IHSC IIU POC based on knowledge of the requested information and subject matter expertise provided a response that the Unit would not have records responsive to the request, as they are not generated by the Unit and that ERO IHSC MQMU would most likely have any responsive records, should they exist [21].  Thus, ERO IHSC IIU did not conduct a search or provide any records responsive to the Request.

59.     On September 20, 2022, based on continuing conversations with the Plaintiff and attempts to resolve any outstanding issues, ERO was re-tasked with a search.   ERO IDU based on the subject matter of the Request again tasked ERO IHSC.   ERO IHSC MQMU, ERO IHSC MCMU and ERO IHSC IIU were all re-tasked with a supplemental search for records.

60.     On September 21, 2022, a supervisory nurse with ERO IHSC MQMU completed a supplemental search for records responsive to the Request.  The supervisory nurse, based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which the ERO IHSC MQMU maintains files — determined that a search of the cumulative detainee death report spreadsheet, which provides information for each detainee that dies while under ICE care be conducted.  Included in the information contained in the spreadsheet is the location of last detention. The supervisory nurse searched each detainee name to determine the location of last detention and did not locate any additional detainees housed at IHSC staffed facilities, for which ERO IHSC MQMU would have completed a report.  As it pertained to detainees who were housed at IHSC staffed facilities, ERO IHSC MQMU located duplicative records that were previously located and provided to the ICE FOIA Office during the initial search.  ERO IHSC MQMU again reiterated that ERO IHSC MQMU

---

[21] Please note that the ICE FOIA Office had already tasked MQMU, who conducted a search on January 26, 2022, and provided responsive records to the ICE FOIA Office.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

does not conduct or maintain records related to event reviews, root cause analyses or develop action items for mortalities that occur while a non-citizen is receiving care at a Non-IHSC facility and that ERO IHSC MQMU provided reports for those detainees at IHSC staffed facilities for which an action plan or root cause analysis was completed.  The duplicative records were provided to the ICE FOIA Office on November 8, 2022.

61.     On October 14, 2022, the ERO IHSC tasking program manager provided a response to the ICE FOIA Office with a summary as it pertained to the request for supplemental searches.  As it pertains to the ERO IHSC IIU, that Unit completes and compiles detainee death mortality reviews, not event reviews, root cause analyses or action plans and thus would not have records responsive to Request Five.  As it pertains to ERO IHSC MCMU, the Unit does not conduct event review, root cause analysis and or action plans for detainee deaths. Lastly, ERO IHSC MQMU conducts event reviews, root cause analysis and action plans only for IHSC staff facilities. This Unit captured and provided actions plans for those detainees at IHSC staffed facilities and for those detainees for which an action plan or root cause analysis was completed.

62.     On October 18, 2022, ERO IHSC IIC provided a response reiterating that the Unit would not have the requested records but previously provided requested mortality reviews [22], which they generate.

IV.     Request Six-Independent Autopsies

63.     Following the filing of the suit in the instant action, based on the subject matter of the Request, the ICE FOIA Office forwarded Request Six to OPR and ERO on December 8, 2021 [23].

_____

[22] A discussion of the search for Mortality Review Reports is below.

[23] Request Six seeks only independent autopsy reports.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

64.     Upon receipt of the Request, based on the subject matter of the Request the OPR FOIA Coordinator tasked OPR ERAU with a search for responsive records.  As previously stated, OPR ERAU, among other things, conducts DDRs to determine whether the agency and detention facility complied with detention standards related to the individual's health, safety, and security.  As part of the DDR process, independent autopsies are requested and reviewed by OPR ERAU, incorporated into and attached to the final DDR, when available.  No other divisions or units were tasked within OPR because, based on the subject matter of the FOIA request, no other offices were likely to have responsive records or would reasonably be expected to have responsive records.

65.     On December 9, 2021, the OPR ERAU Unit Chief conducted a search for the independent autopsies responsive to Request Six.  The Unit Chief, based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which OPR ERAU maintains files — determined that the locations most likely to contain responsive records, if any, was the OPR ERAU SharePoint site.  A search of each detainee's case folder for any independent autopsies that ICE may have possessed for the detainees listed in Request Six was conducted.  Pursuant to these searches, the Unit Chief located records responsive to Request Six and provided them to the OPR FOIA Coordinator.  On December 13, 2021, the OPR FOIA Coordinator, provided the responsive records to the ICE FOIA Office [24].  OPR also suggested that ERO conduct a search to determine whether copies of the autopsies were provided to ERO following the publication of the OPR DDRs and possessed by ERO IHSC [25].

---

[24] Six of the autopsy reports were not located pursuant to the search.  ICE will note that the independent autopsies are conducted by and originated within the relevant state medical examiners offices. Additionally, ICE notes that a review of the DDRs for the six autopsy reports that were not located confirms that ICE did not receive the autopsy reports prior to the publication of the final DDRs.  The autopsy reports are not listed as attachments to the DDR and in at least one case, a footnote in the DDR states that an autopsy was not completed.

[25] Please note that ICE FOIA had already forwarded the Request to ERO prior to OPR ERAU's response.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

66.     On December 8, 2021, ERO was also tasked to conduct a search.  The ERO IDU POC, based on the subject matter of the Request tasked ERO IHSC.  The ERO IHSC program coordinator, based on knowledge of the requested information, subject matter expertise, and knowledge of the manner in which the ERO IHSC maintains files tasked ERO IHSC IIU with a search for records responsive to Request Six, as ERO IHSC IIU would be the unit most likely to have responsive records within ERO IHSC, should they exist.

67.     During the course of detainee death investigations, ERO IHSC IIU completes a mortality review, which is an evaluation of a deceased detainee's medical history and clinical care provided to the detainee to ascertain both cause of death and whether changes to ICE policies, procedures, or practices are warranted; to provide recommendations for follow-up actions; and to identify issues that require further study.  In conjunction with that review, ERO IHSC IIU may also review any independent autopsies that have been provided by the relevant medical examiners' offices and incorporate the findings into the final Mortality Review Report.

68.     On January 4, 2022, an investigator with ERO IHSC IIU was tasked to perform a search for records. ERO IHSC IIU investigators, among other things, are responsible for investigating allegations of inappropriate health care provided to individuals in ICE custody and investigating incident of mortality and significant morbidity involving individuals in ICE custody. Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which ERO IHSC IIU maintains files, the ERO IHSC IIU investigator determined that the locations most likely to contain responsive records, if any, were the ERO IHSC IIU SharePoint, as well as her Microsoft Outlook.  A search was conducted using the listed detainee's names. ERO IHSC IIU located duplicative reports of those already provided by OPR ERAU.  With regard to the reports that were not located

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

during the search, ERO IHSC IIU did not have copies due to the coroner not performing an autopsy or the relevant state not responding to the request for a copy.

69.     On December 8, 2022, based on continuing conversations with the Plaintiff and attempts to resolve any outstanding issues, ERO was re-tasked to determine whether any additional autopsy reports had been provided to ICE since the initial search, given that ERO would be the office to possess any reports that came in following OPR ERAU concluding the DDR.  In response the ERO IDU POC again tasked ERO IHSC IIU with the supplemental search.  An investigator was tasked to perform a search for records.  On December 16, 2022, the investigator against searched the ERO IHSC IIU SharePoint site and her Microsoft Outlook using the detainee names listed in Request Six.  No additional reports were located. Again, ERO IHSC IIU reiterated that IHSC does not have the requested records due to the coroner not performing an autopsy or the state not responding to the request for a copy of the report.

      V.      *Request Seven-Mortality Reviews.[26]*

70.     Following the filing of the suit in the instant action, based on the subject matter of the Request, the ICE FOIA Office forwarded Request Seven to ERO on December 8, 2021.  Upon receipt and based on the ERO IDU POC's subject matter expertise and the subject matter of Request Seven, the ERO IDU POC tasked ERO IHSC with a search for responsive records.  Specifically, ERO IHSC is the program office within ICE which would generate these reports, as part of their responsibilities pertaining to detainee death reviews, should they exist.

71.     Upon receipt of Request Seven, the ERO IHSC program coordinator reviewed the request to determine which offices within ERO IHSC would most likely have records responsive to the request,

---

[26] Request Seven sought only certain Mortality Review Reports.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

24

if any.  Pursuant to that review and based on the ERO IHSC program coordinators subject matter expertise and knowledge of program offices' activities within ERO IHSC, the program coordinator tasked ERO IHSC IIU, as the office within ERO IHSC most likely to have records responsive to the request should they exist.

72.     Again, ERO IHSC IIU is the Unit tasked with completing mortality reviews, which are an evaluation of a deceased detainee's medical history and clinical care provided to the detainee to ascertain both cause of death and whether changes to ICE policies, procedures, or practices are warranted; to provide recommendations for follow-up actions; and to identify issues that require further study.

73.     On January 6, 2022, an investigator with ERO IHSC IIU was tasked to perform a search for records.  Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which ERO IHSC IIU maintains files — determined that the locations most likely to contain responsive records, if any, were the ERO IHSC IIU SharePoint, as well as her Microsoft Outlook.  A search was conducted using the listed detainee's names. Pursuant to this search, ERO IHSC IIU located records responsive to the request[27].  ERO provided the responsive records to the ICE FOIA Office on January 18, 2022.

74.     On October 6, 2022, following continuing conversations with Plaintiff in an attempt to resolve outstanding issues, the ICE FOIA Office again tasked ERO with a search for Request Seven, to determine whether additional reports had been generated since the initial search.

75.     Again, based on the ERO IDU POC's subject matter expertise and the subject matter of Request Seven, the ERO IDU POC tasked ERO IHSC with a search for responsive records.   Pursuant to

---

[27] ERO IHSC IIU located eight of the twelve requested reports at that time.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

that review and based on the ERO IHSC program coordinators subject matter expertise and knowledge of program offices' activities within ERO IHSC, the program coordinator tasked ERO IHSC IIU, as the office within ERO IHSC most likely to have records responsive to the request should they exist.

76.     On November 29, 2022, an investigator with ERO IHSC IIU was tasked to perform a supplemental search for records.  Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which ERO IHSC IIU maintains files — determined that the locations most likely to contain responsive records, if any, were the ERO IHSC IIU SharePoint, as well as her Microsoft Outlook.  A search was conducted using the listed detainee's names. Pursuant to this search, ERO IHSC IIU located records responsive to the Request [28].  ERO provided the responsive records to the ICE FOIA Office on November 29, 2022.

## III.     ICE'S APPLICATION OF FOIA EXEMPTIONS

### A.     Organization of ICE's Vaughn Index and Description of Records [29]

77.     Pursuant to the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), a *Vaughn* index accompanies this declaration providing a description of each redaction and applicable exemption in the productions made to the Plaintiff.

78.     The *Vaughn* index is in a table format.  The first row contains the titles of four (4) columns that provide a brief description of the information contained within the corresponding columns below.  The heading titles, from the left to the right side of the page, are: Document and Page Number,

---

[28] ERO IHSC IIU located the remaining four reports.  All of the reports were dated after the initial search was conducted on January 6, 2022, and thus would not have been captured at the time of that search.  Two of the four reports were preliminary reports, which were produced to the Plaintiff, and as of the date of the final search, final reports were not available.

[29] Please note that prior to briefing Plaintiff provided to Defendant a list of withholdings they wished to challenge. Prior to the filing of ICE's initial brief, ICE made a discretionary re-release of certain pages.  Thus, this declaration and the accompanying *Vaughn* Index only address those withholdings that remain in dispute.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

Withholding: Full/Partial, Description of Records and Redactions, and Reasons for Redactions, and Exemption(s) Applied.

79.     The first heading, Document and Page Number, refers to the document at issue and page number on each of the responsive documents.  The second heading, Full/Partial Withholding, refers to the level of withholdings taken on the documents.  The information below the third heading, Description of Records and Redactions, and Reasons for Redactions, describes the redacted information and the justification for redaction.  The fourth heading, Exemption(s) Applied, describes the exemptions applied to the redactions in the documents.

**B.     FOIA Exemption 5 U.S.C. § 552(b)(3)**

80.     Exemption (b)(3) was asserted to portions of pages 402, 438, 627, 628, 623, 647a, 648, 649, 752, 812, 813, 871, 891, 969b, and 970a to protect information that are exempted from disclosure pursuant to statute and/or regulation.

81.     Exemption (b)(3) allows the withholding of information prohibited from disclosure by another federal statute provided that the statute requires that the information be withheld from the public or establishes a criteria for withholding or refers to particular types of matters to be withheld.

82.     Specifically, Exemption (b)(3) was asserted to immigration information that is deemed confidential by statute and/or regulation.  This information was withheld as it is covered by non-disclosure statutes and/or regulations that mandate the confidentiality of the information and that survive the death of the non-citizens at issue.  The statutes and/or regulations at issue specifically exempt this information from disclosure and the pages at issue contain information exempted from disclosure pursuant to statute and/or regulation. Given that the safety of the survivors may be at issue should the

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

information as to the statute and/or regulation that apply be disclosed, ICE is not disclosing the subject statutes and/or regulations in this publicly filed declaration.[30]

**C.     FOIA Exemption 5 U.S.C. § 552(b)(5)**

83.     Exemption (b)(5) was applied to portions of pages 477a, 499-502, 557 and 596, and to pages 001-051, 107-305, 312-317, 337-366, 1238-1269, 1344-1389, 1445-1488 in full.

84.     Exemption 5 of the FOIA allows the withholding of inter- or intra-agency records that are normally privileged in the civil discovery context.  Pursuant to Exemption (b)(5), the three most frequently invoked privileges are the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege.  ICE applied FOIA Exemption (b)(5) to protect from disclosure documentation subject to the deliberative process privilege.

85.     The deliberative process privilege protects from disclosure pre-decisional and deliberative information.  Specifically, Exemption (b)(5) was applied to draft Healthcare and Security Compliance Analysis Reports, as well as Draft Root Cause Analysis and Action Plan Reports in full in pages 001-051, 107-305, 312-317, 337-366, 1238-1269, 1344-1389, 1445-1488, as well as pages 557 and 596 in part.  This information was withheld to protect the integrity of the deliberative or decision-making processes within the agency by exempting from disclosure the opinions, edits, comments, conclusions, and recommendations suggested in the unfinalized draft reports. This information does not reflect final agency actions or policy; instead, it is a reflection of an issue the author has determined to be, in his/her judgment, worthy of discussion or consideration by colleagues or superiors, and its release would only serve to confuse the public. This privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm.

---

[30] ICE is providing a declaration with additional detail to the Court ex parte for review.

86.     The information contained within the draft documents include comment bubbles, edits, questions to analyze and review, as well as follow-up work to be conducted.  The information contained within the documents includes not only factual information, but also non-final proposed recommendations.  With regard to the factual information contained within the documents, those sections also contain edits and comments and non-final summaries of the facts underlying the detainee death.  The records contain non-final comments and edits to factual sections of the documents identifying specific facts to focus on, review, and conduct follow-up work on, out of a larger group of facts.  Additionally, the factual information is so thoroughly integrated with the deliberative material that its disclosure would expose or cause harm to agency deliberations.

87.     Additionally, as it pertains to the Healthcare and Security Compliance Analysis Reports, these documents predate the final DDRs in which the final agency position and recommendations from the draft reports were included.  ICE OPR ERAU reviews and uses the contractor's Healthcare and Security Compliance Analysis (which may or may not be separated into two separate documents) in the drafting of its own DDRs.  ICE OPR ERAU frequently asks clarifying questions of the contractor subject matter experts, resulting in changes to the analysis.  Often, the contractor's report is left in "draft" form because, ultimately, ICE OPR ERAU's DDR report, once signed by OPR's Associate Director, is considered the final product.  Therefore, several of the Compliance Analyses provided remain in draft format. The final DDRs, which incorporate the draft material included in the draft Healthcare and Security Compliance Analysis Reports have been produced to the Plaintiff.

88.     In addition, Exemption (b)(5) was applied to portions of pages 477a to protect information that discloses non-final recommendations pertaining to the training of staff within the Mortality Review Reports. These portions of the reports are pre-decisional, as they were generated before the final adoption of the agency's final position as it pertained to the implementation of any of the

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

recommendations relating to potential training of detention staff.  These portions of the reports are also deliberative as they contain the give-and-take of the consultative process and assess the merits of particular viewpoints and comments.  Release of this material would expose the opinions, advice, or recommendations offered in the course of agency decision making.  The release of this internal information would likewise discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, which would chill intra- and inter-agency communications and adversely impact the quality of internal policy decisions and the development of ICE agency positions.

89.    Lastly, Exemption (b)(5) was applied to portion of pages 499-502 to protect non-final deliberative information as it pertains to potential process vulnerabilities identified during the course of Root Case Analysis and Action Plans.  This information does not reflect final agency actions or policy; instead, it is a reflection of an issue the author has determined to be, in his/her judgment, worthy of discussion or consideration by colleagues or superiors, and its release would only serve to confuse the public. This privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm. The reports are also deliberative as they contain the give-and-take of the consultative process and assess the merits of particular viewpoints and comments.  Release of this material would expose the opinions, advice, or recommendations offered in the course of agency decision making.

90.    Thus, Exemption (b)(5) was asserted to the pages outlined to protect the categories of information referenced above.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

**D.     FOIA Exemption 5 U.S.C. § 552(b)(7) Threshold** [31]

91.     5 U.S.C. § 552(b)(7) establishes a threshold requirement that, in order to withhold information on the basis of any of its subparts, the records or information must be compiled for law enforcement purposes.

92.     The information for which the ICE FOIA Office asserted Exemption (b)(7) satisfies this threshold requirement.  ICE is the largest investigative arm of DHS, and is responsible, among other duties, for identifying and eliminating vulnerabilities within the nation's borders.  ICE is tasked with preventing any activities that threaten national security and public safety by investigating the people, money, and materials that support illegal enterprises.

93.     Further, pursuant to the Immigration and Nationality Act, codified under Title 8 of the U.S. Code, the Secretary of Homeland Security is charged with the administration and enforcement of laws relating to the immigration and naturalization of aliens, subject to certain exceptions.  See 8 U.S.C. § 1103.

94.     ICE OPR is charged with protecting the overall integrity of ICE. OPR is responsible for the administration of the Personnel Security Program and investigates allegation of criminal and serious misconduct within ICE.  Critical to this mission is the need for an effective internal program to measure compliance with policies and procedures and investigate allegations of employee misconduct.  Additionally, ICE OPR serves as the ICE Chief Security Officer (CSO) and administers security operations at ICE to protect people, information, and facilities, including personnel security, physical security, information security, special security, communications security, and operations security.  ICE OPR is responsible for upholding the agency's professional standards through a multi-disciplinary

---

[31] ICE is asserting Exemptions (b)(7)(E) and (b)(7)(C).

approach of security, inspections and investigations. OPR promotes organizational integrity by vigilantly managing ICE's security programs, conducting independent reviews of ICE programs and operations, and impartially investigating allegations of serious employee and contractor misconduct, as well as internal and external threats against ICE personnel and facilities.

95.      OPR also manages physical security and classified national security information, which includes administering clearance levels and access to classified information, systems and equipment. OPR provides ICE senior leadership with an independent assessment of their programmatic compliance with requirements of agency policies, procedures, and detention standards. OPR's role in safeguarding the organization permits the agency to focus on its larger mission of promoting homeland security and public safety.

96.      ICE ERO upholds U.S. immigration law at, within, and beyond our borders. ERO's work is critical to the enforcement of immigration law against those who present a danger to our national security, are a threat to public safety, or who otherwise undermine the integrity of our immigration system.

97.      ERO operations target public safety threats, such as convicted criminal noncitizens and gang members, as well as individuals who have otherwise violated our nation's immigration laws, including those who illegally re-entered the country after being removed and immigration fugitives ordered removed by federal immigration judges. ERO deportation officers assigned to INTERPOL also assist in targeting and apprehending foreign fugitives or Fugitive Arrest and Removal (FAR) cases who are wanted for crimes committed abroad and who are now at-large in the U.S.

98.      ERO manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release,

including alternatives to detention. In addition, ERO removes noncitizens ordered removed from the

U.S. to more than 150 countries around the world.

99.     The law enforcement records at issue pertain to investigations conducted pursuant to

ICE's law enforcement authorities. Therefore, all of the ICE records responsive to Plaintiff's FOIA

request were compiled for law enforcement purposes and meet the threshold requirement of FOIA

Exemption (b)(7).

E.      **FOIA Exemption 5 U.S.C. § 552(b)(7)(E)**

100.    Exemption (b)(7)(E) was asserted to portions of pages 057, 058, 061, 063a, 067, 076,

088, 089, 090a, 091, 092, 093, 094a, 368, 698, 702, 733, 738a, 745, 746,  772, 843a, 885a, 969b, 972a,

1027a, 1030a, 1038, 1186, 1202, 1272, 1275a, 1282,  1286a, 1293, 1294, 1302a, 1305a, 1310a, 1317,

1318, 1322, 1328a, 1335, 1337, 1338a, 1339a, 1340a, 1391a,  1393a, 1394, 1395, 1396, 1402, 1405,

1420a, 1421, 1435, 1437a, 1438a, 1439a, 1442a, 1443a, 1489, 1490a, 1519a, 1522, 1525, 1534, 1539a,

1540a, 1542a, 1549a, 1577, 1595, 1598a, 1602a, 1627a, 1628a, and 1636a. Exemption (b)(7)(E) was

also asserted to pages 001-051, 107-305, 312-317, 337-366, 1238-1269, 1344-1389, and 1445-1488 in

full.

101.    FOIA Exemption (b)(7)(E) protects from disclosure records complied for law

enforcement purposes, the release of which would disclose techniques and/or procedures for law

enforcement investigations or prosecutions or would disclose guidelines for law enforcement

investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of

the law.

102.    Exemption (b)(7)(E) was applied to portions of pages 057, 058, 061, 076, 772, 1202,

1293, 1294, 1328a, 1628a that pertain to specifics regarding officer transport of detainee to the hospital.

The information includes the number of officers utilized, vendor information pertaining to detainee

transportation, procedures pertaining to officers riding in the ambulance and procedures for officers following an ambulance and how security is maintained and potential vulnerabilities pertaining to this security.  Additionally, portions of these pages also include information on the specifics regarding how detainees are transported between facilities, including the number of detainees transported at one time and the number of officers utilized during transport.

103.    Exemption (b)(7)(E) was also applied to portions of pages 088, 089, 090a, 091, 092, 093, 094a, 702, 972a, 1030a, 1305a, 1310a, 1337, 1338a, 1438a, 1443a, 1539a, 1549a, 1602a, 1627a, and 1636a, to protect the disclosure of security and surveillance cameras located at the relevant facilities, as well as internal photographs of the facilities. Specifically, the information includes the locations of the cameras, both internal and external to the facilities, as well as security vulnerabilities based on the locations of the cameras.

104.    Additionally, Exemption (b)(7)(E) was applied to portions of pages 063a, 067, 092, 368, 733, 746, 1027a, 1038, 1577, 1272, 1317, 1318, 1322, 1335, 1338a, 1339a, 1391a, 1394, 1395, 1402, 1405, 1435, 1438a, 1442a, 1489, 1490a, 1519a, 1534, 1539a, and 1542a, to protect the disclosure of specifics regarding staffing numbers, staffing shortages and potential security vulnerabilities based on staffing at the relevant facilities, as well as specifics on what portions of the facilities are staffed when.

105.    Exemption (b)(7)(E) was applied to portions of pages 088, 702, 738a, 745, 746, 843a, 698, 1282, 1310a, 1338a, 1339a, 1393a, 1394, 1396, 1421, 1438a, 1439a, 1443a, 1525, 1534, and 1540a to protect from disclosure specifics regarding the internal security and internal security vulnerabilities at the relevant detention facilities.  The information includes specifics on security features utilized by the relevant detention facilities, specific times of security rounds, specific times that head counts are conducted, specifics on internal security features including the securing and opening of interior and cell

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030
34

doors, security visibility of certain portions of the facilities, as well as specifics as to clothing of detainees and security staff and potential vulnerabilities in all of these security procedures.

106.    Exemption (b)(7)(E) was applied to portions of pages 885a, 1305a, and 1338a that pertain to specifics regarding external security and security vulnerabilities at the relevant detention facilities. The information includes specifics on security features utilized by the relevant detention facilities, as well as potential vulnerabilities in those security features.

107.    Exemption (b)(7)(E) was also applied to portions of pages 063a, 067, 088, 091, 092, 733, 1186, 1310a, 1393a, 1420a, 1421, 1437a, 1438, and 1522a pertaining to the layout of the facilities, location of cells, what is located where within the facilities, location of security observation points, and location of guard stations.

108.    Exemption (b)(7)(E) was applied to portions of pages 067, 088, 092, 093, 094a, 1186, 1275a, 1286a, 1302a, 1437a, 1595, and 1598a that disclose detainee numbers in specific portions of the relevant detention facilities.

109.    Exemption (b)(7)(E) was applied to portions of page 969b pertaining to a pending HSI investigation, as well as to portions of page 1340a that contain specific information on how law enforcement investigations should take place.  Specifically, the information contains specifics on how interviews of detainee witnesses should take place during the course of detainee death investigations.

110.    Exemption (b)(7)(E) was also asserted to pages 001-051, 107-305, 312-317, 337-366, 1238-1269, 1344-1389, and 1445-1488 in full that contain the same categories of information outlined in paragraphs 78-87 above.[32]

---

[32] Please note that these pages are draft reports which were also withheld under Exemption (b)(5) and were addressed above.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

111.    FOIA Exemption (b)(7)(E), protects from disclosure records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

112.    Accordingly, ICE applied Exemption (b)(7)(E) to information that discloses the number of officers involved in transport, numbers of detainees transported at a time, routes of travel, and potential stops, and specifics on how security is maintained when detainees are transported to the hospital, which represent techniques and/or procedures pertaining to the security detainees. Specifically, the disclosure of this information would risk interference with maintain the security associated with the transport of detainees, as the knowledge of this information would potentially allow bad actors to interfere with detainee transport, based on the knowledge of how this transport occurs and the number of officers involved. Additionally, release of this information may also aid detainees in potential escapes. This information is not commonly known. The release of this information could place law enforcement officers and the public at risk, by compromising the security of detainee transport, leading to a threat to the public, as well as to law enforcement officers, should bad actors learn how these transports take place.

113.    FOIA Exemption (b)(7)(E) was also applied to information pertaining to how law enforcement officers secure detention facilities. This information includes: where security and surveillance cameras are located; information on staffing, including staffing numbers, what areas of the facilities are staffed when and staffing shortages; internal and external security features, including specific times of rounds, specific times of headcounts, securing and opening internal doors and cells, visibility of certain portions of the facilities, and information on the clothing worn by security staff and

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

detainees; the lay out of the facility, including the location of cells, location of observation points and location of guard stations; as well as detainee population numbers in certain portions of the facilities. The withheld information also includes vulnerabilities as it pertains to the security of the relevant facilities.  The withheld information represents techniques and/or procedures pertaining to the security of detention facilities and detainees.  Specifically, the disclosure of this information would risk interference with maintaining the security of the detention facilities as the knowledge of these categories of information, as well as potential vulnerabilities in the security of the facilities would potentially allow bad actors to interfere with detainee detention and risk the security of the facilities, by either attempting to gain unauthorized access, target detention staff, or attempting to assist bad actors with escape from the facilities. Release of this information would also potentially assist detainees themselves with attempts at escape, or the targeting of detention staff. The release of this information could place law enforcement officers and the public at risk, by compromising the security of detention facilities, leading to a threat to the public, as well as to law enforcement officers, should bad actors obtain access to this information.

114.    Additionally, Exemption (b)(7)(E) was asserted to protect information on the specific investigatory steps as it relates to detainee interviews in furtherance of detainee death investigations, as well as information pertaining to and revealing details of a pending HSI investigation [33]. The information withheld in this section provides specific considerations and investigatory techniques regarding how, when and why the tools and techniques should be utilized to develop accurate and sound detainee death investigations. Additionally, the information withheld pertains to facts and evidence regarding a pending HSI investigation. Disclosure of these techniques and practices could assist bad actors seeking to violate

---

[33] ICE is also asserting Exemption (b)(6) and (b)(7)(C) as it pertains to this information.

or circumvent the law by taking proactive steps to counter operational and investigative actions taken by ICE during enforcement operations, based on this knowledge.  This knowledge could be used to interfere with and thwart these investigations.

115.    Thus, Exemption (b)(7)(E) was asserted to the pages outlined to protect the categories of information referenced above.

### F.    FOIA Exemption 5 U.S.C. § 552(b)(6) & (7)(C)

116.    Additionally, ICE is also asserting Exemptions (b)(6) and (b)(7)(C) to pages 402, 438, 627, 628, 623, 647a, 648, 649, 752, 812, 813, 871, 891, 969b, and 970a to protect from disclosure information that could reasonably be expected to constitute an unwarranted invasion of privacy to survivors of the non-citizens.

117.    FOIA Exemption 6 allows the withholding of information found in "personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (Exemption 6).  Records that apply to or describe a particular individual, including investigative records, qualify as "personnel," "medical" or "similar files" under Exemption 6.  When applying this exemption to responsive documentation, the agency must balance the individual's personal privacy interest against the public need for the information.

118.    FOIA Exemption 7(C) similarly protects from disclosure records or information "compiled for law enforcement purposes" if a release of the records or information "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (Exemption 7(C)).

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

119.     When asserting Exemptions 6 and 7(C), ICE balances an individual's survivor privacy interest against the public's interest in shedding light on ICE's performance of its statutory duties. Here, ICE is asserting Exemption 6 in conjunction with Exemption 7(C) to protect from disclosure this information as it could reasonably be expected to constitute an unwarranted invasion of individuals' survivor privacy interests.  Specifically, the information withheld contains specifics on confidential immigration information [34], and as it pertains to page 969b investigative law enforcement information, that could reasonably be expected to constitute an unwarranted invasion of individuals' survivor privacy interests in: not being associated with alleged criminal activity; being free from harassment, criticism, intimidation, legal consequences, economic reprisals, embarrassment, undue public attention, physical harm, an d derogatory inferences and suspicion; and potential danger should the information be released.

120.     The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. Furthermore, the survivors' privacy interests in this information outweighs any minimal public interest that could possibly exist in the disclosure of this information.

121.     ICE determined that the disclosure of the information described in these pages would constitute a clearly unwarranted invasion of survivors' privacy interests and thus Exemption 6 applied. In addition, ICE determined that disclosure of the information described in these pages, which was compiled for law enforcement purposes, could reasonably be expected to constitute an unwarranted invasion of survivors' privacy interest, and thus Exemption 7(C) applied.

122.     Having determined that the survivors have a cognizable privacy interest in not having the information released, ICE FOIA has balanced the interest in safeguarding the survivors' privacy

---

[34] ICE is submitting a declaration with additional information to the Court ex parte.

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

39

interests from unnecessary public scrutiny against the public's interest in shedding light on the operations and activities of ICE in the performance of its statutory duties.  In each instance where Exemptions 6 and 7(C) were applied, the redaction was limited to limited information, which if released, would not shed any further light as to the operations or activities of ICE.   In some redactions, the information surrounding the redactions was released and the limited extent of the redaction is readily apparent from the context of the records.

123.    Based upon the recognition of survivors' privacy interests in law enforcement records, the withholding of the subject information is appropriate.

### IV.    SEGREGABILITY

124.    A line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied.

125.    All information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated and non-exempt portions were released.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.  Signed this day of March 2023.

-----------------------------------------------

_____

Fernando Pineiro, FOIA Officer
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009

DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030