

March 8, 2021

**VIA EMAIL**

The Privacy Office
U.S. Department of Homeland Security
Headquarters & Office of Civil Rights &
Civil Liberties
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655
foia@hq.dhs.gov

Catrina Pavlik-Keenan
Freedom of Information Act Office
U.S. Immigration and Customs
Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
ice-foia@dhs.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the
implementing regulations of your agency, American Oversight makes the following
request for records.

In fiscal year 2020, Immigration and Customs Enforcement (ICE) reported that sixteen
individuals died in immigration detention,[1] the highest number in any single year since
2005.[2] Seven of these individuals are preliminarily identified as having died directly or
indirectly due to Covid-19,[3] which poses a grave threat to detainees and is exacerbated
by their frequently inadequate medical care.[4]

American Oversight seeks records with the potential to shed light on the deaths of
individuals held in the custody of the U.S. Department of Homeland Security (DHS) or
its component agencies, including whether or to what extent DHS officials or
contractors are upholding the standards of care prescribed by federal law and agency
guidance.

---

[1] U.S. Immigration and Customs Enforcement, Detainee Death Reporting,
https://www.ice.gov/detain/detainee-death-reporting.
[2] Hamed Aleaziz, *A Mexican Man Died in ICE Custody After Testing Positive for COVID-
19*, BuzzFeed (Jan. 31, 2021, 4:55 PM), https://www.buzzfeednews.com/article/
hamedaleaziz/mexican-man-dies-ice-coronavirus.
[3] *See supra* note 1.
[4] Press Release, H. Subcomm. on Civil Rights & Civil Liberties, The Trump
Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medical
Care by For-Profit Detention Centers, Sept. 24, 2020,
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-09-
24.%20Staff%20Report%20on%20ICE%20Contractors.pdf.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> Copies of the "Detainee Death Review" reports completed by or for ICE Office of Professional Responsibility as part of the detainee death reviews for each of the following individuals who died in custody.

> 1. Gourgen Mirimanian
> 2. Roberto Rodrigeuz-Espinoza
> 3. Roylan Hernandez-Diaz
> 4. Anthony Oluseye Akinyemi
> 5. Samuelino Mavinga
> 6. Ben James Owen
> 7. Alberto Hernandez-Fundora
> 8. David Hernandez-Colua
> 9. Maria Celeste Ochoa-Yoc De Ramirez
> 10. Orlan Ariel Carcamo-Navarro
> 11. Ramiro Hernandez-Ibarra
> 12. Carlos Ernesto Escobar-Mejia
> 13. Óscar López Acosta
> 14. Choung Woong Ahn
> 15. Santiago Baten-Oxlaj

> An example of a "Detainee Death Review" is attached as Exhibit A to aid your search.

> Please provide all responsive records from April 10, 2018, through the date the search of the search.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[5] The public has a significant interest in the treatment and care of individuals in immigration detention, especially in the midst of a global pandemic and the cases of individuals who have died

---

[5] 5 U.S.C. § 552(a)(4)(A)(iii).

DHS-21-0309

in DHS custody.[6] Records with the potential to shed light on this topic would contribute significantly to public understanding of operations of the federal government, including whether the deceased individuals received appropriate care and whether internal DHS analyses are consistent with public reporting. American Oversight is committed to transparency and makes the responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[7] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[8]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[9] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[10] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[11] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[12] the posting of records related to an ethics

---

[6] *See supra* notes 2 & 4.

[7] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[8] American Oversight currently has approximately 15,680 page likes on Facebook and 105,400 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Mar. 8, 2020); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Mar. 8, 2020).

[9] *See generally News*, American Oversight, https://www.americanoversight.org/blog.

[10] *Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[11] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[12] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall*

DHS-21-0309

waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[13] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[14]

Accordingly, American Oversight qualifies for a fee waiver.

**<u>Guidance Regarding the Search & Processing of Requested Records</u>**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- ▪ Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- ▪ Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[15] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official

---

*Investigation Report: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

[13] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[14] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

DHS-21-0309

systems or if officials have, by intent or through negligence, failed to meet their obligations.[16]

- Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[17] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

- In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

- Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American

---

[16] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14-cv-765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[17] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-0309

Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Khahilia Shaw at foia@americanoversight.org or (202) 539-6507. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Khahilia Shaw*
Khahilia Shaw
on behalf of
American Oversight

DHS-21-0309

# EXHIBIT A

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**SYNOPSIS**

On May 25, 2018, Jeffry HERNANDEZ, a thirty-three year old citizen of Honduras, died while in the custody of U.S. Immigration and Customs Enforcement (ICE) at Lovelace Medical Center (LMC), in Albuquerque, New Mexico (NM).  HERNANDEZ's preliminary cause of death is cardiac arrest.[1]  Autopsy findings and a certificate of death were pending as of the date of this report.

HERNANDEZ was detained at Cibola County Correctional Center (CCCC), in Milan, NM, from May 16, 2018, until her death.[2]  CCCC is owned and operated by CoreCivic.  Medical care is provided by contractor Correct Care Solutions (CCS).  CCCC is required to comply with the ICE Performance Based National Detention Standards (PBNDS) 2011.[3]  At the time of HERNANDEZ's death, CCCC housed approximately 309 male and transgender detainees of all classification levels for periods in excess of 72 hours.

**DETAILS OF REVIEW**

From June 26 to 27, 2018, ICE Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU) staff visited CCCC to review the circumstances surrounding HERNANDEZ's death.  ERAU was assisted in its review by contract subject matter experts (SMEs) in correctional healthcare and security who are employed by Creative Corrections, a national management and consulting firm.[4]  As part of its review, ERAU reviewed immigration, medical, and detention records pertaining to HERNANDEZ, in addition to conducting in-person interviews of individuals employed by CoreCivic, CCS, and the local field office of ICE's Office of Enforcement and Removal Operations (ERO).

During the review, ERAU took note of any deficiencies observed in the detention standards as they relate to the care and custody of the deceased detainee and documented those deficiencies herein for informational purposes only.  Their inclusion in the report should not be construed in any way as indicating the deficiency contributed to the detainee's death.  ERAU determined the following timeline of events, from the time HERNANDEZ entered ICE custody, through her detention at CCCC, and eventual death at LMC.

---

[1] Cardiac arrest is a sudden and unexpected loss of heart function, breathing, and consciousness.

[2] HERNANDEZ self-identified as a transgender woman and referred to herself as Roxsana.  This report refers to HERNANDEZ as female.

[3] As revised in 2016.

[4] *See* <u>Exhibit 1</u>: Creative Correction Medical and Security Compliance Analysis.



1

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**IMMIGRATION AND CRIMINAL HISTORY**

On October 6, 2005, U.S. Customs and Border Protection's (CBPs) Office of Border Patrol (USBP) encountered and arrested HERNANDEZ near Laredo, TX and charged her with illegal entry into the United States (U.S.).[5] HERNANDEZ claimed to be a Mexican citizen and USBP granted her a voluntary return to Mexico that same day.

On an unknown date and location, HERNANDEZ illegally re-entered the U.S.[6]

On April 8, 2006, the Dallas Police Department arrested HERNANDEZ and charged her with theft.[7] On April 20, 2006, the Dallas County Criminal Court (DCCC) convicted HERNANDEZ of the charge and sentenced her to 30 days of incarceration.[8]

On July 11, 2008, the Dallas Police Department arrested HERNANDEZ and charged her with prostitution.[9]

On April 25, 2009, the Dallas Police Department arrested HERNANDEZ and charged her with lewd/immoral/indecent conduct.[10] On the same day, ERO Dallas lodged an Immigration Detainer for HERNANDEZ with the Dallas County Jail.[11] On May 12, 2009, DCCC convicted HERNANDEZ of the July 11, 2008 charge and sentenced her to 45 days incarceration.[12] That same date, DCCC also convicted her of the lewd/immoral/indecent conduct charge and sentenced her to 30 days incarceration. Two days later, on May 14, 2009, DCCC transferred HERNANDEZ to ERO Dallas custody.[13] On May 15, 2009, ERO released HERNANDEZ for voluntary departure to Mexico.[14]

On January 23, 2014, USBP encountered HERNANDEZ in Laredo, TX and arrested her for unlawful entry to the U.S.[15] USBP served HERNANDEZ with a Notice and Order of Expedited Removal charging her as removable under to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA), as amended, as an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.[16]

---

[5] *See* ICE Significant Incident Report, dated May 25, 2018.

[6] *See* ICE Significant Incident Report, dated May 25, 2018.

[7] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.

[8] *See* ICE Significant Incident Report, dated May 25, 2018.  *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.  *See* Dallas County Felony and Misdemeanor Courts Case Information, accessed October 4, 2018.

[9] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.  Hernandez's record contains no information regarding the date or circumstances of the Dallas Police Department releasing her; however, subsequent events indicate that she was released following her July 11, 2008 arrest.

[10] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.

[11] *See* ICE Significant Incident Report, dated May 25, 2018.

[12] *See* id.  *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.

[13] *See* ICE Significant Incident Report, dated May 25, 2018.

[14] *See* EARM/EADM detention details, accessed September 20, 2018.

[15] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated January 23, 2014.

[16] *See* Form I-860, Notice and Order of Expedited Removal, dated January 24, 2014.

2



DHS-ICE-19-0196, 19-0197-A-000323

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

On January 27, 2014, the U.S. District Court for the Southern District of Texas, Laredo Division, convicted HERNANDEZ of unlawful entry and sentenced her to 45 days confinement in the U.S. Bureau of Prison's (BOP) Federal Detention Center (FDC) Houston in Houston, TX.[17]

On March 7, 2014, BOP released HERNANDEZ from FDC Houston into ERO custody.[18]  On March 11, 2014, ERO removed HERNANDEZ to Mexico.[19]

On May 9, 2018, HERNANDEZ presented herself to CBP's Office of Field Operations at the San Ysidro, CA port of entry (POE) seeking asylum from Honduras.  CBP took HERNANDEZ into custody at the POE.[20]  On May 11, 2018, CBP served HERNANDEZ with a Notice and Order of Expedited Removal charging her as removable under § 212(a)(7)(A)(i)(I) of the INA, as an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA.[21]  HERNANDEZ's asylum claim was pending review and adjudication by an asylum officer and/or immigration judge.[22]

### NARRATIVE

**On May 11, 2018**, CBP Officer (b)(6); (b)(7)(C) completed an ICE Health Services Corps (IHSC) In-Processing Health Screening Form for HERNANDEZ, entering "no" for all medical and mental health questions and indicating HERNANDEZ was fit for placement in general population.[23] (b)(6); (b)(7)(C) noted the detainee disclosed she was human immunodeficiency virus (HIV) positive and not taking medication. (b)(6); (b)(7)(C) noted that he did not utilize an interpreter for the encounter.

After HERNANDEZ disclosed she was HIV positive, (b)(6); (b)(7)(C) a physician assigned to perform medical services at the Port of Entry, examined of HERNANDEZ and documented the following:[24]

- HERNANDEZ complained of a headache and cough.
- HERNANDEZ reported she was diagnosed with HIV five months earlier and suffered weight loss, vomiting, and diarrhea for the past month.

---

[17] *See* U.S. District Court for the Southern District of Texas, Laredo Division Judgement, dated January 27, 2014. *See* Form I-213, Record of Deportable/Inadmissible Alien, dated March 7, 2014.

[18] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated March 7, 2014.

[19] *See* ICE Significant Incident Report, dated May 25, 2018.

[20] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated May 9, 2018.

[21] *See* ICE Significant Incident Report, dated May 25, 2018.  *See* Form I-860, Notice and Order of Expedited Removal, dated May 11, 2018.

[22] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated May 11, 2018.

[23] *See* ICE Health Service Corps In-Processing Health Screening Form, dated May 11, 2018.

[24] *See* Mission Medical Support New Patient Comprehensive Exam form, dated May 11, 2018.  Dr. Olcott did not notate whether he used an interpreter for the encounter.



- HERNANDEZ's vital signs were within normal limits, with the exception of an elevated temperature of 99.5 and elevated pulse of 134.[25]
- HERNANDEZ appeared emaciated and ill.
- (b)(6): ordered HERNANDEZ be transferred to the Scripps Mercy Hospital (SMH) in Chula Vista, CA, for a chest x-ray and evaluation to identify possible infections and sepsis.[26]
- HERNANDEZ was not cleared for transport or detention.

Following (b)(6); (b)(7)(C) evaluation, CBP transported HERNANDEZ to SMH where she tested negative for tuberculosis (TB) but positive for bronchitis.[27] SMH prescribed HERNANDEZ Tylenol[28] for her fever, and a Z-Pack[29] and Albuterol inhaler[30] for her bronchitis. ERAU notes HERNANDEZ's record contains no documentation indicating either CBP or SMH administered these medications to the detainee.

Upon her return from SMH that same day, a CBP officer completed a risk assessment for HERNANDEZ in which the officer noted HERNANDEZ self-identified as transgender.[31] CBP also cleared HERNANDEZ for transport and detention.[32] As discussed below, HERNANDEZ remained at the San Ysidro POE in CBP custody until May 14, 2018, when CBP transferred her to custody of ERO San Diego.[33]

**On May 12, 2018**, ERO San Diego requested approval from ERO El Paso to transfer HERNANDEZ to CCCC via the streamlined transfer process.[34] That same day, Supervisory Detention and Deportation Officer (SDDO) (b)(6), (b)(7)(C), ERO Albuquerque, approved the request.[35] ERO identified CCCC as the most appropriate facility for HERNANDEZ because it has a dedicated transgender housing unit and experience housing transgender detainees.[36]

---

[25] Normal vital signs for an adult are as follows: temperature 98.6, pulse 60 to 100 beats per minute, blood pressure 90/60 to 120/80, and respirations 12 to 18 breaths per minute. Normal pulse oxygen, which indicates the saturation of oxygen in the blood, is between 95% and 100%.

[26] Chest x-rays identify lung infections such as TB, pneumonia, and bronchitis. Sepsis is a potentially life-threatening complication of an infection which occurs when chemicals released into the bloodstream to fight the infection trigger inflammatory responses throughout the body.

[27] *See* Scripps physician's aftercare instructions, dated May 11, 2018.

[28] Tylenol is a brand name for acetaminophen.

[29] Z-Pack is an antibiotic.

[30] An albuterol inhaler is a bronchodilator to relax muscles in the lung.

[31] *See* CBP Assessment for Transport, Escort, and Detention, dated May 11, 2018.

[32] *See* CBP medical clearance notification, dated May 11, 2018.

[33] ERAU was unable to confirm the reason for HERNANDEZ's extended time in CBP custody.

[34] S*ee* email from Deportation Officer (DO) (b)(6); (b)(7)(C) to ERO El Paso and Albuquerque office mailboxes, May 12, 2018. The streamlined transfer process is an established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities. It requires coordination across several ERO field offices but results in efficient processing and transport of the large number of aliens entering the U.S. at the San Ysidro POE. HERNANDEZ was transferred via this process as a matter of established routine.

[35] S*ee* email from SDDO (b)(6) to DO Mendivil, May 12, 2018.

[36] ERO transported HERNANDEZ as part of a group of 19 total transgender detainees (classified by ERO as low custody) ultimately destined for CCCC.



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
### JICMS #201807481

**On May 14, 2018**, at an undocumented time, CBP transferred HERNANDEZ to ICE ERO custody.[37]

**On May 15, 2018** at 3:15 p.m., HERNANDEZ arrived at the El Paso Service Processing Center (EPSPC).[38]  EPSPC processed HERNANDEZ and placed her in a holding cell pending transport to CCCC.

**On May 16, 2018**, at 9:45 a.m., HERNANDEZ departed EPSPC,[39] and she arrived at CCCC at 7:59 p.m., along with 18 other transgender detainees.[40]

Upon her arrival, CCCC Officer (b)(6); (b)(7)(C) conducted HERNANDEZ's intake processing in English.[41] (b)(6); (b)(7)(C) stated he does not speak Spanish and did not ask for assistance from Spanish speaking officers or use the telephonic language interpretation services available. (b)(6); (b)(7)(C) stated he noticed HERNANDEZ appeared to have a cold during intake processing.[42]

**On May 17, 2018**, at 2:23 a.m., CCCC officers escorted HERNANDEZ and the other transgender detainees from the intake area to the medical waiting room.[43]  At 4:08 a.m., CCCC provided the detainees with a beverage, and at 6:00 a.m. with breakfast.  HERNADEZ consumed both the beverage and breakfast.

At 7:26 a.m., dental assistant (b)(6); took HERNANDEZ's vital signs and found the detainee's temperature and pulse were abnormally elevated at 100.8 and 136, respectively, and her blood pressure and pulse oxygen abnormally low at 81/61 and 92%, respectively.[44]  During her interview with ERAU, (b)(6); stated she observed HERNANDEZ appeared ill and flagged the detainee's medical chart so she would be the first detainee to receive a medical intake screening that morning by the facility's Registered Nurse (RN).(b)(6); (b)(7)(C)[45]

At 7:35 a.m., (b)(6); (b)(7)(C) conducted HERNANDEZ's medical intake screening and documented the following:[46]

---

[37] S*ee* Form I-203, Order to Detain or Release Alien, dated May 14, 2018.
[38] *See* Global Precision Systems (GPS) ICE El Paso SPC Form G-391, Transportation Log, dated May 15, 2018. ERAU notes GPS is the contract transportation service for EPSPC.
[39] *See* Global Precision Systems (GPS) ICE El Paso SPC Form G-391, Transportation Log, dated May 16, 2018.
[40] S*ee* video surveillance footage, May 16, 2018. .
[41] ERAU confirmed through staff interviews and documentation review that HERNANDEZ did not speak English. ERAU interview with Officer (b)(6); (b)(7)(C) , June 26, 2018.  See Form I-385, Alien Booking Record, dated May 17, 2018.
[42] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[43] S*ee* video surveillance footage, May 17, 2018.
[44] *See* Exhibit 2: CCS receiving screening, dated May 17, 2018.
[45] ERAU interview with (b)(6); , June 26, 2018.
[46] *See* Exhibit 2: CCS receiving screening, dated May 17, 2018.

AMERICAN OVERSIGHT

5

DHS-ICE-19-0196, 19-0197-A-000326

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
### JICMS #201807481

- HERNANDEZ identified herself as a transgender female.
- HERNANDEZ reported being diagnosed with HIV and hepatitis A.[47]
- HERNANDEZ reported having a cough and experiencing a loss of appetite and weight loss.
- HERNANDEZ spoke Spanish. (b)(6); provided translation services for this encounter.
- HERNANDEZ's mental health screening was normal.

(b)(6); (b)(7)(C) administered a TB purified protein derivative (PPD) test to HERNANDEZ.[48]  He also reviewed the accompanying IHSC In-Processing Health Screening form, completed by CBP (b)(6); (b)(7)(C) [49]  ERAU notes this was the only medical document that accompanied HERNANDEZ to CCCC.

(b)(6); (b)(7)(C) completed a medical alert form, noting the detainee had an elevated temperature and reported weakness and significant weight loss over the previous month.[50]  During his interview with ERAU, (b)(6); (b)(7)(C) stated HERNANDEZ appeared very malnourished and dehydrated and he therefore referred her to the CCCC physician.[51]  (b)(6); (b)(7)(C) also notified Director of Nursing (DON) RN (b)(6); (b)(7)(C) and Health Services Administrator (HSA) (b)(6); (b)(7)(C) of HERNANDEZ's condition.  (b)(6); informed CCCC physician (b)(6); (b)(6); of HERNANDEZ's condition by telephone.[52] (b)(6); (b)(7)(C) instructed (b)(6); to provide HERNANDEZ with fluids and stated she would be at the facility shortly to evaluate the detainee.

At 8:08 a.m., medical staff provided HERNANDEZ with Ensure and Pedialyte.[53]

At 9:06 a.m., medical staff placed HERNANDEZ in an isolation room in the medical unit for the detainee's comfort while she waited to be examined by the physician.[54]

At 9:42 a.m., (b)(6); (b)(7)(C) examined HERNANDEZ and documented the following:[55]

---

[47] HIV is the virus that causes acquired immunodeficiency syndrome (AIDS) and the associated progressive failure of the immune system that allows life-threatening infections and cancers to thrive.  Hepatitis A is a virus affecting the liver and transmitted through food and water.  ERAU notes HERNANDEZ later reported she did not have Hepatitis A.

[48] *See* CCS Immunization, Tuberculosis, and Syphilis Testing Record, dated May 17, 2018.  ERAU notes the test would have been read on May 21, 2018, as appropriate, but Cibola medical staff could not read the results because the detainee was in the hospital at this time and did not return to CCCC.

[49] *See* ICE Health Service Corps In-Processing Health Screening Form, dated May 11, 2018.

[50] *See* CCS Medical/Psychiatric Alert, dated May 17, 2018.  This form is placed in the detainee's medical file to alert any medical staff who may interact with the detainee to a relevant medical condition or consideration.

[51] ERAU interview with (b)(6); (b)(7)(C) , June 27, 2018.

[52] ERAU interview with (b)(6); (b)(7)(C) , June 26, 2018.

[53] Ensure is a milk protein concentrate containing vitamins and minerals. Pedialyte reduces dehydration and restores fluids and minerals lost due to diarrhea and vomiting.  ERAU interview with (b)(6); (b)(7)(C) June 27, 2018.

[54] S*ee* video surveillance footage, May 17, 2018.  ERAU interview with Health Services Administrator (b)(6); (b)(6); June 26, 2018.

[55] S*ee* video surveillance footage, May 17, 2018.  S*ee* Exhibit 3: CCS Provider History and Physical Health Assessment, dated May 17, 2018.

6



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

- (b)(6); (b)(7)(C) conducted the examination in Spanish which she speaks fluently.
- HERNANDEZ's temperature (102), pulse (128), and respirations (20) were abnormally high; and, the detainee's blood pressure (81/61), and pulse oxygen (92%) were abnormally low.
- HERNANDEZ self-identified as a transgender female but reported no history of taking hormones.
- HERNANDEZ reported significant weight loss over the previous four to six months and a history of depression and difficulty sleeping.
- HERNANDEZ reported taking no medications and no prior surgeries or hospitalizations.
- (b)(6); (b)(7)(C) physical examination found the detainee emaciated with increased amount of white phlegm and dry mucous membranes in her mouth, poor skin turgor, muscle wasting, coarse breath sounds in her lungs, tachycardia, and multiple cavities.[56]
- (b)(6); (b)(7)(C) determined HERNANDEZ suffered from dehydration, starvation, untreated HIV, fever, and cough.
- (b)(6); (b)(7)(C) s treatment plan included transporting the detainee to the local emergency department to provide her with intravenous (IV) fluids, a chest x-ray, and to diagnose potential opportunistic infections resulting from the detainee's compromised immune system.
- (b)(6); (b)(7)(C) provided HERNANDEZ a face mask to wear to protect her from environmental viruses and bacteria.
- (b)(6); (b)(7)(C) ordered the following laboratory tests to be completed at the hospital: complete blood count (CBC),[57] rapid plasma reagin (RPR) with reflex,[58] comprehensive metabolic panel (CMP),[59] thyroid stimulating hormone (TSH),[60] hepatitis panel,[61] urinalysis for sexually transmitted diseases, HIV confirmation test with viral load,[62] and chest x-ray.

(b)(6); (b)(7)(C) stated HERNANDEZ was alert and stable but looked starved, tired, weak, and appeared to be suffering from long term protein and calorie malnutrition.[63] (b)(6); (b)(7)(C) ordered HERNANDEZ transported to Cibola General Hospital (CGH) in Grants, NM, by facility vehicle.

---

[56] Emaciated refers to an abnormally thin or weak state.  Phlegm is mucus excreted from the body in abnormally large quantities.  Turgor refers to the rigidity of tissues.  Tachycardia refers to an abnormally rapid heart rate.
[57] A CBC measures the level of red blood cells, white blood cells, platelets (clotting cells), hemoglobin (oxygen transport cells) and hematocrit (ratio of red blood cells to the total blood volume).
[58] A RPR detects syphilis.
[59] A CMP is a group of blood tests that provide an overall picture of the body's chemical balance and metabolism.
[60] TSH determines thyroid-stimulating hormone levels.
[61] A hepatitis panel identifies indicators of a hepatitis infection.
[62] An HIV confirmation test with viral load measures the amount of HIV ribonucleic acid (RNA) in the blood.  RNA is the genetic material that makes up certain viruses.
[63] ERAU interview with (b)(6); (b)(7)(C) , June 26, 2018.

7


AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000328

(b)(6); (b)(7)(C) stated during interview that because she expected (b)(6); (b)(7)(C) to send HERNANDEZ to the hospital, she notified security staff of the possible transport while Dr. (b)(6); (b)(7)(C) was conducting the detainee's physical examination.[64]

At 10:09 a.m., HERNANDEZ returned to the isolation room wearing a paper mask and laid down on the bed.[65]  At 10:52 a.m., HERNANDEZ got into in a wheelchair, and medical staff escorted her out of the medical unit to meet the transport van.

At 11:08 a.m., HERNANDEZ entered the van without difficulty.[66]  At 11:20 a.m., the van departed CCCC en route to CGH.[67]  Officer (b)(6); (b)(7)(C) drove the van and Officer (b)(6); (b)(7)(C) rode in the passenger seat.[68]

At 11:44 a.m., the van arrived at CHG and (b)(6); (b)(7)(C) escorted HERNANDEZ into the emergency department.[69] (b)(6); (b)(7)(C) stated the detainee was alert, walking, and talking.[70]

CGH physician (b)(6); (b)(7)(C) diagnosed HERNANDEZ with septic shock,[71] as well as dehydration, HIV infection, nodular pulmonary disease,[72] lymphadenopathy,[73] anemia,[74] and thrombocytopenia.[75]

CGH medical staff evaluated and treated HERNANDEZ, and documented the following:[76]

- HERNANDEZ's vital signs were all outside of normal limits and ranged as follows: temperature from 101.1 to 104.9, pulse from 92 to 173, respirations from 9 to 36, blood pressure from 80/52 to 102/65, and pulse oxygen between 88% and 100%.
- HERNANDEZ received an electrocardiograph[77] (EKG).
- CGH provided HERNANDEZ with IV fluids, acetaminophen to reduce temperature, famotidine to reduce stomach acid, and the antibiotics azithromycin[78] and ceftriaxone.[79]

---

[64] ERAU interview with (b)(6); (b)(7)(C) , June 27, 2018.
[65] S*ee* video surveillance footage, May 17, 2018.
[66] S*ee* id.
[67] S*ee* id.  *See* CoreCivic Escort Trip log, dated May 17, 2018.
[68] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.  *See* CCCC Driver Vehicle Inspection Report, dated May 17, 2018.
[69] *See* hospital logbook, dated May 17, 2018.
[70] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[71] Septic shock is a life-threatening condition resulting from an infection throughout the body which can lead to organ failure and produces changes in temperature, blood pressure, heart rate, white blood cell count, and breathing.
[72] Nodular pulmonary disease is small masses in the lungs.
[73] Lymphadenopathy is enlarged lymph nodes.
[74] Anemia is a medical condition characterized by a lack of healthy red blood cells in the blood.
[75] Thrombocytopenia is a low level of platelets, the cells that help the blood clot.  *See* CGH Emergency Record, dated May 17, 2018.
[76] *See* CGH Emergency Record, May 17, 2018.
[77] An EKG measures the heart's electrical impulses.
[78] Azithromycin is used to treat bacterial infections in the body.
[79] Ceftriaxone is used to treat bacterial infections in the body.


AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000329

- CGH catheterized HERNANDEZ because she was unable to void her bladder.
- CGH administered a rapid HIV test which confirmed HERNANDEZ was HIV positive.

(b)(6); determined HERNANDEZ was in poor condition and required a higher level of care than CGH could provide, so he arranged for air ambulance transportation to transfer her to Lovelace Medical Center (LMC) in Albuquerque, NM.[80]  CGH staff notified I (b)(6); (b)(7)(C) of the plan to transfer HERNANDEZ to LMC.[81]

At 6:40 p.m., (b)(6); (b)(7)(C) relieved (b)(6); (b)(7)(C) of their hospital post.[82]  During her interview with ERAU, (b)(6); (b)(7)(C) stated hospital staff discussions regarding transferring HERNANDEZ to LMC were underway at the time of her arrival at CGH.[83]  A CGH nurse explained the transfer details to HERNANDEZ in Spanish.

At 9:18 p.m., CGH loaded HERNANDEZ into the air ambulance helicopter.[84] (b)(6); (b)(7)(C) accompanied HERNANDEZ in the helicopter along with the pilot and two nurses, including one who spoke Spanish and communicated with her.[85] (b)(6); (b)(7)(C) drove the facility van to LMC.[86]

At 9:38 p.m., the helicopter departed CGH.[87]  HERNANDEZ remained awake and alert during transport.[88]  Medical staff monitored the detainee's vital signs throughout transport and found they were within normal limits, with the exception of elevated respirations of 20, and low blood pressure readings of 105/70, 101/76, 106/69, and 99/69.[89]

At 10:05 p.m., the helicopter landed on the Heart Hospital helipad in Albuquerque, NM.[90]  An ambulance met the helicopter and transported HERNANDEZ, the two nurses, and (b)(6); (b)(7)(C) to LMC.[91]  The drive was approximately three minutes in duration.[92]

At 10:14 p.m., HERNANDEZ arrived at LMC and medical staff placed her in a negative pressure room in the intensive care unit (ICU).[93]

---

[80] See CGH Physician Transfer Record, May 17, 2018.
[81] ERAU interview with (b)(6); (b)(7)(C) June 26, 2018.
[82] See hospital logbook, dated May 17, 2018.
[83] ERAU interview with Officer (b)(6); (b)(7)(C) June 27, 2018.
[84] See hospital logbook, dated May 17, 2018.
[85] ERAU interview with Officer (b)(6); June 27, 2018.
[86] See hospital logbook, dated May 17, 2018.  ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[87] See id.
[88] See PHI Air Medical Transport Medical Record, dated May 17, 2018.
[89] See id.
[90] See hospital logbook, dated May 17, 2018.
[91] ERAU interview with (b)(6); (b)(7)(C) June 27, 2018.
[92] Id.
[93] See hospital logbook, dated May 17, 2018.

9


AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000330

At 10:50 p.m., (b)(6); (b)(7)(C) arrived at LMC.[94]

**On May 18, 2018**, at 12:45 p.m., (b)(6); (b)(7)(C) called LMC for an update on HERNANDEZ's condition and documented the following:[95]

- HERNANDEZ remained in isolation to protect her from opportunistic infections and because CCCC did not know her TB status. Sputum samples were collected to test for TB.[96]
- HERNANDEZ's laboratory blood test results were pending.
- HERNANDEZ's hydration status improved but her HIV status remained of serious concern.
- HERNANDEZ's treatment plan included consultation with infectious disease specialists and administration of broad spectrum antibiotics.[97]
- HERNANDEZ was stable and on IV fluids which included broad spectrum antibiotics and Levophed.[98]

At 1:45 p.m., HERNANDEZ received a computed tomography (CT) scan of her abdomen, with results expected the following day.[99]

At 9:30 p.m., HERNANDEZ remained in isolation in the ICU but was stable and able to eat and take fluids.[100]

**On May 19, 2018**, at 3:48 p.m., HERNANDEZ received a CT scan of her neck due to her enlarged lymph nodes, with results expected the following day.[101]

At 5:30 p.m., LMC reported HERNANDEZ was alert and stable with a good appetite but experienced an elevated temperature of 104 earlier in the day.[102] HERNANDEZ continued to receive IV fluids, antibiotics, and blood pressure medication.

---

[94] *See* id. ERAU notes HERNANDEZ remained at LMC until her death on May 25, 2018. ERAU was unable to obtain medical records from LMC and therefore the remaining narrative is based on the hospital logbook, interviews with staff, and the CCCC medical record progress notes.
[95] *See* CCS progress note, dated May 18, 2018. *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[96] ERAU notes while HERNANDEZ was in CBP custody she was tested and found to be negative for TB, but the relevant documentation did not accompany her to CCCC.
[97] Broad spectrum antibiotics kill or inhibit a wide range of harmful or disease-causing bacteria and include piperacillin/tazobactam and vancomycin.
[98] Levophed is a brand of medication used to treat low blood pressure.
[99] *See* hospital logbook, dated May 18, 2018. *See* CCS Memorandum – Significant Event Notice – Death from HSA (b)(6); (b)(7)(C) dated May 25, 2018. A CT scan uses a series of x-ray images taken from different angles around the body and uses computer processing to create cross-sectional images of the bones, blood vessels and soft tissues.
[100] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[101] *See* hospital logbook, dated May 19, 2018. *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[102] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

10



At 9:30 p.m., an LMC nurse provided (b)(6); (b)(7)(C) the following updates regarding the detainee's condition:[103]

- HERNANDEZ's chest x-ray was negative for TB and the third and final sputum test would be completed the following day.
- HERNANDEZ's abdominal CT scan showed an enlarged spleen and peritoneal lymph nodes.[104]
- LMC medical staff suspected HERNANDEZ was suffering from T-cell lymphoma and would likely need a biopsy.[105]
- HERNANDEZ's CD4 count was 189.[106]

**On May 20, 2018**, at 8:40 a.m., LMC informed (b)(6); (b)(7)(C) that HERNANDEZ remained in stable condition.[107]  At 10:30 p.m., LMC informed (b)(6); (b)(7)(C) that HERNANDEZ was afebrile[108] and no longer on blood pressure medication.

**On May 21, 2018**, at 1:35 p.m., LMC staff prepared HERNANDEZ for surgical biopsy.[109]  At 2:09 p.m., they moved her to an operating room where medical staff removed an axillary lymph node for biopsy.[110]  HERNANDEZ remained in stable condition.  LMC confirmed the detainee tested negative for TB.

At 3:58 p.m., medical staff moved HERNANDEZ from the recovery room back to the ICU.[111]  HERNANDEZ was awake and watched television.

**On May 22, 2018**, at 9:40 a.m., LMC reported the following:[112]

- HERNANDEZ remained in stable condition following the lymph node removal procedure.
- HERNANDEZ's temperature increased to 102.2 the previous night.
- HERNADEZ was receiving Bactrim[113] once per day and a penicillin[114] injection weekly.
- HERNANDEZ's blood pressure decreased and was being maintained with IV fluids.
- HERNANDEZ remained in the ICU.

---

[103] *See* CCS progress note, dated May 18, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C)  dated May 25, 2018.

[104] Peritoneal refers to the serous membrane lining of the walls of the abdomen and pelvic cavities.

[105] T-cell is a type of lymphocyte/white blood cell in the immune system to fight infection. Lymphoma is a type of blood cancer.  A biopsy is a procedure to obtain a sample of cells from the body for laboratory testing.

[106] HIV infection advances to AIDS when there are less than 200 CD4 T-cells per millimeter of blood.

[107] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

[108] Afebrile is a medical term meaning normal temperature.

[109] *See* hospital logbook, dated May 21, 2018.

[110] *See* id.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) , dated May 25, 2018.

[111] *See* hospital logbook, dated May 21, 2018.

[112] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) , dated May 25, 2018.

[113] Bactrim is an antibiotic.

[114] Penicillin is an antibiotic.

11


AMERICAN OVERSIGHT

At 3:00 p.m., HERNANDEZ underwent a lumbar puncture procedure.[115]  At 3:41 p.m., she returned to her room in the ICU.

At 5:45 p.m., LMC informed [b)(6), (b)(7)(C)] that HERNANDEZ did not have an appetite but was drinking Ensure, and the biopsy results were pending.[116]

**On May 23, 2018**, at 4:45 p.m., HERNANDEZ received a CT scan of her stomach.[117]

At 9:32 p.m., HERNANDEZ received a chest x-ray.[118]

At 10:30 p.m., [b)(6), (b)(7)(C)] spoke with an LMC nurse who reported HERNANDEZ experienced a high fever and elevated pulse throughout the day.[119]   HERNANDEZ remained on oral antibiotics. The biopsy results continued to be pending, but the detainee's lumbar puncture results were normal.

**On May 24, 2018**, at 11:00 a.m., [b)(6), (b)(7)(C)] spoke with an LMC nurse and documented the following:[120]

- HERNANDEZ was in serious condition with a guarded prognosis.[121]
- Laboratory tests and chest x-ray results were as follows:
  - Blood culture found no growth, indicating a low probability of blood infection caused by bacteria or fungi.
  - HERNANDEZ tested negative for malaria, parasites, and toxoplasmosis.[122]
  - HERNANDEZ tested positive for syphilis.
  - HERNANDEZ's chest x-ray found slight bilateral pleural effusion.[123]
- HERNANDEZ's heart rate and temperature were abnormally high throughout the previous night, at 150 and 104.5, respectively.  LMC staff provided the detainee with Tylenol and a cooling blanket to reduce her temperature.

At 1:10 p.m., HERNANDEZ informed a nurse she felt congested and was having difficulty breathing.[124]  At 1:30 p.m., HERNANDEZ received an x-ray, followed by an ultrasound.

---

[115] A lumbar puncture is a medical procedure in which a needle is inserted into the spinal canal, most commonly to collect cerebrospinal fluid for diagnostic testing.  *See* hospital logbook, dated May 22, 2018.
[116] *See* CCS progress note, dated May 22, 2018.
[117] *See* hospital logbook, dated May 23, 2018.
[118] *See* id.
[119] *See* CCS progress note, dated May 23, 2018.
[120] *See* CCS progress note, dated May 24, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from [b)(6), (b)(7)(C)], dated May 25, 2018.
[121] Guarded prognosis means a patient's condition is uncertain and concerning.
[122] Toxoplasmosis is an infectious disease caused by the one-celled protozoan parasite.
[123] Bilateral pleural effusion refers to an abnormal buildup of fluid around both lungs.
[124] *See* hospital logbook, dated May 24, 2018.



DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
JICMS #201807481

At 3:22 p.m., LMC performed a procedure, called a thoracentesis,[125] to remove the fluid from HERNANDEZ's lungs.[126]  At 4:00 p.m., the detainee's pulse oxygen began dropping and she developed tachypnea,[127] supraventricular tachycardia (SVT),[128] and an elevated blood pressure.[129]

Starting at approximately 5:00 p.m., HERNANDEZ began coughing up mucus and having more difficulty breathing. [130]

At 5:55 p.m., LMC staff attempted to intubate[131] HERNANDEZ.  At 6:35 p.m., after some difficulty, intubation was complete.  At 6:40 p.m., the detainee received a chest x-ray and at 7:07 p.m., medical staff sedated HERNANDEZ.

At 7:40 p.m., LMC nursing staff informed (b)(6); (b)(7)(C) posted at the hospital at the time, that HERNANDEZ was on life support and in critical condition.[132]

At 10:10 p.m., HERNANDEZ developed bradycardia[133] and pulseless electrical activity (PEA).[134] LMC immediately initiated chest compressions and administered multiple doses of epinephrine.[135]  At 10:16 p.m., HERNANDEZ was revived, but developed SVT.  Medical staff administered a dose of Adenosine[136] in order to return her heart rate to a normal level, but it was not effective.  LMC staff also administered a dose of metoprolol[137] to HERNANDEZ in order to lower her blood pressure.

**May 25, 2018, Day of Death**

At 12:48 a.m., HERNANDEZ went into cardiac arrest.[138]  LMC staff initiated cardiopulmonary resuscitation (CPR), used an automated external defibrillator (AED), and administered medications.

---

[125] Thoracentesis is a procedure to remove the fluid between the lung and chest wall.
[126] *See* hospital logbook, dated May 24, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[127] Tachypnea is very rapid respirations.
[128] SVT is an abnormally rapid heart rate.
[129] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[130] *See* hospital logbook, dated May 24, 2018.
[131] Intubation is the placement of a flexible plastic tube into the patient's trachea in order to maintain an open airway and facilitate the ventilation of the lungs.
[132] *See* hospital logbook, dated May 24, 2018.
[133] Bradycardia is an abnormally slow heartbeat.
[134] PEA is common in cardiac arrest situations where an electrocardiogram shows electrical activity in the heart, but the patient has no palpable pulse.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) (b)(6); dated May 25, 2018.
[135] Epinephrine constricts blood vessels, which increases blood pressure and increases heart rate.
[136] Adenosine is used to return an abnormally rapid heart rate normal.
[137] Metoprolol is a medication used to treat high blood pressure, chest pain (angina), and heart failure.
[138] *See* hospital logbook, dated May 25, 2018.

13



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

At 1:18 a.m., LMC staff stabilized HERNANDEZ,[139] but at 1:23 a.m., the detainee entered cardiac arrest again and medical staff performed CPR.  At 1:27 a.m., staff discontinued CPR but continued rescue breaths.

At 1:36 a.m., LMC Nurse Practitioner (NP) [(b)(6); (b)(7)(C)] called CCCC medical staff to discuss ceasing resuscitation efforts on HERNANDEZ.[140]  CCCC LPN [(b)(6); (b)(7)(C)] spoke to NP [(b)(6);] and contacted [(b)(6);] and ICE Field Medical Coordinator (FMC) [(b)(6); (b)(7)(C)] for guidance.[141]  [(b)(6); (b)(7)(C)] directed [(b)(6); (b)(7)(C)] to continue resuscitation efforts on the detainee because she did not have a do-not-resuscitate order on file.[142]

HERNANDEZ went into cardiac arrest and was subsequently revived by hospital staff several times over the next two hours.[143]  At 3:29 a.m., HERNANDEZ went into cardiac arrest, but hospital staff could not revive her.  At 3:32 a.m., LMC physicians pronounced HERNANDEZ dead.[144]

At 3:33 a.m., [(b)(6); (b)(7)(C)] notified Commander [(b)(6); (b)(7)(C)] and Warden [(b)(6); (b)(7)(C)] of HERNANDEZ's death via telephone.[145]  At 3:36 a.m., [(b)(6); (b)(7)(C)] notified [(b)(6); (b)(7)(C)].[146]  At 3:40 a.m., [(b)(6); (b)(7)(C)] notified CCCC medical staff of the death.[147]

At 5:47 a.m., hospital security staff took custody of HERNANDEZ's body and moved it to the hospital morgue.[148]  [(b)(6); (b)(7)(C)] witnessed LMC secure the body in the morgue and then returned to CCCC.[149]

**Post Death Events**

HERNANDEZ's preliminary cause of death is cardiac arrest.[150]  At the time this report was published the final death certificate and autopsy report results were pending.

**On May 25, 2018,** [(b)(6); (b)(7)(C)] assigned Facility Investigator [(b)(6); (b)(7)(C)] to conduct an after-action review to assess CCCC staff compliance with facility policies and procedures. [(b)(6); (b)(7)(C)] cited no findings and concluded staff followed applicable facility policies and procedures.[151]

---

[139] *See* id.

[140] *See* id.

[141] *See* CCS general notes, dated May 25, 2018.

[142] ERAU interview with Health Services Administrator [(b)(6); (b)(7)(C)], June 26, 2018.

[143] *See* hospital logbook, dated May 25, 2018.

[144] *See* id.  *See* CCS Memorandum – Significant Event Notice – Death from [(b)(6); (b)(7)(C)] dated May 25, 2018.

[145] *See* hospital logbook, dated May 25, 2018.  *See* Sergeant [(b)(6);] Incident Statement, dated May 25, 2018.

[146] *See* CCS incident report, dated May 25, 2018.

[147] *See* CCS general notes, dated May 25, 2018.

[148] *See* hospital logbook, dated May 25, 2018.

[149] *See* id.

[150] *See* ICE Significant Incident Report, dated May 25, 2018.

[151] *See* CoreCivic Investigation Report, dated May 29, 2018.

14



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**On June 21, 2018**, CCS conducted a mortality review of the death.  CCS declined to provide the details and findings from the mortality review with ERAU.[152]

## MEDICAL CARE AND SECURITY REVIEW

ERAU reviewed the medical care CCCC provided HERNANDEZ, as well as the facility's efforts to ensure that she was safe and secure while detained at the facility.  ERAU found CCCC fully compliant with the ICE PBNDS 2011 Medical Care Standard, as well as with those relevant components of the ICE PBNDS 2011 pertaining to safety and security.[153]  However, ERAU identified one area of concern regarding HERNANDEZ's care.

## AREAS OF CONCERN

ERAU notes the following area of concern regarding HERNANDEZ's intake processing:

- Although HERNANDEZ spoke only Spanish, (b)(6); (b)(7)(C) conducted the detainee's intake processing in English and did not use language interpretation services.  Effective communication between officers and detainees is crucial in the delivery and receipt of important information relevant to a detainee and their detention.

---

[152] ERAU interview with Health Services Administrator (b)(6);, June 26, 2018.
[153] *See* Exhibit 1: Creative Corrections Security and Medical Compliance Review.

AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000336

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**EXHIBITS**

1. Creative Corrections Security and Medical Compliance Review.
2. CCS receiving screening, dated May 17, 2018.
3. CCS Provider History and Physical Health Assessment, dated May 17, 2018.

DHS-ICE-19-0196, 19-0197-A-000337





March 8, 2021

**VIA EMAIL**

The Privacy Office
U.S. Department of Homeland Security
Headquarters & Office of Civil Rights &
Civil Liberties
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655
foia@hq.dhs.gov

Catrina Pavlik-Keenan
Freedom of Information Act Office
U.S. Immigration and Customs
Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
ice-foia@dhs.gov

**Re: Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the
implementing regulations of your agency, American Oversight makes the following
request for records.

In fiscal year 2020, Immigration and Customs Enforcement (ICE) reported that sixteen
individuals died in immigration detention,[1] the highest number in any single year since
2005.[2] Seven of these individuals are preliminarily identified as having died directly or
indirectly due to Covid-19,[3] which poses a grave threat to detainees and is exacerbated
by their frequently inadequate medical care.[4]

American Oversight seeks records with the potential to shed light on the deaths of
individuals held in the custody of the U.S. Department of Homeland Security (DHS) or
its component agencies, including whether or to what extent DHS officials or
contractors are upholding the standards of care prescribed by federal law and agency
guidance.

---

[1] U.S. Immigration and Customs Enforcement, Detainee Death Reporting,
https://www.ice.gov/detain/detainee-death-reporting.
[2] Hamed Aleaziz, *A Mexican Man Died in ICE Custody After Testing Positive for COVID-19*, BuzzFeed (Jan. 31, 2021, 4:55 PM), https://www.buzzfeednews.com/article/
hamedaleaziz/mexican-man-dies-ice-coronavirus.
[3] *See supra* note 1.
[4] Press Release, H. Subcomm. on Civil Rights & Civil Liberties, The Trump
Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medical
Care by For-Profit Detention Centers, Sept. 24, 2020,
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-09-
24.%20Staff%20Report%20on%20ICE%20Contractors.pdf.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

>Copies of the "Healthcare and Security Compliance Analysis" reports—or equivalent internal procedural compliance analysis—completed by or for ICE Office of Professional Responsibility as part of the detainee death reviews for each of the following individuals who died in custody.
>
>  1.  Gourgen Mirimanian
>  2.  Anthony Oluseye Akinyemi
>  3.  Samuelino Mavinga
>  4.  Ben James Owen
>  5.  Alberto Hernandez-Fundora
>  6.  David Hernandez-Colua
>  7.  Maria Celeste Ochoa-Yoc De Ramirez
>  8.  Orlan Ariel Carcamo-Navarro
>  9.  Ramiro Hernandez-Ibarra
> 10.  Carlos Ernesto Escobar-Mejia
> 11.  Óscar López Acosta
> 12.  Choung Woong Ahn
> 13.  Santiago Baten-Oxlaj
>
>An example of a "Healthcare and Security Compliance Analysis" is attached as Exhibit A to aid your search.
>
>Please provide all responsive records from April 10, 2018, through the date the search of the search.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[5] The public has a significant interest in the treatment and care of individuals in immigration detention, especially in the midst of a global pandemic and the cases of individuals who have died in DHS custody.[6] Records with the potential to shed light on this topic would

---

[5] 5 U.S.C. § 552(a)(4)(A)(iii).

[6] *See supra* notes 2 & 4.

DHS-21-0310

contribute significantly to public understanding of operations of the federal government, including whether the deceased individuals received appropriate care and whether internal DHS analyses are consistent with public reporting. American Oversight is committed to transparency and makes the responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[7] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[8]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[9] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[10] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[11] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[12] the posting of records related to an ethics

---

[7] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[8] American Oversight currently has approximately 15,680 page likes on Facebook and 105,400 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Mar. 8, 2020); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Mar. 8, 2020).

[9] *See generally News*, American Oversight, https://www.americanoversight.org/blog.

[10] *Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[11] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g.*, *CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[12] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g.*, *Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall*, American Oversight,

DHS-21-0310

waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[13] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[14]

Accordingly, American Oversight qualifies for a fee waiver.

## Guidance Regarding the Search & Processing of Requested Records

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[15] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official systems or if officials have, by intent or through negligence, failed to meet their obligations.[16]

---

https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

[13] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[14] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g.*, *New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

[16] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

DHS-21-0310

- ▪ Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[17] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

- ▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

- ▪ Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will

---

[17] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-0310

accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Khahilia Shaw at foia@americanoversight.org or (202) 539-6507. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

<div style="margin-left: 40%;">

Sincerely,

*/s/ Khahilia Shaw*
Khahilia Shaw
on behalf of
American Oversight

</div>

– 6 –

DHS-21-0310

# EXHIBIT A

**DETAINEE DEATH REVIEW**
**Jeffry HERNANDEZ,** (b)(6); (b)(7)(C)
**Healthcare and Security Compliance Analysis**
**Cibola County Correctional Center, Milan, New Mexico**

As requested by the ICE Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU), Creative Corrections participated in a review of the death of detainee Jeffry HERNANDEZ. A site visit was conducted June 26 through 27, 2018 by ERAU personnel (b)(6); (b)(7)(C) Management and Program Analyst and team leader; (b)(6); (b)(7)(C) Management and Program Analyst; Creative Corrections contract personnel (b)(6); (b)(7)(C) Security Subject Matter Expert; and (b)(6); (b)(7)(C) Registered Nurse, Healthcare Subject Matter Expert. In addition, telephone interviews were conducted between August 22, 2018 and September 18, 2018 by (b)(6); (b)(7)(C) and Creative Corrections Program Manager (b)(6); (b)(7)(C) Contractor participation was requested to determine compliance with the ICE 2011 Performance Based National Detention Standards (PBNDS), 2016 revisions, governing medical care and security operations.

This report was prepared collaboratively by (b)(6); (b)(7)(C)
Included is a case synopsis, description of the Cibola County Correctional Facility (CCCC) and its medical services, a narrative summary of events, and conclusions. The information and findings herein are based on analysis of detainee HERNANDEZ's detention file and medical record, tour of the intake and medical areas, interviews of CCCC and ERO personnel, and review of hospital and air transport records, facility policies, video surveillance footage, and available incident related documentation.

## SYNOPSIS

Jeffry HERNANDEZ, a 33 year-old transgender woman, entered the United States at the San Ysidro Port of Entry requesting asylum on May 9, 2018, one week before she was admitted to CCCC. On May 11, 2018 while still in the custody of U.S. Customs and Border Protection (CBP), she was examined by a physician following screening by a CBP officer. The physician documented she was human immunodeficiency virus (HIV) positive, emaciated, and ill appearing with a productive cough. She was sent to a hospital the same day where cleared for tuberculosis (TB) and given medications for bronchitis. Available evidence indicates ERO did not receive documentation of the physician's examination, the hospital report, or medications.

HERNANDEZ remained in CBP custody until May 14, 2018 while ICE Enforcement and Removal Operations (ERO) arranged for her transport and ultimate detention at CCCC, a facility





DHS-ICE-19-0196, 19-0197-A-000269

Page 269

designated for housing transgender detainees.  She was in ERO custody for 56 hours before she was admitted to CCCC, an estimated 24 of which were in two detention facilities, six in the San Luis Regional Detention Center and 18 in the El Paso Service Processing Center.  The remaining time in ERO custody prior to HERNANDEZ's admission to CCCC was spent in transit. HERNANDEZ was not medically screened at either the San Luis or El Paso facilities because her stay at both facilities was brief and her transfer was imminent.

During medical intake screening at CCCC, HERNANDEZ reported she was HIV positive and never treated.  She also reported significant weight loss in the past month and a half.  Vital signs were abnormal, she had a persistent cough, and appeared very malnourished and dehydrated.  A physician was notified and the detainee was examined on an expedited basis.  The physician diagnosed untreated HIV, dehydration, starvation, and fever with cough.    She ordered HERNANDEZ's transport to the local hospital for intravenous fluids to treat dehydration and to rule out an infection secondary to HIV and pneumonia.

Following evaluation and diagnostic testing, the emergency department physician determined that detainee HERNANDEZ's condition required care beyond the hospital's scope.  She was transferred by air to a hospital in Albuquerque, New Mexico and admitted to the intensive care unit (ICU).  She remained in the ICU for eight days, during which she received intravenous antibiotics, medication to increase her blood pressure, abdominal and neck CT scans, multiple blood tests, and chest x-rays.  HERNANDEZ's condition began to deteriorate following thoracentesis to remove excess fluid between the lungs and chest wall on the seventh day of her hospitalization, following which she was intubated and placed on a ventilator.  She experienced multiple episodes of cardiac arrest over the course of the five hours preceding her death. Resuscitative efforts failed following a final episode and at 3:32 a.m. on May 25, 2018, death was pronounced.

The reported preliminary cause of death was cardiac arrest.  The death certificate and autopsy report are not available as of the date of this report.

## MEDICAL SERVICES

CCCC is scheduled for its first American Correctional Association accreditation audit in October 2018.  CCCC is not accredited by the National Commission on Correctional Health Care.

Healthcare services are provided seven days per week 24 hours per day by contractor Correct Care Solutions (CCS) based in Nashville, Tennessee.  Although the staffing plan allocates 31.8 positions, 32.5 positions were filled at the time of the site visit.  They included the following: Health Services Administrator (HSA); two physicians; one full time nurse practitioner (NP); three part time NPs; one dentist; Director of Nursing (DON);  12 full time registered nurses





(RN); one part time RN, three full time licensed practical nurses (LPN); one part-time LPN; two licensed mental health counselors (LMHC); one pharmacy technician; and four medical record clerks.  Services provided under independent contract include tele-psychiatry 20 hours per week; pharmacy, radiology and laboratory.   The HSA reported that due to difficulty hiring LPNs in the area, RNs fill five LPN positions.    The reviewer confirmed the credentials of medical staff involved in detainee HERNANDEZ's care were current and primary-source verified.

## FACILITY DESCRIPTION

CCCC was built by Cibola County and purchased in 1998 by contractor CoreCivic, formerly Corrections Corporation of America.  The facility houses male and transgender ICE detainees, Cibola County inmates, and United States Marshal Service detainees.  The facility capacity is 1204.  On May 25, 2018, the date of detainee HERNANDEZ's death, the facility population was 953, including 309 ICE detainees.

There are three perimeter fences surrounding the facility.  Razor wire is along the top of the outer perimeter fence and between the two fences furthest from CCCC buildings.  Visitors seeking entry to the secure perimeter are processed in a small building and pass through a metal detector, and personal items are searched by way of an X-ray machine.   Visitors are then issued identification badges and move within the facility under escort.  Video surveillance cameras are used throughout the facility to monitor and record events.

## SUMMARY OF EVENTS

### May 9, 2018
ERO's Detainee Death Notice documents HERNANDEZ applied for admission to the US at the San Ysidro Port of Entry.

### May 11, 2018
(b)(6); (b)(7)(C) completed an ICE Health Services Corps (IHSC) In-Processing Health Screening Form, entering "no" for all questions.  The form includes a handwritten note stating, "HIV Positive/No Meds".

> **Note**:  (b)(6); (b)(7)(C) title is not identified on the form, but multiple forms provided to reviewers identify him as a CBP officer.

---

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                                      Page 3
Medical and Security Compliance Analysis
September 28, 2018







A printed CBP San Ysidro SIGMA EVENT report modified by [b)(6); (b)(7)(C)] this date includes a handwritten note stating, "HIV Positive No meds/Fever chills".

[b)(6); (b)(7)(C)] MD documented completion of a physical examination on a Mission Medical Support New Patient Comprehensive Exam form.   He wrote that the detainee's chief complaints were HIV, a headache, and cough.  HERNANDEZ reported she was diagnosed with HIV five months earlier and over the past month, lost 40 pounds and had recurring vomiting and diarrhea. Recorded vital signs were as follows:   elevated temperature of 99.5, elevated pulse of 134, respirations 18, blood pressure 112/70, and pulse oxygen 99 percent.  The examination findings were that HERNANDEZ was emaciated and ill appearing with a productive cough.    Doctor [(b)(6), (c)] assessment and plan identified HIV, weight loss, cough, headache and tachycardia[1] and directed transfer to the emergency room for chest X-ray and evaluation to rule out active infection[2] and sepsis.   He also directed that HERNANDEZ wear a mask, and noted that she was not medically cleared for transport and detention.

A report from Scripps Mercy Hospital, Chula Vista, CA documents a positive finding for bronchitis, a normal chest X-ray, and that there was no clinical evidence of tuberculosis.  The report, also dated May 11, 2018, includes instructions for Tylenol[3] for fever, Z-Pack[4], and an Albuterol inhaler[5].  Detainee HERNANDEZ was cleared for travel and incarceration.

>  **Note**:  Reviewers are not familiar with CBP processes; therefore, no explanation for the two-day delay in medical screening and tuberculosis clearance can be offered.

>  **Note**:  It is unknown whether the medications listed on the hospital report were dispensed or given to HERNANDEZ.

**May 12, 2018**
By email timed 4:30 p.m., ICE/ERO San Diego requested transfer of 19 detainees, including HERNANDEZ, to CCCC under the streamlined transfer process.   The email was written by [b)(6); (b)(7)(C)] (title unknown) and was directed to two email groups and multiple persons with ICE email addresses.  [(b)(6); (b)(7)(C)] Supervisory Detention and Deportation Officer (SDDO), ICE Albuquerque, replied at 7:21 p.m. stating bed space at CCCC was approved.

---

[1] Tachycardia is a heart rate that that exceeds the normal resting rate.  Normal pulse rate for an adult is 60 to 100 beats per minute.

[2] Chest X-rays identify lung infections such as TB, pneumonia, and bronchitis.

[3] Tylenol is a brand name for acetaminophen.

[4] Z-Pack is an antibiotic.

[5] An albuterol inhaler is a bronchodilator to relax muscles in the lung.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                    Page 4
Medical and Security Compliance Analysis
September 28, 2018




AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000272

**May 13, 2018**

By email timed 8:21 a.m. to ICE Air Charter Operations, (b)(6); (b)(7)(C) requested 19 seats for 19 transgender females. He wrote that they were apprehended at the San Ysidro Port of Entry and were to be transferred directly from there to the El Paso, Texas Area of Responsibility, noting, "…arrangements have been made with the receiving office to have a complete medical evaluation upon arrival. Therefore they will not need certain medications at the time of transport; i.e., HIV medication." May 22, 2018 was the flight date referenced by (b)(6); (b)(7)(C) corrected to May 15, 2018 by subsequent email.

> **Note**: As detailed below, the first complete medical evaluation of HERNANDEZ after she was picked up at San Ysidro was at CCCC, 56 hours after she entered ERO custody. She passed through the San Luis Regional Detention Center and El Paso Service Processing Center (EPSPC) before being transferred to CCCC.

**May 14, 2018**

By email timed 10:34 a.m., (b)(6); (b)(7)(C) ICE Air Charter Operations, approved transport from the Phoenix-Mesa Gateway Airport to the El Paso Airport on May 15, 2018.

According to (b)(6); (b)(7)(C) , SDDO assigned to the ERO San Diego Field Office, LaSalle Corrections transportation officers for the San Luis Regional Detention Center (SLRDC) picked up HERNANDEZ and 18 other transgender detainees at the San Ysidro Point of Entry at approximately 12:00 p.m. Their transport was requested by email the day before. The detainees arrived at SLRDC at 6:00 p.m. and according to Assistant Field Office Director (AFOD) (b)(6); (b)(7)(C) were placed in a holding cell. He reported that because their departure was imminent, the detainees were not medically screened. Asked whether ERO was aware of any medical information received from CBP when HERNANDEZ's custody was transferred, both AFOD (b)(6); (b)(7)(C) stated they assume the CBP officer (b)(6); screening was received, but knew of nothing further.

**May 15, 2018**

A LaSalle Corrections Transport Trip Log lists HERNANDEZ among other detainees who departed SLRDC on a bus bound for the Phoenix-Mesa Gateway Airport at 12:00 a.m. The bus arrived at 4:00 a.m. and according (b)(6); (b)(7)(C) the detainees boarded a flight to El Paso. The time of flight departure is unknown, although according to (b)(6); (b)(7)(C) SDDO assigned to the ERO El Paso, the flight arrived in El Paso at 2:48 p.m. He said the passengers were met by ICE personnel and then turned over to contractor Global Precision Systems for transport by bus to the EPSPC.

ICE form G-391 documents the bus arrived at EPSPC at 3:15 p.m. According to SDDO (b)(6); HERNANDEZ was placed in a housing unit with other transgender detainees pending

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                                    Page 5
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000273

transfer to CCCC the next day. He stated that if HERNANDEZ did not voice a medical concern and none were observed by officers involved in her transport or movement into EPSPC, no medical screening would have taken place. He confirmed with EPSPC healthcare personnel that they had no record of her; therefore, no medical concerns were brought to their attention.

**May 16, 2018**

ICE form G-391 documents a total of 29 detainees were processed for transport to "ICE CAP" in Albuquerque, New Mexico between 8:30 and 9:45 a.m. The time of arrival at ICE CAP was 2:30 p.m. According to (b)(6); (b)(7)(C) ICE CAP refers to the ERO sub-office in Albuquerque where there is a "meet and greet" with officers assuming custody for transport to designated detention facilities. He said that HERNANDEZ and the other detainees were turned over to the custody of CCCC transport officers. The time of departure for CCCC was not documented.

Per CCCC video surveillance footage, a Transcor[6] bus carrying 28 detainees arrived at the facility's sallyport gate at **7:59 p.m.** At **8:10 p.m.**, nine detainees were removed from the bus and escorted into the facility. At **8:13 p.m.**, 19 more detainees were removed from the bus. Booking Officer (b)(6); (b)(7)(C) informed the review team that the detainees in the second group were transgender and included HERNANDEZ.

> **Note**: The EADM shows HERNANDEZ was booked into CCCC approximately nine hours before video evidence shows she arrived.

The detainees were escorted into the facility at **8:43 p.m.** after restraints were removed. Form I-216, Record of Persons Transferred, documents all 19 transgender detainees were classified low custody by ERO. CCCC's intake area has seven holding cells, a property room, a shower room and three medical examination rooms. The video shows the detainees were taken to holding cells once inside the facility. Five at a time, the detainees were then escorted to the property room where they were provided with facility uniforms, shoes, linens, a hygiene kit and an identification card. During tour of the intake area, a property officer informed reviewers that arriving detainees' personal property is inventoried and then laundered by detainee workers before being placed in storage. HERNANDEZ's property included a jacket, shirt and underwear and one pair each of socks, shoes and pants. She signed a receipt for the items and forms acknowledging receipt of facility property, the right of CCCC to inspect non-privileged mail and to monitor non-attorney telephone calls, and receipts for the National ICE Detainee Handbook and the facility handbook.

> **Note**: With the exception of the handbook receipt, all forms were in English.

---

[6] Transcor America LLC is a subsidiary of CoreCivic and provides transportation services.





(b)(6); (b)(7)(C) was questioned about completion of the admission process. He described HERNANDEZ as quiet and said she seemed scared. He acknowledged he does not speak Spanish but asserted he is able to communicate through hand gestures and using the few Spanish words he has learned. He stated that although Spanish speaking officers are available in the intake area, he did not ask for assistance or use the language line to communicate. Officer (b)(6); recalled HERNANDEZ answered no when asked if she had any medical problems, and offered his observation that it "seemed like she had the common cold and looked like she was under the weather." He said the detainee "seemed to understand when he asked her other yes or no questions, answering no to each one. HERNANDEZ was able to stand and walk on her own and did not lean on the table or counters for support.

**May 17, 2018**

Video surveillance footage from the intake area shows the 19 transgender detainees were escorted to the medical waiting area at **2:23 a.m.** They all placed blankets on the floor and laid down. At **4:08 a.m.**, the detainees were provided with a beverage. Detainee HERNANDEZ got up to take the beverage and then sat in a chair to drink it. At **4:11 a.m.**, she went to the waiting area bathroom, returning in a minute and laying on the floor again. At **6:00 a.m.**, breakfast was served and detainee HERNANDEZ stood and walked to the door to retrieve a tray. She then sat on the floor and appears to have eaten the entire contents before returning the tray to staff at **6:14 a.m.**

Vital signs of detainees awaiting medical screening were taken by dental assistant (b)(6); this date. She reported she started this process at 6:00 a.m., although based on the video evidence, detainee HERNANDEZ was not called out of the waiting room until **7:26 a.m.** With the exception of normal respirations of 16 breaths per minute, her vital signs were abnormal, as follows: temperature and pulse elevated at 100.8 and 136, respectively; blood pressure low at 81/6; and pulse oxygen 92%[7]. She was five feet three inches tall and weighed 89 pounds. During interview (b)(6); stated the detainee looked ill so she put her paperwork aside so she would be the first one screened when the RN arrived.

At **7:35 a.m.** RN (b)(6); (b)(7)(C) conducted the intake screening. He signed and stamped two Medical Summary of Federal Prisoner/Alien in Transit forms to document his review, one reflecting HERNANDEZ departed from SLRDC on May 15, 2018; the second reflecting departure from EPC on May 16, 2018. The SLRDC form provides no information on TB clearance; the EPC form has a checkmark indicating a purified protein derivative (PPD)[8] was

---

[7] Normal vital signs for an adult are as follows: temperature 98.6, pulse 60 to 100 beats per minute, blood pressure 90/60 to 120/80, and respirations 12 to 18 breaths per minute. Normal pulse oxygen, which indicates the saturation of oxygen in the blood, is between 95 and 100 percent.
[8] A PPD skin test determines exposure to tuberculosis. Once planted, 48 to 72 hours must elapse before results





completed, but does not provide a date. The section for documenting current medical problems is blank on both forms. In the Medication Required for Care En Route section, the following printed information appears: "*DETAINEE IN ICE CUSTODY LESS THAN 72 HOURS* DETAINEE TRANSFER MEETS REQUIREMENTS PER JPATS[9] CABIN CREW POLICIES & PROCEDURES MANUAL 'Medical Regulations, Section D 4.(a), page 33, regarding TB clearance." (b)(6); (b)(7)(C) also signed the afore-described IHSC In-Processing Health Screening form completed on May 11, 2018 by CBP Officer (b)(6); (b)(7)(C) with all negative findings except for a handwritten note documenting, "HIV positive/NO MEDS". Neither of the transfer forms were signed and dated by SLRDC and EPC personnel.

> **Note**: The New Patient Comprehensive Exam form completed by (b)(6); (b)(7)(C) and report of Scripps Mercy Hospital, both dated May 11, 2018, were not received by CCCC. As discussed above, the hospital report documents a chest X-ray was negative, there was no clinical evidence of TB, and a positive finding for bronchitis. The report also includes directions for Tylenol for fever, an antibiotic, and albuterol inhaler. No medications were received with HERNANDEZ.

(b)(6); (b)(7)(C) documented HERNANDEZ speaks Spanish and that Ms. Ford served as interpreter for screening. (b)(6); co-signed the screening, Consent for Treatment, CCS Intake Education Information, and CCS Health Services Notice forms confirming she provided interpretation assistance. Detainee HERNANDEZ identified as transgender female and reported she was HIV positive and had Hepatitis A[10].

> **Note**: Following one of two entries documenting that detainee HERNANDEZ reported Hepatitis A, "[Patient] denies this" is written. As discussed below, she denied having Hepatitis A during physical examination by the physician.

(b)(6); (b)(7)(C) noted HERNANDEZ's current symptoms included cough, loss of appetite, and weight loss, writing, "[Patient] states loosing [*sic*] a lot of [weight] in the last month and a half." She reported she was not taking any medications.

> **Note**: It is unknown whether the medications listed on the Scripps Medical Center report were ever given to HERNANDEZ.

---

may be read.

[9] JPATS is the Justice Prisoner Alien Transportation System.

[10] Hepatitis A is a virus affecting the liver that is transmitted through food and water.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                        Page 8
Medical and Security Compliance Analysis
September 28, 2018





The mental health and suicide risk screening questions were answered in the negative, as were Prison Rape Elimination Act (PREA) questions with the exception of detainee HERNANDEZ's self-identification as transgender.

On a CCS Immunization, Tuberculosis, and Syphilis Testing Record, (b)(6); (b)(7)(C) documented he planted a PPD to test HERNANDEZ for TB.

> **Note**:  Asked about the TB test during interview, (b)(6); (b)(7)(C) said he had no knowledge of the chest X-ray performed at Scripps Medical Center because the report was not provided to CCCC.   He also noted HERNANDEZ appeared sick, had a cough, and experienced significant weight loss, symptoms of possible TB.   As for the check mark appearing on the EPC transfer summary indicating a PPD test was completed, HERNANDEZ was not held there long enough for it to be read; therefore, (b)(6); (b)(7)(C) action was appropriate.

(b)(6); (b)(7)(C) completed a Medical/Psychiatric Alert form, noting that there was obvious shaking in HERNANDEZ's hands and arms, her temperature was elevated, she complained of feeling weak, and reported significant weight loss in the past month.  During interview, (b)(6); (b)(7)(C) commented the detainee appeared very malnourished and dehydrated, and that he referred her to the physician. (b)(6); (b)(7)(C) consulted with (b)(6); (b)(7)(C) , HSA concerning providing HERNANDEZ with fluids and electrolytes.  She was given Ensure[11] and Pedialyte[12] and returned to the waiting area where the video shows she again laid on the floor. This occurred at **8:08 a.m.**

At **8:56 a.m.** (b)(6); (b)(7)(C) and another medical staff person are seen on video entering the waiting room and assisting detainee HERNANDEZ to her feet.  During interview, (b)(6); (b)(7)(C) said (b)(6); (b)(7)(C) had called before she arrived for work and notified her of HERNANDEZ's condition.  She also asked if the detainee could be given something for the elevated temperature and cough.  (b)(6); (b)(7)(C) stated she told her no because she did not want to mask any symptoms and said she would be arriving at CCCC soon.  She instructed them to push fluids.  When she arrived, she went immediately to the waiting room.  The video shows (b)(6); (b)(7)(C) and the other medical staff person escorting HERNANDEZ out of the waiting room at **8:58 a.m.**

An addition to the vital signs section of the intake screening form timed **9:00 a.m.** documents the detainee's temperature was 102.0.  The entry is not signed or initialed.  (b)(6); (b)(7)(C) informed the review team that it was decided the detainee would be placed in a medical isolation room pending evaluation by the physician, not for housing but for comfort.  CCCC has two medical

---

[11] Ensure is a milk protein concentrate containing vitamins and minerals.
[12] Pedialyte reduces dehydration and restores fluids and minerals lost due to diarrhea and vomiting.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                                                    Page 9
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000277

isolation rooms, both equipped with negative pressure for respiratory isolation.  There is a video surveillance camera in the cell.   Video shows HERNANDEZ entering Isolation Room 1 at **9:06 a.m.** after it was cleaned and fresh linens were placed on the bed.  She laid on the bed and medical staff placed several blankets over her.

At **9:42 a.m.**, detainee HERNANDEZ was escorted out of the isolation room and into an examination room by [(b)(6); (b)(7)(C)]    In a medical record entry timed **10:00 a.m.** [(b)(6); (b)(7)(C)] documented completion of HERNANDEZ's medical/dental/mental health examination.  She did not use an interpreter because she reported during interview that she is fluent in Spanish.  Vital signs were taken and all were abnormal, as follows:  temperature 102, pulse 128, respirations 20 breaths, blood pressure 81/61, and pulse oxygen 92 percent.  [(b)(6); (b)(7)(C)]      noted detainee HERNANDEZ identified as transgender but had not taken hormones.   The detainee reported significant weight loss during the last four to six months and that she had not been treated for HIV.   She also reported she was not taking any medications and had no prior surgeries or hospitalizations; also, that she has difficulty sleeping and a history of depression.  The physical examination found HERNANDEZ was emaciated with increased amount of white phlyem[13], dry mucous membranes in mouth, multiple cavities, normal lymph nodes, coarse breath sounds in lungs, tachycardia,  normal bowel sounds, poor skin turgor, and muscle wasting.  [(b)(6); (b)(7)(C)] assessment was dehydration, starvation, untreated HIV, fever, and cough.  The treatment plan was to rule out infection secondary to HIV and pneumonia, obtain a chest x-ray, and transport to the local emergency department for intravenous (IV) fluids.   A mask was placed on HERNANDEZ to protect her from environmental viruses/bacteria; also, to protect staff as her TB status was unknown by CCCC.  Orders were written for the following laboratory tests to be completed at the hospital: complete blood count (CBC)[14]; rapid plasma reagin (RPR) with reflex[15]; comprehensive metabolic panel (CMP)[16]; thyroid stimulating hormone (TSH)[17]; hepatitis panel[18]; urinalysis for sexually transmitted diseases; HIV confirmation test with viral load[19]; and chest X-ray.

[(b)(6); (b)(7)(C)]      was asked about this encounter during interview.   Consistent with her documentation, [(b)(6); (b)(7)(C)] commented HERNANDEZ looked starved, tired and weak; that the

---

[13] Phylem is mucus excreted in abnormally large quantities.

[14] A CBC measures the levels of red blood cells, white blood cells, platelet (clotting cells) levels, hemoglobin (oxygen transport cells) and hematocrit (ratio of red blood cells to the total blood volume).

[15] An RPR detects syphilis.

[16] A CMP is a group of blood tests that provide an overall picture of the body's chemical balance and metabolism.

[17] TSH determines thyroid-stimulating hormone levels.

[18] A hepatitis panel finds markers of hepatitis infection.

[19] An HIV confirmation test with viral load measures the amount of HIV ribonucleic acid (RNA) in blood.  RNA is the genetic material that makes up certain viruses.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                     Page 10
Medical and Security Compliance Analysis
September 28, 2018






DHS-ICE-19-0196, 19-0197-A-000278

 muscles in her face were wasted; and that she appeared to have suffered from long term protein and calorie malnutrition. Her breathing sounded "rough" and her mouth and eyes were dry. Dr. (b)(6); said that despite these observations, HERNANDEZ was alert and "making sense." The detainee told her she had been diagnosed with HIV at a clinic in Honduras. She reported that she managed to escape and was hiding from Honduran gangs who had prostituted her. She decided to join the caravan to the U.S. rather that returning to the Honduran clinic for HIV treatment because the gangs were looking for her and she believed they might be waiting there.

(b)(6); (b)(7)(C) order for HERNANDEZ's transfer to CGH specifies she was to be transported by facility vehicle. Asked about this decision, (b)(6); (b)(7)(C) said that after due consideration, she decided in favor of transport by facility vehicle rather than an ambulance based on the following:

- Though the detainee was very sick, she did not require medical supervision by emergency services personnel or life sustaining equipment during transport.
- She believed the detainee would arrive at the hospital more quickly if taken by facility vehicle.
- Cibola County is a small, rural county with only one ambulance. Having determined HERNANDEZ could safely be transported in a facility vehicle, (b)(6); (b)(7)(C) did not want to tie up the ambulance in case it was needed for a patient with more acute urgent care needs.

(b)(6); (b)(7)(C) told the review team that acting under the assumption that the detainee would be going to the hospital, she notified security of the possible transport while (b)(6); (b)(7)(C) was conducting the physical examination. (b)(6); (b)(7)(C) prepared the necessary paperwork and copies of HERNANDEZ's medical record for the officers to take to the hospital.

The video shows that at **10:09 a.m.**, detainee HERNANDEZ returned to Isolation Room 1 wearing a paper mask and laid down. At **10:52 a.m.**, she walked out of the room and sat in a wheelchair at the doorway. She was then wheeled off the medical unit and out through the Fire Exit.

Video from the vehicle sallyport camera shows that at **10:59 a.m.**, a van entered and backed up to the intake exterior door. At **11:07 a.m.**, a supervisor is seen verifying HERNANDEZ's identity to authorize her transfer to the hospital, and at **11:08 a.m.**, she was placed in the van. The view of the vehicle from the sallyport camera was partially obscured but escorting staff verified she was able to enter the van unassisted. At **11:13 a.m.**, the van entered the vehicle sallyport and following search, exited at **11:20 a.m.** en route to Cibola General Hospital (CGH).

AMERICAN OVERSIGHT

[(b)(6); (b)(7)(C)] was assigned to escort HERNANDEZ to the hospital. He recalled on interview that she was taken outside in a wheelchair and when he asked if she could walk to the van, she said yes. [(b)(6); (b)(7)(C)], the second transport officer, stated on interview that when detainee HERNANDEZ entered the van she just wanted to lay down and was told she could. [(b)(6); (b)(7)(C)] said the detainee spoke no English. Both officers reported that upon arrival at the hospital, HERNANDEZ was able to walk from the vehicle to the Emergency Department. An entry in the hospital logbook documents the time of arrival was **11:44 a.m.** According to [(b)(6); (b)(7)(C)] detainee HERNANDEZ was able to walk to the ER but did so slowly. Officer [(b)(6);] reported she was alert and talking and that hospital staff placed her in a curtained area where she drank some water.

In a memorandum prepared by [(b)(6); (b)(7)(C)] following HERNANDEZ's death, she wrote CGH personnel reported at **2:30 p.m.** that the detainee was on IV fluids and antibiotics. She wrote that the hospital suspected sepsis and that the decision to admit HERNANDEZ was pending laboratory and radiology results.

The CGH record documents detainee HERNANDEZ was evaluated and the following actions were taken:
- Detainee HERNANDEZ was evaluated;
- Intravenous (IV) fluids were initiated;
- An electrocardiograph[20] (EKG) was done;
- Laboratory and radiology diagnostic tests were ordered;
- Acetaminophen was given to reduce temperature;
- Famotidine was given to reduce stomach acid;
- HERNANDEZ was catheterized as she was unable to void;
- IV antibiotics azithromycin and ceftriaxone were given; and,
- Vital signs were closely monitored and documented within the following ranges: temperature 104.9 to 101.1; pulse 92 to173; respirations 9 to 36; blood pressure 80/52 to 102/65; and pulse oxygen 88 to 100 percent.

Based on physical examination findings, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock[21]; dehydration; HIV infection; nodular pulmonary disease[22]; lymphadenopathy[23]; anemia[24]; and

---

[20] An EKG measures the heart's electrical impulses.
[21] Septic shock is a life threatening condition resulting from an infection throughout the body which can lead to organ failure and produces changes in temperature, blood pressure, heart rate, white blood cell count, and breathing.
[22] Nodular pulmonary disease is small masses in the lungs.
[23] Lymphadenopathy is enlarged lymph nodes.





thrombocytopenia[25]. Rapid HIV test was reactive confirming her HIV status. The ED physician determined detainee HERNANDEZ required a higher level of care than available at CGH and made arrangements to transfer her by air ambulance to Lovelace Medical Center (LMC) in Albuquerque, NM. Detainee HERNANDEZ's condition was listed as poor.

(b)(6); (b)(7)(C) said during interview that she was informed by CGH staff when it was determined the detainee was "way beyond" their ability to care for and that they were sending her to LMC. She indicated that the preferred option, University of New Mexico Hospital, had no beds. Dr. (b)(6); commented that by the time the detainee arrived at CCCC, the actions taken were "too little, too late"; possibly by as much as six months.

Per the hospital logbook, at **6:40 p.m.** (b)(6); (b)(7)(C) assumed vigil duty at CGH. (b)(6); (b)(7)(C) stated on interview that when she arrived, discussions about moving HERNANDEZ to LMC were underway. She reported one nurse explained the transfer details to the detainee in Spanish, then nursing staff prepared her for transfer.

The report of PHI Air Medical documents transport by air was decided upon because the trip would take approximately 35 minutes versus more than four hours by ground. (b)(6); (b)(7)(C) memorandum states the attending physician at CGH decided ground transportation was not appropriate, noting HERNANDEZ's blood pressure was low. (b)(6); (b)(7)(C) informed the review team that she was chosen to ride in the helicopter based on her body weight relative to (b)(6); (b)(7)(C) reported that the detainee was taken by stretcher to the helipad, and that she was placed in front next to the pilot. (b)(6); (b)(7)(C) sat in the back with two nurses, one of whom spoke Spanish. A logbook entry documents the group boarded the helicopter at **9:18 p.m.**

Per the PHI report, detainee HERNANDEZ was provided eye and ear protection when placed on the helicopter. The time of departure was **9:38 p.m.** per the PHI report and logbook entry. HERNANDEZ remained awake and alert and even smiling during transport. Her vital signs were monitored and documented as follows: pulse and pulse oxygen were within normal limits at 77 to 79 and 95 to 100 percent, respectively. HERNANDEZ's respirations were elevated at 20, and her blood pressure remained low as follows: 105/70; 101/76; 106/69; and 99/69.

**Note**: The line on the form where temperature was recorded is not legible.

The hospital logbook documents the helicopter landed in Albuquerque at **10:05 p.m.** Sergeant (b)(6); told the review team that the helicopter was met on the Heart Hospital helipad by an

---

[24] Anemia is a decreased number of blood cells.
[25] Thrombocytopenia is a low level of platelets, the cells that help the blood clot.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                    Page 13
Medical and Security Compliance Analysis
September 28, 2018





ambulance, and the two nurses accompanied the detainee in back. (b)(6); (b)(7)(C) sat in front with the driver.  Per the report of Superior Ambulance Service, the trip to from the helipad to LMC took three minutes and was completed without incident.

An entry to the hospital logbook documents the ambulance arrived at LMC at **10:14 p.m.** and HERNANDEZ was taken through the emergency room to the intensive care unit (ICU) where she was placed in a negative pressure room.  Per (b)(6); (b)(7)(C), the detainee was alert and talking and asked for food.  She was told no until testing was completed.  At **10:50 p.m.**, Officer (b)(6); who drove the facility vehicle from CHG, arrived at LMC.

Detainee HERNANDEZ remained at LMC until her death on May 25, 2018[26].   The following information is based on officers' log entries, information reported during interviews, and entries in the medical record summarizing updates received by CCCC health care personnel.   In addition, the afore-referenced summary memorandum prepared by (b)(6); (b)(7)(C) following the detainee's death is referenced when it provides information not included in medical record entries.

## May 18, 2018
In a **12:45 p.m.** progress note, (b)(6); (b)(7)(C) wrote that the ICU nurse reported HERNANDEZ was in isolation because her low blood counts made her vulnerable to opportunistic infections; also, because her TB status was unknown.   Sputum samples were being collected to test for TB.

> **Note**:  As discussed above, a Scripps Medical Center report documents a chest X-ray completed while HERNANDEZ was in CBP custody was negative for TB and that there was no evidence of active infection.

The ICU nurse also reported that the physician's treatment plan included consulting with infectious disease specialists and administering broad spectrum antibiotics[27], and that laboratory test results were awaited.  HERNANDEZ's hydration status was improved but her HIV status remained guarded.  (b)(6); (b)(7)(C) summary memorandum adds that the detainee was on IV fluids and Levophed for stabilization of blood pressure; also, that a computed tomography scan (CT) of the abdomen would be done to rule out an abscess.

Officers' logbook entries document nurses conducted routine checks, and that the CT scan was completed at **1:45 p.m.**  At **2:38 p.m.**, (b)(6); (b)(7)(C) resumed vigil duty and stated on interview that it seemed HERNANDEZ was doing a little better.  She had brushed her hair and was talking

---

[26] The LMC medical record was not provided to reviewers.

[27] Broad spectrum antibiotics are piperacillin/tazobactam and vancomycin.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                        Page 14
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000282

more.  She seemed comfortable and staff said she had slept most of the night, although the sergeant heard medical staff say she had a fever.

(b)(6); (b)(7)(C) memorandum documents an update was received at **9:30 p.m.**  The detainee's vital signs were stable and she was reportedly hungry and able to eat and take fluids.

**May 19, 2018**
Entries to the hospital log document no unusual incidents this date.  A visit by a chaplain was logged at **10:16 a.m.**, and at **3:48 p.m.**, the detainee was taken for CT scan.

In her memorandum, (b)(6); (b)(7)(C) wrote that the first update for the day was provided at **5:30 p.m.**  She wrote HERNANDEZ was oriented and stable with a good appetite, but her fever spiked at 104 during the day.  She was receiving IV fluids, antibiotics, and blood pressure medication.  A CT scan of the neck was performed due to enlarged lymph nodes with results expected the next day.

(b)(6); (b)(7)(C) documented in a **10:45 p.m.** progress note that the LMC nurse reported HERNANDEZ was feeling better and eating well.  A chest X-ray was negative for TB and the third and final sputum test was to be done the next day.  (b)(6); (b)(7)(C) summary memorandum covers this update as well, adding that the abdominal CT showed an enlarged spleen and peritoneal[28] lymph nodes.  She noted (b)(6); (b)(7)(C) reported the concern was T-cell[29] lymphoma[30] and that the detainee would probably need fine needle biopsies.  The detainee's CD4 count was 189[31].

**May 20, 2018**
(b)(6); (b)(7)(C) memorandum documents that (b)(6); (b)(7)(C) received a morning update at **8:40 a.m.**  HERNANDEZ remained stable and there was no change in her condition.

A hospital logbook entry documents that at **11:25 a.m.**, the doctor stated HERNANDEZ may need surgery the following day. The detainee ate lunch and watched television after **1:00 p.m.**  In the afternoon, the detainee slept and later ate dinner.

---

[28] Peritoneal refers to the serous membrane lining of the walls of the abdomen and pelvic cavities.

[29] T-cell is a type of lymphocyte/white blood cell in the immune system to fight infection.

[30] Lymphoma is a type of blood cancer.

[31] HIV infection advances to AIDS when there are less than 200 CD4 T-cells per millimeter of blood.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                    Page 15
Medical and Security Compliance Analysis
September 28, 2018





(b)(6);
(b)(7)(C) documented an evening update timed **10:30 p.m.** in her memorandum.  She wrote the detainee was afebrile[32] and no longer on medication to maintain her blood pressure.   A needle biopsy was planned for Monday.

**May 21, 2018**

Officers' log entries document that HERNANDEZ was taken for pre-operative preparation at **1:35 p.m.** and to the operating room at **2:09 p.m.**  (b)(6); (b)(7)(C) memorandum documents a **3:45 p.m.** update indicating HERNANDEZ had axillary lymph node removal for biopsy and was stable.  Sputum smears for TB were negative.

The hospital log documents that at **3:38 p.m.**,  (b)(6); (b)(7)(C)  conducted a routine administrative visit.  At **3:58 p.m.**, the detainee was returned to the ICU from the recovery room.  At **7:49 p.m.**, the vigil officer wrote that the detainee was awake and watching television.  She fell asleep at **10:45 p.m.**

**May 22, 2018**

(b)(6), (b)(7)(C) memorandum documents a **9:40 a.m.** update indicating HERNANDEZ was stable following axillary lymph node removal.  Her fever spiked at 102.2 the night before and she was receiving Bactrim[33] once a day and a penicillin[34] injection weekly.   The detainee's blood pressure was lower and being maintained with IV fluids.  She remained in the ICU.

The hospital logbook documents that at **2:25 p.m.**, HERNANDEZ was taken for a lumbar puncture procedure[35] which began at **3:00 p.m.** and was completed at **3:27 p.m.**  The detainee returned to her room in the ICU at **3:41 p.m.**  Throughout the evening, the detainee watched TV or slept.

(b)(6); (b)(7)(C) documented in a progress note timed **5:45 p.m.** that detainee HERNANDEZ spiked a fever that afternoon and was receiving antibiotics; also, that she had no appetite but was drinking Ensure and that biopsy results were still pending.

> **Note**:  Completion of the lumbar puncture at 3:00 p.m. was not addressed in the 5:45 p.m. update given to 

---

[32] Afebrile means normal temperature.

[33] Bactrim is an antibiotic.

[34] Penicillin is an antibiotic.

[35] A lumbar puncture is a medical procedure in which a needle is inserted into the spinal canal, most commonly to collect cerebrospinal fluid.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                    Page 16
Medical and Security Compliance Analysis
September 28, 2018



**May 23, 2018**

Officers' log entries document HERNANDEZ ate breakfast, after which a nurse commented her heart rate was, "a little high due to eating." A **12:05 p.m.** entry documents the detainee still had a high fever but, "Still manages to smile and be thankful for having the nurses watch over her." At **2:00 p.m.**, the officer logged that that the detainee would be getting a blood transfusion and at **4:45 p.m.**, that the detainee had a CT scan.

At **7:38 p.m.**, (b)(6); (b)(7)(C) took over vigil duty. She recalled on interview that HERNANDEZ was sitting up and that it was her impression that the detainee was doing a lot better. A **9:32 p.m.** log entry documents a chest X-Ray was completed.

(b)(6); (b)(7)(C) documented in a progress note timed **10:30 p.m.** that an ICU nurse reported HERNANDEZ had had a high fever all day and a pulse exceeding 150. She remained on oral antibiotics but IV antibiotics may be resumed the next day. The biopsy results were not back; blood cultures showed no growth so far; and lumbar puncture was negative. In her memorandum, (b)(6); (b)(7)(C) wrote that they were unable to get an earlier report and summarized the information documented by (b)(6); (b)(7)(C)

> **Note**: A blood transfusion and CT scan documented in officers' logbook entries were not addressed in the 10:30 p.m. update given to (b)(6); (b)(7)(C)

**May 24, 2018**

In a progress note timed **11:00 a.m.**, (b)(6); (b)(7)(C) documented an update provided to her by an ICU nurse. She wrote that (b)(6); (b)(7)(C) was present during the conversation. (b)(6); (b)(7)(C) progress note and the HSA's memorandum document the following laboratory test and chest X-ray results:

- Blood culture showed no growth;
- RPR[36] positive;
- Malaria negative;
- Toxoplasmosis[37] negative;
- Negative for parasites;
- Urine culture and lumbar puncture both negative;
- Chest x-ray showed small bilateral plural effusion[38].

(b)(6); (b)(7)(C) documented the detainee's condition was serious with guarded prognosis due to HIV status, poor nutritional status for two years, fever of unknown origin, pleural effusion, and

---

[36] RPR is a test for syphilis.
[37] Toxoplasmosis is an infectious disease caused by the one-celled protozoan parasite.
[38] Bilateral plural effusion is characterized by an abnormal amount of fluid around the lungs.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                          Page 17
Medical and Security Compliance Analysis
September 28, 2018





lymphadenopathy suspicious for T-cell lymphoma. (b)(6); (b)(7)(C) memorandum documents that HERNANDEZ's highest heart rate the night before was 150 with a temperature of 104.5, and that Tylenol and a cooling blanket were used to bring down her temperature. (b)(6); wrote that the detainee's condition at the time of the update was critical.

(b)(6); (b)(7)(C) was assigned to vigil duty on the day shift. She documented in the logbook that at **1:10 p.m.**, detainee HERNANDEZ told the nurse she felt congested and was having difficulty breathing. At **1:24 p.m.**, a breathing treatment was administered and at **1:30 p.m.**, an X-Ray was taken. At **1:34 p.m.**, an ultrasound was completed and at **3:22 p.m.**, the detainee was taken to radiology to have fluid removed from her lungs. During interview, (b)(6); (b)(7)(C) stated a very large amount of fluid was removed from the detainee's lungs, and that HERNANDEZ was "very tough" throughout the procedure.

In her memorandum, (b)(6); wrote that at approximately 3:00 p.m., a thoracentesis[39] removed 1600 cc of fluid, 700 cc from one side of the chest and 900 cc from the other. By **4:00 p.m.** the detainee's pulse oxygen started falling, dropping to 74 percent, and she developed tachypnea[40], supra ventricular tachycardia[41], and an elevated blood pressure.

A **5:00 p.m.** entry to the logbook documents HERNANDEZ was coughing up a large amount of mucus. (b)(6); (b)(7)(C) stated during interview that she kept handing her napkins, commenting the detainee was wearing a breathing mask and tube but had difficulty breathing while she was coughing. She laid on her side and kept coughing, and (b)(6); (b)(7)(C) observed she looked "scared." At one point, (b)(6); (b)(7)(C) left to get more napkins and when she returned, the detainee could not hold back a cough and expelled mucus on her. (b)(6); (b)(7)(C) left the area and washed her face.

> **Note**: (b)(6); (b)(7)(C) was informed by reviewers that the institution's Exposure Control Plan provides information on counseling and blood testing if she has concerns about possible HIV exposure.

(b)(6); (b)(7)(C) was also on vigil at this time. On interview, he stated that the detainee's condition worsened after the procedure where they drained her lung. He concurred that the detainee was coughing a lot and had a lot of phlegm. At **5:35 p.m.**, (b)(6); (b)(7)(C) logged, "Detainee having a hard time breathing and coughing a lot of mucus." At **5:40 p.m.**, she logged that HERNANDEZ had a high heart rate and was having a hard time breathing. A **5:55 p.m.** entry documents the process of intubation[42] was started with eight medical staff assisting.

---

[39] Thoracentesis is a procedure to remove the fluid between the lung and chest wall.
[40] Tachypnea is very rapid respirations.
[41] Tachycardia is an abnormally rapid heartbeat.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                                Page 18
Medical and Security Compliance Analysis
September 28, 2018



AMERICAN OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000286

[b)(6); (b)(7)(C)] logged that the process was completed at **6:35 p.m.**, noting that medical staff had difficulty intubating the detainee because she "had a difficult airway." A **6:40 p.m.** entry documents a chest X-Ray was taken and at **7:07 p.m.**, HERNANDEZ was sedated.

> **Note**: [b)(6); (b)(7)(C)] memorandum documents the decision to intubate was not made until 7:45 p.m., approximately two hours after the time [b)(6); (b)(7)(C)] documented the process was started. Specifically, she wrote, "At approximately 1945 the decision was made to intubate, sedated, and place the patient on a ventilator. Patient also had a central line[43] placed."

During interview of [b)(6); (b)(7)(C)] she said that when she arrived for her shift at **7:40 p.m.** and observed the detainee's condition, she thought, "What happened?" She stated HERNANDEZ was hooked up to medical equipment and was not responsive. [b)(6); (b)(7)(C)] documented in the logbook that the head nurse told her HERNANDEZ "is paralyzed due to condition and is on life support in critical condition." The nurse told the sergeant that the detainee could code during the night.

[b)(6); (b)(7)(C)] documented that at **10:10 p.m.** detainee HERNANDEZ developed bradycardia[44] and pulseless electrical activity (PEA)[45]. Hospital staff was present and immediately started chest compressions, multiple doses of epinephrine[46] were administered, and the detainee was revived by 10:16 p.m. Detainee HERNANDEZ then developed supraventricular tachycardia (SVT)[47] and Adenosine[48] was administered but not effective. Metoprolol was also given to lower the detainee's blood pressure.

## May 25, 2018

A logbook entry documents that at **12:48 a.m.**, detainee HERNANDEZ coded again. Hospital staff performed cardiopulmonary resuscitation (CPR), used the automated external defibrillator (AED) and gave the detainee medications. At **1:07 a.m.**, detainee Hernandez coded again. At **1:18 a.m.**, the officer documented in the logbook that the nurse stated the detainee was stable. However, at **1:23 a.m.**, the detainee again coded. Hospital staff started but discontinued chest compressions at **1:27 a.m.**, performing rescue breaths only.

---

[42] Intubation is placement of a flexible plastic tube into the trachea to maintain an open airway to facilitate ventilation of the lungs.
[43] Placement of a central line refers to the placement of a catheter into a large vein for fluid replacement and intravenous medication administration.
[44] Bradycardia is an abnormally slow heartbeat.
[45] PEA means there is electrical activity, but the heart does not contract.
[46] Epinephrine constricts blood vessels, which increases blood pressure and increases heart rate.
[47] SVT is an abnormally rapid heart rate.
[48] Adenosine is used to convert SVT to normal.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                    Page 19
Medical and Security Compliance Analysis
September 28, 2018





At **1:33 a.m.**, LMC Nurse Practitioner (NP) (b)(6); (b)(7)(C) stated he wanted to stop all procedures. (b)(6); (b)(7)(C) stated during interview that (b)(6); (b)(7)(C) asked the officers for a contact number for ICE or CCCC as he needed direction regarding continued resuscitation efforts. (b)(6); (b)(7)(C) documented in the CCCC medical record that (b)(6); (b)(7)(C) called at 1:30 a.m. to report that detainee HERNANDEZ had been coding every five minutes, had poor brain function, and that all means of treatment were exhausted. The NP stated that because the detainee had no known family, he was looking for direction from the responsible party. (b)(6); (b)(7)(C) told the NP she would relay the message to the HSA and ICE Field Medical Coordinator (FMC) (b)(6); (b)(7)(C)   She documented the notifications were made within 12 minutes. (b)(6); informed the review team that the FMC called the NP and gave direction to continue resuscitation efforts because the detainee did not have a Do Not Resuscitate order on file.

Log entries document that HERNANDEZ coded at **1:44 a.m.**, **2:22 a.m.**, **3:02 a.m.**, **and 3:04 a.m**. Each time, CPR was performed until the detainee regained a pulse. At **3:29 a.m.**, HERNANDEZ coded again. At **3:32 a.m.**, death was pronounced. (b)(6); (b)(7)(C) documented notification of the detainee's death by FMC (b)(6); and Commander (b)(6); (b)(7)(C) shift supervisor.

> **Note**: (b)(6); (b)(7)(C) memorandum documents death at 3:32 a.m. was pronounced by two hospital physicians. The names were not provided.

At **5:47 a.m.**, hospital security staff arrived to move HERNANDEZ's body to the morgue on the ground floor of the hospital. CCCC vigil officers observed the body being placed in the morgue and then returned to CCCC. Both (b)(6); (b)(7)(C) stated they were provided with information on the employee assistance program (EAP) hotline. (b)(6); (b)(7)(C) stated the EAP number is posted in medical and she ensured healthcare staff knew the service is available. During interview of (b)(6); (b)(7)(C) she shared that the staff were taking HERNANDEZ's death very hard because she was so sweet and nice.

On the day of the detainee's death, (b)(6); (b)(7)(C) assigned Facility Investigator (b)(6); (b)(7)(C) to review events from HERNANDEZ's intake through her departure for CGH to assess staff compliance with policies and procedures. (b)(6); (b)(7)(C) shared during interview he started as CCCC's investigator a year ago following a 30 year career in law enforcement, 27 years with the New Mexico State Police and three years as police chief in Grants, NM, a nearby community. He said he watched all pertinent video and noted HERNANDEZ waited a long time in both the intake and medical waiting areas. He nonetheless concluded policies and procedures were followed. He documented his findings in a two page report submitted to the warden on May 29, 2018.

Creative Corrections

AMERICAN OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000288

 stated a mortality review was conducted and the report was sent to CCS headquarters. She stated the report could not be shared with the review team, but reported participating staff included the warden, associate warden, physician, HSA, DON, quality improvement RN, and infectious disease RN.

According to [b)(6)] the preliminary cause of death was cardiac arrest.  The death certificate and autopsy report were not available at the time of the site visit.

## CONCLUSIONS

### Medical

Two days after HERNANDEZ requested asylum at the San Ysidro Port of Entry, a CBP officer completed an in-processing medical screening form, identifying her as HIV positive and without medications.  A physical examination completed by a physician the same day noted her HIV status, weight loss, cough, headache, and elevated heart rate.  She was sent to a hospital to rule out sepsis and active infection.   The hospital report documents a chest X-ray was normal and there was no clinical evidence of TB; however, HERNANDEZ was found to have bronchitis. Hospital instructions included Tylenol for fever, antibiotics, and an inhaler.  Reviewers do not know whether the medications were provided and given by CBP.

ERO accepted custody of HERNANDEZ three days after she was examined at the hospital, May 14, 2018.  She arrived at CCCC approximately 56 hours later.  During that time, she did not come into contact with medical professionals because she was in transit between multiple locations pending her ultimate arrival at CCCC; also, because she reportedly did not report and officers did not observe any medical conditions of concern.  Medical transfer summaries from SLRDC and EPSPC provide no medical information, including TB clearance, documenting in pre-printed format only that HERNANDEZ was in ERO custody less than 72 hours.  Based on reported information and documentation, the May 11, 2018 physical examination report referencing a productive cough and Scripps hospital report documenting TB clearance and diagnosis of bronchitis, with medications, were not available to SLRDC, EPSPC, and CCCC. ERO personnel reported that if the documentation and/or medications was provided by CBP when custody was transferred to ERO, it would have accompanied HERNANDEZ during each step of the transportation process.   ERO personnel also reported that if any transportation, SLRDC, or EPSPC officers became aware of any medical concerns during the 56 hours HERNANDEZ was in ERO custody, notification of healthcare professionals would have been expected.



AMERICAN
OVERSIGHT

Detainee HERNANDEZ's medical screening at CCCC was initiated approximately 11 hours after video shows her exiting the transport vehicle with 18 other transgender detainees.   When vital signs were found abnormal, she was appropriately given priority for full screening by an RN.  Interpretation assistance was used and documented.  The RN informed the DON and HSA of the vital signs and that HERNANDEZ reported she was HIV positive, had a persistent cough, significant weight loss over several weeks, and appeared malnourished and dehydrated.  In turn, the HSA notified the physician. Upon reporting to the facility, the physician promptly examined HERNANDEZ and diagnosed untreated HIV, dehydration, starvation, and fever with a cough. The physician ordered detainee HERNANDEZ's transport to the local hospital by facility vehicle for IV fluids and to rule out infection secondary to HIV and pneumonia.   The physical examination was started approximately an hour and a half after the intake screening and the detainee was moved to the facility vehicle for transport approximately 50 minutes thereafter. This demonstrates that CCCC staff acted with due haste once HERNANDEZ was seen by medical professionals.

Following the detainee's transport to CGH, then to LMC, the physician and HSA proactively kept abreast of her condition, diagnostic testing, and treatment.  The physician documented the updates she received in the medical record; the HSA did not but included them in a summary memorandum prepared after HERNANDEZ's death.

CCCC health care staff were notified of EAP services, and a mortality review involving key medical and security personnel was reportedly conducted.

**Compliance Findings**

The reviewer identified no deficiencies in the ICE 2011 PBNDS, Medical Care, revised 2016.

**Area of Note**

During the 56 hours HERNANDEZ was in transit between the San Ysidro Port of Entry and CCCC, she was held in two detention facilities for a total of approximately 24 hours; SLRDC for six and EPSPC for approximately 18.   Because the Medical Care standard is specific to facilities holding detainees more than 72 hours, its requirements do not apply in this case.  Evaluating compliance with ERO directives or contract requirements governing transportation of detainees in transit to their ultimate destination is beyond the scope of this analysis; however, ERO personnel informed reviewers that officers are expected to report medical concerns or complaints to health care professionals. Absent documentation of any concerns, it appears none were voiced by the detainee or observed by officers.   However, it is noteworthy and of concern that HERNANDEZ was immunocompromised and ill when SLRDC transportation officers assumed custody on behalf of ERO and by the time she reached CCCC, was so ill that a physician ordered





her immediate transport to the emergency room.   It is unknown whether medications for bronchitis were started while HERNANDEZ remained in CBP custody but if they were, they are unlikely to have run their course and were not provided to the SLRDC officers who assumed custody at San Ysidro.

Because CCCC did not have documentation of TB clearance and because HERNANDEZ's symptoms upon arrival were suggestive of the disease, she was tested at the hospital and was again confirmed negative.  Although she did not have TB, that fact was not known during the 56 hours spent in ERO custody before she arrived at CCCC.  Whether or not noted by transportation officers and staff at SLRDC and EPSPC, there can be no question that HERNANDEZ's productive cough continued while she was in transit.  Whereas Scripps Mercy Hospital cleared her for travel and incarceration, it is possible her bronchitis may have been determined non-contagious.  However, had she had TB, the officers and detainees with whom she came in contact would have been exposed to the highly communicable and dangerous disease.

Reviewers recommend implementation of basic medical screening procedures, including TB symptom screening, by transport officers and personnel at facilities holding detainees in transit.

## Safety and Security

Video shows detainee HERNANDEZ exited a bus with 18 other transgender detainees at 8:13 p.m. on May 16, 2018.  She entered the facility 30 minutes later and over the course of the next five and half hours, security processing for HERNANDEZ and the other detainees was completed.   Translation services were not used during security processing, despite the fact that all staff acknowledged detainee HERNANDEZ spoke no English.    In addition, with exception of the handbook receipt, the forms she signed acknowledging understanding of information provided were in English.

In preparation for the medical intake screening, health care staff took the detainee's vital signs five hours after she was moved to the medical waiting area.  When it was determined she should be moved to an isolation cell for her comfort pending physical examination, security personnel assisted.  After the examination, security staff facilitaed the detainee's transport to the local hospital in a facility vehicle.  There were no identified delays.  Later, she was airlifted by helicopter to a hospital in Albuquerque.  Vigil officers appropriately documented events at both hospitals in a logbook.

A review of staff's actions was completed by the facility investigator.   The review included analysis of pertinent video surveillance footage.




**Compliance Findings**

The reviewer identified no deficiencies in the ICE 2011 PBNDS, revised 2016 governing safety and security.

**Area of Concern**

Security personnel did not use interpretation assistance to complete the intake process and with one exception, all forms signed by the detainee were in English.  Because admission processing includes conveyance of information and signing of documents acknowledging understanding, reviewers recommend reinforcement of the expectation to use language interpretation assistance; also, translation of acknowledgment of understanding statements in languages most commonly spoken by ICE detainees.






October 12, 2021

**VIA ONLINE PORTAL**

The Privacy Office                          Freedom of Information Act Office
U.S. Department of Homeland Security        U.S. Immigration & Customs
Headquarters & Office of Civil Rights &     Enforcement
Civil Liberties                             500 12th Street SW, Stop 5009
245 Murray Lane SW                          Washington, DC 20536-5009
STOP-0655                                   Via Online Portal
Washington, DC 20528-0655
Via Online Portal

**Re: Freedom of Information Act Request**

Dear FOIA Officers:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the
implementing regulations of your agency, American Oversight makes the following
request for records.

Conditions faced by individuals held in immigration detention remain an urgent public
concern. In fiscal year 2020, 21 individuals died in U.S. Immigration & Customs
Enforcement (ICE) custody, the highest number of deaths since 2005[1] and a significant
increase in deaths from the previous year, despite a much smaller detainee population.[2]
The ongoing threat posed by the Covid-19 pandemic exacerbates existing concerns,
particularly as the number of individuals detained by ICE has increased nearly to pre-
pandemic levels.[3]

American Oversight seeks records with the potential to shed light on the treatment and
care of individuals held in immigration detention, including those who have died in
federal custody.

---

[1] Catherine Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*,
CNN (updated Sept. 30, 2020, 8:11 AM), https://www.cnn.com/2020/09/30/us/ice-
deaths-detention-2020/index.html.
[2] Lise Olsen, *Deaths in ICE Custody Skyrocketed During the COVID-19 Pandemic*, TX
Observer (Jan. 20, 2021, 10:36 AM), https://www.texasobserver.org/deaths-in-ice-
custody-skyrocketed-during-the-covid-19-pandemic/.
[3] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the
U.S.*, N.Y. Times (updated Aug. 12, 2021),
https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

A complete copy of any ICE Health Service Corps "Event Review," "Root Cause Analysis," or "Action Plan," completed for each of the following individuals who died in ICE custody:

| | | | |
|---|---|---|---|
| 1. | Gourgen Mirimanian | 21. | Orlan Ariel Carcamo-Navarro |
| 2. | Roxsana Hernandez | 22. | Ramiro Hernandez-Ibarra |
| 3. | Huy Chi Tran | 23. | Carlos Ernesto Escobar-Mejia |
| 4. | Efraín Romero de la Rosa | 24. | Óscar López Acosta |
| 5. | Augustina Ramirez-Arreola | 25. | Choung Woong Ahn |
| 6. | Wilfredo Padron | 26. | Santiago Baten-Oxlaj |
| 7. | Mergensana Amar | 27. | Onoval Perez-Montufa |
| 8. | Guerman Volkov | 28. | Luis Sanchez-Perez |
| 9. | Abel Reyes-Clemente | 29. | James Tomas Hill |
| 10. | Simratpal Singh | 30. | Kuah Hui Lee |
| 11. | Pedro Arriago-Santoya | 31. | Jose Freddy Guillen Vega |
| 12. | Roberto Rodriguez-Espinoza | 32. | Fernando Sabonger-Garcia |
| 13. | Nebane Abienwi | 33. | Cipriano Chavez Alvarez |
| 14. | Roylan Hernandez-Diaz | 34. | Romien Jally |
| 15. | Anthony Oluseye Akinyemi | 35. | Anthony Jones |
| 16. | Samuelino Mavinga | 36. | Felipe Montes |
| 17. | Ben James Owen | 37. | Jesse Dean |
| 18. | Alberto Hernandez-Fundora | 38. | Diego Fernando Gallego-Agudelo |
| 19. | David Hernandez-Colula | | |
| 20. | Maria Celeste Ochoa-Yoc De Ramirez | | |

An example of an "Event Review, Root Cause Analysis/Action Plan" is included as Exhibit A to aid your search.

Please provide all responsive records from April 10, 2018, through the date the search is conducted.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to

DHS-21-1423

public understanding of operations or activities of the government."[4] The public has a significant interest in the treatment and care of individuals held in immigration detention.[5] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including the extent to which conditions within ICE facilities may have contributed to the deaths of these individuals. American Oversight is committed to transparency and makes the responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[6] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[7]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[8] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[9] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[10] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and

---

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] *See supra*, notes 1–3.

[6] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[7] American Oversight currently has approximately 15,630 page likes on Facebook and 108,500 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Oct. 12, 2021); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Oct. 12, 2021).

[8] *See generally News*, American Oversight, https://www.americanoversight.org/blog.

[9] *Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[10] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g.*, *CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

DHS-21-1423

analyses of what those records reveal;[11] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[12] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[13]

Accordingly, American Oversight qualifies for a fee waiver.

### Guidance Regarding the Search & Processing of Requested Records

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs, as well as letters, emails, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted

---

[11] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.
[12] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.
[13] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

DHS-21-1423

using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[14] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official systems or if officials have, by intent or through negligence, failed to meet their obligations.[15]

- Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[16] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

- In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

- Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

---

[14] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[16] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-1423

**Conclusion**

If you have any questions regarding how to construe this request for records or believe
that further discussions regarding search and processing would facilitate a more
efficient production of records of interest to American Oversight, please do not hesitate
to contact American Oversight to discuss this request. American Oversight welcomes
an opportunity to discuss its request with you before you undertake your search or
incur search or duplication costs. By working together at the outset, American
Oversight and your agency can decrease the likelihood of costly and time-consuming
litigation in the future.

Where possible, please provide responsive material in an electronic format by email.
Alternatively, please provide responsive material in native format or in PDF format on
a USB drive. Please send any responsive material being sent by mail to American
Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will
accelerate release of responsive records to American Oversight, please also provide
responsive material on a rolling basis.

We share a common mission to promote transparency in government. American
Oversight looks forward to working with your agency on this request. If you do not
understand any part of this request, please contact Hart Wood at
foia@americanoversight.org or 202.919.6303. Also, if American Oversight's request for
a fee waiver is not granted in full, please contact us immediately upon making such a
determination.

Sincerely,

*/s/ Hart Wood*
Hart Wood
on behalf of
American Oversight

DHS-21-1423

# EXHIBIT A

# ICE Health Service Corps
## Event Review, Root Cause Analysis/Action Plan

| Facility: | Date & Time Event Discovered: | Location of Event: | Type of Event: |
|---|---|---|---|
| Choose a facility.          Houston | 6/30/2019 | Dorm | Unanticipated Death |

**Brief Summary of Event** *(Use page 3 of this document to provide the Sequence of Events)*:

Balderamo-Torres, Yimi A# 206179679

"At 0538, RNs were on site for sick call rounds. Core civic called an emergency at 0539. At 0540, both RNs were in the dorm and found detainee lying in bed, unresponsive to stimuli." Vital signs: "During routine assessment, detainee was pulseless and without spontaneous respirations. EMS assessed blood sugars: 36 mg/dl and 78 mg/dl."

"At 0538, RNs were on site for sick call rounds. Core civic called an emergency at 0539. At 0540, both RNs were in the dorm and found detainee lying in bed, unresponsive to stimuli and cyanotic. RNs immediately moved detainee to the floor for initiation of CPR; right radial and left carotid were found to be pulseless. CPR initiated at 0541 and instruction was given to Core Civic to call 911. 911 called at 0542. Emergency equipment arrived to dorm and AED placed on detainee at 0543, as well as, ambu-bag with oxygen. After approximately 15 rounds of CPR, some bloody drainage noted from side of mouth and nose. During compressions, detainee's head was turned to right side to clear airway; no pooling of blood noted to back of mouth; head repositioned for oxygenation. First responders arrive at 0555. CPR was maintained continuously until first reponders took over at 0556. At that time, responders continued CPR and applied their own AED device, intubated detainee and used oxygen. Responders applied EKG; blood sugar was assessed and found to be 36 mg/dl. Responders administered D50 fluids and epinephrine twice. Blood sugar reassessed by responders at 0610 and found to be 78 mg/dl. Responding teams continue CPR attempts on detainee while leaving the dorm at 0615. "

| Severity Score | Probability Score | Risk score |
|---|---|---|
| ☒ Negligible (1) | ☒ Rare (1) | ☒ Low (1-3) |
| ☐ Minor (2) | ☐ Unlikely (2) | ☐ Moderate (4-6) |
| ☐ Moderate (3) | ☐ Possible (3) | ☐ High (8-12) |
| ☐ Major (4) | ☐ Likely (4) | ☐ Extreme (15-25) |
| ☐ Catastrophic (5) | ☐ Almost certain (5) | |

*Severity score multiplied by probability score equals risk score*

| ☒ Event Review Only | ☐ Full RCA |
|---|---|

**Outcome of Event:**

| ☒Death | ☐ Permanent Harm | ☐ Severe Temporary Harm | ☐ No Significant Harm with Additional Monitoring | ☐ No Harm |
|---|---|---|---|---|



# ICE Health Service Corps
## Event Review, Root Cause Analysis/Action Plan

HEADQUARTERS USE ONLY

| Assigned HQ Risk Manager | Assigned FHPM | Assigned RCS | Assigned HSA/AHSA | Date RCA Initiated |
|---|---|---|---|---|
| (b)(6); (b)(7)(C) | | | | Click here to enter a date. |



AMERICAN OVERSIGHT

DHS-20-0638-F-000278

2020-ICLI-00057   2336

## ICE Health Service Corps
## Event Review, Root Cause Analysis/Action Plan

### Sequence of Events Log

| Date | Time | Provider | Sequence of Events |
|------|------|----------|--------------------|
| 6/6/2019 | 23:00 | RN | Intake screening performed at MONTGOMERY Processing Center. Pain assessment and all screenings were negative/within normal limits [WNL] (to include: medical screening, trauma screening, substance abuse screening, oral and mental health screening). He denied a past medical history<br><br>Pt complained of "rash on b/l arms and on the abdomen said he had mosquito bites when he was coming through the desert."<br><br>Review of systems negative except "SKIN: Rash admits, on the extremities b/l arms and abdomen. , that is moderate."<br><br>Vitals 98.6 Temp (T), 61 Heartrate (HR), 104/64 Blood pressure (BP), 17 respirations (R), 119.2 lbs and 98% O2 sat. Patient was noted to be oriented to person, place, time and situation.<br><br>The intake exam was WNL. Assessment was documented as "risk for impaired skin integrity."<br><br>RN documented, "Disposition: Medically cleared, f/u visit scheduled, pending cxr."<br><br>(Incidental finding: RN documented "No" to the templated response "skin broken out in bumps/rash observed") |
| 6/6/2019 | 23:00 | RN | Prescreening normal. Disposition: Not documented |
| 6/7/2019 | 07:43 | APP | Physical exam performed by APP. APP documented that the pt had, "significant health history, but was bitten by mosquitoes on his way into the country and is requesting for a cream for it, especially on his arms and his body."<br><br> The detainee denied a medical and surgical history. Review of symptoms indicated, "Itching admits, that is moderate to arms and body.  Rash admits, on the trunk, on the extremities, that is moderate."<br><br>Vital signs: 98.2T, 53 HR, 127/75 HR, 120.8 lbs, and 98% O2 sat<br><br>Patient's physical exam was normal except: "SKIN: Generalized scattered erythematous rashes on trunk, BUE and legs with healing nail scratch marks, no infections noted." |



# ICE Health Service Corps
## Event Review, Root Cause Analysis/Action Plan

| | | | |
|---|---|---|---|
| | | | Diagonsis: Bitten or stung by nonvenomous insect and other nonvenomous arthropods, initial encounter. Treatment: Hydrocortisone Cream 1%, (trunk, arms, legs) BID 14 days and ammonium lactate cream 12% (trunk, arms, and legs) BID 90 days<br><br>Pt was "educated on assessment; Tx plan; prescribed MEDS and their side effects; patient verbalized understanding." Follow up scheduled for 1 year. Pt was medically cleared for custody. |
| 6/18/2019 | 10:58 | RN | Transfer summary completed by RN |
| 6/18/2019 | 19:02 | LVN | Pre-screening completed. Pre-screeing was normal. Disposition: Pre-Screening: No Priority (incidental finding-LVN did not update the medication question to "yes") |
| 6/18/2019 | 21:54 | LVN | Intake screening performed at HOUSTON Contract Dentention Facility. Pain assessment and all screenings were negative/within normal limits (to include: medical screening, trauma screening, substance abuse screening, oral and mental health screening)<br><br>Review of systems negative. Vitals 98.9T, 72 min, 130/77 HR, 16 respirations, 125.8 lbs, and 99% O2 sat<br><br>The intake exam was WNL. LVN documented, "Disposition: Medically cleared for custody." RN co-signature noted at 06:09 on 6/20/19. |
| 6/29/2019 | 10:00 | RN | Physical exam (simple) performed by RN. The detainee denied a medical and surgical history. Review of symptoms was negative (WNL)<br><br>Vital signs: 98.1T, 84 HR, 136/83 HR, 18 respirations, 126.6 lbs, and 100% O2 sat<br><br>Patient's physical exam was normal. Skin exam was documented as, "SKIN: normal, no rash or evidence of infection."<br><br>Assessment: "Encounter for general adult medical examination without abnormal findings - Z00.00 (Primary)" Follow up 1 year<br><br>MD signed off on exam 7/1/19: "07/01/2019 08:00 > No obvious conditions, Detainees encounters reviewed from arrival at MPC to passing on 06/30/2019, denied past medical history. Only reported complaint of rash on body and arms" |
| 6/30/2019 | 06:02 | RN | ER referral note. Patient was unresponsive. Treatment documented as "Referral to-Ambulance Land; Reason: Unresponsive"<br><br>Disposition: Referral to appropriate health care service for emergency treatment |



DHS-20-0638-F-000280

## ICE Health Service Corps
## Event Review, Root Cause Analysis/Action Plan

| | | | |
|---|---|---|---|
| | | | Notes: Transferred to ER via EMS<br><br>07/01/2019 04:36 AM "the note was locked by the health service administrator but completed by the RN" |
| 6/30/2019 | Time | RN | Doc/umenation as follows:<br><br>"At 0538, RNs were on site for sick call rounds. Core civic called an emergency at 0539. At 0540, both RNs were in the dorm and found detainee lying in bed, unresponsive to stimuli."<br><br>Vital signs: "During routine assessment, detainee was pulseless and without spontaneous respirations. EMS assessed blood sugars: 36 mg/dl and 78 mg/dl."<br><br>"At 0538, RNs were on site for sick call rounds. Core civic called an emergency at 0539. At 0540, both RNs were in the dorm and found detainee lying in bed, unresponsive to stimuli and cyanotic. RNs immediately moved detainee to the floor for initiation of CPR; right radial and left carotid were found to be pulseless. CPR initiated at 0541 and instruction was given to Core Civic to call 911. 911 called at 0542. Emergency equipment arrived to dorm and AED placed on detainee at 0543, as well as, ambu-bag with oxygen. After approximately 15 rounds of CPR, some bloody drainage noted from side of mouth and nose. During compressions, detainee's head was turned to right side to clear airway; no pooling of blood noted to back of mouth; head repositioned for oxygenation. First responders arrive at 0555. CPR was maintained continuously until first reponders took over at 0556. At that time, responders continued CPR and applied their own AED device, intubated detainee and used oxygen. Responders applied EKG; blood sugar was assessed and found to be 36 mg/dl. Responders administered D50 fluids and epinephrine twice. Blood sugar reassessed by responders at 0610 and found to be 78 mg/dl. Responding teams continue CPR attempts on detainee while leaving the dorm at 0615. " |
| Select date. | Time | Click here to enter text. | Click here to enter text. |

| Process Review | | | |
|---|---|---|---|
| **Process** | **Steps** (Document each step in the process) | **Process Vulnerabilities** (Behavioral Choices-reckless behavior, at risk behavior, human error, staffing, equipment, staff performance, communication,) | **Incidental/Contributing Factor/Root Cause** |
| Pre-screening | Step One: Nurse triage of patient and prioritize the patient<br>Step Two: Nurses document in eCW after seeing the patient (no computer | RN documented the pre-screening but did not update the eCW template to reflect that the detainee was prescribed 2 medications (template question not updated: "Are you taking any medications? No") | Incidental |



DHS-20-0638-F-000281

**ICE Health Service Corps**
**Event Review, Root Cause Analysis/Action Plan**

| | | | |
|---|---|---|---|
| | available in area used for pre-screening) | | |
| | Step Three: RN documents pre-screening within 2 hours and updates eCW pre-screen template as needed | | |
| | Step four: Nurse selection disposition of patient | | |
| Intake | Step One: Nurse sees patient (one by one) and updates eCW template via computer | *If patient was transferred from another facility, did a medical transfer summary accompany the patient? No* | Incidental |
| | Step Two: Determine disposition of patient (normal exams pending CXRs are for RN follow) | | |
| | Step Three: Medically clear patient | | |
| | Step Four: LVNs assign eCW note to RN for review | | |
| | Step Five: eCW automatically generates PE-S for normal findings for 10 days (PE-C for abnormal findings) | | |
| | RN co-signs the LVN note within 24 hours | RN signed note 2 days after LVN completion in eCW | |
| PE-Simple | Step One: RNs performs a review of the chart to verify if a previous PE-S was completed | The RN performed the PE-S review | Incidental |
| | Step Two: If it was not completed, then the RN performs full physical exam (site RNs notified of 90 review, but full physical is more thorough) | | |
| | Step Three: RN assigns PE-S to physican for review | Per IIU findings, RN performed PE-S and was not aware of the 90 day review documentation that could have been completed | |
| | Step four: Physician will review RN and sign off within 14 days | | |
| Emergency Reponse | Step One: If pt is found unresponsive by custody, CPR is to be initiated | Custody did not immediate start CPR, but medical was nearby and initated response efforts. Add language from AHA | Incidental |
| | Step Two: Medical is informed of pt status and need for backup | | |



**ICE Health Service Corps**
**Event Review, Root Cause Analysis/Action Plan**

| | | |
|---|---|---|
| | Step Three: EMS called | |
| | Step Four: CPR continues until EMS arrives and assumes | |



DHS-20-0638-F-000283

**ICE Health Service Corps**
**Event Review, Root Cause Analysis/Action Plan**

**Root Cause Analysis**

**Root Cause Analysis Committee Composition**

| # | Discipline | Title |
|---|---|---|
| 1 | Click here to enter text. | Click here to enter text. |
| 2 | Click here to enter text. | Click here to enter text. |
| 3 | Click here to enter text. | Click here to enter text. |
| 4 | Click here to enter text. | Click here to enter text. |
| 5 | Click here to enter text. | Click here to enter text. |
| 6 | Click here to enter text. | Click here to enter text. |
| 7 | Click here to enter text. | Click here to enter text. |
| 8 | Click here to enter text. | Click here to enter text. |



DHS-20-0638-F-000284

2020-ICLI-00057   2342

**ICE Health Service Corps**
**Event Review, Root Cause Analysis/Action Plan**

**Action Plan**

| Contributing Factors or Root Cause | Risk Reduction Strategies (Action Plan) | Implementation Due Date | Classification of Action Plan | Responsible Party | Measurement Strategy and Expected Outcome | Action Plan Follow Up Date | Compliance Level Achieved | Complete |
|---|---|---|---|---|---|---|---|---|
| Incidental | Action Item #1:<br>• Training on Medication Reconcilliation at intake for nursing staff<br>o In-service with talking points<br>o Staff Roster to track those trained | October 2019 | Training | Nurse Manager | **Measurement:** Attendance to training<br><br>**Expected Outcome**: Trained nursing staff | November QI Check-in | 10/31/2019 | Yes |
| Incidental | Action Item #2:<br>Training on PE-S policy with nursing staff to be held concurrently with Action Item #1 training | October 2019 | Training | Nurse Manager | **Measurement:** Attendance to training<br><br>**Expected outcome**: Trained nursing staff | November QI Check-in | 10/31/2019 | Yes |
| Incidental | Action Item #3:<br>Custody staff CPR response was consistent with American Heart Association training for providing CPR to adults | N/A | N/A | N/A | **Measurement:** N/A<br><br>**Expected Outcome:** N/A | N/A | Click here to enter a date. | Yes |

**If compliance levels were not met, what actions were taken?**

| Click here to enter text. | **Comments:**<br>Click here to enter text. |
|---|---|

**What immediate improvement measures have already been implemented?**

| Click here to enter text. | **Comments:** |
|---|---|



**ICE Health Service Corps**
**Event Review, Root Cause Analysis/Action Plan**

| Click here to enter text. |
| --- |

**Headquarters Recommendations for National Implementation**

| Click here to enter text. |
| --- |

| Signatures | |
| --- | --- |
| (b)(6); (b)(7)(C) | **DAD of HCC** |
| | **Unit Chief** |
| Digitally signed by JAMES R REID<br>Date: 2020.05.20 09:16:37 -04'00' | **Regional Compliance Specialist** |
| | **Risk Manager** |
| | **AD (as needed)** |

(b)(6); (b)(7)(C)

Digitally signed by (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)
Date: 2020.06.09 13:24:27 -04'00'

(b)(6); (b)(7)(C)

Digitally signed by (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)
Date: 2020.06.18 15:33:15 -04'00'



DHS-20-0638-F-000286



October 12, 2021

**VIA ONLINE PORTAL**

The Privacy Office                          Freedom of Information Act Office
U.S. Department of Homeland Security         U.S. Immigration & Customs
Headquarters & Office of Civil Rights &      Enforcement
Civil Liberties                              500 12th Street SW, Stop 5009
245 Murray Lane SW                           Washington, DC 20536-5009
STOP-0655                                    Via Online Portal
Washington, DC 20528-0655
Via Online Portal

**Re: Freedom of Information Act Request**

Dear FOIA Officers:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the
implementing regulations of your agency, American Oversight makes the following
request for records.

Conditions faced by individuals held in immigration detention remain an urgent public
concern. In fiscal year 2020, 21 individuals died in U.S. Immigration & Customs
Enforcement (ICE) custody, the highest number of deaths since 2005[1] and a significant
increase in deaths from the previous year, despite a much smaller detainee population.[2]
The ongoing threat posed by the Covid-19 pandemic exacerbates existing concerns,
particularly as the number of individuals detained by ICE has increased nearly to pre-
pandemic levels.[3]

American Oversight seeks records with the potential to shed light on the treatment and
care of individuals held in immigration detention, including those who have died in
federal custody.

---

[1] Catherine Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*,
CNN (updated Sept. 30, 2020, 8:11 AM), https://www.cnn.com/2020/09/30/us/ice-
deaths-detention-2020/index.html.
[2] Lise Olsen, *Deaths in ICE Custody Skyrocketed During the COVID-19 Pandemic*, TX
Observer (Jan. 20, 2021, 10:36 AM), https://www.texasobserver.org/deaths-in-ice-
custody-skyrocketed-during-the-covid-19-pandemic/.
[3] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the
U.S.*, N.Y. Times (updated Aug. 12, 2021),
https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> A complete copy of any "Detainee Death Review" reports completed by or for ICE Office of Professional Responsibility as part of the detainee death reviews for each of the following individuals who died in ICE custody.

> 1. Onoval Perez-Montufa
> 2. Luis Sanchez-Perez
> 3. James Tomas Hill
> 4. Kuah Hui Lee
> 5. Jose Freddy Guillen Vega
> 6. Fernando Sabonger-Garcia
> 7. Cipriano Chavez Alvarez
> 8. Romien Jally
> 9. Anthony Jones
> 10. Felipe Montes
> 11. Jesse Dean
> 12. Diego Fernando Gallego-Agudelo

> An example of a "Detainee Death Review" is attached as Exhibit A to aid your search.

> Please provide all responsive records from July 12, 2020, through the date the search is conducted.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[4] The public has a significant interest in the treatment and care of individuals held in immigration detention.[5] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including the extent to which conditions within ICE facilities may have contributed to the deaths of these individuals. American Oversight is committed to transparency and makes the

---

[4] 5 U.S.C. § 552(a)(4)(A)(iii).
[5] *See supra*, notes 1-3.

DHS-21-1424

responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[6] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[7]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[8] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[9] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[10] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[11] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such

---

[6] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[7] American Oversight currently has approximately 15,630 page likes on Facebook and 108,500 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Oct. 12, 2021); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Oct. 12, 2021).

[8] *See generally News,* American Oversight, https://www.americanoversight.org/blog.

[9] *Trump Administration's Contacts with Ukraine,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[10] *See generally The Trump Administration's Response to Coronavirus,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings,* American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[11] *See generally Audit the Wall,* American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall,* American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

DHS-21-1424

waivers;[12] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[13]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs, as well as letters, emails, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[14] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official

---

[12] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[13] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

[14] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

DHS-21-1424

systems or if officials have, by intent or through negligence, failed to meet their obligations.[15]

▪ Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[16] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

▪ Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American

---

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[16] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-1424

Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Hart Wood at foia@americanoversight.org or 202.919.6303. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Hart Wood*
Hart Wood
on behalf of
American Oversight

DHS-21-1424

# EXHIBIT A

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**SYNOPSIS**

On May 25, 2018, Jeffry HERNANDEZ, a thirty-three year old citizen of Honduras, died while in the custody of U.S. Immigration and Customs Enforcement (ICE) at Lovelace Medical Center (LMC), in Albuquerque, New Mexico (NM).  HERNANDEZ's preliminary cause of death is cardiac arrest.[1]  Autopsy findings and a certificate of death were pending as of the date of this report.

HERNANDEZ was detained at Cibola County Correctional Center (CCCC), in Milan, NM, from May 16, 2018, until her death.[2]  CCCC is owned and operated by CoreCivic.  Medical care is provided by contractor Correct Care Solutions (CCS).  CCCC is required to comply with the ICE Performance Based National Detention Standards (PBNDS) 2011.[3]  At the time of HERNANDEZ's death, CCCC housed approximately 309 male and transgender detainees of all classification levels for periods in excess of 72 hours.

**DETAILS OF REVIEW**

From June 26 to 27, 2018, ICE Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU) staff visited CCCC to review the circumstances surrounding HERNANDEZ's death.  ERAU was assisted in its review by contract subject matter experts (SMEs) in correctional healthcare and security who are employed by Creative Corrections, a national management and consulting firm.[4]  As part of its review, ERAU reviewed immigration, medical, and detention records pertaining to HERNANDEZ, in addition to conducting in-person interviews of individuals employed by CoreCivic, CCS, and the local field office of ICE's Office of Enforcement and Removal Operations (ERO).

During the review, ERAU took note of any deficiencies observed in the detention standards as they relate to the care and custody of the deceased detainee and documented those deficiencies herein for informational purposes only.  Their inclusion in the report should not be construed in any way as indicating the deficiency contributed to the detainee's death.  ERAU determined the following timeline of events, from the time HERNANDEZ entered ICE custody, through her detention at CCCC, and eventual death at LMC.

---

[1] Cardiac arrest is a sudden and unexpected loss of heart function, breathing, and consciousness.

[2] HERNANDEZ self-identified as a transgender woman and referred to herself as Roxana.  This report refers to HERNANDEZ as female.

[3] As revised in 2016.

[4] *See* <u>Exhibit 1</u>: Creative Correction Medical and Security Compliance Analysis.



DHS-ICE-19-0196, 19-0197-A-000322

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**IMMIGRATION AND CRIMINAL HISTORY**

On October 6, 2005, U.S. Customs and Border Protection's (CBPs) Office of Border Patrol (USBP) encountered and arrested HERNANDEZ near Laredo, TX and charged her with illegal entry into the United States (U.S.).[5]  HERNANDEZ claimed to be a Mexican citizen and USBP granted her a voluntary return to Mexico that same day.

On an unknown date and location, HERNANDEZ illegally re-entered the U.S.[6]

On April 8, 2006, the Dallas Police Department arrested HERNANDEZ and charged her with theft.[7]  On April 20, 2006, the Dallas County Criminal Court (DCCC) convicted HERNANDEZ of the charge and sentenced her to 30 days of incarceration.[8]

On July 11, 2008, the Dallas Police Department arrested HERNANDEZ and charged her with prostitution.[9]

On April 25, 2009, the Dallas Police Department arrested HERNANDEZ and charged her with lewd/immoral/indecent conduct.[10]  On the same day, ERO Dallas lodged an Immigration Detainer for HERNANDEZ with the Dallas County Jail.[11]  On May 12, 2009, DCCC convicted HERNANDEZ of the July 11, 2008 charge and sentenced her to 45 days incarceration.[12]  That same date, DCCC also convicted her of the lewd/immoral/indecent conduct charge and sentenced her to 30 days incarceration.  Two days later, on May 14, 2009, DCCC transferred HERNANDEZ to ERO Dallas custody.[13]  On May 15, 2009, ERO released HERNANDEZ for voluntary departure to Mexico.[14]

On January 23, 2014, USBP encountered HERNANDEZ in Laredo, TX and arrested her for unlawful entry to the U.S.[15]  USBP served HERNANDEZ with a Notice and Order of Expedited Removal charging her as removable under to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA), as amended, as an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.[16]

---

[5] *See* ICE Significant Incident Report, dated May 25, 2018.
[6] *See* ICE Significant Incident Report, dated May 25, 2018.
[7] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.
[8] *See* ICE Significant Incident Report, dated May 25, 2018.  *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.  *See* Dallas County Felony and Misdemeanor Courts Case Information, accessed October 4, 2018.
[9] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.  Hernandez's record contains no information regarding the date or circumstances of the Dallas Police Department releasing her; however, subsequent events indicate that she was released following her July 11, 2008 arrest.
[10] *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.
[11] *See* ICE Significant Incident Report, dated May 25, 2018.
[12] *See* id.  *See* Federal Bureau of Investigation RAP sheet, January 23, 2014.
[13] *See* ICE Significant Incident Report, dated May 25, 2018.
[14] *See* EARM/EADM detention details, accessed September 20, 2018.
[15] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated January 23, 2014.
[16] *See* Form I-860, Notice and Order of Expedited Removal, dated January 24, 2014.

2



On January 27, 2014, the U.S. District Court for the Southern District of Texas, Laredo Division, convicted HERNANDEZ of unlawful entry and sentenced her to 45 days confinement in the U.S. Bureau of Prison's (BOP) Federal Detention Center (FDC) Houston in Houston, TX.[17]

On March 7, 2014, BOP released HERNANDEZ from FDC Houston into ERO custody.[18] On March 11, 2014, ERO removed HERNANDEZ to Mexico.[19]

On May 9, 2018, HERNANDEZ presented herself to CBP's Office of Field Operations at the San Ysidro, CA port of entry (POE) seeking asylum from Honduras. CBP took HERNANDEZ into custody at the POE.[20] On May 11, 2018, CBP served HERNANDEZ with a Notice and Order of Expedited Removal charging her as removable under § 212(a)(7)(A)(i)(I) of the INA, as an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA.[21] HERNANDEZ's asylum claim was pending review and adjudication by an asylum officer and/or immigration judge.[22]

## NARRATIVE

**On May 11, 2018**, CBP Officer (b)(6); (b)(7)(C) completed an ICE Health Services Corps (IHSC) In-Processing Health Screening Form for HERNANDEZ, entering "no" for all medical and mental health questions and indicating HERNANDEZ was fit for placement in general population.[23] (b)(6); (b)(7)(C) noted the detainee disclosed she was human immunodeficiency virus (HIV) positive and not taking medication. (b)(6); (b)(7)(C) noted that he did not utilize an interpreter for the encounter.

After HERNANDEZ disclosed she was HIV positive, (b)(6); (b)(7)(C) a physician assigned to perform medical services at the Port of Entry, examined of HERNANDEZ and documented the following:[24]

- HERNANDEZ complained of a headache and cough.
- HERNANDEZ reported she was diagnosed with HIV five months earlier and suffered weight loss, vomiting, and diarrhea for the past month.

---

[17] *See* U.S. District Court for the Southern District of Texas, Laredo Division Judgement, dated January 27, 2014. *See* Form I-213, Record of Deportable/Inadmissible Alien, dated March 7, 2014.
[18] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated March 7, 2014.
[19] *See* ICE Significant Incident Report, dated May 25, 2018.
[20] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated May 9, 2018.
[21] *See* ICE Significant Incident Report, dated May 25, 2018. *See* Form I-860, Notice and Order of Expedited Removal, dated May 11, 2018.
[22] *See* Form I-213, Record of Deportable/Inadmissible Alien, dated May 11, 2018.
[23] *See* ICE Health Service Corps In-Processing Health Screening Form, dated May 11, 2018.
[24] *See* Mission Medical Support New Patient Comprehensive Exam form, dated May 11, 2018. Dr. Olcott did not notate whether he used an interpreter for the encounter.



- HERNANDEZ's vital signs were within normal limits, with the exception of an elevated temperature of 99.5 and elevated pulse of 134.[25]
- HERNANDEZ appeared emaciated and ill.
-  (b)(6): ordered HERNANDEZ be transferred to the Scripps Mercy Hospital (SMH) in Chula Vista, CA, for a chest x-ray and evaluation to identify possible infections and sepsis.[26]
- HERNANDEZ was not cleared for transport or detention.

Following (b)(6); (b)(7)(C) evaluation, CBP transported HERNANDEZ to SMH where she tested negative for tuberculosis (TB) but positive for bronchitis.[27]  SMH prescribed HERNANDEZ Tylenol[28] for her fever, and a Z-Pack[29] and Albuterol inhaler[30] for her bronchitis.  ERAU notes HERNANDEZ's record contains no documentation indicating either CBP or SMH administered these medications to the detainee.

Upon her return from SMH that same day, a CBP officer completed a risk assessment for HERNANDEZ in which the officer noted HERNANDEZ self-identified as transgender.[31]  CBP also cleared HERNANDEZ for transport and detention.[32]  As discussed below, HERNANDEZ remained at the San Ysidro POE in CBP custody until May 14, 2018, when CBP transferred her to custody of ERO San Diego.[33]

**On May 12, 2018**, ERO San Diego requested approval from ERO El Paso to transfer HERNANDEZ to CCCC via the streamlined transfer process.[34]  That same day, Supervisory Detention and Deportation Officer (SDDO) (b)(6); (b)(7)(C), ERO Albuquerque, approved the request.[35]  ERO identified CCCC as the most appropriate facility for HERNANDEZ because it has a dedicated transgender housing unit and experience housing transgender detainees.[36]

---

[25] Normal vital signs for an adult are as follows:  temperature 98.6, pulse 60 to 100 beats per minute, blood pressure 90/60 to 120/80, and respirations 12 to 18 breaths per minute. Normal pulse oxygen, which indicates the saturation of oxygen in the blood, is between 95% and 100%.

[26] Chest x-rays identify lung infections such as TB, pneumonia, and bronchitis.  Sepsis is a potentially life-threatening complication of an infection which occurs when chemicals released into the bloodstream to fight the infection trigger inflammatory responses throughout the body.

[27] *See* Scripps physician's aftercare instructions, dated May 11, 2018.

[28] Tylenol is a brand name for acetaminophen.

[29] Z-Pack is an antibiotic.

[30] An albuterol inhaler is a bronchodilator to relax muscles in the lung.

[31] *See* CBP Assessment for Transport, Escort, and Detention, dated May 11, 2018.

[32] *See* CBP medical clearance notification, dated May 11, 2018.

[33] ERAU was unable to confirm the reason for HERNANDEZ's extended time in CBP custody.

[34] S*ee* email from Deportation Officer (DO) (b)(6), (b)(7)(C) to ERO El Paso and Albuquerque office mailboxes, May 12, 2018.  The streamlined transfer process is an established expedited movement process and route to facilitate the transfer of eligible detainees from ports of entry to designated detention facilities.  It requires coordination across several ERO field offices but results in efficient processing and transport of the large number of aliens entering the U.S. at the San Ysidro POE.  HERNANDEZ was transferred via this process as a matter of established routine.

[35] S*ee* email from SDDO (b)(6) to DO Mendivil, May 12, 2018.

[36] ERO transported HERNANDEZ as part of a group of 19 total transgender detainees (classified by ERO as low custody) ultimately destined for CCCC.

**On May 14, 2018**, at an undocumented time, CBP transferred HERNANDEZ to ICE ERO custody.[37]

**On May 15, 2018** at 3:15 p.m., HERNANDEZ arrived at the El Paso Service Processing Center (EPSPC).[38]  EPSPC processed HERNANDEZ and placed her in a holding cell pending transport to CCCC.

**On May 16, 2018**, at 9:45 a.m., HERNANDEZ departed EPSPC,[39] and she arrived at CCCC at 7:59 p.m., along with 18 other transgender detainees.[40]

Upon her arrival, CCCC Officer (b)(6); (b)(7)(C) conducted HERNANDEZ's intake processing in English.[41] (b)(6); (b)(7)(C) stated he does not speak Spanish and did not ask for assistance from Spanish speaking officers or use the telephonic language interpretation services available. (b)(6); (b)(7)(C) stated he noticed HERNANDEZ appeared to have a cold during intake processing.[42]

**On May 17, 2018**, at 2:23 a.m., CCCC officers escorted HERNANDEZ and the other transgender detainees from the intake area to the medical waiting room.[43]  At 4:08 a.m., CCCC provided the detainees with a beverage, and at 6:00 a.m. with breakfast.  HERNADEZ consumed both the beverage and breakfast.

At 7:26 a.m., dental assistant (b)(6); took HERNANDEZ's vital signs and found the detainee's temperature and pulse were abnormally elevated at 100.8 and 136, respectively, and her blood pressure and pulse oxygen abnormally low at 81/61 and 92%, respectively.[44]  During her interview with ERAU, (b)(6); stated she observed HERNANDEZ appeared ill and flagged the detainee's medical chart so she would be the first detainee to receive a medical intake screening that morning by the facility's Registered Nurse (RN).(b)(6); (b)(7)(C)[45]

At 7:35 a.m., (b)(6); (b)(7)(C) conducted HERNANDEZ's medical intake screening and documented the following:[46]

[37] S*ee* Form I-203, Order to Detain or Release Alien, dated May 14, 2018.
[38] *See* Global Precision Systems (GPS) ICE El Paso SPC Form G-391, Transportation Log, dated May 15, 2018. ERAU notes GPS is the contract transportation service for EPSPC.
[39] *See* Global Precision Systems (GPS) ICE El Paso SPC Form G-391, Transportation Log, dated May 16, 2018.
[40] S*ee* video surveillance footage, May 16, 2018. .
[41] ERAU confirmed through staff interviews and documentation review that HERNANDEZ did not speak English. ERAU interview with Officer (b)(6); (b)(7)(C), June 26, 2018.  See Form I-385, Alien Booking Record, dated May 17, 2018.
[42] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[43] S*ee* video surveillance footage, May 17, 2018.
[44] *See* Exhibit 2: CCS receiving screening, dated May 17, 2018.
[45] ERAU interview with (b)(6); , June 26, 2018.
[46] *See* Exhibit 2: CCS receiving screening, dated May 17, 2018.



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

- HERNANDEZ identified herself as a transgender female.
- HERNANDEZ reported being diagnosed with HIV and hepatitis A.[47]
- HERNANDEZ reported having a cough and experiencing a loss of appetite and weight loss.
- HERNANDEZ spoke Spanish. (b)(6); provided translation services for this encounter.
- HERNANDEZ's mental health screening was normal.

(b)(6); (b)(7)(C) administered a TB purified protein derivative (PPD) test to HERNANDEZ.[48]  He also reviewed the accompanying IHSC In-Processing Health Screening form, completed by CBP (b)(6); (b)(7)(C) [49]  ERAU notes this was the only medical document that accompanied HERNANDEZ to CCCC.

(b)(6); (b)(7)(C) completed a medical alert form, noting the detainee had an elevated temperature and reported weakness and significant weight loss over the previous month.[50]  During his interview with ERAU, (b)(6); (b)(7)(C) stated HERNANDEZ appeared very malnourished and dehydrated and he therefore referred her to the CCCC physician.[51]  (b)(6); (b)(7)(C) also notified Director of Nursing (DON) RN (b)(6); (b)(7)(C) and Health Services Administrator (HSA) (b)(6); (b)(7)(C) of HERNANDEZ's condition.  (b)(6); informed CCCC physician (b)(6); (b)(6); of HERNANDEZ's condition by telephone.[52] (b)(6); (b)(7)(C) instructed (b)(6); to provide HERNANDEZ with fluids and stated she would be at the facility shortly to evaluate the detainee.

At 8:08 a.m., medical staff provided HERNANDEZ with Ensure and Pedialyte.[53]

At 9:06 a.m., medical staff placed HERNANDEZ in an isolation room in the medical unit for the detainee's comfort while she waited to be examined by the physician.[54]

At 9:42 a.m., (b)(6); (b)(7)(C) examined HERNANDEZ and documented the following:[55]

---

[47] HIV is the virus that causes acquired immunodeficiency syndrome (AIDS) and the associated progressive failure of the immune system that allows life-threatening infections and cancers to thrive.  Hepatitis A is a virus affecting the liver and transmitted through food and water.  ERAU notes HERNANDEZ later reported she did not have Hepatitis A.

[48] *See* CCS Immunization, Tuberculosis, and Syphilis Testing Record, dated May 17, 2018.  ERAU notes the test would have been read on May 21, 2018, as appropriate, but Cibola medical staff could not read the results because the detainee was in the hospital at this time and did not return to CCCC.

[49] *See* ICE Health Service Corps In-Processing Health Screening Form, dated May 11, 2018.

[50] *See* CCS Medical/Psychiatric Alert, dated May 17, 2018.  This form is placed in the detainee's medical file to alert any medical staff who may interact with the detainee to a relevant medical condition or consideration.

[51] ERAU interview with (b)(6); (b)(7)(C) June 27, 2018.

[52] ERAU interview with (b)(6); (b)(7)(C) June 26, 2018.

[53] Ensure is a milk protein concentrate containing vitamins and minerals. Pedialyte reduces dehydration and restores fluids and minerals lost due to diarrhea and vomiting. ERAU interview with (b)(6); (b)(7)(C) June 27, 2018.

[54] S*ee* video surveillance footage, May 17, 2018.  ERAU interview with Health Services Administrator (b)(6); (b)(6); June 26, 2018.

[55] S*ee* video surveillance footage, May 17, 2018.  S*ee* Exhibit 3: CCS Provider History and Physical Health Assessment, dated May 17, 2018.

6



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

- (b)(6); (b)(7)(C) conducted the examination in Spanish which she speaks fluently.
- HERNANDEZ's temperature (102), pulse (128), and respirations (20) were abnormally high; and, the detainee's blood pressure (81/61), and pulse oxygen (92%) were abnormally low.
- HERNANDEZ self-identified as a transgender female but reported no history of taking hormones.
- HERNANDEZ reported significant weight loss over the previous four to six months and a history of depression and difficulty sleeping.
- HERNANDEZ reported taking no medications and no prior surgeries or hospitalizations.
- (b)(6); (b)(7)(C) physical examination found the detainee emaciated with increased amount of white phlegm and dry mucous membranes in her mouth, poor skin turgor, muscle wasting, coarse breath sounds in her lungs, tachycardia, and multiple cavities.[56]
- (b)(6); (b)(7)(C) determined HERNANDEZ suffered from dehydration, starvation, untreated HIV, fever, and cough.
- (b)(6); (b)(7)(C) treatment plan included transporting the detainee to the local emergency department to provide her with intravenous (IV) fluids, a chest x-ray, and to diagnose potential opportunistic infections resulting from the detainee's compromised immune system.
- (b)(6); (b)(7)(C) provided HERNANDEZ a face mask to wear to protect her from environmental viruses and bacteria.
- (b)(6); (b)(7)(C) ordered the following laboratory tests to be completed at the hospital: complete blood count (CBC),[57] rapid plasma reagin (RPR) with reflex,[58] comprehensive metabolic panel (CMP),[59] thyroid stimulating hormone (TSH),[60] hepatitis panel,[61] urinalysis for sexually transmitted diseases, HIV confirmation test with viral load,[62] and chest x-ray.

(b)(6); (b)(7)(C) stated HERNANDEZ was alert and stable but looked starved, tired, weak, and appeared to be suffering from long term protein and calorie malnutrition.[63] (b)(6); (b)(7)(C) ordered HERNANDEZ transported to Cibola General Hospital (CGH) in Grants, NM, by facility vehicle.

---

[56] Emaciated refers to an abnormally thin or weak state. Phlegm is mucus excreted from the body in abnormally large quantities. Turgor refers to the rigidity of tissues. Tachycardia refers to an abnormally rapid heart rate.
[57] A CBC measures the level of red blood cells, white blood cells, platelets (clotting cells), hemoglobin (oxygen transport cells) and hematocrit (ratio of red blood cells to the total blood volume).
[58] A RPR detects syphilis.
[59] A CMP is a group of blood tests that provide an overall picture of the body's chemical balance and metabolism.
[60] TSH determines thyroid-stimulating hormone levels.
[61] A hepatitis panel identifies indicators of a hepatitis infection.
[62] An HIV confirmation test with viral load measures the amount of HIV ribonucleic acid (RNA) in the blood. RNA is the genetic material that makes up certain viruses.
[63] ERAU interview with (b)(6); (b)(7)(C), June 26, 2018.

7



(b)(6); (b)(7)(C) stated during interview that because she expected (b)(6); (b)(7)(C) to send HERNANDEZ to the hospital, she notified security staff of the possible transport while Dr. (b)(6); (b)(7)(C) was conducting the detainee's physical examination.[64]

At 10:09 a.m., HERNANDEZ returned to the isolation room wearing a paper mask and laid down on the bed.[65] At 10:52 a.m., HERNANDEZ got into in a wheelchair, and medical staff escorted her out of the medical unit to meet the transport van.

At 11:08 a.m., HERNANDEZ entered the van without difficulty.[66] At 11:20 a.m., the van departed CCCC en route to CGH.[67] Officer (b)(6); (b)(7)(C) drove the van and Officer (b)(6); (b)(7)(C) rode in the passenger seat.[68]

At 11:44 a.m., the van arrived at CHG and (b)(6); (b)(7)(C) escorted HERNANDEZ into the emergency department.[69] (b)(6); (b)(7)(C) stated the detainee was alert, walking, and talking.[70]

CGH physician (b)(6); (b)(7)(C) diagnosed HERNANDEZ with septic shock,[71] as well as dehydration, HIV infection, nodular pulmonary disease,[72] lymphadenopathy,[73] anemia,[74] and thrombocytopenia.[75]

CGH medical staff evaluated and treated HERNANDEZ, and documented the following:[76]

- HERNANDEZ's vital signs were all outside of normal limits and ranged as follows: temperature from 101.1 to 104.9, pulse from 92 to 173, respirations from 9 to 36, blood pressure from 80/52 to 102/65, and pulse oxygen between 88% and 100%.
- HERNANDEZ received an electrocardiograph[77] (EKG).
- CGH provided HERNANDEZ with IV fluids, acetaminophen to reduce temperature, famotidine to reduce stomach acid, and the antibiotics azithromycin[78] and ceftriaxone.[79]

---

[64] ERAU interview with (b)(6); (b)(7)(C), June 27, 2018.
[65] S*ee* video surveillance footage, May 17, 2018.
[66] S*ee* id.
[67] S*ee* id. *See* CoreCivic Escort Trip log, dated May 17, 2018.
[68] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018. *See* CCCC Driver Vehicle Inspection Report, dated May 17, 2018.
[69] *See* hospital logbook, dated May 17, 2018.
[70] ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[71] Septic shock is a life-threatening condition resulting from an infection throughout the body which can lead to organ failure and produces changes in temperature, blood pressure, heart rate, white blood cell count, and breathing.
[72] Nodular pulmonary disease is small masses in the lungs.
[73] Lymphadenopathy is enlarged lymph nodes.
[74] Anemia is a medical condition characterized by a lack of healthy red blood cells in the blood.
[75] Thrombocytopenia is a low level of platelets, the cells that help the blood clot. *See* CGH Emergency Record, dated May 17, 2018.
[76] *See* CGH Emergency Record, May 17, 2018.
[77] An EKG measures the heart's electrical impulses.
[78] Azithromycin is used to treat bacterial infections in the body.
[79] Ceftriaxone is used to treat bacterial infections in the body.

8



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

- CGH catheterized HERNANDEZ because she was unable to void her bladder.
- CGH administered a rapid HIV test which confirmed HERNANDEZ was HIV positive.

(b)(6);          g determined HERNANDEZ was in poor condition and required a higher level of care than CGH could provide, so he arranged for air ambulance transportation to transfer her to Lovelace Medical Center (LMC) in Albuquerque, NM.[80]  CGH staff notified I(b)(6); (b)(7)(C) of the plan to transfer HERNANDEZ to LMC.[81]

At 6:40 p.m., (b)(6); (b)(7)(C)                              relieved (b)(6); (b)(7)(C) of their hospital post.[82]  During her interview with ERAU,(b)(6); (b)(7)(C) stated hospital staff discussions regarding transferring HERNANDEZ to LMC were underway at the time of her arrival at CGH.[83]  A CGH nurse explained the transfer details to HERNANDEZ in Spanish.

At 9:18 p.m., CGH loaded HERNANDEZ into the air ambulance helicopter.[84] (b)(6); (b)(7)(C) accompanied HERNANDEZ in the helicopter along with the pilot and two nurses, including one who spoke Spanish and communicated with her.[85] (b)(6); (b)(7)(C) drove the facility van to LMC.[86]

At 9:38 p.m., the helicopter departed CGH.[87]  HERNANDEZ remained awake and alert during transport.[88]  Medical staff monitored the detainee's vital signs throughout transport and found they were within normal limits, with the exception of elevated respirations of 20, and low blood pressure readings of 105/70, 101/76, 106/69, and 99/69.[89]

At 10:05 p.m., the helicopter landed on the Heart Hospital helipad in Albuquerque, NM.[90]  An ambulance met the helicopter and transported HERNANDEZ, the two nurses, and (b)(6); (b)(7)(C) to LMC.[91]  The drive was approximately three minutes in duration.[92]

At 10:14 p.m., HERNANDEZ arrived at LMC and medical staff placed her in a negative pressure room in the intensive care unit (ICU).[93]

---

[80] *See* CGH Physician Transfer Record, May 17, 2018.
[81] ERAU interview with (b)(6); (b)(7)(C)          June 26, 2018.
[82] *See* hospital logbook, dated May 17, 2018.
[83] ERAU interview with Officer (b)(6); (b)(7)(C) June 27, 2018.
[84] *See* hospital logbook, dated May 17, 2018.
[85] ERAU interview with Officer (b)(6);          June 27, 2018.
[86] *See* hospital logbook, dated May 17, 2018.  ERAU interview with Officer (b)(6); (b)(7)(C) June 26, 2018.
[87] *See* id.
[88] *See* PHI Air Medical Transport Medical Record, dated May 17, 2018.
[89] *See* id.
[90] *See* hospital logbook, dated May 17, 2018.
[91] ERAU interview with (b)(6); (b)(7)(C)          June 27, 2018.
[92] Id.
[93] *See* hospital logbook, dated May 17, 2018.

9


AMERICAN
OVERSIGHT

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

At 10:50 p.m., (b)(6); (b)(7)(C) arrived at LMC.[94]

**On May 18, 2018**, at 12:45 p.m., (b)(6); (b)(7)(C) called LMC for an update on HERNANDEZ's condition and documented the following:[95]

- HERNANDEZ remained in isolation to protect her from opportunistic infections and because CCCC did not know her TB status.  Sputum samples were collected to test for TB.[96]
- HERNANDEZ's laboratory blood test results were pending.
- HERNANDEZ's hydration status improved but her HIV status remained of serious concern.
- HERNANDEZ's treatment plan included consultation with infectious disease specialists and administration of broad spectrum antibiotics.[97]
- HERNANDEZ was stable and on IV fluids which included broad spectrum antibiotics and Levophed.[98]

At 1:45 p.m., HERNANDEZ received a computed tomography (CT) scan of her abdomen, with results expected the following day.[99]

At 9:30 p.m., HERNANDEZ remained in isolation in the ICU but was stable and able to eat and take fluids.[100]

**On May 19, 2018**, at 3:48 p.m., HERNANDEZ received a CT scan of her neck due to her enlarged lymph nodes, with results expected the following day.[101]

At 5:30 p.m., LMC reported HERNANDEZ was alert and stable with a good appetite but experienced an elevated temperature of 104 earlier in the day.[102]  HERNANDEZ continued to receive IV fluids, antibiotics, and blood pressure medication.

---

[94] *See* id.  ERAU notes HERNANDEZ remained at LMC until her death on May 25, 2018.  ERAU was unable to obtain medical records from LMC and therefore the remaining narrative is based on the hospital logbook, interviews with staff, and the CCCC medical record progress notes.

[95] *See* CCS progress note, dated May 18, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

[96] ERAU notes while HERNANDEZ was in CBP custody she was tested and found to be negative for TB, but the relevant documentation did not accompany her to CCCC.

[97] Broad spectrum antibiotics kill or inhibit a wide range of harmful or disease-causing bacteria and include piperacillin/tazobactam and vancomycin.

[98] Levophed is a brand of medication used to treat low blood pressure.

[99] *See* hospital logbook, dated May 18, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from HSA (b)(6); (b)(7)(C) dated May 25, 2018.  A CT scan uses a series of x-ray images taken from different angles around the body and uses computer processing to create cross-sectional images of the bones, blood vessels and soft tissues.

[100] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

[101] *See* hospital logbook, dated May 19, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

[102] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.

10



DHS-ICE-19-0196, 19-0197-A-000331

At 9:30 p.m., an LMC nurse provided [b)(6); (b)(7)(C)] the following updates regarding the detainee's condition:[103]

- HERNANDEZ's chest x-ray was negative for TB and the third and final sputum test would be completed the following day.
- HERNANDEZ's abdominal CT scan showed an enlarged spleen and peritoneal lymph nodes.[104]
- LMC medical staff suspected HERNANDEZ was suffering from T-cell lymphoma and would likely need a biopsy.[105]
- HERNANDEZ's CD4 count was 189.[106]

**On May 20, 2018**, at 8:40 a.m., LMC informed [b)(6); (b)(7)(C)] that HERNANDEZ remained in stable condition.[107]  At 10:30 p.m., LMC informed [b)(6); (b)(7)(C)] that HERNANDEZ was afebrile[108] and no longer on blood pressure medication.

**On May 21, 2018**, at 1:35 p.m., LMC staff prepared HERNANDEZ for surgical biopsy.[109]  At 2:09 p.m., they moved her to an operating room where medical staff removed an axillary lymph node for biopsy.[110]  HERNANDEZ remained in stable condition.  LMC confirmed the detainee tested negative for TB.

At 3:58 p.m., medical staff moved HERNANDEZ from the recovery room back to the ICU.[111] HERNANDEZ was awake and watched television.

**On May 22, 2018**, at 9:40 a.m., LMC reported the following:[112]

- HERNANDEZ remained in stable condition following the lymph node removal procedure.
- HERNANDEZ's temperature increased to 102.2 the previous night.
- HERNADEZ was receiving Bactrim[113] once per day and a penicillin[114] injection weekly.
- HERNANDEZ's blood pressure decreased and was being maintained with IV fluids.
- HERNANDEZ remained in the ICU.

---

[103] *See* CCS progress note, dated May 18, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from [b)(6); (b)(7)(C)] dated May 25, 2018.

[104] Peritoneal refers to the serous membrane lining of the walls of the abdomen and pelvic cavities.

[105] T-cell is a type of lymphocyte/white blood cell in the immune system to fight infection. Lymphoma is a type of blood cancer.  A biopsy is a procedure to obtain a sample of cells from the body for laboratory testing.

[106] HIV infection advances to AIDS when there are less than 200 CD4 T-cells per millimeter of blood.

[107] *See* CCS Memorandum – Significant Event Notice – Death from [b)(6); (b)(7)(C)] dated May 25, 2018.

[108] Afebrile is a medical term meaning normal temperature.

[109] *See* hospital logbook, dated May 21, 2018.

[110] *See* id.  *See* CCS Memorandum – Significant Event Notice – Death from [b)(6); (b)(7)(C)], dated May 25, 2018.

[111] *See* hospital logbook, dated May 21, 2018.

[112] *See* CCS Memorandum – Significant Event Notice – Death from [b)(6); (b)(7)(C)], dated May 25, 2018.

[113] Bactrim is an antibiotic.

[114] Penicillin is an antibiotic.



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

At 3:00 p.m., HERNANDEZ underwent a lumbar puncture procedure.[115]  At 3:41 p.m., she returned to her room in the ICU.

At 5:45 p.m., LMC informed (b)(6), (b)(7)(C) that HERNANDEZ did not have an appetite but was drinking Ensure, and the biopsy results were pending.[116]

**On May 23, 2018**, at 4:45 p.m., HERNANDEZ received a CT scan of her stomach.[117]

At 9:32 p.m., HERNANDEZ received a chest x-ray.[118]

At 10:30 p.m., (b)(6), (b)(7)(C) spoke with an LMC nurse who reported HERNANDEZ experienced a high fever and elevated pulse throughout the day.[119]   HERNANDEZ remained on oral antibiotics. The biopsy results continued to be pending, but the detainee's lumbar puncture results were normal.

**On May 24, 2018**, at 11:00 a.m., (b)(6), (b)(7)(C) spoke with an LMC nurse and documented the following:[120]

- HERNANDEZ was in serious condition with a guarded prognosis.[121]
- Laboratory tests and chest x-ray results were as follows:
  - Blood culture found no growth, indicating a low probability of blood infection caused by bacteria or fungi.
  - HERNANDEZ tested negative for malaria, parasites, and toxoplasmosis.[122]
  - HERNANDEZ tested positive for syphilis.
  - HERNANDEZ's chest x-ray found slight bilateral pleural effusion.[123]
- HERNANDEZ's heart rate and temperature were abnormally high throughout the previous night, at 150 and 104.5, respectively.  LMC staff provided the detainee with Tylenol and a cooling blanket to reduce her temperature.

At 1:10 p.m., HERNANDEZ informed a nurse she felt congested and was having difficulty breathing.[124]  At 1:30 p.m., HERNANDEZ received an x-ray, followed by an ultrasound.

---

[115] A lumbar puncture is a medical procedure in which a needle is inserted into the spinal canal, most commonly to collect cerebrospinal fluid for diagnostic testing.  *See* hospital logbook, dated May 22, 2018.
[116] *See* CCS progress note, dated May 22, 2018.
[117] *See* hospital logbook, dated May 23, 2018.
[118] *See* id.
[119] *See* CCS progress note, dated May 23, 2018.
[120] *See* CCS progress note, dated May 24, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6), (b)(7)(C), dated May 25, 2018.
[121] Guarded prognosis means a patient's condition is uncertain and concerning.
[122] Toxoplasmosis is an infectious disease caused by the one-celled protozoan parasite.
[123] Bilateral pleural effusion refers to an abnormal buildup of fluid around both lungs.
[124] *See* hospital logbook, dated May 24, 2018.



12

At 3:22 p.m., LMC performed a procedure, called a thoracentesis,[125] to remove the fluid from HERNANDEZ's lungs.[126]  At 4:00 p.m., the detainee's pulse oxygen began dropping and she developed tachypnea,[127] supraventricular tachycardia (SVT),[128] and an elevated blood pressure.[129]

Starting at approximately 5:00 p.m., HERNANDEZ began coughing up mucus and having more difficulty breathing. [130]

At 5:55 p.m., LMC staff attempted to intubate[131] HERNANDEZ.  At 6:35 p.m., after some difficulty, intubation was complete.  At 6:40 p.m., the detainee received a chest x-ray and at 7:07 p.m., medical staff sedated HERNANDEZ.

At 7:40 p.m., LMC nursing staff informed (b)(6); (b)(7)(C) posted at the hospital at the time, that HERNANDEZ was on life support and in critical condition.[132]

At 10:10 p.m., HERNANDEZ developed bradycardia[133] and pulseless electrical activity (PEA).[134] LMC immediately initiated chest compressions and administered multiple doses of epinephrine.[135]  At 10:16 p.m., HERNANDEZ was revived, but developed SVT.  Medical staff administered a dose of Adenosine[136] in order to return her heart rate to a normal level, but it was not effective.  LMC staff also administered a dose of metoprolol[137] to HERNANDEZ in order to lower her blood pressure.

**May 25, 2018, Day of Death**

At 12:48 a.m., HERNANDEZ went into cardiac arrest.[138]  LMC staff initiated cardiopulmonary resuscitation (CPR), used an automated external defibrillator (AED), and administered medications.

---

[125] Thoracentesis is a procedure to remove the fluid between the lung and chest wall.
[126] *See* hospital logbook, dated May 24, 2018.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[127] Tachypnea is very rapid respirations.
[128] SVT is an abnormally rapid heart rate.
[129] *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) dated May 25, 2018.
[130] *See* hospital logbook, dated May 24, 2018.
[131] Intubation is the placement of a flexible plastic tube into the patient's trachea in order to maintain an open airway and facilitate the ventilation of the lungs.
[132] *See* hospital logbook, dated May 24, 2018.
[133] Bradycardia is an abnormally slow heartbeat.
[134] PEA is common in cardiac arrest situations where an electrocardiogram shows electrical activity in the heart, but the patient has no palpable pulse.  *See* CCS Memorandum – Significant Event Notice – Death from (b)(6); (b)(7)(C) (b)(6) dated May 25, 2018.
[135] Epinephrine constricts blood vessels, which increases blood pressure and increases heart rate.
[136] Adenosine is used to return an abnormally rapid heart rate normal.
[137] Metoprolol is a medication used to treat high blood pressure, chest pain (angina), and heart failure.
[138] *See* hospital logbook, dated May 25, 2018.



At 1:18 a.m., LMC staff stabilized HERNANDEZ,[139] but at 1:23 a.m., the detainee entered cardiac arrest again and medical staff performed CPR. At 1:27 a.m., staff discontinued CPR but continued rescue breaths.

At 1:36 a.m., LMC Nurse Practitioner (NP) [(b)(6); (b)(7)(C)] called CCCC medical staff to discuss ceasing resuscitation efforts on HERNANDEZ.[140] CCCC LPN [(b)(6); (b)(7)(C)] spoke to NP [(b)(6);] and contacted [(b)(6);] and ICE Field Medical Coordinator (FMC) [(b)(6); (b)(7)(C)] for guidance.[141] [(b)(6); (b)(7)(C)] directed [(b)(6); (b)(7)(C)] to continue resuscitation efforts on the detainee because she did not have a do-not-resuscitate order on file.[142]

HERNANDEZ went into cardiac arrest and was subsequently revived by hospital staff several times over the next two hours.[143] At 3:29 a.m., HERNANDEZ went into cardiac arrest, but hospital staff could not revive her. At 3:32 a.m., LMC physicians pronounced HERNANDEZ dead.[144]

At 3:33 a.m., [(b)(6); (b)(7)(C)] notified Commander [(b)(6); (b)(7)(C)] and Warden [(b)(6); (b)(7)(C)] of HERNANDEZ's death via telephone.[145] At 3:36 a.m., [(b)(6); (b)(7)(C)] notified [(b)(6); (b)(7)(C)].[146] At 3:40 a.m., [(b)(6); (b)(7)(C)] notified CCCC medical staff of the death.[147]

At 5:47 a.m., hospital security staff took custody of HERNANDEZ's body and moved it to the hospital morgue.[148] [(b)(6); (b)(7)(C)] witnessed LMC secure the body in the morgue and then returned to CCCC.[149]

**Post Death Events**

HERNANDEZ's preliminary cause of death is cardiac arrest.[150] At the time this report was published the final death certificate and autopsy report results were pending.

**On May 25, 2018**, [(b)(6); (b)(7)(C)] assigned Facility Investigator [(b)(6); (b)(7)(C)] to conduct an after-action review to assess CCCC staff compliance with facility policies and procedures. [(b)(6); (b)(7)(C)] cited no findings and concluded staff followed applicable facility policies and procedures.[151]

---

[139] *See* id.

[140] *See* id.

[141] *See* CCS general notes, dated May 25, 2018.

[142] ERAU interview with Health Services Administrator [(b)(6); (b)(7)(C)], June 26, 2018.

[143] *See* hospital logbook, dated May 25, 2018.

[144] *See* id. *See* CCS Memorandum – Significant Event Notice – Death from [(b)(6); (b)(7)(C)] dated May 25, 2018.

[145] *See* hospital logbook, dated May 25, 2018. *See* Sergeant [(b)(6):] Incident Statement, dated May 25, 2018.

[146] *See* CCS incident report, dated May 25, 2018.

[147] *See* CCS general notes, dated May 25, 2018.

[148] *See* hospital logbook, dated May 25, 2018.

[149] *See* id.

[150] *See* ICE Significant Incident Report, dated May 25, 2018.

[151] *See* CoreCivic Investigation Report, dated May 29, 2018.

14



## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**On June 21, 2018**, CCS conducted a mortality review of the death.  CCS declined to provide the details and findings from the mortality review with ERAU.[152]

## MEDICAL CARE AND SECURITY REVIEW

ERAU reviewed the medical care CCCC provided HERNANDEZ, as well as the facility's efforts to ensure that she was safe and secure while detained at the facility.  ERAU found CCCC fully compliant with the ICE PBNDS 2011 Medical Care Standard, as well as with those relevant components of the ICE PBNDS 2011 pertaining to safety and security.[153]  However, ERAU identified one area of concern regarding HERNANDEZ's care.

## AREAS OF CONCERN

ERAU notes the following area of concern regarding HERNANDEZ's intake processing:

- Although HERNANDEZ spoke only Spanish, (b)(6); (b)(7)(C) conducted the detainee's intake processing in English and did not use language interpretation services.  Effective communication between officers and detainees is crucial in the delivery and receipt of important information relevant to a detainee and their detention.

---

[152] ERAU interview with Health Services Administrator (b)(6); , June 26, 2018.
[153] *See* Exhibit 1: Creative Corrections Security and Medical Compliance Review.

AMERICAN OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000336

## DETAINEE DEATH REVIEW – Jeffry HERNANDEZ
## JICMS #201807481

**EXHIBITS**

1. Creative Corrections Security and Medical Compliance Review.
2. CCS receiving screening, dated May 17, 2018.
3. CCS Provider History and Physical Health Assessment, dated May 17, 2018.

16



DHS-ICE-19-0196, 19-0197-A-000337



October 12, 2021

**VIA ONLINE PORTAL**

| | |
|---|---|
| The Privacy Office | Freedom of Information Act Office |
| U.S. Department of Homeland Security | U.S. Immigration & Customs |
| Headquarters & Office of Civil Rights & | Enforcement |
| Civil Liberties | 500 12th Street SW, Stop 5009 |
| 245 Murray Lane SW | Washington, DC 20536-5009 |
| STOP-0655 | Via Online Portal |
| Washington, DC 20528-0655 | |
| Via Online Portal | |

**Re: Freedom of Information Act Request**

Dear FOIA Officers:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

Conditions faced by individuals held in immigration detention remain an urgent public concern. In fiscal year 2020, 21 individuals died in U.S. Immigration & Customs Enforcement (ICE) custody, the highest number of deaths since 2005[1] and a significant increase in deaths from the previous year, despite a much smaller detainee population.[2] The ongoing threat posed by the Covid-19 pandemic exacerbates existing concerns, particularly as the number of individuals detained by ICE has increased nearly to pre-pandemic levels.[3]

American Oversight seeks records with the potential to shed light on the treatment and care of individuals held in immigration detention, including those who have died in federal custody.

---

[1] Catherine Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*, CNN (updated Sept. 30, 2020, 8:11 AM), https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html.

[2] Lise Olsen, *Deaths in ICE Custody Skyrocketed During the COVID-19 Pandemic*, TX Observer (Jan. 20, 2021, 10:36 AM), https://www.texasobserver.org/deaths-in-ice-custody-skyrocketed-during-the-covid-19-pandemic/.

[3] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the U.S.*, N.Y. Times (updated Aug. 12, 2021), https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> A complete copy of any "Healthcare and Security Compliance Analysis" reports – or equivalent internal procedural analysis – completed by or for ICE Office of Professional Responsibility as part of the detainee death reviews for each of the following individuals who died in ICE custody.

> 1. Onoval Perez-Montufa
> 2. Luis Sanchez-Perez
> 3. James Tomas Hill
> 4. Kuah Hui Lee
> 5. Jose Freddy Guillen Vega
> 6. Fernando Sabonger-Garcia
> 7. Cipriano Chavez Alvarez
> 8. Romien Jally
> 9. Anthony Jones
> 10. Felipe Montes
> 11. Jesse Dean
> 12. Diego Fernando Gallego-Agudelo

> An example of a "Healthcare and Security Compliance Analysis" is attached as Exhibit A to aid your search.

> Please provide all responsive records from July 12, 2020, through the date the search is conducted.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[4] The public has a significant interest in the treatment and care of individuals held in immigration detention.[5] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including the extent to which conditions within ICE facilities may have contributed to the deaths

---

[4] 5 U.S.C. § 552(a)(4)(A)(iii).

[5] *See supra*, notes 1-3.

DHS-21-1425

of these individuals. American Oversight is committed to transparency and makes the responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[6] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[7]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[8] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[9] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[10] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[11] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such

---

[6] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[7] American Oversight currently has approximately 15,630 page likes on Facebook and 108,500 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Oct. 12, 2021); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Oct. 12, 2021).

[8] *See generally News,* American Oversight, https://www.americanoversight.org/blog.

[9] *Trump Administration's Contacts with Ukraine,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[10] *See generally The Trump Administration's Response to Coronavirus,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings,* American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[11] *See generally Audit the Wall,* American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall,* American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

DHS-21-1425

waivers;[12] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[13]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs, as well as letters, emails, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[14] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official

---

[12] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.
[13] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.
[14] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

DHS-21-1425

systems or if officials have, by intent or through negligence, failed to meet their obligations.[15]

- Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[16] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

- In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

- Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American

---

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[16] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-1425

Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Hart Wood at foia@americanoversight.org or 202.919.6303. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Hart Wood*
Hart Wood
on behalf of
American Oversight

DHS-21-1425

# EXHIBIT A

**DETAINEE DEATH REVIEW**
**Jeffry HERNANDEZ,** (b)(6); (b)(7)(C)
**Healthcare and Security Compliance Analysis**
**Cibola County Correctional Center, Milan, New Mexico**

As requested by the ICE Office of Professional Responsibility (OPR), External Reviews and Analysis Unit (ERAU), Creative Corrections participated in a review of the death of detainee Jeffry HERNANDEZ. A site visit was conducted June 26 through 27, 2018 by ERAU personnel (b)(6); (b)(7)(C) Management and Program Analyst and team leader; (b)(6); (b)(7)(C) Management and Program Analyst; Creative Corrections contract personnel (b)(6); (b)(7)(C) Security Subject Matter Expert; and (b)(6); (b)(7)(C) Registered Nurse, Healthcare Subject Matter Expert. In addition, telephone interviews were conducted between August 22, 2018 and September 18, 2018 by (b)(6); (b)(7)(C) and Creative Corrections Program Manager (b)(6); (b)(7)(C) Contractor participation was requested to determine compliance with the ICE 2011 Performance Based National Detention Standards (PBNDS), 2016 revisions, governing medical care and security operations.

This report was prepared collaboratively by (b)(6); (b)(7)(C)
Included is a case synopsis, description of the Cibola County Correctional Facility (CCCC) and its medical services, a narrative summary of events, and conclusions. The information and findings herein are based on analysis of detainee HERNANDEZ's detention file and medical record, tour of the intake and medical areas, interviews of CCCC and ERO personnel, and review of hospital and air transport records, facility policies, video surveillance footage, and available incident related documentation.

## SYNOPSIS

Jeffry HERNANDEZ, a 33 year-old transgender woman, entered the United States at the San Ysidro Port of Entry requesting asylum on May 9, 2018, one week before she was admitted to CCCC. On May 11, 2018 while still in the custody of U.S. Customs and Border Protection (CBP), she was examined by a physician following screening by a CBP officer. The physician documented she was human immunodeficiency virus (HIV) positive, emaciated, and ill appearing with a productive cough. She was sent to a hospital the same day where cleared for tuberculosis (TB) and given medications for bronchitis. Available evidence indicates ERO did not receive documentation of the physician's examination, the hospital report, or medications.

HERNANDEZ remained in CBP custody until May 14, 2018 while ICE Enforcement and Removal Operations (ERO) arranged for her transport and ultimate detention at CCCC, a facility

---





designated for housing transgender detainees.  She was in ERO custody for 56 hours before she was admitted to CCCC, an estimated 24 of which were in two detention facilities, six in the San Luis Regional Detention Center and 18 in the El Paso Service Processing Center.  The remaining time in ERO custody prior to HERNANDEZ's admission to CCCC was spent in transit.  HERNANDEZ was not medically screened at either the San Luis or El Paso facilities because her stay at both facilities was brief and her transfer was imminent.

During medical intake screening at CCCC, HERNANDEZ reported she was HIV positive and never treated.  She also reported significant weight loss in the past month and a half.  Vital signs were abnormal, she had a persistent cough, and appeared very malnourished and dehydrated.  A physician was notified and the detainee was examined on an expedited basis.  The physician diagnosed untreated HIV, dehydration, starvation, and fever with cough.   She ordered HERNANDEZ's transport to the local hospital for intravenous fluids to treat dehydration and to rule out an infection secondary to HIV and pneumonia.

Following evaluation and diagnostic testing, the emergency department physician determined that detainee HERNANDEZ's condition required care beyond the hospital's scope.  She was transferred by air to a hospital in Albuquerque, New Mexico and admitted to the intensive care unit (ICU).  She remained in the ICU for eight days, during which she received intravenous antibiotics, medication to increase her blood pressure, abdominal and neck CT scans, multiple blood tests, and chest x-rays.  HERNANDEZ's condition began to deteriorate following thoracentesis to remove excess fluid between the lungs and chest wall on the seventh day of her hospitalization, following which she was intubated and placed on a ventilator.  She experienced multiple episodes of cardiac arrest over the course of the five hours preceding her death. Resuscitative efforts failed following a final episode and at 3:32 a.m. on May 25, 2018, death was pronounced.

The reported preliminary cause of death was cardiac arrest.  The death certificate and autopsy report are not available as of the date of this report.

## MEDICAL SERVICES

CCCC is scheduled for its first American Correctional Association accreditation audit in October 2018.  CCCC is not accredited by the National Commission on Correctional Health Care.

Healthcare services are provided seven days per week 24 hours per day by contractor Correct Care Solutions (CCS) based in Nashville, Tennessee.  Although the staffing plan allocates 31.8 positions, 32.5 positions were filled at the time of the site visit.  They included the following: Health Services Administrator (HSA); two physicians; one full time nurse practitioner (NP); three part time NPs; one dentist; Director of Nursing (DON);  12 full time registered nurses




(RN); one part time RN, three full time licensed practical nurses (LPN); one part-time LPN; two licensed mental health counselors (LMHC); one pharmacy technician; and four medical record clerks.  Services provided under independent contract include tele-psychiatry 20 hours per week; pharmacy, radiology and laboratory.   The HSA reported that due to difficulty hiring LPNs in the area, RNs fill five LPN positions.    The reviewer confirmed the credentials of medical staff involved in detainee HERNANDEZ's care were current and primary-source verified.


# FACILITY DESCRIPTION

CCCC was built by Cibola County and purchased in 1998 by contractor CoreCivic, formerly Corrections Corporation of America.  The facility houses male and transgender ICE detainees, Cibola County inmates, and United States Marshal Service detainees.  The facility capacity is 1204.  On May 25, 2018, the date of detainee HERNANDEZ's death, the facility population was 953, including 309 ICE detainees.

There are three perimeter fences surrounding the facility.  Razor wire is along the top of the outer perimeter fence and between the two fences furthest from CCCC buildings.  Visitors seeking entry to the secure perimeter are processed in a small building and pass through a metal detector, and personal items are searched by way of an X-ray machine.   Visitors are then issued identification badges and move within the facility under escort.  Video surveillance cameras are used throughout the facility to monitor and record events.


## SUMMARY OF EVENTS

### May 9, 2018
ERO's Detainee Death Notice documents HERNANDEZ applied for admission to the US at the San Ysidro Port of Entry.


### May 11, 2018
(b)(6); (b)(7)(C) completed an ICE Health Services Corps (IHSC) In-Processing Health Screening Form, entering "no" for all questions.  The form includes a handwritten note stating, "HIV Positive/No Meds".

> **Note**:  (b)(6); (b)(7)(C) title is not identified on the form, but multiple forms provided to reviewers identify him as a CBP officer.

---

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                         Page 3
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000271

A printed CBP San Ysidro SIGMA EVENT report modified by [b)(6); (b)(7)(C)] this date includes a handwritten note stating, "HIV Positive No meds/Fever chills".

[b)(6); (b)(7)(C)] MD documented completion of a physical examination on a Mission Medical Support New Patient Comprehensive Exam form.   He wrote that the detainee's chief complaints were HIV, a headache, and cough.   HERNANDEZ reported she was diagnosed with HIV five months earlier and over the past month, lost 40 pounds and had recurring vomiting and diarrhea. Recorded vital signs were as follows:   elevated temperature of 99.5, elevated pulse of 134, respirations 18, blood pressure 112/70, and pulse oxygen 99 percent.   The examination findings were that HERNANDEZ was emaciated and ill appearing with a productive cough.    Doctor [b)(6);] assessment and plan identified HIV, weight loss, cough, headache and tachycardia[1] and directed transfer to the emergency room for chest X-ray and evaluation to rule out active infection[2] and sepsis.   He also directed that HERNANDEZ wear a mask, and noted that she was not medically cleared for transport and detention.

A report from Scripps Mercy Hospital, Chula Vista, CA documents a positive finding for bronchitis, a normal chest X-ray, and that there was no clinical evidence of tuberculosis.   The report, also dated May 11, 2018, includes instructions for Tylenol[3] for fever, Z-Pack[4], and an Albuterol inhaler[5].  Detainee HERNANDEZ was cleared for travel and incarceration.

> **Note**:  Reviewers are not familiar with CBP processes; therefore, no explanation for the two-day delay in medical screening and tuberculosis clearance can be offered.

> **Note**:  It is unknown whether the medications listed on the hospital report were dispensed or given to HERNANDEZ.

**May 12, 2018**
By email timed 4:30 p.m., ICE/ERO San Diego requested transfer of 19 detainees, including HERNANDEZ, to CCCC under the streamlined transfer process.    The email was written by [b)(6); (b)(7)(C)] (title unknown) and was directed to two email groups and multiple persons with ICE email addresses.  [b)(6); (b)(7)(C)] Supervisory Detention and Deportation Officer (SDDO), ICE Albuquerque, replied at 7:21 p.m. stating bed space at CCCC was approved.

---

[1] Tachycardia is a heart rate that that exceeds the normal resting rate.  Normal pulse rate for an adult is 60 to 100 beats per minute.

[2] Chest X-rays identify lung infections such as TB, pneumonia, and bronchitis.

[3] Tylenol is a brand name for acetaminophen.

[4] Z-Pack is an antibiotic.

[5] An albuterol inhaler is a bronchodilator to relax muscles in the lung.





**May 13, 2018**

By email timed 8:21 a.m. to ICE Air Charter Operations, [b)(6); (b)(7)(C)] requested 19 seats for 19 transgender females.  He wrote that they were apprehended at the San Ysidro Port of Entry and were to be transferred directly from there to the El Paso, Texas Area of Responsibility, noting, "…arrangements have been made with the receiving office to have a complete medical evaluation upon arrival.  Therefore they will not need certain medications at the time of transport; i.e., HIV medication."  May 22, 2018 was the flight date referenced by [b)(6); (b)(7)(C)] corrected to May 15, 2018 by subsequent email.

> **Note**:  As detailed below, the first complete medical evaluation of HERNANDEZ after she was picked up at San Ysidro was at CCCC, 56 hours after she entered ERO custody. She passed through the San Luis Regional Detention Center and El Paso Service Processing Center (EPSPC) before being transferred to CCCC.

**May 14, 2018**

By email timed 10:34 a.m., [b)(6); (b)(7)(C)] ICE Air Charter Operations, approved transport from the Phoenix-Mesa Gateway Airport to the El Paso Airport on May 15, 2018.

According to [b)(6); (b)(7)(C)], SDDO assigned to the ERO San Diego Field Office, LaSalle Corrections transportation officers for the San Luis Regional Detention Center (SLRDC) picked up HERNANDEZ and 18 other transgender detainees at the San Ysidro Point of Entry at approximately 12:00 p.m.  Their transport was requested by email the day before.  The detainees arrived at SLRDC at 6:00 p.m. and according to Assistant Field Office Director (AFOD) [b)(6);] [b)(6);] were placed in a holding cell.  He reported that because their departure was imminent, the detainees were not medically screened.  Asked whether ERO was aware of any medical information received from CBP when HERNANDEZ's custody was transferred, both AFOD [b)(6); (b)(7)(C)] stated they assume the CBP officer [b)(6);] screening was received, but knew of nothing further.

**May 15, 2018**

A LaSalle Corrections Transport Trip Log lists HERNANDEZ among other detainees who departed SLRDC on a bus bound for the Phoenix-Mesa Gateway Airport at 12:00 a.m.  The bus arrived at 4:00 a.m. and according [b)(6); (b)(7)(C)] the detainees boarded a flight to El Paso.  The time of flight departure is unknown, although according to [b)(6); (b)(7)(C)] SDDO assigned to the ERO El Paso, the flight arrived in El Paso at 2:48 p.m.  He said the passengers were met by ICE personnel and then turned over to contractor Global Precision Systems for transport by bus to the EPSPC.

ICE form G-391 documents the bus arrived at EPSPC at 3:15 p.m.  According to SDDO [b)(6);] HERNANDEZ was placed in a housing unit with other transgender detainees pending

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                        Page 5
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000273

transfer to CCCC the next day.  He stated that if HERNANDEZ did not voice a medical concern and none were observed by officers involved in her transport or movement into EPSPC, no medical screening would have taken place.  He confirmed with EPSPC healthcare personnel that they had no record of her; therefore, no medical concerns were brought to their attention.

**May 16, 2018**

ICE form G-391documents a total of 29 detainees were processed for transport to "ICE CAP" in Albuquerque, New Mexico between 8:30 and 9:45 a.m.  The time of arrival at ICE CAP was 2:30 p.m.  According to (b)(6); (b)(7)(C) ICE CAP refers to the ERO sub-office in Albuquerque where there is a "meet and greet" with officers assuming custody for transport to designated detention facilities.  He said that HERNANDEZ and the other detainees were turned over to the custody of CCCC transport officers.  The time of departure for CCCC was not documented.

Per CCCC video surveillance footage, a Transcor[6] bus carrying 28 detainees arrived at the facility's sallyport gate at **7:59 p.m.**  At **8:10 p.m.**, nine detainees were removed from the bus and escorted into the facility.  At **8:13 p.m.**, 19 more detainees were removed from the bus.  Booking Officer (b)(6); (b)(7)(C) informed the review team that the detainees in the second group were transgender and included HERNANDEZ.

> **Note**:  The EADM shows HERNANDEZ was booked into CCCC approximately nine hours before video evidence shows she arrived.

The detainees were escorted into the facility at **8:43 p.m.** after restraints were removed.  Form I-216, Record of Persons Transferred, documents all 19 transgender detainees were classified low custody by ERO.  CCCC's intake area has seven holding cells, a property room, a shower room and three medical examination rooms.  The video shows the detainees were taken to holding cells once inside the facility.  Five at a time, the detainees were then escorted to the property room where they were provided with facility uniforms, shoes, linens, a hygiene kit and an identification card.  During tour of the intake area, a property officer informed reviewers that arriving detainees' personal property is inventoried and then laundered by detainee workers before being placed in storage.  HERNANDEZ's property included a jacket, shirt and underwear and one pair each of socks, shoes and pants.  She signed a receipt for the items and forms acknowledging receipt of facility property, the right of CCCC to inspect non-privileged mail and to monitor non-attorney telephone calls, and receipts for the National ICE Detainee Handbook and the facility handbook.

> **Note**:  With the exception of the handbook receipt, all forms were in English.

---

[6] Transcor America LLC is a subsidiary of CoreCivic and provides transportation services.





DHS-ICE-19-0196, 19-0197-A-000274

(b)(6); (b)(7)(C) was questioned about completion of the admission process. He described HERNANDEZ as quiet and said she seemed scared. He acknowledged he does not speak Spanish but asserted he is able to communicate through hand gestures and using the few Spanish words he has learned. He stated that although Spanish speaking officers are available in the intake area, he did not ask for assistance or use the language line to communicate. Officer (b)(6); recalled HERNANDEZ answered no when asked if she had any medical problems, and offered his observation that it "seemed like she had the common cold and looked like she was under the weather." He said the detainee "seemed to understand when he asked her other yes or no questions, answering no to each one. HERNANDEZ was able to stand and walk on her own and did not lean on the table or counters for support.

## May 17, 2018

Video surveillance footage from the intake area shows the 19 transgender detainees were escorted to the medical waiting area at **2:23 a.m.** They all placed blankets on the floor and laid down. At **4:08 a.m.**, the detainees were provided with a beverage. Detainee HERNANDEZ got up to take the beverage and then sat in a chair to drink it. At **4:11 a.m.**, she went to the waiting area bathroom, returning in a minute and laying on the floor again. At **6:00 a.m.**, breakfast was served and detainee HERNANDEZ stood and walked to the door to retrieve a tray. She then sat on the floor and appears to have eaten the entire contents before returning the tray to staff at **6:14 a.m.**

Vital signs of detainees awaiting medical screening were taken by dental assistant (b)(6); this date. She reported she started this process at 6:00 a.m., although based on the video evidence, detainee HERNANDEZ was not called out of the waiting room until **7:26 a.m.** With the exception of normal respirations of 16 breaths per minute, her vital signs were abnormal, as follows: temperature and pulse elevated at 100.8 and 136, respectively; blood pressure low at 81/6; and pulse oxygen 92%[7]. She was five feet three inches tall and weighed 89 pounds. During interview (b)(6); stated the detainee looked ill so she put her paperwork aside so she would be the first one screened when the RN arrived.

At **7:35 a.m.** RN (b)(6); (b)(7)(C) conducted the intake screening. He signed and stamped two Medical Summary of Federal Prisoner/Alien in Transit forms to document his review, one reflecting HERNANDEZ departed from SLRDC on May 15, 2018; the second reflecting departure from EPC on May 16, 2018. The SLRDC form provides no information on TB clearance; the EPC form has a checkmark indicating a purified protein derivative (PPD)[8] was

---

[7] Normal vital signs for an adult are as follows: temperature 98.6, pulse 60 to 100 beats per minute, blood pressure 90/60 to 120/80, and respirations 12 to 18 breaths per minute. Normal pulse oxygen, which indicates the saturation of oxygen in the blood, is between 95 and 100 percent.
[8] A PPD skin test determines exposure to tuberculosis. Once planted, 48 to 72 hours must elapse before results




completed, but does not provide a date.   The section for documenting current medical problems is blank on both forms.   In the Medication Required for Care En Route section, the following printed information appears: "*DETAINEE IN ICE CUSTODY LESS THAN 72 HOURS* DETAINEE TRANSFER MEETS REQUIREMENTS PER JPATS[9] CABIN CREW POLICIES & PROCEDURES MANUAL 'Medical Regulations, Section D 4.(a), page 33, regarding TB clearance." (b)(6); (b)(7)(C) also signed the afore-described IHSC In-Processing Health Screening form completed on May 11, 2018 by CBP Officer (b)(6); (b)(7)(C) with all negative findings except for a handwritten note documenting, "HIV positive/NO MEDS".   Neither of the transfer forms were signed and dated by SLRDC and EPC personnel.

> **Note**:  The New Patient Comprehensive Exam form completed by (b)(6); (b)(7)(C) and report of Scripps Mercy Hospital, both dated May 11, 2018, were not received by CCCC.   As discussed above, the hospital report documents a chest X-ray was negative, there was no clinical evidence of TB, and a positive finding for bronchitis.   The report also includes directions for Tylenol for fever, an antibiotic, and albuterol inhaler.   No medications were received with HERNANDEZ.

(b)(6); (b)(7)(C) documented HERNANDEZ speaks Spanish and that Ms. Ford served as interpreter for screening.   (b)(6). co-signed the screening, Consent for Treatment, CCS Intake Education Information, and CCS Health Services Notice forms confirming she provided interpretation assistance.   Detainee HERNANDEZ identified as transgender female and reported she was HIV positive and had Hepatitis A[10].

> **Note**:  Following one of two entries documenting that detainee HERNANDEZ reported Hepatitis A, "[Patient] denies this" is written.   As discussed below, she denied having Hepatitis A during physical examination by the physician.

(b)(6); (b)(7)(C) noted HERNANDEZ's current symptoms included cough, loss of appetite, and weight loss, writing, "[Patient] states loosing [*sic*] a lot of [weight] in the last month and a half."   She reported she was not taking any medications.

> **Note**:  It is unknown whether the medications listed on the Scripps Medical Center report were ever given to HERNANDEZ.

---

may be read.

[9] JPATS is the Justice Prisoner Alien Transportation System.

[10] Hepatitis A is a virus affecting the liver that is transmitted through food and water.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                    Page 8
Medical and Security Compliance Analysis
September 28, 2018





The mental health and suicide risk screening questions were answered in the negative, as were Prison Rape Elimination Act (PREA) questions with the exception of detainee HERNANDEZ's self-identification as transgender.

On a CCS Immunization, Tuberculosis, and Syphilis Testing Record, (b)(6); (b)(7)(C) documented he planted a PPD to test HERNANDEZ for TB.

> **Note**: Asked about the TB test during interview, (b)(6); (b)(7)(C) said he had no knowledge of the chest X-ray performed at Scripps Medical Center because the report was not provided to CCCC.   He also noted HERNANDEZ appeared sick, had a cough, and experienced significant weight loss, symptoms of possible TB.   As for the check mark appearing on the EPC transfer summary indicating a PPD test was completed, HERNANDEZ was not held there long enough for it to be read; therefore, (b)(6); (b)(7)(C) action was appropriate.

(b)(6); (b)(7)(C) completed a Medical/Psychiatric Alert form, noting that there was obvious shaking in HERNANDEZ's hands and arms, her temperature was elevated, she complained of feeling weak, and reported significant weight loss in the past month.  During interview, (b)(6); (b)(7)(C) commented the detainee appeared very malnourished and dehydrated, and that he referred her to the physician. (b)(6); (b)(7)(C) consulted with (b)(6); (b)(7)(C) , HSA concerning providing HERNANDEZ with fluids and electrolytes.  She was given Ensure[11] and Pedialyte[12] and returned to the waiting area where the video shows she again laid on the floor. This occurred at **8:08 a.m.**

At **8:56 a.m.** (b)(6); (b)(7)(C) and another medical staff person are seen on video entering the waiting room and assisting detainee HERNANDEZ to her feet.  During interview, (b)(6); (b)(7)(C) said (b)(6); (b)(7)(C) had called before she arrived for work and notified her of HERNANDEZ's condition.  She also asked if the detainee could be given something for the elevated temperature and cough. (b)(6); (b)(7)(C) stated she told her no because she did not want to mask any symptoms and said she would be arriving at CCCC soon.  She instructed them to push fluids.  When she arrived, she went immediately to the waiting room.  The video shows (b)(6); (b)(7)(C) and the other medical staff person escorting HERNANDEZ out of the waiting room at **8:58 a.m.**

An addition to the vital signs section of the intake screening form timed **9:00 a.m.** documents the detainee's temperature was 102.0.  The entry is not signed or initialed. (b)(6); (b)(7)(C) informed the review team that it was decided the detainee would be placed in a medical isolation room pending evaluation by the physician, not for housing but for comfort.  CCCC has two medical

---

[11] Ensure is a milk protein concentrate containing vitamins and minerals.
[12] Pedialyte reduces dehydration and restores fluids and minerals lost due to diarrhea and vomiting.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                                    Page 9
Medical and Security Compliance Analysis
September 28, 2018





isolation rooms, both equipped with negative pressure for respiratory isolation. There is a video surveillance camera in the cell. Video shows HERNANDEZ entering Isolation Room 1 at **9:06 a.m.** after it was cleaned and fresh linens were placed on the bed. She laid on the bed and medical staff placed several blankets over her.

At **9:42 a.m.**, detainee HERNANDEZ was escorted out of the isolation room and into an examination room by (b)(6); (b)(7)(C) In a medical record entry timed **10:00 a.m.** (b)(6); (b)(7)(C) documented completion of HERNANDEZ's medical/dental/mental health examination. She did not use an interpreter because she reported during interview that she is fluent in Spanish. Vital signs were taken and all were abnormal, as follows: temperature 102, pulse 128, respirations 20 breaths, blood pressure 81/61, and pulse oxygen 92 percent. (b)(6); (b)(7)(C) noted detainee HERNANDEZ identified as transgender but had not taken hormones. The detainee reported significant weight loss during the last four to six months and that she had not been treated for HIV. She also reported she was not taking any medications and had no prior surgeries or hospitalizations; also, that she has difficulty sleeping and a history of depression. The physical examination found HERNANDEZ was emaciated with increased amount of white phlyem[13], dry mucous membranes in mouth, multiple cavities, normal lymph nodes, coarse breath sounds in lungs, tachycardia, normal bowel sounds, poor skin turgor, and muscle wasting. (b)(6); (b)(7)(C) assessment was dehydration, starvation, untreated HIV, fever, and cough. The treatment plan was to rule out infection secondary to HIV and pneumonia, obtain a chest x-ray, and transport to the local emergency department for intravenous (IV) fluids. A mask was placed on HERNANDEZ to protect her from environmental viruses/bacteria; also, to protect staff as her TB status was unknown by CCCC. Orders were written for the following laboratory tests to be completed at the hospital: complete blood count (CBC)[14]; rapid plasma reagin (RPR) with reflex[15]; comprehensive metabolic panel (CMP)[16]; thyroid stimulating hormone (TSH)[17]; hepatitis panel[18]; urinalysis for sexually transmitted diseases; HIV confirmation test with viral load[19]; and chest X-ray.

(b)(6); (b)(7)(C) was asked about this encounter during interview. Consistent with her documentation, (b)(6); (b)(7)(C) commented HERNANDEZ looked starved, tired and weak; that the

---

[13] Phylem is mucus excreted in abnormally large quantities.

[14] A CBC measures the levels of red blood cells, white blood cells, platelet (clotting cells) levels, hemoglobin (oxygen transport cells) and hematocrit (ratio of red blood cells to the total blood volume).

[15] An RPR detects syphilis.

[16] A CMP is a group of blood tests that provide an overall picture of the body's chemical balance and metabolism.

[17] TSH determines thyroid-stimulating hormone levels.

[18] A hepatitis panel finds markers of hepatitis infection.

[19] An HIV confirmation test with viral load measures the amount of HIV ribonucleic acid (RNA) in blood. RNA is the genetic material that makes up certain viruses.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                    Page 10
Medical and Security Compliance Analysis
September 28, 2018





muscles in her face were wasted; and that she appeared to have suffered from long term protein and calorie malnutrition. Her breathing sounded "rough" and her mouth and eyes were dry. Dr. (b)(6); (b)(7)(C) said that despite these observations, HERNANDEZ was alert and "making sense." The detainee told her she had been diagnosed with HIV at a clinic in Honduras. She reported that she managed to escape and was hiding from Honduran gangs who had prostituted her. She decided to join the caravan to the U.S. rather that returning to the Honduran clinic for HIV treatment because the gangs were looking for her and she believed they might be waiting there.

(b)(6); (b)(7)(C) order for HERNANDEZ's transfer to CGH specifies she was to be transported by facility vehicle. Asked about this decision, (b)(6); (b)(7)(C) said that after due consideration, she decided in favor of transport by facility vehicle rather than an ambulance based on the following:

- Though the detainee was very sick, she did not require medical supervision by emergency services personnel or life sustaining equipment during transport.
- She believed the detainee would arrive at the hospital more quickly if taken by facility vehicle.
- Cibola County is a small, rural county with only one ambulance. Having determined HERNANDEZ could safely be transported in a facility vehicle, (b)(6); (b)(7)(C) did not want to tie up the ambulance in case it was needed for a patient with more acute urgent care needs.

(b)(6); (b)(7)(C) told the review team that acting under the assumption that the detainee would be going to the hospital, she notified security of the possible transport while (b)(6); (b)(7)(C) was conducting the physical examination. (b)(6); (b)(7)(C) prepared the necessary paperwork and copies of HERNANDEZ's medical record for the officers to take to the hospital.

The video shows that at **10:09 a.m.**, detainee HERNANDEZ returned to Isolation Room 1 wearing a paper mask and laid down. At **10:52 a.m.**, she walked out of the room and sat in a wheelchair at the doorway. She was then wheeled off the medical unit and out through the Fire Exit.

Video from the vehicle sallyport camera shows that at **10:59 a.m.**, a van entered and backed up to the intake exterior door. At **11:07 a.m.**, a supervisor is seen verifying HERNANDEZ's identity to authorize her transfer to the hospital, and at **11:08 a.m.**, she was placed in the van. The view of the vehicle from the sallyport camera was partially obscured but escorting staff verified she was able to enter the van unassisted. At **11:13 a.m.**, the van entered the vehicle sallyport and following search, exited at **11:20 a.m.** en route to Cibola General Hospital (CGH).



AMERICAN
OVERSIGHT

(b)(6), (b)(7)(C) was assigned to escort HERNANDEZ to the hospital. He recalled on interview that she was taken outside in a wheelchair and when he asked if she could walk to the van, she said yes. (b)(6); (b)(7)(C) , the second transport officer, stated on interview that when detainee HERNANDEZ entered the van she just wanted to lay down and was told she could. (b)(6); (b)(7)(C) said the detainee spoke no English. Both officers reported that upon arrival at the hospital, HERNANDEZ was able to walk from the vehicle to the Emergency Department. An entry in the hospital logbook documents the time of arrival was **11:44 a.m.** According to (b)(6), (b)(7)(C) detainee HERNANDEZ was able to walk to the ER but did so slowly. Officer (b)(6); reported she was alert and talking and that hospital staff placed her in a curtained area where she drank some water.

In a memorandum prepared by (b)(6); (b)(7)(C) following HERNANDEZ's death, she wrote CGH personnel reported at **2:30 p.m.** that the detainee was on IV fluids and antibiotics. She wrote that the hospital suspected sepsis and that the decision to admit HERNANDEZ was pending laboratory and radiology results.

The CGH record documents detainee HERNANDEZ was evaluated and the following actions were taken:
- Detainee HERNANDEZ was evaluated;
- Intravenous (IV) fluids were initiated;
- An electrocardiograph[20] (EKG) was done;
- Laboratory and radiology diagnostic tests were ordered;
- Acetaminophen was given to reduce temperature;
- Famotidine was given to reduce stomach acid;
- HERNANDEZ was catheterized as she was unable to void;
- IV antibiotics azithromycin and ceftriaxone were given; and,
- Vital signs were closely monitored and documented within the following ranges: temperature 104.9 to 101.1; pulse 92 to173; respirations 9 to 36; blood pressure 80/52 to 102/65; and pulse oxygen 88 to 100 percent.

Based on physical examination findings, abnormal chest and abdominal x-rays, and abnormal blood tests, the Emergency Department physician's initial diagnoses included: septic shock[21]; dehydration; HIV infection; nodular pulmonary disease[22]; lymphadenopathy[23]; anemia[24]; and

---

[20] An EKG measures the heart's electrical impulses.
[21] Septic shock is a life threatening condition resulting from an infection throughout the body which can lead to organ failure and produces changes in temperature, blood pressure, heart rate, white blood cell count, and breathing.
[22] Nodular pulmonary disease is small masses in the lungs.
[23] Lymphadenopathy is enlarged lymph nodes.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                      Page 12
Medical and Security Compliance Analysis
September 28, 2018





DHS-ICE-19-0196, 19-0197-A-000280

thrombocytopenia[25]. Rapid HIV test was reactive confirming her HIV status. The ED physician determined detainee HERNANDEZ required a higher level of care than available at CGH and made arrangements to transfer her by air ambulance to Lovelace Medical Center (LMC) in Albuquerque, NM. Detainee HERNANDEZ's condition was listed as poor.

(b)(6); (b)(7)(C) said during interview that she was informed by CGH staff when it was determined the detainee was "way beyond" their ability to care for and that they were sending her to LMC. She indicated that the preferred option, University of New Mexico Hospital, had no beds. Dr. (b)(6); commented that by the time the detainee arrived at CCCC, the actions taken were "too little, too late"; possibly by as much as six months.

Per the hospital logbook, at **6:40 p.m.** (b)(6); (b)(7)(C) assumed vigil duty at CGH. (b)(6); (b)(7)(C) stated on interview that when she arrived, discussions about moving HERNANDEZ to LMC were underway. She reported one nurse explained the transfer details to the detainee in Spanish, then nursing staff prepared her for transfer.

The report of PHI Air Medical documents transport by air was decided upon because the trip would take approximately 35 minutes versus more than four hours by ground. (b)(6); (b)(7)(C) memorandum states the attending physician at CGH decided ground transportation was not appropriate, noting HERNANDEZ's blood pressure was low. (b)(6); (b)(7)(C) informed the review team that she was chosen to ride in the helicopter based on her body weight relative to (b)(6); (b)(7)(C) reported that the detainee was taken by stretcher to the helipad, and that she was placed in front next to the pilot. (b)(6); (b)(7)(C) sat in the back with two nurses, one of whom spoke Spanish. A logbook entry documents the group boarded the helicopter at **9:18 p.m.**

Per the PHI report, detainee HERNANDEZ was provided eye and ear protection when placed on the helicopter. The time of departure was **9:38 p.m.** per the PHI report and logbook entry. HERNANDEZ remained awake and alert and even smiling during transport. Her vital signs were monitored and documented as follows: pulse and pulse oxygen were within normal limits at 77 to 79 and 95 to 100 percent, respectively. HERNANDEZ's respirations were elevated at 20, and her blood pressure remained low as follows: 105/70; 101/76; 106/69; and 99/69.

> **Note**: The line on the form where temperature was recorded is not legible.

The hospital logbook documents the helicopter landed in Albuquerque at **10:05 p.m.** Sergeant (b)(6); told the review team that the helicopter was met on the Heart Hospital helipad by an

---

[24] Anemia is a decreased number of blood cells.
[25] Thrombocytopenia is a low level of platelets, the cells that help the blood clot.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                    Page 13
Medical and Security Compliance Analysis
September 28, 2018





ambulance, and the two nurses accompanied the detainee in back.  (b)(6); (b)(7)(C)   sat in front with the driver.  Per the report of Superior Ambulance Service, the trip to from the helipad to LMC took three minutes and was completed without incident.

An entry to the hospital logbook documents the ambulance arrived at LMC at **10:14 p.m.** and HERNANDEZ was taken through the emergency room to the intensive care unit (ICU) where she was placed in a negative pressure room.  Per (b)(6); (b)(7)(C) , the detainee was alert and talking and asked for food.  She was told no until testing was completed.  At **10:50 p.m.**, Officer (b)(6); who drove the facility vehicle from CHG, arrived at LMC.

Detainee HERNANDEZ remained at LMC until her death on May 25, 2018[26].  The following information is based on officers' log entries, information reported during interviews, and entries in the medical record summarizing updates received by CCCC health care personnel.  In addition, the afore-referenced summary memorandum prepared by (b)(6); (b)(7)(C) following the detainee's death is referenced when it provides information not included in medical record entries.

## May 18, 2018

In a **12:45 p.m.** progress note, (b)(6); (b)(7)(C) wrote that the ICU nurse reported HERNANDEZ was in isolation because her low blood counts made her vulnerable to opportunistic infections; also, because her TB status was unknown.   Sputum samples were being collected to test for TB.

> **Note**:  As discussed above, a Scripps Medical Center report documents a chest X-ray completed while HERNANDEZ was in CBP custody was negative for TB and that there was no evidence of active infection.

The ICU nurse also reported that the physician's treatment plan included consulting with infectious disease specialists and administering broad spectrum antibiotics[27], and that laboratory test results were awaited.  HERNANDEZ's hydration status was improved but her HIV status remained guarded.  (b)(6); (b)(7)(C) summary memorandum adds that the detainee was on IV fluids and Levophed for stabilization of blood pressure; also, that a computed tomography scan (CT) of the abdomen would be done to rule out an abscess.

Officers' logbook entries document nurses conducted routine checks, and that the CT scan was completed at **1:45 p.m.**  At **2:38 p.m.**, (b)(6); (b)(7)(C) resumed vigil duty and stated on interview that it seemed HERNANDEZ was doing a little better.  She had brushed her hair and was talking

---

[26] The LMC medical record was not provided to reviewers.

[27] Broad spectrum antibiotics are piperacillin/tazobactam and vancomycin.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                    Page 14
Medical and Security Compliance Analysis
September 28, 2018



AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000282

more.  She seemed comfortable and staff said she had slept most of the night, although the sergeant heard medical staff say she had a fever.

(b)(6); (b)(7)(C) memorandum documents an update was received at **9:30 p.m.**  The detainee's vital signs were stable and she was reportedly hungry and able to eat and take fluids.

**May 19, 2018**
Entries to the hospital log document no unusual incidents this date.  A visit by a chaplain was logged at **10:16 a.m.**, and at **3:48 p.m.**, the detainee was taken for CT scan.

In her memorandum, (b)(6); (b)(7)(C) wrote that the first update for the day was provided at **5:30 p.m.**  She wrote HERNANDEZ was oriented and stable with a good appetite, but her fever spiked at 104 during the day.  She was receiving IV fluids, antibiotics, and blood pressure medication.  A CT scan of the neck was performed due to enlarged lymph nodes with results expected the next day.

(b)(6); (b)(7)(C) documented in a **10:45 p.m.** progress note that the LMC nurse reported HERNANDEZ was feeling better and eating well.  A chest X-ray was negative for TB and the third and final sputum test was to be done the next day.  (b)(6); (b)(7)(C) summary memorandum covers this update as well, adding that the abdominal CT showed an enlarged spleen and peritoneal[28] lymph nodes.  She noted (b)(6); (b)(7)(C) reported the concern was T-cell[29] lymphoma[30] and that the detainee would probably need fine needle biopsies.  The detainee's CD4 count was 189[31].

**May 20, 2018**
(b)(6); (b)(7)(C) memorandum documents that (b)(6); (b)(7)(C) received a morning update at **8:40 a.m.**  HERNANDEZ remained stable and there was no change in her condition.

A hospital logbook entry documents that at **11:25 a.m.**, the doctor stated HERNANDEZ may need surgery the following day. The detainee ate lunch and watched television after **1:00 p.m.**  In the afternoon, the detainee slept and later ate dinner.

---

[28] Peritoneal refers to the serous membrane lining of the walls of the abdomen and pelvic cavities.

[29] T-cell is a type of lymphocyte/white blood cell in the immune system to fight infection.

[30] Lymphoma is a type of blood cancer.

[31] HIV infection advances to AIDS when there are less than 200 CD4 T-cells per millimeter of blood.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                                    Page 15
Medical and Security Compliance Analysis
September 28, 2018





[b)(6); (b)(7)(C)] documented an evening update timed **10:30 p.m.** in her memorandum.  She wrote the detainee was afebrile[32] and no longer on medication to maintain her blood pressure.   A needle biopsy was planned for Monday.

**May 21, 2018**
Officers' log entries document that HERNANDEZ was taken for pre-operative preparation at **1:35 p.m.** and to the operating room at **2:09 p.m.** [b)(6); (b)(7)(C)] memorandum documents a **3:45 p.m.** update indicating HERNANDEZ had axillary lymph node removal for biopsy and was stable.  Sputum smears for TB were negative.

The hospital log documents that at **3:38 p.m.**, [b)(6); (b)(7)(C)] conducted a routine administrative visit.  At **3:58 p.m.**, the detainee was returned to the ICU from the recovery room. At **7:49 p.m.**, the vigil officer wrote that the detainee was awake and watching television.  She fell asleep at **10:45 p.m.**

**May 22, 2018**
[b)(6); (b)(7)(C)] memorandum documents a **9:40 a.m.** update indicating HERNANDEZ was stable following axillary lymph node removal.  Her fever spiked at 102.2 the night before and she was receiving Bactrim[33] once a day and a penicillin[34] injection weekly.   The detainee's blood pressure was lower and being maintained with IV fluids.  She remained in the ICU.

The hospital logbook documents that at **2:25 p.m.**, HERNANDEZ was taken for a lumbar puncture procedure[35] which began at **3:00 p.m.** and was completed at **3:27 p.m.**   The detainee returned to her room in the ICU at **3:41 p.m.**   Throughout the evening, the detainee watched TV or slept.

[b)(6); (b)(7)(C)] documented in a progress note timed **5:45 p.m.** that detainee HERNANDEZ spiked a fever that afternoon and was receiving antibiotics; also, that she had no appetite but was drinking Ensure and that biopsy results were still pending.

> **Note**:  Completion of the lumbar puncture at 3:00 p.m. was not addressed in the 5:45 p.m. update given to 

---

[32] Afebrile means normal temperature.

[33] Bactrim is an antibiotic.

[34] Penicillin is an antibiotic.

[35] A lumbar puncture is a medical procedure in which a needle is inserted into the spinal canal, most commonly to collect cerebrospinal fluid.

DETAINEE DEATH REVIEW:  Jeffry HERNANDEZ                                           Page 16
Medical and Security Compliance Analysis
September 28, 2018



AMERICAN OVERSIGHT

DHS-ICE-19-0196, 19-0197-A-000284

**May 23, 2018**

Officers' log entries document HERNANDEZ ate breakfast, after which a nurse commented her heart rate was, "a little high due to eating." A **12:05 p.m.** entry documents the detainee still had a high fever but, "Still manages to smile and be thankful for having the nurses watch over her." At **2:00 p.m.**, the officer logged that that the detainee would be getting a blood transfusion and at **4:45 p.m.**, that the detainee had a CT scan.

At **7:38 p.m.**, (b)(6); (b)(7)(C) took over vigil duty. She recalled on interview that HERNANDEZ was sitting up and that it was her impression that the detainee was doing a lot better. A **9:32 p.m.** log entry documents a chest X-Ray was completed.

(b)(6); (b)(7)(C) documented in a progress note timed **10:30 p.m.** that an ICU nurse reported HERNANDEZ had had a high fever all day and a pulse exceeding 150. She remained on oral antibiotics but IV antibiotics may be resumed the next day. The biopsy results were not back; blood cultures showed no growth so far; and lumbar puncture was negative. In her memorandum, (b)(6); (b)(7)(C) wrote that they were unable to get an earlier report and summarized the information documented by (b)(6); (b)(7)(C)

> **Note**: A blood transfusion and CT scan documented in officers' logbook entries were not addressed in the 10:30 p.m. update given to (b)(6); (b)(7)(C)

**May 24, 2018**

In a progress note timed **11:00 a.m.**, (b)(6); (b)(7)(C) documented an update provided to her by an ICU nurse. She wrote that (b)(6); (b)(7)(C) was present during the conversation. (b)(6); (b)(7)(C) progress note and the HSA's memorandum document the following laboratory test and chest X-ray results:

- Blood culture showed no growth;
- RPR[36] positive;
- Malaria negative;
- Toxoplasmosis[37] negative;
- Negative for parasites;
- Urine culture and lumbar puncture both negative;
- Chest x-ray showed small bilateral plural effusion[38].

(b)(6); (b)(7)(C) documented the detainee's condition was serious with guarded prognosis due to HIV status, poor nutritional status for two years, fever of unknown origin, pleural effusion, and

---

[36] RPR is a test for syphilis.
[37] Toxoplasmosis is an infectious disease caused by the one-celled protozoan parasite.
[38] Bilateral plural effusion is characterized by an abnormal amount of fluid around the lungs.





lymphadenopathy suspicious for T-cell lymphoma. [(b)(6); (b)(7)(C)] memorandum documents that HERNANDEZ's highest heart rate the night before was 150 with a temperature of 104.5, and that Tylenol and a cooling blanket were used to bring down her temperature. [(b)(6);] wrote that the detainee's condition at the time of the update was critical.

[(b)(6); (b)(7)(C)] was assigned to vigil duty on the day shift. She documented in the logbook that at **1:10 p.m.**, detainee HERNANDEZ told the nurse she felt congested and was having difficulty breathing. At **1:24 p.m.**, a breathing treatment was administered and at **1:30 p.m.**, an X-Ray was taken. At **1:34 p.m.**, an ultrasound was completed and at **3:22 p.m.**, the detainee was taken to radiology to have fluid removed from her lungs. During interview, [(b)(6); (b)(7)(C)] stated a very large amount of fluid was removed from the detainee's lungs, and that HERNANDEZ was "very tough" throughout the procedure.

In her memorandum, [(b)(6);] wrote that at approximately 3:00 p.m., a thoracentesis[39] removed 1600 cc of fluid, 700 cc from one side of the chest and 900 cc from the other. By **4:00 p.m.** the detainee's pulse oxygen started falling, dropping to 74 percent, and she developed tachypnea[40], supra ventricular tachycardia[41], and an elevated blood pressure.

A **5:00 p.m.** entry to the logbook documents HERNANDEZ was coughing up a large amount of mucus. [(b)(6); (b)(7)(C)] stated during interview that she kept handing her napkins, commenting the detainee was wearing a breathing mask and tube but had difficulty breathing while she was coughing. She laid on her side and kept coughing, and [(b)(6); (b)(7)(C)] observed she looked "scared." At one point, [(b)(6); (b)(7)(C)] left to get more napkins and when she returned, the detainee could not hold back a cough and expelled mucus on her. [(b)(6); (b)(7)(C)] left the area and washed her face.

> **Note**: [(b)(6); (b)(7)(C)] was informed by reviewers that the institution's Exposure Control Plan provides information on counseling and blood testing if she has concerns about possible HIV exposure.

[(b)(6); (b)(7)(C)] was also on vigil at this time. On interview, he stated that the detainee's condition worsened after the procedure where they drained her lung. He concurred that the detainee was coughing a lot and had a lot of phlegm. At **5:35 p.m.**, [(b)(6); (b)(7)(C)] logged, "Detainee having a hard time breathing and coughing a lot of mucus." At **5:40 p.m.**, she logged that HERNANDEZ had a high heart rate and was having a hard time breathing. A **5:55 p.m.** entry documents the process of intubation[42] was started with eight medical staff assisting.

---

[39] Thoracentesis is a procedure to remove the fluid between the lung and chest wall.
[40] Tachypnea is very rapid respirations.
[41] Tachycardia is an abnormally rapid heartbeat.





[b)(6); (b)(7)(C)] logged that the process was completed at **6:35 p.m.**, noting that medical staff had difficulty intubating the detainee because she "had a difficult airway." A **6:40 p.m.** entry documents a chest X-Ray was taken and at **7:07 p.m.**, HERNANDEZ was sedated.

> **Note**: [b)(6); (b)(7)(C)] memorandum documents the decision to intubate was not made until 7:45 p.m., approximately two hours after the time [b)(6); (b)(7)(C)] documented the process was started. Specifically, she wrote, "At approximately 1945 the decision was made to intubate, sedated, and place the patient on a ventilator. Patient also had a central line[43] placed."

During interview of [b)(6); (b)(7)(C)] she said that when she arrived for her shift at **7:40 p.m.** and observed the detainee's condition, she thought, "What happened?" She stated HERNANDEZ was hooked up to medical equipment and was not responsive. [b)(6); (b)(7)(C)] documented in the logbook that the head nurse told her HERNANDEZ "is paralyzed due to condition and is on life support in critical condition." The nurse told the sergeant that the detainee could code during the night.

[b)(6); (b)(7)(C)] documented that at **10:10 p.m.** detainee HERNANDEZ developed bradycardia[44] and pulseless electrical activity (PEA)[45]. Hospital staff was present and immediately started chest compressions, multiple doses of epinephrine[46] were administered, and the detainee was revived by 10:16 p.m. Detainee HERNANDEZ then developed supraventricular tachycardia (SVT)[47] and Adenosine[48] was administered but not effective. Metoprolol was also given to lower the detainee's blood pressure.

**May 25, 2018**

A logbook entry documents that at **12:48 a.m.**, detainee HERNANDEZ coded again. Hospital staff performed cardiopulmonary resuscitation (CPR), used the automated external defibrillator (AED) and gave the detainee medications. At **1:07 a.m.**, detainee Hernandez coded again. At **1:18 a.m.**, the officer documented in the logbook that the nurse stated the detainee was stable. However, at **1:23 a.m.**, the detainee again coded. Hospital staff started but discontinued chest compressions at **1:27 a.m.**, performing rescue breaths only.

---

[42] Intubation is placement of a flexible plastic tube into the trachea to maintain an open airway to facilitate ventilation of the lungs.

[43] Placement of a central line refers to the placement of a catheter into a large vein for fluid replacement and intravenous medication administration.

[44] Bradycardia is an abnormally slow heartbeat.

[45] PEA means there is electrical activity, but the heart does not contract.

[46] Epinephrine constricts blood vessels, which increases blood pressure and increases heart rate.

[47] SVT is an abnormally rapid heart rate.

[48] Adenosine is used to convert SVT to normal.

DETAINEE DEATH REVIEW: Jeffry HERNANDEZ                                    Page 19
Medical and Security Compliance Analysis
September 28, 2018





At **1:33 a.m.**, LMC Nurse Practitioner (NP) [(b)(6); (b)(7)(C)] stated he wanted to stop all procedures. [(b)(6); (b)(7)(C)] stated during interview that [(b)(6); (b)(7)(C)] asked the officers for a contact number for ICE or CCCC as he needed direction regarding continued resuscitation efforts. [(b)(6); (b)(7)(C)] documented in the CCCC medical record that [(b)(6); (b)(7)(C)] called at 1:30 a.m. to report that detainee HERNANDEZ had been coding every five minutes, had poor brain function, and that all means of treatment were exhausted.  The NP stated that because the detainee had no known family, he was looking for direction from the responsible party. [(b)(6); (b)(7)(C)] told the NP she would relay the message to the HSA and ICE Field Medical Coordinator (FMC) [(b)(6); (b)(7)(C)]   She documented the notifications were made within 12 minutes. [(b)(6);] informed the review team that the FMC called the NP and gave direction to continue resuscitation efforts because the detainee did not have a Do Not Resuscitate order on file.

Log entries document that HERNANDEZ coded at **1:44 a.m.**, **2:22 a.m.**, **3:02 a.m.**, **and 3:04 a.m**.  Each time, CPR was performed until the detainee regained a pulse.   At **3:29 a.m.**, HERNANDEZ coded again.  At **3:32 a.m.**, death was pronounced. [(b)(6); (b)(7)(C)] documented notification of the detainee's death by FMC [(b)(6);] and Commander [(b)(6); (b)(7)(C)] shift supervisor.

> **Note**: [(b)(6); (b)(7)(C)] memorandum documents death at 3:32 a.m. was pronounced by two hospital physicians.    The names were not provided.

At **5:47 a.m.**, hospital security staff arrived to move HERNANDEZ's body to the morgue on the ground floor of the hospital.  CCCC vigil officers observed the body being placed in the morgue and then returned to CCCC.  Both [(b)(6); (b)(7)(C)] stated they were provided with information on the employee assistance program (EAP) hotline. [(b)(6); (b)(7)(C)] stated the EAP number is posted in medical and she ensured healthcare staff knew the service is available.  During interview of [(b)(6); (b)(7)(C)] she shared that the staff were taking HERNANDEZ's death very hard because she was so sweet and nice.

On the day of the detainee's death, [(b)(6); (b)(7)(C)] assigned Facility Investigator [(b)(6); (b)(7)(C)] to review events from HERNANDEZ's intake through her departure for CGH to assess staff compliance with policies and procedures. [(b)(6); (b)(7)(C)] shared during interview he started as CCCC's investigator a year ago following a 30 year career in law enforcement, 27 years with the New Mexico State Police and three years as police chief in Grants, NM, a nearby community.  He said he watched all pertinent video and noted HERNANDEZ waited a long time in both the intake and medical waiting areas.  He nonetheless concluded policies and procedures were followed.  He documented his findings in a two page report submitted to the warden on May 29, 2018.



[b)(6), (b)(7)(C)] stated a mortality review was conducted and the report was sent to CCS headquarters. She stated the report could not be shared with the review team, but reported participating staff included the warden, associate warden, physician, HSA, DON, quality improvement RN, and infectious disease RN.

According to [(b)(6)] the preliminary cause of death was cardiac arrest. The death certificate and autopsy report were not available at the time of the site visit.

## CONCLUSIONS

## Medical

Two days after HERNANDEZ requested asylum at the San Ysidro Port of Entry, a CBP officer completed an in-processing medical screening form, identifying her as HIV positive and without medications. A physical examination completed by a physician the same day noted her HIV status, weight loss, cough, headache, and elevated heart rate. She was sent to a hospital to rule out sepsis and active infection. The hospital report documents a chest X-ray was normal and there was no clinical evidence of TB; however, HERNANDEZ was found to have bronchitis. Hospital instructions included Tylenol for fever, antibiotics, and an inhaler. Reviewers do not know whether the medications were provided and given by CBP.

ERO accepted custody of HERNANDEZ three days after she was examined at the hospital, May 14, 2018. She arrived at CCCC approximately 56 hours later. During that time, she did not come into contact with medical professionals because she was in transit between multiple locations pending her ultimate arrival at CCCC; also, because she reportedly did not report and officers did not observe any medical conditions of concern. Medical transfer summaries from SLRDC and EPSPC provide no medical information, including TB clearance, documenting in pre-printed format only that HERNANDEZ was in ERO custody less than 72 hours. Based on reported information and documentation, the May 11, 2018 physical examination report referencing a productive cough and Scripps hospital report documenting TB clearance and diagnosis of bronchitis, with medications, were not available to SLRDC, EPSPC, and CCCC. ERO personnel reported that if the documentation and/or medications was provided by CBP when custody was transferred to ERO, it would have accompanied HERNANDEZ during each step of the transportation process. ERO personnel also reported that if any transportation, SLRDC, or EPSPC officers became aware of any medical concerns during the 56 hours HERNANDEZ was in ERO custody, notification of healthcare professionals would have been expected.





Detainee HERNANDEZ's medical screening at CCCC was initiated approximately 11 hours after video shows her exiting the transport vehicle with 18 other transgender detainees. When vital signs were found abnormal, she was appropriately given priority for full screening by an RN. Interpretation assistance was used and documented. The RN informed the DON and HSA of the vital signs and that HERNANDEZ reported she was HIV positive, had a persistent cough, significant weight loss over several weeks, and appeared malnourished and dehydrated. In turn, the HSA notified the physician. Upon reporting to the facility, the physician promptly examined HERNANDEZ and diagnosed untreated HIV, dehydration, starvation, and fever with a cough. The physician ordered detainee HERNANDEZ's transport to the local hospital by facility vehicle for IV fluids and to rule out infection secondary to HIV and pneumonia. The physical examination was started approximately an hour and a half after the intake screening and the detainee was moved to the facility vehicle for transport approximately 50 minutes thereafter. This demonstrates that CCCC staff acted with due haste once HERNANDEZ was seen by medical professionals.

Following the detainee's transport to CGH, then to LMC, the physician and HSA proactively kept abreast of her condition, diagnostic testing, and treatment. The physician documented the updates she received in the medical record; the HSA did not but included them in a summary memorandum prepared after HERNANDEZ's death.

CCCC health care staff were notified of EAP services, and a mortality review involving key medical and security personnel was reportedly conducted.

**Compliance Findings**

The reviewer identified no deficiencies in the ICE 2011 PBNDS, Medical Care, revised 2016.

**Area of Note**

During the 56 hours HERNANDEZ was in transit between the San Ysidro Port of Entry and CCCC, she was held in two detention facilities for a total of approximately 24 hours; SLRDC for six and EPSPC for approximately 18. Because the Medical Care standard is specific to facilities holding detainees more than 72 hours, its requirements do not apply in this case. Evaluating compliance with ERO directives or contract requirements governing transportation of detainees in transit to their ultimate destination is beyond the scope of this analysis; however, ERO personnel informed reviewers that officers are expected to report medical concerns or complaints to health care professionals. Absent documentation of any concerns, it appears none were voiced by the detainee or observed by officers. However, it is noteworthy and of concern that HERNANDEZ was immunocompromised and ill when SLRDC transportation officers assumed custody on behalf of ERO and by the time she reached CCCC, was so ill that a physician ordered





her immediate transport to the emergency room.    It is unknown whether medications for bronchitis were started while HERNANDEZ remained in CBP custody but if they were, they are unlikely to have run their course and were not provided to the SLRDC officers who assumed custody at San Ysidro.

Because CCCC did not have documentation of TB clearance and because HERNANDEZ's symptoms upon arrival were suggestive of the disease, she was tested at the hospital and was again confirmed negative.  Although she did not have TB, that fact was not known during the 56 hours spent in ERO custody before she arrived at CCCC.  Whether or not noted by transportation officers and staff at SLRDC and EPSPC, there can be no question that HERNANDEZ's productive cough continued while she was in transit.  Whereas Scripps Mercy Hospital cleared her for travel and incarceration, it is possible her bronchitis may have been determined non-contagious.  However, had she had TB, the officers and detainees with whom she came in contact would have been exposed to the highly communicable and dangerous disease.

Reviewers recommend implementation of basic medical screening procedures, including TB symptom screening, by transport officers and personnel at facilities holding detainees in transit.

## Safety and Security

Video shows detainee HERNANDEZ exited a bus with 18 other transgender detainees at 8:13 p.m. on May 16, 2018.  She entered the facility 30 minutes later and over the course of the next five and half hours, security processing for HERNANDEZ and the other detainees was completed.   Translation services were not used during security processing, despite the fact that all staff acknowledged detainee HERNANDEZ spoke no English.    In addition, with exception of the handbook receipt, the forms she signed acknowledging understanding of information provided were in English.

In preparation for the medical intake screening, health care staff took the detainee's vital signs five hours after she was moved to the medical waiting area.  When it was determined she should be moved to an isolation cell for her comfort pending physical examination, security personnel assisted.  After the examination, security staff facilitaed the detainee's transport to the local hospital in a facility vehicle.  There were no identified delays.  Later, she was airlifted by helicopter to a hospital in Albuquerque.  Vigil officers appropriately documented events at both hospitals in a logbook.

A review of staff's actions was completed by the facility investigator.  The review included analysis of pertinent video surveillance footage.





**Compliance Findings**

The reviewer identified no deficiencies in the ICE 2011 PBNDS, revised 2016 governing safety and security.

**Area of Concern**

Security personnel did not use interpretation assistance to complete the intake process and with one exception, all forms signed by the detainee were in English.  Because admission processing includes conveyance of information and signing of documents acknowledging understanding, reviewers recommend reinforcement of the expectation to use language interpretation assistance; also, translation of acknowledgment of understanding statements in languages most commonly spoken by ICE detainees.





DHS-ICE-19-0196, 19-0197-A-000292



October 12, 2021

**VIA ONLINE PORTAL**

The Privacy Office
U.S. Department of Homeland Security
Headquarters & Office of Civil Rights &
Civil Liberties
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655
Via Online Portal

Freedom of Information Act Office
U.S. Immigration & Customs
Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
Via Online Portal

**Re: Freedom of Information Act Request**

Dear FOIA Officers:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of your agency, American Oversight makes the following request for records.

Conditions faced by individuals held in immigration detention remain an urgent public concern. In fiscal year 2020, 21 individuals died in U.S. Immigration & Customs Enforcement (ICE) custody, the highest number of deaths since 2005[1] and a significant increase in deaths from the previous year, despite a much smaller detainee population.[2] The ongoing threat posed by the Covid-19 pandemic exacerbates existing concerns, particularly as the number of individuals detained by ICE has increased nearly to pre-pandemic levels.[3]

American Oversight seeks records with the potential to shed light on the treatment and care of individuals held in immigration detention, including those who have died in federal custody.

---

[1] Catherine Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*, CNN (updated Sept. 30, 2020, 8:11 AM), https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html.
[2] Lise Olsen, *Deaths in ICE Custody Skyrocketed During the COVID-19 Pandemic*, TX Observer (Jan. 20, 2021, 10:36 AM), https://www.texasobserver.org/deaths-in-ice-custody-skyrocketed-during-the-covid-19-pandemic/.
[3] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the U.S.*, N.Y. Times (updated Aug. 12, 2021), https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.

 1030 15th Street NW, Suite B255, Washington, DC 20005  |  AmericanOversight.org

**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> A complete copy of any independent autopsies supplied to DHS or ICE, including those by county or state medical examiners, for each of the following individuals who died in ICE custody:
>
> 1.  Onoval Perez-Montufa
> 2.  Luis Sanchez-Perez
> 3.  James Tomas Hill
> 4.  Kuah Hui Lee
> 5.  Jose Freddy Guillen Vega
> 6.  Fernando Sabonger-Garcia
> 7.  Cipriano Chavez Alvarez
> 8.  Romien Jally
> 9.  Anthony Jones
> 10. Felipe Montes
> 11. Jesse Dean
> 12. Diego Fernando Gallego-Agudelo
>
> An example of an independent autopsy is attached as Exhibit A to aid your search.
>
> Please provide all responsive records from July 12, 2020, through the date the search is conducted.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[4] The public has a significant interest in the treatment and care of individuals held in immigration detention.[5] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including the extent to which conditions within ICE facilities may have contributed to the deaths of these individuals. American Oversight is committed to transparency and makes the

---

[4] 5 U.S.C. § 552(a)(4)(A)(iii).
[5] *See supra*, notes 1–3.

DHS-21-1426

responses agencies provide to FOIA requests publicly available, and the public's understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[6] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[7]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[8] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[9] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[10] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[11] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such

---

[6] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[7] American Oversight currently has approximately 15,630 page likes on Facebook and 108,500 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Oct. 12, 2021); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Oct. 12, 2021).

[8] *See generally News,* American Oversight, https://www.americanoversight.org/blog.

[9] *Trump Administration's Contacts with Ukraine,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[10] *See generally The Trump Administration's Response to Coronavirus,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings,* American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[11] *See generally Audit the Wall,* American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall,* American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

waivers;[12] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[13]

Accordingly, American Oversight qualifies for a fee waiver.

## Guidance Regarding the Search & Processing of Requested Records

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs, as well as letters, emails, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unofficial systems or stored outside of official files are subject to the Federal Records Act and FOIA.[14] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official

---

[12] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[13] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

[14] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

DHS-21-1426

systems or if officials have, by intent or through negligence, failed to meet their obligations.[15]

▪ Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[16] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

▪ Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American

---

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[16] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-1426

Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Hart Wood at foia@americanoversight.org or 202.919.6303. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Hart Wood*
Hart Wood
on behalf of
American Oversight

DHS-21-1426

# EXHIBIT A



**SCHOOL OF MEDICINE**
OFFICE OF
THE MEDICAL INVESTIGATOR

# DEATH INVESTIGATION SUMMARY

Case Number: 2018-03102

## HERNANDEZ RODRIGUEZ, ROY ALEXANDER

**County Pronounced:** Bernalillo
**Law Enforcement:**
**Agent:**
**Date of Birth:** 2/18/1985
**Pronounced Date/Time:** 5/25/2018 3:32:00 AM
**Central Office Investigator:** (b)(6);
**Deputy Field Investigator** (b)(6);                COI

---

### CAUSE OF DEATH

Multicentric Castleman disease

*Due to*

Acquired immunodeficiency syndrome

### MANNER OF DEATH

Natural

---

(b)(6);          **MD**
(b)(7)(C)

Chief Medical Investigator, Professor of Pathology
and Radiology

All signatures authenticated electronically
Date: 4/8/2019 2:34:18 PM

---



**DECLARATION**

The death of HERNANDEZ RODRIGUEZ, ROY ALEXANDER was investigated by the Office of the Medical Investigator under the statutory authority of the Office of the Medical Investigator.

I, (b)(6); MD, a board certified anatomic and forensic pathologis licensed to practice pathology in the State of New Mexico, do declare that I personally performed or supervised the tasks described within this Death Investigation Summary document.  It is only after careful consideration of all data available to me at the time that this report was finalized that I attest to the diagnoses and opinions stated herein.

Numerous photographs were obtained along the course of the examination.  I have personally reviewed those photographs and attest that they are representative of findings reported in this document.

This document is divided into 10 sections with a final Procedural Notes section:

1. Summary and Opinion
2. External Examination
3. Medical Intervention
4. Postmortem Changes
5. Evidence of Injuries
6. Internal Examination
7. Neuropathology
8. Microscopy
9. Postmortem Computed Tomography
10. Other

Should you have questions after review of this material, please feel free to contact me at the Office of the Medical Investigator (Albuquerque, New Mexico) - 505-272 (b)(6);

Printed: 4/9/2019 9:56:30 AM

Report Name: Death Investigation Summary

AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-E-000108

2019-ICLI-00051 1506
Death Investigation Report page 2 of 31

| | | |
|---|---|---|
| Case Number: **2018-03102** | **Summary Opinion** | **HERNANDEZ RODRIGUEZ, ROY ALEXANDER** |

**Medical Investigator**

**Medical Investigator Trainee**

 MD

## SUMMARY AND OPINION

Pathologic Diagnoses

-Acquired immunodeficiency syndrome
  -Human herpesvirus-8 (HHV-8) positive multicentric Castleman disease (Tricore Reference Laboratory & CDC reports)
    -Lymphadenopathy, paratracheal and hilar regions
    -Splenomegaly
    -Diffuse alveolar damage
    -Anasarca
    -Multiple cardiac arrests with successful resuscitations
      -Acute hypoxic-ischemic encephalopathy & diffuse cerebral edema
      -Fractures, anterior ribs and sternum, resuscitative
  -Epstein-Barr virus (EBV) associated lymphoproliferative disorder
  -Kaposi's sarcoma
  -Ulcer, esophagus, shallow

-Left occipital subcutaneous scalp hematoma, small, by CT scan
-Dilated lacteal, jejunum, incidental
-Probe patent foramen ovale, incidental


Opinion

This 33 year old transgender woman, Roy Alexander Hernandez Rodriguez, (with a preferred name of Roxsana Hernandez and also known as Jeffry Hernandez, Jeifri Hernandez-Rodriguez, and Yenfri Hernandez-Rodriguez) was taken into federal custody in California on May 11, 2017.  At that time, she was ill with cough, congestion and fever. There was a history of an untreated human immunodeficiency virus (HIV) infection for 5-6 months. She was diagnosed with bronchitis at a Scripps Care Clinic on May 12, 2018 and given antibiotics. She was then transferred to New Mexico on May 16, 2018 for incarceration.

On intake medical screening within 12 hours of arrival, she was noted to be ill and was sent to the Cibola General Hospital Emergency Room in Grants, NM where she complained of fever, cough, sore throat, abdominal pain and vomiting.  She was noted to be hypotensive, tachycardic, tachypneic, febrile, hypoxemic, anemic (hematocrit 25.3%) and thrombocytopenic (platelet count 69,000/microliter).   A prothrombin time was elevated at 15.7 seconds. The d-dimer concentration was markedly elevated at 449 ng/ml.  A rapid Strep test, throat culture, and blood cultures were negative. HIV infection was confirmed by testing for HIV antibodies.  A computed tomography (CT) scan showed numerous pulmonary micronodules and enlarged hilar and mediastinal lymph nodes. Her clinicians thought she was in septic shock with an untreated HIV infection, dehydration (blood urea nitrogen 26 mg/dl, creatinine 1.0 mg/dl) and emaciation/starvation (albumin 2.2 g/dl). She was treated with antibiotics and fluids and was transferred to Lovelace Medical Center-Downtown in Albuquerque, NM on May 17, 2018.

At Lovelace Medical Center-Downtown, she indicated that she was originally from Honduras but had been living in Mexico since she was 19 years old. She had cough and an unintentional 30 lb weight loss for 2 months while she was traveling through Mexico to the US, and fever for 2 weeks.  There was cervical and inguinal lymphadenopathy. She was diagnosed with an untreated HIV infection, sepsis requiring vasopressors for hypotension, and malnutrition.  An abdominal CT scan showed splenomegaly. A CT scan of the chest showed clear lungs, small pleural effusions, and bilateral axillary lymphadenopathy.  A test for Treponema pallidum antibody was positive and an RPR was positive with a titer of 1:32.  She was treated for syphilis. By May 19, 2018 the blood urea nitrogen and creatinine had normalized. A prealbumin concentration was low at 5.1 mg/dl. Tests for hepatitis B surface antigen and hepatitis C antibody were negative. A test for HIV viral load showed 744,000 copies/ml.  The CD4 count was 189 cells/cubic millimeter and she was started on Bactrim to cover for Pneumocystis carinii pneumonia.  A CT scan of the neck showed bilateral lymphadenopathy.  A QuantiFERON TB GOLD test was negative.  A test for Cryptococcus antigen was negative.  A



DHS-ICE-19-0196, 19-0197-E-000109

| Case Number: | 2018-03102 | Summary Opinion | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

urine Histoplasma antigen test was negative.  An Ebstein Barr virus panel showed prior exposure while a Monospot test was negative.  Tests for Cytomegalovirus antibodies were negative for IgM and positive for IgG.  Blood cultures from Cibola General Hospital were negative after 5 days.  Sputum cultures were negative. Toxoplasmosis antibodies were negative. A malaria screen of a blood smear was negative.The lymphadenopathy was thought to be potentially secondary to the HIV infection. A nasopharyngeal swab was negative for influenza viruses, adenovirus, respiratory syncytial virus (RSV), rhinovirus, metapneumovirus, and parainfluenza viruses by PCR.  On May 20, 2019 she was feeling better.

On May 21, 2018, she underwent an excisional biopsy of a right axillary lymph node which was later reported as demonstrating multicentric Castleman disease.

Neurosyphilis was considered. A lumbar puncture on May 22, 2019 showed a white blood cell count of 9 with 90% lymphocytes and a protein of 34.  A VDRL on cerebrospinal fluid was non-reactive.  Her fevers persisted.

On May 23, 2019, there was pancytopenia with a hematocrit that dropped to 20.2% and continued thrombocytopenia. She was transfused with red blood cells and platelets. She developed anasarca.

On May 24, 2018, she complained of shortness of breath. She underwent bilateral thoracentesis for expanded pleural effusions the same day.  The left pleural fluid contained 490 white blood cells/microliter of which 16% were neutrophils and 46% were lymphocytes.  The right pleural fluid had a similar count with 15% neutrophils and 65% lymphocytes.  No organisms were seen. A malaria smear was negative. Fibrinogen was normal. A d-dimer concentration was elevated at 10.82 microgram/ml FEU.  Abdominal distention with abdominal pain on palpation was noted.  She demonstrated respiratory failure and was emergently intubated.  The liver enzymes became elevated.  The hematocrit was 22.5% and the platelet count was 105,000/microliter.  She was transfused with more red blood cells. Another abdominal CT scan showed anasarca with moderate bilateral pleural effusions and moderate ascites and splenomegaly. The evening of May 24, 2019, she had the first of a series of at least 10 cardiac arrests with successful resuscitations until she was pronounced dead on May 25, 2018.  On May 25, 2019 the platelet count had fallen to 59,000/microliter.

At autopsy, there was diffuse alveolar damage. The spleen and the lymph nodes in the chest were enlarged. Hematopathology consultants reviewed the antemortem lymph node biopsy, confirmed the diagnosis of multicentric Castleman Disease, and identified focal lymph node involvement by Kaposi's sarcoma. The multicentric Castleman Disease and Kaposi's sarcoma were associated with a human herpesvirus 8 (HHV-8) infection. Kaposi's sarcoma in the presence of HIV antibodies is an acquired immunodeficiency syndrome (AIDS) defining condition. The hematopathology consultants also identified an independent Epstein-Barr virus associated lymphoproliferative disorder.

An evaluation of autopsy tissues by the Infectious Disease Pathology Branch at the Centers for Disease Control and Prevention (CDC) confirmed the diagnosis of multicentric Castleman disease and identified positive staining for both HHV-8 (pancreas, spleen, lymph node, lung) and HIV (lymph node) infections.  CDC testing excluded infection by hantavirus, Leptospira species, influenza viruses, parainfluenza viruses, and RSV. CDC testing also excluded infection by bacteria and fungi in lung tissues.

A small occipital scalp hematoma was seen by computed tomography (CT) scan.  The origin of this injury is unknown. There were fractures of multiple ribs and the sternum from cardiopulmonary resuscitation attempts. No other injuries were observed.

A neuropathologic exam showed mild to moderate acute hypoxic-ischemic changes and mild diffuse cerebral edema likely secondary to the multiple cardiac arrests with successful resuscitations. There was no evidence of HIV/AIDS encephalopathy or an opportunistic HIV-related brain infection.

A culture of stool was negative for Yersinia enterocolitica, Escherichia coli O157:H7, and Campylobacter and Salmonella species.  Stool was negative for Shiga toxin by PCR.  Stool was negative for Giardia lamblia and Cryptpsporidium by an enzyme immunoassay method.

The cause of death is best classified as multicentric Castleman disease due to acquired immunodeficiency syndrome. HHV-8 associated multicentric Castleman disease usually occurs in individuals with HIV infections and a weakened immune system. These individuals can develop a severe form of the disease that is rapidly progressive and lead to death within weeks such as seen in this decedent.  Multicentric Castleman disease can present with a variety of nonspecific symptoms and signs reflective of an inflammatory process that include fever, night sweats, enlarged lymph nodes, loss of appetite and weight loss, shortness of breath, enlarged liver and spleen, pancytopenia, peripheral neuropathy, hypoalbuminemia, and skin rash.  The decedent manifested most of these findings.



| Case Number: | 2018-03102 | Summary Opinion | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
| --- | --- | --- | --- |

The manner of death is natural.



| Case Number: | 2018-03102 | External Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

Medical Investigator                        Medical Investigator Trainee

(b)(6);        MD

| | |
|---|---|
| External exam date time: | 5/26/2018 10:23:00 AM |
| Authority for examination: | OMI |
| ID confirmed at time of exam: | Yes |
| Means used to confirm identity: | Photo |
| Other verification means: | |
| Location of orange bracelet: | Left wrist |
| Name on orange bracelet: | Decedent name |
| Other name on orange bracelet: | |
| Location of green bracelet: | Left wrist |
| Name on green bracelet: | Decedent name |
| Other name on green bracelet: | |
| Hospital ID tags or bracelets? | Yes |
| If yes specify stated name and location: | Left wrist- decedent name |
| Body length (cm): | 164.00 |
| Body weight (kgs): | 60.00 |
| BMI: | 22.31 |

| | |
|---|---|
| Development: | Well-developed |
| Development comments: | |
| Stature: | Well-nourished |
| Age: | Appears to be stated age |
| Anasarca: | No |
| Edema localized: | No |
| Dehydration: | No |
| Scalp hair color: | Blonde |
| Scalp hair color comments: | |
| French braids with pigtails | |
| Scalp hair length: | Long |
| Eyes: | Both eyes present |
| Irides: | Brown |
| Eyes corneae: | Translucent |
| Eyes sclerae: | White |
| Eyes conjunctivae: | Translucent |
| Eyes petechiae: | No |
| Palpebral petechiae: | No |
| Bulbar petechiae: | No |
| Facial petechiae: | No |



| Case Number: | 2018-03102 | External Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| Oral mucosal petechiae: | No |
|---|---|
| Nose: | Normally formed |
| Ears: | Normally formed |
| Lips: | Normally formed |
| Facial hair: | Stubble in the pattern of a beard and moustache |
| Facial hair color: | Brown |
| Facial hair color comments: | |
| sparse hair | |
| Maxillary dentition: | Natural |
| Mandibular dentition: | Natural |
| Condition of dentition: | Adequate |
| Neck: | Unremarkable |
| Trachea midline: | Yes |
| Chest development: | Normal |
| Chest symmetrical: | Yes |
| Chest diameter: | Appropriate |
| Abdomen: | Flat |
| Anus: | Unremarkable |
| Back: | Unremarkable |
| Spine: | Normal |
| External genitalia: | Male |
| Breast development: | None |
| Breast masses: | None |
| Right hand digits complete: | Yes |
| Left hand digits complete: | Yes |
| Right foot digits complete: | Yes |
| Left foot digits complete: | Yes |
| Extremities: | Well-developed and symmetrical |
| Extremities comment: | |
| pink toenail polish slight edema | |
| Muscle group atrophy: | No |
| Senile purpura: | No |
| Pitting edema: | Yes |
| Muscle other: | No |

| Tattoo(s) | |
|---|---|
| Tattoos present: | No |

| Cosmetic Piercing(s) | |
|---|---|
| Cosmetic piercing present: | No |

| Scar(s) | |
|---|---|
| Scar(s) present: | Yes |



DHS-ICE-19-0196, 19-0197-E-000113

| Case Number: | 2018-03102 | External Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| | |
|---|---|
| Scar anterior chest: | Yes |
| Scar right hand: | Yes |
| Scar left hand: | Yes |
| Scar right knee: | Yes |
| Scar left thigh: | Yes |
| Scar left knee: | Yes |

### Reporting Tracking

| | | |
|---|---|---|
| Reported by: | (b)(6); (b)(7)(C) | |
| Verified by: | | MD on 6/7/2018 1:40:12 PM |
| Reviewed and approved by: | | MD on 4/8/2019 2:35:41 PM |



Death Investigation Report page 6 of 31

| Case Number: | 2018-03102 | Medical Intervention | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

**Medical Investigator**

(b)(6); (b)(7)(C) MD

**Medical Investigator Trainee**

**Evidence of medical intervention:**   Yes

| Indwelling Tubes |
|---|

| **If nasogastric tube present, specify course and position:** | No |
| **If endotracheal tube present, specify course and position:** | No |
| **Tracheostomy site/tube:** | No |
| **Mediastinal tube(s):** | No |
| **Chest tube(s):** | No |
| **If Foley catheter present, specify course and position:** | No |

**Medical intervention other:**

bandages over needle punctures, right forearm, right groin, left arm

Sutured wound with covering bandage in right axilla

CPR abraded contusions over sternum

| Electrocardiogram (ECG) Monitoring Pads |
|---|

**ECG Monitoring Pads Present?:**   No

| Defibrillator Pads |
|---|

**Defibrillator pads present?:**   No

| Vascular Catheter(s): |
|---|

**Vascular catheter(s):**   No

| Recent Surgical Intervention |
|---|

**Evidence of recent surgical intervention:**   No

| Report Tracking |
|---|

**Reported by:**

**Verified by:**   (b)(6); (b)(7)(C) MD on 1/24/2019 11:01:15 AM

**Reviewed and approved by:**   MD on 4/8/2019 2:35:41 PM



DHS-ICE-19-0196, 19-0197-E-000115

2019-ICLI-00051 1513

Death Investigation Report page 9 of 31

| Case Number: | 2018-03102 | Postmortem Changes | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

**Medical Investigator**

(b)(6);
(b)(7)(C) MD

**Medical Investigator Trainee**

| | |
|---|---|
| **External exam date:** | 5/26/2018 10:19:00 AM |
| **Body temperature:** | Cool subsequent to refrigeration |
| **Rigor mortis:** | Fully fixed |
| **Livor mortis - color:** | Purple |
| **Livor mortis - fixation (if applicable):** | Partially fixed |
| **Livor mortis - position (if applicable):** | Posterior |
| **State of preservation:** | No decomposition |

### Report Tracking

| | |
|---|---|
| **Reported by:** | |
| **Verified by:** | (b)(6); (b)(7)(C) MD on 5/26/2018 10:21:38 AM |
| **Reviewed and approved by:** | MD on 4/8/2019 2:35:41 PM |

Printed: 4/9/2019 9:56:31 AM
DHS-ICE-19-0196, 19-0197-E-000116
2019-ICLI-00051 1514
Death Investigation Report page 10 of 31



| Case Number: | 2018-03102 | Evidence of Injury | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

**Medical Investigator**

(b)(6);
(b)(7)(C) MD

**Medical Investigator Trainee**

**Are there any injuries:** Yes

## Evidence of Injury:

**Autopsy date:** 6/7/2018 12:58:00 PM

| # | Injury | Location | Injury Description |
|---|--------|----------|--------------------|
| 1 | Blunt injury | Head | See Computed Tomography (CT) section |

## Report Tracking

**Reported by:**

**Verified by:** (b)(6); (b)(7)(C) MD on 3/15/2019 11:03:36 AM

**Reviewed and approved by:** MD on 4/8/2019 2:35:41 PM



DHS-ICE-19-0196, 19-0197-E-000117
2019-ICLI-00051 1515
Death Investigation Report page 1 of 31

| Case Number: | 2018-03102 | Internal Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| Medical Investigator | Medical Investigator Trainee |
|---|---|
| (b)(6); MD | |

| | |
|---|---|
| **Date of Autopsy:** | 6/7/2018 12:58:00 PM |
| **Date of Internal Exam:** | 6/7/2018 1:01:00 PM |

| BODY CAVITIES | |
|---|---|
| **Chest cavities examined:** | Yes |
| **See evidence of injury section** | No |
| **Organs in normal anatomic position** | Yes |
| **Other organ position comments** | |
| **Diaphragm:** | Intact |
| **Serosal surfaces:** | Smooth and glistening |
| **Body cavity adhesions present:** | No |
| **Fluid accumulation present:** | Yes |
| **Fluid accumulation right chest cavity:** | Yes |
| **Fluid accumulation left chest cavity** | Yes |
| **Fluid accumulation pericardial sac:** | No |
| **Fluid accumulation abdominal cavity:** | Yes |
| **Fluid accumulation pelvis:** | No |
| **Fluid accumulation comments:** | |

200 ml clear pink fluid each chest cavity
300 ml similar fluid abdominal cavity

| HEAD | |
|---|---|
| **Brain examined:** | Yes |
| **See separate forensic neuropathology consultation report** | Yes |
| **See evidence of injury section:** | No |
| **See evidence of medical Intervention section:** | No |
| **See postmortem changes section:** | No |
| **Brain fresh (g):** | 1300 |
| **Brain fixed (g):** | 1295 |
| **Facial skeleton:** | No palpable fractures |
| **Calvarium:** | No fractures |
| **Skull base:** | No fractures |
| **Skull comments:** | |

| Spinal Cord | |
|---|---|
| **Spinal cord examined:** | No |

| Middle Ears | |
|---|---|

AMERICAN OVERSIGHT

| Case Number: | **2018-03102** | **Internal Examination** | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| | |
|---|---|
| **Middle ears examined:** | No |

| **Neck** | |
|---|---|
| **Neck examined:** | Yes |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section** | No |
| **See Postmortem Changes section:** | No |
| **Subcutaneous soft tissues:** | Unremarkable |
| **Strap muscles:** | Unremarkable |
| **Jugular veins:** | Unremarkable |
| **Carotid arteries:** | Unremarkable |
| **Tongue:** | Unremarkable |
| **Epiglottis:** | Unremarkable |
| **Hyoid bone:** | Unremarkable |
| **Larynx:** | Other - See comments |
| **Palatine tonsils:** | Not examined |
| **Other neck comments:** | edema in aryepiglottic folds<br>approximately 1 cm area of hemorrhage in laryngeal mucosa |

| **CARDIOVASCULAR SYSTEM** | |
|---|---|
| **Heart examined:** | Yes |
| **See separate Cardiovascular Pathology report:** | No |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section:** | No |
| **See Postmortem Changes section:** | No |

| **Heart** | |
|---|---|
| **Right coronary ostium position:** | Normal |
| **Left coronary ostium position:** | Normal |
| **Supply of the posterior myocardium:** | Right coronary artery |
| **Heart fresh (g):** | 250.0 |
| **Heart fixed (g):** | |

| **Coronary artery stenosis by atherosclerosis (in percent):** | |
|---|---|
| **Right coronary ostium:** | 0 |
| **Proximal third right coronary artery:** | 0 |
| **Middle third right coronary artery:** | 0 |
| **Distal third right coronary artery:** | 0 |
| **Left coronary ostium:** | 0 |
| **Left main coronary artery:** | 0 |
| **Proximal third left anterior descending coronary artery:** | 0 |
| **Middle third left anterior descending coronary artery:** | 0 |



Internal Examination

**Page 2**

| Case Number: | 2018-03102 | **Internal Examination** | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| | |
|---|---|
| **Distal third left anterior descending coronary artery:** | 0 |
| **Proximal third left circumflex coronary artery:** | 0 |
| **Middle third left circumflex coronary artery:** | 0 |
| **Distal third left circumflex coronary artery:** | 0 |

| **Cardiac Chambers and Valves:** | |
|---|---|
| **Cardiac chambers:** | Unremarkable |
| **Tricuspid valve:** | Unremarkable |
| **Pulmonic valve:** | Unremarkable |
| **Mitral valve:** | Unremarkable |
| **Aortic valve:** | Unremarkable |
| **Right ventricular myocardium:** | No fibrosis, erythema, pathologic infiltration of adipose tissue or areas of accentuated softening or induration |
| **Left ventricular myocardium:** | No fibrosis, erythema, or areas of accentuated softening or induration |
| **Atrial septum:** | Other - See comments |
| **Ventricular septum:** | Unremarkable |
| **Other septal comments:** | |

2-3 mm diameter probe patent foramen ovale

| **Aorta** | |
|---|---|
| **Aorta examined:** | Yes |
| **Orifices of the major vascular branches:** | Patent |
| **Coarctation:** | No |
| **Vascular dissection:** | No |
| **Aneurysm formation:** | No |
| **Complex atherosclerosis:** | No |
| **Other aortic pathology:** | No |

| **Vena Cava** | |
|---|---|
| **Great vessels examined:** | Yes |
| **Vena cava and major tributaries:** | Patent |

| **RESPIRATORY SYSTEM** | |
|---|---|
| **Lungs examined:** | Yes |
| **See separate Cardiovascular Pathology report:** | No |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section:** | No |
| **See Postmortem Changes section:** | No |
| **Lung right (g):** | 1240 |
| **Lung left (g):** | 1070 |
| **Upper and lower airways:** | Unobstructed, and the mucosal surfaces are smooth and yellow-tan |



AMERICAN
OVERSIGHT

| Case Number: | 2018-03102 | **Internal Examination** | HERNANDEZ RODRIGUEZ, ROY ~~ALEXANDER~~ |
| --- | --- | --- | --- |

| | |
| --- | --- |
| **Pulmonary parenchyma color:** | Dark red-purple |
| **Pulmonary parenchyma congestion and edema:** | Marked amounts of blood and frothy fluid |
| **Pulmonary trunk:** | Free of saddle embolus |
| **Pulmonary artery thrombi:** | None |
| **Pulmonary artery atherosclerosis:** | None |

### HEPATOBILIARY SYSTEM

| | |
| --- | --- |
| **Liver examined:** | Yes |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section:** | No |
| **See Postmortem Changes section:** | No |
| **Liver (g):** | 1760 |
| **Bile vol (mL):** | |
| **Gallstones autopsy:** | No |
| **Gallstones autopsy desc:** | |
| **Hepatic parenchyma (color):** | Pale brown |
| **Hepatic parenchyma (texture):** | Unremarkable |
| **Hepatic vasculature:** | Unremarkable and free of thrombus |
| **Gallbladder:** | Unremarkable |
| **Gallstones:** | None |
| **Intrahepatic biliary tree:** | Unremarkable |
| **Extrahepatic biliary tree:** | Unremarkable |

### GASTROINTESTINAL SYSTEM

| | |
| --- | --- |
| **Alimentary tract examined:** | Yes |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section:** | No |
| **See Postmortem Changes section:** | No |
| **Stomach contents vol (mL):** | 20 |
| **Stomach contents description:** | |
| thick yellow liquid | |
| **Appendix found:** | Yes |

### Esophagus

| | |
| --- | --- |
| **Course:** | Normal course without fistulae |
| **Mucosa:** | Other - See comments |
| **Other esophageal comments:** | |
| smooth grey-white mucosa with 1 x 0.5 cm shallow hemorrhagic ulcer in mid portion | |

### Stomach

| | |
| --- | --- |
| **Mucosa:** | Usual rugal folds |
| **Pylorus:** | Patent and without muscular hypertrophy |

### Small Intestine

| | |
| --- | --- |
| **Luminal contents:** | Partially digested food |



| Case Number: | 2018-03102 | Internal Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| **Mucosa:** | Other - See comments |
|---|---|
| **Caliber and continuity:** | Appropriate caliber without interruption of luminal continuity |
| **Other small intestine comments:** | |

1cm yellow soft mucosal nodule in jeunum

| Colon | |
|---|---|
| **Luminal contents:** | Unformed stool |
| **Mucosa:** | Unremarkable |
| **Caliber and continuity:** | Appropriate caliber without interruption of luminal continuity |

| Pancreas | |
|---|---|
| **Form:** | Normal tan, lobulated appearance |

| GENITOURINARY SYSTEM | |
|---|---|
| **Genitourinary system examined:** | Yes |
| **See Evidence of Injury section:** | No |
| **See Evidence of Medical Intervention section:** | No |
| **See Postmortem Changes section:** | No |

| Kidneys | |
|---|---|
| **Kidneys capsules:** | Thin, semitransparent |
| **Cortical surfaces:** | Smooth |
| **Cortices:** | Normal thickness and well-delineated from the medullary pyramids |
| **Calyces, pelves and ureters:** | Non-dilated and free of stones and masses |
| **Other kidney comments:** | |
| pale brown | |
| **Kidney right (g):** | 130 |
| **Kidney left (g):** | 130 |
| **Urine volume (mL):** | 0 |
| **Urine description:** | |

| Urinary Bladder | |
|---|---|
| **Urinary bladder mucosa:** | Gray-tan and smooth |

| Male | |
|---|---|
| **Male:** | Yes |

| Testicles | |
|---|---|
| **Location:** | Bilaterally intrascrotal |
| **Size:** | Unremarkable |
| **Consistency:** | Homogeneous |
| **Other testicle comments:** | |

| Prostate Gland | |
|---|---|
| **Size:** | Unremarkable |
| **Consistency:** | Homogeneous |
| **Other prostate gland comments:** | |

| RETICULOENDOTHELIAL SYSTEM | |
|---|---|
| **Reticuloendothelial system examined:** | Yes |



DHS-ICE-19-0196, 19-0197-E-000122
2019-ICLI-00051 1520
Death Investigation Report page 16 of 31

| Case Number: | 2018-03102 | Internal Examination | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

| See Evidence of Injury section: | No |
|---|---|
| See Evidence of Medical Intervention section: | No |
| See Postmortem Changes section: | No |

### Spleen

| Spleen (g): | 555 |
|---|---|
| Spleen parenchyma: | Moderately firm |
| Spleen capsule: | Intact |
| Spleen white pulp: | Indiscernible |

### Bone Marrow

| Color: | Red-brown, homogeneous and ample |
|---|---|

### Lymph Nodes

| Regional adenopathy: | Other - See comments |
|---|---|
| Other lymph node comments: | |

prominent 1-4 cm paratracheal and hilar lymph nodes

### Thymus

| Thymus (g): | |
|---|---|
| Parenchyma: | Absent (involution by adipose tissue) |

### ENDOCRINE SYSTEM

| Endocrine system examined: | Yes |
|---|---|
| See Evidence of Injury section: | No |
| See Evidence of Medical Intervention section: | No |
| See Postmortem Changes section: | No |

### Pituitary Gland

| Size: | Normal |
|---|---|

### Thyroid Gland

| Position: | Normal |
|---|---|
| Size: | Normal |
| Parenchyma: | Homogeneous |

### Adrenal Glands

| Adrenal right (g): | |
|---|---|
| Adrenal left (g): | |
| Size: | Normal |
| Parenchyma: | Yellow cortices and gray medullae with the expected corticomedullary ratio |

### MUSCULOSKELETAL SYSTEM

| Musculoskeletal system examined: | Yes |
|---|---|
| See Evidence of Injury section: | No |
| See Evidence of Medical Intervention section: | No |
| See Postmortem Changes section: | No |
| Bony framework: | Unremarkable |
| Musculature: | Other - See comments |



**Case Number:** 2018-03102 | **Internal Examination** | **HERNANDEZ RODRIGUEZ, ROY ALEXANDER**

| | |
|---|---|
| **Subcutaneous soft tissues:** | Other - See comments |
| **Other musculoskeletal system comments:** | anasarca in exposed soft tissues |

**ADDITIONAL COMMENTS**

**Report Tracking**

**Reported by:**

**Verified by:** (b)(6); (b)(7)(C)    MD on 6/7/2018 1:54:19 PM

**Reviewed and approved by:** MD on 4/8/2019 2:35:41 PM



| Case Number: | **2018-03102** | **Neuropathology Examination** | **HERNANDEZ RODRIGUEZ, ROY ALEXANDER** |

**Medical Investigator**                    **Medical Investigator Trainee**

(b)(6); MD
(b)(7)(C)

**Summary:**

NEUROPATHOLOGIC FINDINGS:
I.  Mild to moderate acute hypoxic-ischemic changes.
II.  Mild diffuse cerebral edema.
III.  Scattered chronic inflammatory infiltrate, leptomeninges.

SUMMARY AND EXPLANATION OF FINDINGS:
The decedent is a 33-year-old man with a medical history significant for AIDS.

Neuropathologic examination demonstrates a macroscopically normal appearing brain with mild cerebral edema.
Microscopically, mild to moderate acute hypoxic-ischemic changes are present.  Scattered chronic inflammatory
mononuclear infiltrates involve the leptomeninges of the hippocampal section and the pons.

Microscopic features of HIV/AIDS encephalopathy are not present (multinucleated giant cells and microglial nodules).
Features of opportunistic CNS infections are not identified.

| | |
|---|---|
| **Brain exam date:** | 6/27/2018 12:00:00 AM |
| **Brain:** | Yes |
| **Dura:** | Yes |
| **Other materials available for exam:** | Pituitary gland |
| **Brain Dissection Method:** | Cerebrum - coronal |
| **Brain fresh:** | 1300.00 |
| **Brain fresh:** | |
| **Brain fixed:** | 1295.00 |
| **Evidence of Injury** | |
| **General Description (External):** | |
| **Dura mater:** | Smooth and without massess |
| **Dural venous sinuses:** | Patent |
| **Cortical bridging vein:** | Disrupted upon brain removal |
| **Other cortical bridging vein comment(s):** | |
| Disrupted upon brain removal | |
| **Leptomeninges:** | Smooth and translucent |
| **Superficial Cortical Vasculature:** | No thromboses or vascular malformations |
| **Gyral convolution patterns:** | Within normal limits |
| **Gyral convolutions:** | Slight widening and flattening |
| **Uncal processes:** | Not grooved or herniated |
| **Cerebellar tonsils:** | Not grooved or herniated |
| **Basilar arterial vasculature:** | Normal |
| **Cranial nerve roots:** | Normal |
| **General Description (Internal):** | |
| **Cerebral cortex:** | Intact and without contusion |



AMERICAN OVERSIGHT

DHS-ICE-19-0196, 19-0197-E-000125

2019-ICLI-00051 1523
Death Investigation Report page 19 of 31

| Case Number: | **2018-03102** | **Neuropathology Examination** | **HERNANDEZ RODRIGUEZ, ROY ALEXANDER** |
|---|---|---|---|

| **Gray-white matter junctions:** | Distinct |
|---|---|
| **Internal capsule:** | No neoplasm, cyst, abscess or hemorrhage |
| **Ventricular system:** | Appropriately configured and not compressed |
| **Deep gray nuclei:** | No neoplasm, cyst, abscess or hemorrhage |
| **Other comment(s) about the deep gray nuclei:** | |
| **Hippocampi:** | No neoplasm, cyst, abscess or hemorrhage |
| **Mammillary bodies:** | No neoplasm, cyst, abscess or hemorrhage |
| **Superior cerebellar vermis:** | No neoplasm, cyst, abscess or hemorrhage |
| **Cerebellar parenchyma:** | No neoplasm, cyst, abscess or hemorrhage |
| **Brainstem structures:** | No neoplasm, cyst, abscess or hemorrhage |
| **Proximal cervical spinal cord:** | No neoplasm, cyst, abscess or hemorrhage |
| **Substantia nigra:** | Normally pigmented |
| **Locus ceruleus:** | Normally pigmented |

**Other Tissues Examined**

| **Spinal cord:** | Other |
|---|---|
| **Other comment(s) about the spinal cord:** | |

The superior cervical spinal cord shows no abnormalities.

| **Eyes:** | Not examined |
|---|---|
| **Cervical spine:** | Not examined |

**Microscopic Description**

The isocortex (left frontal and left occipital) demonstrates normal appearing isocortex with appropriate lamination and morphologically appearing neurons with scattered acute hypoxic-ischemic changes. The subcortical white matter is appropriately myelinated and contains normal appearing supporting glia. Frequent capillaries contain abundant polymorphonuclear cells. The overlying leptomeninges are thickened by collagen strands with scant chronic mononuclear inflammatory cells.

Sections of the left basal ganglia and right thalamus show mild acute hypoxic-ischemic changes. The extreme capsule, claustrum, external capsule and internal capsule are histologically normal. Scattered small vessels demonstrate abundant polymorphonuclear cells. The thalamus demonstrates histologically normal appearing large neurons.

The hippocampus shows mild acute hypoxic-ischemic changes involving CA1, with otherwise normal histology. The leptomeninges show focal chronic inflammatory infiltrate comprised of macrophages and plasma cells.

The pons is histologically and structurally normal, with normal appearing pontine nuclei, corticospinal/corticobulbar tracts, and transverse pontocerebellar tracts. The leptomeninges are thickened, with chronic inflammatory cells composed of macrophages and plasma cells.

Microscopic examination of the cerebellum shows mild to moderate acute hypoxic-ischemic changes involving the Purkinje cells and the dentate nucleus.

Sections of dura mater show no abnormality. The anterior pituitary gland demonstrates normal cytoarchitecture. The posterior pituitary gland is composed of normal appearing neuropil.

*Unless otherwise indicated sections are stained only with hematoxylin and eosin (H&E).



DHS-ICE-19-0196, 19-0197-E-000126
2019-ICLI-00051 1524
Death Investigation Report page 20 of 31

| Case Number: | **2018-03102** | Neuropathology Examination | **HERNANDEZ RODRIGUEZ, ROY ALEXANDER** |
|---|---|---|---|
| **Cassette Code** | **Tissue Location** | | **Stain** |
| B1 | Frontal lobe | | |
| B2 | Basal ganglia, left | | |
| B3 | Thalamus | | |
| B4 | Hippocampus | | |
| B5 | Occipital lobe | | |
| B6 | Pons | | |
| B7 | Cerebellum | | |
| B8 | Dura, pituitary | | |

| Report Tracking |
|---|
| **Reported by:** |
| **Verified by:**          (b)(6);          MD on 8/21/2018 10:49:16 AM |
| **Reviewed and approved by:**    (b)(7)(C)    MD on 4/8/2019 2:35:41 PM |



| Case Number: | **2018-03102** | **Microscopy** | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

**Medical Investigator**

(b)(6); (b)(7)(C)  MD

**Medical Investigator Trainee**

**Microscopic description:**

Heart: No pathologic abnormality.

Lungs: Extensive intra-alveolar mononuclear cells, neutrophils, erythrocytes and fibrin with focal hyaline membranes and interstitial expansion.  PAS, GMS and AFB stains show no organisms.

Kidney: No pathologic abnormality.

Liver: Autolysis. Moderate microvesicular fatty change in hepatocytes. Paucity of lymphocytes in portal triads.

Adrenals: Autolysis. No pathologic abnormality.

Pancreas: Autolysis. No pathologic abnormality.

Esophagus: Focal non-specific submucosal chronic inflammation. No ulcer appreciated.  A PAS stained section shows Candidal-type organisms without associated inflammation on a desquamated mucosal fragment likely representing colonization.  A GMS stained section is negative for organisms.

Stomach: Autolysis. No pathologic abnormality.

Small intestine: Autolysis. A section of duodenum has no pathologic abnormality.  A section of jejunum has dilated submucosal lymphoid channels.

Colon: Sections of colon including rectum show autolysis with no pathologic abnormality.

Spleen: Autolysis.

Lymph nodes: Autolysis. See Hematopathology Consultation report for description of well preserved histology on antemortem lymph node biopsy.


*Unless otherwise indicated sections are stained only with hematoxylin and eosin (H&E).



DHS-ICE-19-0196, 19-0197-E-000128
2019-ICLI-00051 1526
Death Investigation Report page 22 of 31

| Case Number: | 2018-03102 | Microscopy | | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

| Block | Tissue Location | Description | Stain |
|-------|----------------|-------------|-------|
| A1 | Heart | | |
| A2 | Right lung | | |
| A3 | Liver, kidney | | |
| A4 | Adrenals | | |
| A5 | Rectum | | |
| A6 | Spleen, pancreas | | |
| A7 | Esophagus | | |
| A8 | Stomach | | |
| A9 | Duodenum | | |
| A10 | Left lung | | |
| A11 | Hilar and paratracheal lymph nodes | | |
| A12 | Esophageal ulcer | | |
| A13 | jejunum and jejunal mucosal nodule | | |
| A14 | Colon | | |

| Report Tracking |
|-----------------|

**Reported by:**

**Verified by:**   (b)(6); (b)(7)(C)   MD on 3/27/2019 5:48:08 PM

**Reviewed and approved by:**   MD on 4/8/2019 2:35:41 PM

Microscopy:

**Page 2**

Printed: 4/9/2019 9:56:34 AM

DHS-ICE-19-0196, 19-0197-E-000129

2019-ICLI-00051 1527

Death Investigation Report page 23 of 31



**Medical Investigator**

(b)(6);  MD

**Date of examination:**  6/7/2018 12:58:00 PM

**Study date:**  5/26/2018 9:37:00 AM

**Accession number:**

**Exam type:**

**Technique:**

**Comparison:**

**Comments:**

Lungs:
Diffuse opacification of both lungs.
Left lung calcified granuloma.
Small bilateral pleural effusions.
Multiple nonspecific enlarged mediastinal lymph nodes.
Calcified left hilar lymph nodes.

Heart, Pericardium and Thoracic Aorta:
Small pericardial effusion.

Liver and Gallbladder:
Negative

Pancreas:
Negative

Spleen:
Negative

Kidneys:
Right nephrolith

Adrenal Glands:
Calcification of left adrenal from prior infection or hematoma

Gastrointestinal Tract:
Fluid filled but nondilated loops of bowel.
Moderate abdominal ascites.
Multiple mesenteric lymph nodes.

Urinary Bladder:
Negative

Genitalia:
Negative.
Subcutaneous scrotal edema

Brain and meninges:
Negative

Skull:
No fracture
Diffuse subcutaneous edema. Small subcutaneous scalp hematoma over left occipital region.

Cervical Vertebrae:



| Case Number: | 2018-03102 | PMCT | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

Negative
Extensive cervical lymphadenopathy.

Thoracic and Lumbar Vertebrae:
Negative

Thoracic wall:
Rib fractures: Anterior left 3-6 rib fractures and anterior right 2-4 rib fractures likely from resuscitation.
Sternal fracture: Nondisplaced transverse sternal fracture likely from resuscitation.

Pelvis:
Negative
Multiple enlarged inguinal lymph nodes.

Extremity fracture:
No acute or subacute extremity fractures. Diffuse subcutaneous edema.

Body surface injury:
Diffuse subcutaneous edema. Extensive edema precludes evaluation for soft tissue injury.
Axillary lymphadenopathy, some calcified on the right.

IMPRESSION:
• Left scalp hematoma. No other evidence of soft tissue injury although diffuse soft tissue edema/anasarca could obscure soft tissue findings of injury.
• Extensive lymphadenopathy may be related to HIV or HIV related infection, lymphoma, or other etiology.
• Anasarca.
• Diffuse opacification of lungs may relate to diffuse pulmonary edema, ARDS, or pneumonia.

Interpreting radiologist:
Gary Mlady MD, Chair, UNM Dept of Radiology
Above report sent via email on 12/10/18

| Report Tracking | | |
|---|---|---|
| **Reported by:** | | |
| **Verified by:** | (b)(6); (b)(7)(C) | MD on 3/11/2019 4:01:02 PM |
| **Reviewed and approved by:** | | MD on 4/8/2019 2:35:41 PM |



| Case Number: | **2018-03102** | **Other** | **HERNANDEZ RODRIGUEZ, ROY ~~ALEXANDER~~** |
|---|---|---|---|

**Medical Investigator**                    **Medical Investigator Trainee**

(b)(6);
(b)(7)(C) MD

**Date of examination:**          6/7/2018 12:58:00 PM

**Other comments:**

Internal visceral examination conducted on 6-7-18

| **Report Tracking** |
|---|

**Reported by:**

**Verified by:**                    (b)(6);        MD on 6/7/2018 1:09:25 PM
                              (b)(7)(C)
**Reviewed and approved by:**              MD on 4/8/2019 2:35:41 PM



Other

| Case Number: | 2018-03102 | Procedural Notes | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

**Case Number:**           2018-03102

**Decedent Name:**         HERNANDEZ RODRIGUEZ, ROY ALEXANDER

**Pathologist:**           (b)(6);           MD

**Fellow/Resident:**

**Date of Examination:**   6/7/2018 12:58:00 PM

### Morphology technican(s) present

| Yellow Sheet | Morphology Technician | |
|---|---|---|
| Identification | (b)(6); (b)(7)(C) | |
| Autopsy | | |
| Evidence | | |
| Evidence | | |
| Radiology | | |
| Retention | | |
| LabOther | | |
| Attendees | | |

### Morphology technican supervisor(s) present

| Yellow Sheet | Morphology Technician Lead | |
|---|---|---|
| Identification | (b)(6); (b)(7)(C) | |
| Autopsy | | |
| Evidence | | |
| Radiology | | |
| Retention | | |
| LabOther | | |
| Attendees | | |



**Case Number:** **2018-03102**                **Procedural Notes**                **HERNANDEZ RODRIGUEZ, ROY ALEXANDER**

---

**Autopsy attendees**

Other morphology technicians present:

(b)(6); (b)(7)(C)

Staff Tech
Sr Tech



| Case Number: | 2018-03102 | Procedural Notes | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

## Specimens obtained for laboratory testing

| | |
|---|---|
| HIV serology: | No |
| HIV spin and store: | Yes |
| HCV/HBV serology : | No |
| Influenza serology: | No |
| Other serology: | No |
| Freezer protocol: | No |
| DNA card: | Yes |
| Metabolic screen: | No |
| Cytogenetics: | No |
| Med-X protocol: | No |
| Urine dipstick: | No |
| Blood cultures (bacterial): | No |
| Lung cultures (bacterial): | No |
| CSF culture (bacterial): | No |
| Spleen culture (bacterial): | No |
| Stool culture (bacterial): | No |
| Other bacterial culture (specify): | |
| Mycobacterial culture (lung): | No |
| Mycobacterial culture (other): | No |
| Viral Cultures: | No |

## Approach to autopsy dissection

| | |
|---|---|
| Rokitansky evisceration: | No |
| Virchow evisceration: | Yes |
| Modified evisceration: | No |



DHS-ICE-19-0196, 19-0197-E-000135

2019-ICLI-00051 1533
Death Investigation Report page 29 of 31

| Case Number: | 2018-03102 | **Procedural Notes** | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |

| Special autopsy techniques | |
|---|---|
| HIV serology: | No |
| Pericranial membrane removal: | No |
| Neck anterior dissection: | No |
| Neck posterior dissection: | No |
| Facial dissection: | No |
| Vertebral artery dissection (in situ): | No |
| Cervical spine removal: | No |
| Layered anterior trunk dissection: | No |
| Anterolateral rib arc dissection: | No |
| Back dissection: | No |
| Posterior rib arc dissection: | No |
| Extremity soft tissue dissection: | No |
| Eye enucleation: | No |
| Inner middle ear evaluation: | No |
| Maxilla or mandible resection: | No |
| Spinal cord removal (anterior): | No |
| Spinal cord removal (posterior): | No |
| Other dissection(s): | |

| Tissues retention | |
|---|---|
| Stock jar with standard tissue retention: | No |
| Rib segment: | No |
| Pituitary gland: | No |
| Breast tissue (women only): | No |
| Brain retention: | No |
| Spinal cord retention: | No |
| Cervical spine retention: | No |
| Heart retention: | No |
| Heart-lung block retention: | No |
| Rib cage retention: | No |
| Long bone retention: | No |
| Other retention,specify: | |

| Disposition of tissues retained for extended examination | |
|---|---|
| Specimen outcome: | Not applicable; no tissues were retained for extended examination. |



| Case Number: | 2018-03102 | Procedural Notes | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

### Number of scene photos produced by the OMI

**Scene Photos:** 0

### Number of autopsy photos produced by the OMI

**Autopsy Photos:** 58

### Evidence collected

| | |
|---|---|
| **FBI blood tube:** | No |
| **Blood spot card:** | No |
| **APD blood card:** | No |
| **Thumbprint:** | Yes |
| **Fingerprints:** | No |
| **Palmprints:** | No |
| **Print hold:** | Yes |
| **Oral swab:** | No |
| **Vaginal swab:** | No |
| **Anal swab:** | No |
| **Other swab:** | No |
| **Fingernails:** | No |
| **Scalp hair:** | No |
| **Pubic hair:** | No |
| **Pubic hair combing:** | No |
| **Projectile(s):** | No |
| **Retain clothing:** | No |
| **Retain valuables:** | No |
| **Retain trace evidence:** | No |
| **Retain body bag:** | No |
| **Retain hand bags:** | No |
| **Ligature:** | No |
| **Other evidence retained:** | |

### Personal effects

| Property Type | Property Description | Property Detail |
|---|---|---|
| Valuables | Hair tie | n/a |
| None | Other | No Clothing Items to Inventory |
| Fingerprints | Describe | one set |

### Clothing

| Property Type | Property Description | Property Detail |
|---|---|---|


DHS-ICE-19-0196, 19-0197-E-000137

2019-ICLI-00051 1535

Death Investigation Report page 31 of 31



SCHOOL OF
MEDICINE
OFFICE OF
THE MEDICAL INVESTIGATOR

# Report of Findings

Case Number: 2018-03102

## HERNANDEZ RODRIGUEZ, ROY ALEXANDER

**County Pronounced:** Bernalillo
**Law Enforcement:**
**Agent:**
**Date of Birth:** 2/18/1985
**Pronounced Date/Time:** 5/25/2018 3:32:00 AM
**Central Office Investigator:** (b)(6);
**Deputy Field Investigator:** (b)(6); COI
(b)(7)(C)

## CAUSE OF DEATH

Multicentric Castleman disease

*Due to*

Acquired immunodeficiency syndrome

## MANNER OF DEATH

Natural

---

(b)(6);         **MD**

Chief Medical Investigator, Professor of Pathology
and Radiology

All signatures authenticated electronically
Date: 4/8/2019 2:34:18 PM



AMERICAN
OVERSIGHT

| Case Number: | **2018-03102** | **Summary Opinion** | **HERNANDEZ RODRIGUEZ, ROY** |
|---|---|---|---|
| | | | ~~ALEXANDER~~ |

**Medical Investigator**    **Medical Investigator Trainee**

(b)(6);    MD

## SUMMARY AND OPINION

Pathologic Diagnoses

-Acquired immunodeficiency syndrome
  -Human herpesvirus-8 (HHV-8) positive multicentric Castleman disease (Tricore Reference Laboratory & CDC reports)
    -Lymphadenopathy, paratracheal and hilar regions
    -Splenomegaly
    -Diffuse alveolar damage
    -Anasarca
    -Multiple cardiac arrests with successful resuscitations
      -Acute hypoxic-ischemic encephalopathy & diffuse cerebral edema
      -Fractures, anterior ribs and sternum, resuscitative
  -Epstein-Barr virus (EBV) associated lymphoproliferative disorder
  -Kaposi's sarcoma
  -Ulcer, esophagus, shallow

-Left occipital subcutaneous scalp hematoma, small, by CT scan
-Dilated lacteal, jejunum, incidental
-Probe patent foramen ovale, incidental

Opinion

This 33 year old transgender woman, Roy Alexander Hernandez Rodriguez, (with a preferred name of Roxsana Hernandez and also known as Jeffry Hernandez, Jeifri Hernandez-Rodriguez, and Yenfri Hernandez-Rodriguez) was taken into federal custody in California on May 11, 2017. At that time, she was ill with cough, congestion and fever. There was a history of an untreated human immunodeficiency virus (HIV) infection for 5-6 months. She was diagnosed with bronchitis at a Scripps Care Clinic on May 12, 2018 and given antibiotics. She was then transferred to New Mexico on May 16, 2018 for incarceration.

On intake medical screening within 12 hours of arrival, she was noted to be ill and was sent to the Cibola General Hospital Emergency Room in Grants, NM where she complained of fever, cough, sore throat, abdominal pain and vomiting. She was noted to be hypotensive, tachycardic, tachypneic, febrile, hypoxemic, anemic (hematocrit 25.3%) and thrombocytopenic (platelet count 69,000/microliter). A prothrombin time was elevated at 15.7 seconds. The d-dimer concentration was markedly elevated at 449 ng/ml. A rapid Strep test, throat culture, and blood cultures were negative. HIV infection was confirmed by testing for HIV antibodies. A computed tomography (CT) scan showed numerous pulmonary micronodules and enlarged hilar and mediastinal lymph nodes. Her clinicians thought she was in septic shock with an untreated HIV infection, dehydration (blood urea nitrogen 26 mg/dl, creatinine 1.0 mg/dl) and emaciation/starvation (albumin 2.2 g/dl). She was treated with antibiotics and fluids and was transferred to Lovelace Medical Center-Downtown in Albuquerque, NM on May 17, 2018.

At Lovelace Medical Center-Downtown, she indicated that she was originally from Honduras but had been living in Mexico since she was 19 years old. She had cough and an unintentional 30 lb weight loss for 2 months while she was traveling through Mexico to the US, and fever for 2 weeks. There was cervical and inguinal lymphadenopathy. She was diagnosed with an untreated HIV infection, sepsis requiring vasopressors for hypotension, and malnutrition. An abdominal CT scan showed splenomegaly. A CT scan of the chest showed clear lungs, small pleural effusions, and bilateral axillary lymphadenopathy. A test for Treponema pallidum antibody was positive and an RPR was positive with a titer of 1:32. She was treated for syphilis. By May 19, 2018 the blood urea nitrogen and creatinine had normalized. A prealbumin concentration was low at 5.1 mg/dl. Tests for hepatitis B surface antigen and hepatitis C antibody were negative. A test for HIV viral load showed 744,000 copies/ml. The CD4 count was 189 cells/cubic millimeter and she was started on Bactrim to cover for Pneumocystis carinii pneumonia. A CT scan of the neck showed bilateral lymphadenopathy. A QuantiFERON TB GOLD test was negative. A test for Cryptococcus antigen was negative. A



AMERICAN
OVERSIGHT

DHS-ICE-19-0196, 19-0197-E-000139

2019-ICLI-00051 1537

urine Histoplasma antigen test was negative.  An Ebstein Barr virus panel showed prior exposure while a Monospot test was negative.  Tests for Cytomegalovirus antibodies were negative for IgM and positive for IgG.  Blood cultures from Cibola General Hospital were negative after 5 days.  Sputum cultures were negative. Toxoplasmosis antibodies were negative. A malaria screen of a blood smear was negative.The lymphadenopathy was thought to be potentially secondary to the HIV infection. A nasopharyngeal swab was negative for influenza viruses, adenovirus, respiratory syncytial virus (RSV), rhinovirus, metapneumovirus, and parainfluenza viruses by PCR.  On May 20, 2019 she was feeling better.

On May 21, 2018, she underwent an excisional biopsy of a right axillary lymph node which was later reported as demonstrating multicentric Castleman disease.

Neurosyphilis was considered. A lumbar puncture on May 22, 2019 showed a white blood cell count of 9 with 90% lymphocytes and a protein of 34.  A VDRL on cerebrospinal fluid was non-reactive.  Her fevers persisted.

On May 23, 2019, there was pancytopenia with a hematocrit that dropped to 20.2% and continued thrombocytopenia. She was transfused with red blood cells and platelets. She developed anasarca.

On May 24, 2018, she complained of shortness of breath. She underwent bilateral thoracentesis for expanded pleural effusions the same day.  The left pleural fluid contained 490 white blood cells/microliter of which 16% were neutrophils and 46% were lymphocytes.  The right pleural fluid had a similar count with 15% neutrophils and 65% lymphocytes.  No organisms were seen. A malaria smear was negative. Fibrinogen was normal. A d-dimer concentration was elevated at 10.82 microgram/ml FEU.  Abdominal distention with abdominal pain on palpation was noted.  She demonstrated respiratory failure and was emergently intubated.  The liver enzymes became elevated.  The hematocrit was 22.5% and the platelet count was 105,000/microliter.  She was transfused with more red blood cells. Another abdominal CT scan showed anasarca with moderate bilateral pleural effusions and moderate ascites and splenomegaly. The evening of May 24, 2019, she had the first of a series of at least 10 cardiac arrests with successful resuscitations until she was pronounced dead on May 25, 2018.  On May 25, 2019 the platelet count had fallen to 59,000/microliter.

At autopsy, there was diffuse alveolar damage. The spleen and the lymph nodes in the chest were enlarged. Hematopathology consultants reviewed the antemortem lymph node biopsy, confirmed the diagnosis of multicentric Castleman Disease, and identified focal lymph node involvement by Kaposi's sarcoma. The multicentric Castleman Disease and Kaposi's sarcoma were associated with a human herpesvirus 8 (HHV-8) infection. Kaposi's sarcoma in the presence of HIV antibodies is an acquired immunodeficiency syndrome (AIDS) defining condition. The hematopathology consultants also identified an independent Epstein-Barr virus associated lymphoproliferative disorder.

An evaluation of autopsy tissues by the Infectious Disease Pathology Branch at the Centers for Disease Control and Prevention (CDC) confirmed the diagnosis of multicentric Castleman disease and identified positive staining for both HHV-8 (pancreas, spleen, lymph node, lung) and HIV (lymph node) infections.  CDC testing excluded infection by hantavirus, Leptospira species, influenza viruses, parainfluenza viruses, and RSV. CDC testing also excluded infection by bacteria and fungi in lung tissues.

A small occipital scalp hematoma was seen by computed tomography (CT) scan.  The origin of this injury is unknown. There were fractures of multiple ribs and the sternum from cardiopulmonary resuscitation attempts. No other injuries were observed.

A neuropathologic exam showed mild to moderate acute hypoxic-ischemic changes and mild diffuse cerebral edema likely secondary to the multiple cardiac arrests with successful resuscitations. There was no evidence of HIV/AIDS encephalopathy or an opportunistic HIV-related brain infection.

A culture of stool was negative for Yersinia enterocolitica, Escherichia coli O157:H7, and Campylobacter and Salmonella species.  Stool was negative for Shiga toxin by PCR.  Stool was negative for Giardia lamblia and Cryptpsporidium by an enzyme immunoassay method.

The cause of death is best classified as multicentric Castleman disease due to acquired immunodeficiency syndrome. HHV-8 associated multicentric Castleman disease usually occurs in individuals with HIV infections and a weakened immune system. These individuals can develop a severe form of the disease that is rapidly progressive and lead to death within weeks such as seen in this decedent.  Multicentric Castleman disease can present with a variety of nonspecific symptoms and signs reflective of an inflammatory process that include fever, night sweats, enlarged lymph nodes, loss of appetite and weight loss, shortness of breath, enlarged liver and spleen, pancytopenia, peripheral neuropathy, hypoalbuminemia, and skin rash.  The decedent manifested most of these findings.

Cause Of Death:                                              **Page 2**                                    Printed: 4/9/2019 9:55:05 AM



| Case Number: | 2018-03102 | Summary Opinion | HERNANDEZ RODRIGUEZ, ROY ALEXANDER |
|---|---|---|---|

The manner of death is natural.





October 12, 2021

**VIA ONLINE PORTAL**

The Privacy Office
U.S. Department of Homeland Security
Headquarters & Office of Civil Rights &
Civil Liberties
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655
Via Online Portal

Freedom of Information Act Office
U.S. Immigration & Customs
Enforcement
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
Via Online Portal

**Re: Freedom of Information Act Request**

Dear FOIA Officers:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the
implementing regulations of your agency, American Oversight makes the following
request for records.

Conditions faced by individuals held in immigration detention remain an urgent public
concern. In fiscal year 2020, 21 individuals died in U.S. Immigration & Customs
Enforcement (ICE) custody, the highest number of deaths since 2005[1] and a significant
increase in deaths from the previous year, despite a much smaller detainee population.[2]
The ongoing threat posed by the Covid-19 pandemic exacerbates existing concerns,
particularly as the number of individuals detained by ICE has increased nearly to pre-
pandemic levels.[3]

American Oversight seeks records with the potential to shed light on the treatment and
care of individuals held in immigration detention, including those who have died in
federal custody.

---

[1] Catherine Shoichet, *The Death Toll in ICE Custody is the Highest It's Been in 15 Years*,
CNN (updated Sept. 30, 2020, 8:11 AM), https://www.cnn.com/2020/09/30/us/ice-
deaths-detention-2020/index.html.
[2] Lise Olsen, *Deaths in ICE Custody Skyrocketed During the COVID-19 Pandemic*, TX
Observer (Jan. 20, 2021, 10:36 AM), https://www.texasobserver.org/deaths-in-ice-
custody-skyrocketed-during-the-covid-19-pandemic/.
[3] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the
U.S.*, N.Y. Times (updated Aug. 12, 2021),
https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.



**Requested Records**

American Oversight requests that your agency produce the following records within twenty business days:

> A complete copy of any ICE Health Service Corps "Mortality Review" reports completed as part of the detainee death reviews for each of the following individuals who died in ICE custody:
>
> 1. Onoval Perez-Montufa
> 2. Luis Sanchez-Perez
> 3. James Tomas Hill
> 4. Kuah Hui Lee
> 5. Jose Freddy Guillen Vega
> 6. Fernando Sabonger-Garcia
> 7. Cipriano Chavez Alvarez
> 8. Romien Jally
> 9. Anthony Jones
> 10. Felipe Montes
> 11. Jesse Dean
> 12. Diego Fernando Gallego-Agudelo
>
> An example of a "Mortality Review" is attached as Exhibit A to aid your search.
>
> Please provide all responsive records from July 12, 2020, through the date the search is conducted.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American Oversight requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government, and the disclosures will likely contribute to a better understanding of relevant government procedures by the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested information is "in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government."[4] The public has a significant interest in the treatment and care of individuals held in immigration detention.[5] Records with the potential to shed light on this matter would contribute significantly to public understanding of operations of the federal government, including the extent to which conditions within ICE facilities may have contributed to the deaths of these individuals. American Oversight is committed to transparency and makes the responses agencies provide to FOIA requests publicly available, and the public's

---

[4] 5 U.S.C. § 552(a)(4)(A)(iii).
[5] *See supra*, notes 1-3.

DHS-21-1427

understanding of the government's activities would be enhanced through American Oversight's analysis and publication of these records.

This request is primarily and fundamentally for non-commercial purposes.[6] As a 501(c)(3) nonprofit, American Oversight does not have a commercial purpose and the release of the information requested is not in American Oversight's financial interest. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the accountability of government officials. American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, or other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and Twitter.[7]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[8] Examples reflecting this commitment to the public disclosure of documents and the creation of editorial content include the posting of records related to the Trump Administration's contacts with Ukraine and analyses of those contacts;[9] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[10] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[11] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such

---

[6] *See* 5 U.S.C. § 552(a)(4)(A)(iii).

[7] American Oversight currently has approximately 15,630 page likes on Facebook and 108,500 followers on Twitter. American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Oct. 12, 2021); American Oversight (@weareoversight), Twitter, https://twitter.com/weareoversight (last visited Oct. 12, 2021).

[8] *See generally News,* American Oversight, https://www.americanoversight.org/blog.

[9] *Trump Administration's Contacts with Ukraine,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[10] *See generally The Trump Administration's Response to Coronavirus,* American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings,* American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings.

[11] *See generally Audit the Wall,* American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall,* American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

DHS-21-1427

waivers;[12] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unoffical business.[13]

Accordingly, American Oversight qualifies for a fee waiver.

**Guidance Regarding the Search & Processing of Requested Records**

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- In conducting your search, please understand the terms "record," "document," and "information" in their broadest sense, to include any written, typed, recorded, graphic, printed, or audio material of any kind. We seek records of any kind, including electronic records, audiotapes, videotapes, and photographs, as well as letters, emails, facsimiles, telephone messages, voice mail messages, and transcripts, notes, or minutes of any meetings, telephone conversations, or discussions.

- Our request for records includes any attachments to those records or other materials enclosed with those records when they were previously transmitted. To the extent that an email is responsive to our request, our request includes all prior messages sent or received in that email chain, as well as any attachments to the email.

- Please search all relevant records or systems containing records regarding agency business. Do not exclude records regarding agency business contained in files, email accounts, or devices in the personal custody of your officials, such as personal email accounts or text messages. Records of official business conducted using unoffical systems or stored outside of official files are subject to the Federal Records Act and FOIA.[14] It is not adequate to rely on policies and procedures that require officials to move such information to official systems within a certain period of time; American Oversight has a right to records contained in those files even if material has not yet been moved to official

---

[12] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.
[13] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.
[14] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 149–50 (D.C. Cir. 2016); *cf. Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955–56 (D.C. Cir. 2016).

DHS-21-1427

systems or if officials have, by intent or through negligence, failed to meet their obligations.[15]

▪ Please use all tools available to your agency to conduct a complete and efficient search for potentially responsive records. Agencies are subject to government-wide requirements to manage agency information electronically,[16] and many agencies have adopted the National Archives and Records Administration (NARA) Capstone program, or similar policies. These systems provide options for searching emails and other electronic records in a manner that is reasonably likely to be more complete than just searching individual custodian files. For example, a custodian may have deleted a responsive email from his or her email program, but your agency's archiving tools may capture that email under Capstone. At the same time, custodian searches are still necessary; agencies may not have direct access to files stored in .PST files, outside of network drives, in paper format, or in personal email accounts.

▪ In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

▪ Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

## Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight to discuss this request. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American

---

[15] *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, No. 14–cv–765, slip op. at 8 (D.D.C. Dec. 12, 2016).

[16] Presidential Memorandum—Managing Government Records, 76 Fed. Reg. 75,423 (Nov. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/11/28/presidential-memorandum-managing-government-records; Office of Mgmt. & Budget, Exec. Office of the President, Memorandum for the Heads of Executive Departments & Independent Agencies, "Managing Government Records Directive," M-12-18 (Aug. 24, 2012), https://www.archives.gov/files/records-mgmt/m-12-18.pdf.

DHS-21-1427

Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Hart Wood at foia@americanoversight.org or 202.919.6303. Also, if American Oversight's request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Hart Wood*
Hart Wood
on behalf of
American Oversight

DHS-21-1427

# EXHIBIT A

*PREDECISIONAL/DELIBERATIVE PROCESS – FOR INTERNAL DISCUSSION ONLY / NOT FOR DISTRIBUTION*



*Office of Enforcement and Removal Operations*
*ICE Health Service Corps*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration
and Customs
Enforcement

March 27, 2019

MEMORANDUM FOR:     Stewart D. Smith, DHSc, MPH    (b)(6); (b)(7)(C)
                    Assistant Director
                    ICE Health Service Corps

THROUGH:            (b)(6); (b)(7)(C)
                    Deputy Assistant Director of Clinical Services/Medical Director
                    ICE Health Service Corps

                    (b)(6); (b)(7)(C)    (b)(6); (b)(7)(C)
                    Chief of Staff
                    ICE Health Service Corps

FROM:               (b)(6); (b)(7)(C)    (b)(6); (b)(7)(C)
                    Western Regional Clinical Director
                    ICE Health Service Corps

                    CDR (b)(6); (b)(7)(C) PA-C    (b)(6); (b)(7)(C)
                    Western Regional Advanced Practice Provider
                    ICE Health Service Corps

                    CDR (b)(6); (b)(7)(C) RN    (b)(6); (b)(7)(C)
                    Field Medical Coordinator
                    ICE Health Service Corps

                    CDR (b)(6); (b)(7)(C) RN    (b)(6); (b)(7)(C)
                    Investigator
                    ICE Health Service Corps

SUBJECT:            Mortality Review – Report of Findings
                    Jeffry (Roxsana) HERNANDEZ, A206 418 141

*For Official Use Only. This document contains pre-decisional and/or deliberative process information exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b) (5). Do not release without prior approval of U.S. Immigration and Customs Enforcement, ICE Health Service Corps.*



DHS-ICE-19-0196, 19-0197-E-000098

*PREDECISIONAL/DELIBERATIVE PROCESS – FOR INTERNAL DISCUSSION ONLY / NOT FOR DISTRIBUTION*

Mortality Review - Jeffry (Roxsana) HERNANDEZ, A206 418 141
Page 2 of 5

**Executive Summary:**

On May 9, 2018, U.S. Customs and Border Protection (CBP) apprehended Ms. Jeffry (Roxsana) HERNANDEZ, a 33-year-old Honduran transgender female, at the San Ysidro, California (CA), port of entry. On May 11, 2018, while in CBP custody, a medical doctor (MD) evaluated Ms. HERNANDEZ for untreated human immunodeficiency virus (HIV), headache, and cough. The MD diagnosed Ms. HERNANDEZ with a reported history of HIV with weight loss, cough, headache, tachycardia (rapid heart rate), and rule out sepsis (infection throughout the body). The MD ordered a respiratory mask to be placed on Ms. HERNANDEZ, and to transport her to Scripps Emergency Department (ED) in Chula Vista, CA, to rule out active infection. On this same day, the ED MD evaluated Ms. HERNANDEZ, diagnosed her with bronchitis (inflammation of the airways which can cause cough and fever), prescribed Tylenol (acetaminophen) for fever, Z-Pack (azithromycin, an antibiotic) and albuterol inhaler (opens airways) for bronchitis, and documented Ms. HERNANDEZ was cleared for travel and incarceration.

On May 13, 2018, U.S. Immigration and Customs Enforcement (ICE) assumed custody of Ms. HERNANDEZ and transferred her on May 16, 2018, to Cibola County Correctional Center (CCCC) in Milan, New Mexico (NM), a designated transgender facility.

On May 17, 2018, a CCCC registered nurse (RN) completed Ms. HERNANDEZ's intake screening, documented her weight as 89 pounds, noting a history of untreated HIV, and persistent cough with weight loss over the previous several weeks. The RN identified Ms. HERNANDEZ's heart rate was elevated at 136 (normal is 60 – 100), blood pressure was decreased at 81/61 (normal is 90/60 – 120/80), and she had a fever of 100.8 (normal is 97.8 to 99.1). The RN placed Ms. HERNANDEZ on medical observation pending the MD's evaluation. On this same date, the MD evaluated Ms. HERNANDEZ and referred her to Cibola General Hospital (CGH) ED in Milan, NM, by CCCC vehicle transport. The CGH ED MD diagnosed Ms. HERNANDEZ with septic shock, anemia, dehydration, HIV, lymphadenopathy (enlarged lymph nodes), nodular pulmonary disease, and thrombocytopenia (low platelet levels), and arranged for Ms. HERNANDEZ's transfer to Lovelace Medical Center (LMC) in Albuquerque, NM, by air transport.

At LMC, Ms. HERNANDEZ was admitted as an inpatient and, in addition to the above conditions, she was diagnosed with: acquired immune deficiency syndrome (AIDS), acute respiratory distress syndrome (ARDS), splenomegaly (enlarged spleen), herpes simplex virus (HSV), syphilis, Multicentric Castleman's Disease (a rare disease causing overgrowth of cells in multiple lymph nodes; signs and symptoms are often nonspecific, and are mild in some people, but can be life threatening in others. Symptoms may include enlarged lymph nodes in multiple regions, fever, weight loss, nausea, rash, and/or enlarged liver and spleen), and malnutrition. Ms. HERNANDEZ's condition progressively deteriorated requiring intubation and mechanical ventilation (machine used to assist or replace spontaneous breathing).

*For Official Use Only. This document contains pre-decisional and/or deliberative process information exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b) (5). Do not release without prior approval of U.S. Immigration and Customs Enforcement, ICE Health Service Corps.*



*PREDECISIONAL/DELIBERATIVE PROCESS – FOR INTERNAL DISCUSSION ONLY / NOT FOR DISTRIBUTION*

Mortality Review - Jeffry (Roxsana) HERNANDEZ, A206 418 141
Page 3 of 5

On May 24, 2018, Ms. HERNANDEZ went into cardiac arrest and was successfully resuscitated. Despite treatment efforts, Ms. HERNANDEZ experienced five more cardiac arrest events. On May 25, 2018, Ms. HERNANDEZ was pronounced dead at 3:32 a.m. An autopsy is currently pending with the NM Office of the Medical Investigator (OMI) to determine the manner and cause of death. On June 8, 2018, the NM OMI released a preliminary cause of death as consistent with untreated HIV and without signs of abuse or injury. An addendum will be issued as soon as the information becomes available.

## Mortality Finding:

A mortality review committee (MRC) determined that Ms. HERNANDEZ's medical care at CCCC was provided within the safe limits of practice and did not directly or indirectly contribute to her death.

Based on the overall findings of this review, Ms. HERNANDEZ arrived at CCCC in a seriously ill state. The CCCC staff identified her presenting condition and transferred her to a higher level of treatment facility, before her condition deteriorated any further.

## Mortality Review Detailed Report:

On May 25, 2018, ICE Health Service Corps (IHSC) received notification of the death of ICE detainee Jeffry (Roxsana) HERNANDEZ, A206 418 141. Ms. HERNANDEZ, a 33-year-old Honduran transgender female, was in ICE custody from May 13 to May 25, 2018, and assigned to CCCC on the date of her death.

The IHSC Assistant Director requested a mortality review to learn from Ms. HERNANDEZ's death by reviewing the care provided and the circumstances leading up to her death. The goal of the mortality review is to determine the appropriateness of clinical care; ascertain whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.

The following report is based on the findings of the MRC, which convened on March 13, 2019. The review was based on the following information: 1) Ms. HERNANDEZ's CCCC medical records, emergency medical services (EMS) and community hospital records; 2) incident and notification reports; 3) ICE ENFORCE Alien Removal Module (EARM) and ICE ENFORCE Alien Detention Module (EADM) database records; 4) Ms. HERNANDEZ's CCCC detention file; 5) Ms. HERNANDEZ's death certificate and autopsy report; 6) an on-site review and staff interviews conducted by fact-finder, CDR (b)(6); (b)(7)(C) at CCCC on June 19, 2018; and 7) applicable CCCC and ICE detention standards.

*For Official Use Only. This document contains pre-decisional and/or deliberative process information exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b) (5). Do not release without prior approval of U.S. Immigration and Customs Enforcement, ICE Health Service Corps.*



*PREDECISIONAL/DELIBERATIVE PROCESS – FOR INTERNAL DISCUSSION ONLY / NOT FOR DISTRIBUTION*

Mortality Review - Jeffry (Roxsana) HERNANDEZ, A206 418 141
Page 4  of 5

ICE detention standards used for this review: ICE Performance-Based National Detention Standards (PBNDS), 2011 (revised December 2016). Below is a summary of health care delivery/program strengths, weaknesses, and recommendations found during this review:

### *Strengths*

During this review, it was clear that CCCC staff are earnest and dedicated professionals. Strengths identified during this investigation were: 1) medical prescreening of new arrivals; 2) adherence to current clinical practice guidelines; 3) policy addressing critical vital signs; 4) medical facility, staffing, detainee population, and mission were all congruent; 5) and, most importantly, CCCC medical staff were receptive to this review process and looked forward to receiving constructive feedback.

### *Weaknesses*

1.  **Continuity of care.**

    - The CBP's *Assessment for Transport, Escort, and Detention* form provided to ICE, did not reflect any of Ms. HERNANDEZ's known medical conditions, or the medications prescribed during her visit to Scripps ED on May 11, 2018.

    - The medical transfer summaries received by CCCC did not reflect Ms. HERNANDEZ's current medical conditions, or the medications prescribed during her visit to Scripps ED on May 11, 2018.

2.  **Medical housing.**

    - CCCC staff placed Ms. HERNANDEZ in medical housing without obtaining a physician's order for admission.

    Applicable standards of care for this finding:

    - PBNDS 2011: 4.3, Medical Care; section V.F. *Facilities;* (3) *Medical Housing*.
    - CCCC Policy: G-03, *Infirmary Care*.
    - CCCC Policy: A-13, *Clinical Protocol*.

3.  **Reporting of abnormal vital signs.**

    - CCCC staff recorded abnormal vital signs during the intake screening process but did not notify the physician.

*For Official Use Only. This document contains pre-decisional and/or deliberative process information exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b) (5). Do not release without prior approval of U.S. Immigration and Customs Enforcement, ICE Health Service Corps.*



DHS-ICE-19-0196, 19-0197-E-000101

*PREDECISIONAL/DELIBERATIVE PROCESS – FOR INTERNAL DISCUSSION ONLY / NOT FOR DISTRIBUTION*

Mortality Review - Jeffry (Roxsana) HERNANDEZ, A206 418 141
Page 5  of 5

Applicable standards of care for this finding:

- CCCC Policy: A-06, *Critical Vital Signs.*

***Recommendations***

- Forward these findings to the IHSC Deputy Assistant Director (DAD) of Health Care Compliance (HCC).
- The IHSC DAD of HCC will share these findings through appropriate communication channels to ICE, the CCCC administrator and health authority for review and any action(s) deemed appropriate.
- ICE should consider sharing relevant findings with CBP.

End of report.

*For Official Use Only. This document contains pre-decisional and/or deliberative process information exempt from mandatory disclosure under the Freedom of Information Act, 5 U.S.C. 552(b)(5). Do not release without prior approval of U.S. Immigration and Customs Enforcement, ICE Health Service Corps.*

