**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-0303 (TNM) |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.,* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
## IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 2

ARGUMENT ........................................................................................................... 6

   I.    FOIA and Summary Judgment Standards of Review ............................. 6

   II.   ICE's Searches Were Inadequate ........................................................... 8

       A.   ICE did not reasonably identify all directorates likely to possess responsive records ........................................................................ 9

       B.   ICE did not reasonably identify and search all offices or file systems where records were likely to be found ...................................... 13

       C.   ICE ERO IHSC employed unreasonably limited search terms to identify records responsive to FOIA Request Three ............................. 16

   III.   ICE's Withholdings Are Not Supported by Law ................................... 18

       A.   ICE has failed to justify its withholdings under Exemption 3 ................. 18

       B.   Exemption 5 does not protect responsive records withheld by ICE ......... 20

           i.    ICE has not shown that the records withheld under Exemption 5 are connected to a decisionmaking process as required to invoke the deliberative process privilege .................................................. 22

           ii.   Even if the withheld material was protected by the deliberative process privilege, Defendants have not established any foreseeable harm from its release ..................................................... 27

       C.   ICE has failed to satisfy the requirements for withholding under Exemption 7(E) ...................................................................... 29

           i.    ICE has not provided sufficient facts to show that the records at issue were compiled for a law enforcement purpose ................... 29

           ii.   ICE has not shown that the withheld material is investigatory or prosecutorial in nature ..................................................... 33

   IV.   ICE Has Not Performed an Adequate Segregability Analysis ............................. 37

CONCLUSION ..................................................................................................... 39

**<u>TABLE OF AUTHORITIES</u>**

**Cases** **Page(s)**

*100Reporters LLC v. U.S. Dep't of Just.*,
  248 F. Supp. 3d 115 (D.D.C. 2017) ................................................................... 26
*ACLU v. Dep't of Defense*,
  628 F.3d 612 (D.C. Cir. 2011) .......................................................................... 32
*\*Advancement Project v. U.S. Dep't of Homeland Sec.*,
  549 F. Supp. 3d 128 (D.D.C. 2021) ................................................................. 36
*\*Am. C.L. Union v. Dep't of Homeland Sec.*,
  No. 20-3204 (RDM), 2023 WL 2733721 (D.D.C. Mar. 31, 2023) ................... 12, 16
*\*Am. C.L. Union v. Dep't of Homeland Sec.*
  20-2320 (RBW), 2022 WL 17250300 (D.D.C. Nov. 28, 2022) ....................... 35, 36, 37
*Am. Ctr. for Equitable Treatment, Inc. v. Off. of Mgmt. & Budget*,
  281 F. Supp. 3d 144 (D.D.C. 2017) ................................................................. 16
*Am. Immigr. Council v. U.S. Customs and Border Patrol*,
  2023 WL 2755412 (D.D.C. Apr. 3, 2023) ......................................................... 24
*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*,
  21 F. Supp. 3d 60 (D.D.C. 2014) ....................................................................... 9
*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*,
  950 F. Supp. 2d 221 (D.D.C. 2013) ................................................................. 23, 32
*Am. Oversight v. Off. of Mgmt. & Budget*,
  613 F. Supp. 3d 219 (D.D.C. 2020) ................................................................. 13
*Am. Oversight v. U.S. Gen. Servs. Admin.*,
  486 F. Supp. 3d 306 (D.D.C. 2020) ................................................................. 14
*Ams. for Fair Treatment v. U.S. Postal Serv.*,
  2023 WL 2610861 (D.D.C. Mar. 23, 2023) ..................................................... 28
*Armstrong v. Exec. Off. of the President*,
  97 F.3d 575 (D.C. Cir. 1996) ........................................................................... 38
*Assassination Archives & Rsch. Ctr. v. CIA*,
  334 F.3d 55 (D.C. Cir. 2003) ............................................................................ 8
*Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*,
  830 F.2d 331 (D.C. Cir. 1987) .......................................................................... 19
*Bagwell v. U.S. Dep't of Just.*,
  311 F. Supp. 3d 223 (D.D.C. 2018) ................................................................. 17
*Baldrige v. Shapiro*,
  455 U.S. 345 (1982) ......................................................................................... 18
*Barnard v. Dep't of Homeland Sec.*,
  598 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................... 29
*Beck v. Dep't of Just.*,
  997 F.2d 1489 (D.C. Cir. 1993) ......................................................................... 7
*\*Benavides v. Bureau of Prisons*,
  774 F. Supp. 2d 141 (D.D.C. 2011) ................................................................. 31, 32

*Bigwood v. U.S. Agency for Int'l Dev.*,
484 F. Supp. 2d 58 (D.D.C. 2007)........................................................................ 7

*Bigwood v. U.S. Dep't of Defense*,
132 F. Supp. 3d 124 (D.D.C. 2015)...................................................................... 9

*Bloche v. Dep't of Defense*,
279 F. Supp. 3d 68 (D.D.C. 2017)................................................................. 38, 39

*Brick v. Dep't of Just.*,
293 F. Supp. 3d 9 (D.D.C. 2017)....................................................................... 19

*Campbell v. U.S. Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998)............................................................................ 29

*CIA v. Sims*,
471 U.S. 159 (1985) ....................................................................................... 18

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
567 F. Supp. 3d 204 (D.D.C. 2021).......................................................... 33, 34, 35

*\*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*,
648 F. Supp. 2d 152 (D.D.C. 2009).................................................................. 25

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980).......................................................................... 21

*Coffey v. Bureau of Land Mgmt.*,
249 F. Supp. 3d 488 (D.D.C. 2017).................................................................. 16

*\*Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
3 F.4th 350 (D.C. Cir. 2021) .................................................................. 21, 27, 28

*Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,
567 F. Supp. 3d 97 (D.D.C. 2021)..................................................................... 27

*Competitive Enter. Inst. v. EPA*,
232 F. Supp. 3d 172 (D.D.C. 2017)..................................................................... 6

*Cowsen-El v. U.S. Dep't of Just.*,
826 F. Supp. 532 (D.D.C. 1992)........................................................................ 33

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
670 F.2d 1051 (D.C. Cir. 1981)......................................................................... 20

*Ctr. for Biological Diversity v. EPA*,
279 F. Supp. 3d 121 (D.D.C. 2017).................................................................... 26

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) .................................................................................... 20, 35

*DiBacco v. U.S. Army*,
795 F.3d 178 (D.C. Cir. 2015)........................................................................... 13

*Ecological Rights Found. v. EPA*,
2021 WL 535725 (D.D.C. Feb. 13, 2021) ........................................................... 36

*EPA v. Mink*,
410 U.S. 73 (1973) ......................................................................................... 21

*Farrugia v. Exec. Off. for U.S. Att'ys*,
2006 WL 335771 (D.D.C. Feb. 14, 2006) ................................................... 8, 37, 38

*Frontier Found. v. U.S. Dep't of Just.*,
826 F. Supp. 2d 157 (D.D.C. 2011).................................................................... 24

*Goland v. CIA*,
607 F.2d 339 (D.C. Cir. 1978)........................................................................... 19

*Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
762 F. Supp. 2d 123 (D.D.C. 2011) ................................................................ 26

*Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*,
335 F. Supp. 3d 7 (D.D.C. 2018) .................................................................... 17

*Hansten v. Drug Enf't Admin.*,
2022 WL 2904151 (D.D.C. July 22, 2022) ..................................................... 33

*Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec.*,
291 F. Supp. 3d 69 (D.D.C. 2018) ............................................................. 24, 25

*Henderson v. U.S. Dep't of Just.*,
157 F. Supp. 3d 42 (D.D.C. 2016) .................................................................. 32

*Hinckley v. United States*,
140 F.3d 277 (D.C. Cir. 1998) ....................................................................... 24

*Jefferson v. Dep't of Just., Off. of Pro.*,
284 F.3d 172 (D.C. Cir. 2002) ................................................................... 29, 31

*Jordan v. U.S. Dep't of Just.*,
591 F.2d 753 (D.C. Cir. 1978) ....................................................................... 20

*Judicial Watch, Inc. v. U.S. Postal Serv.*,
297 F. Supp. 2d 252 (D.D.C. 2004) ........................................................... 22, 24

*Kidder v. FBI*,
517 F. Supp. 2d 17 (D.D.C. 2007) .................................................................. 38

*Long v. Immigr. & Customs Enf't,*,
149 F. Supp. 3d 39 (D.D.C. 2015) .................................................................. 32

*Machado Amadis v. U.S. Dep't of State*,
971 F.3d 364 (D.C. Cir. 2020) ....................................................................... 21

*Mapother v. Dep't of Just.*,
3 F.3d 1533 (D.C. Cir. 1993) ......................................................................... 20

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ................................................................... 37, 38

*Milner v. Dep't of the Navy*,
562 U.S. 562 (2011) ........................................................................................ 7

*Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*,
877 F. Supp. 2d 87 (S.D.N.Y. 2012) .............................................................. 13

*New Orleans Workers' Ctr. for Racial Just. v. U.S. Immigr. & Customs Enf't,
373 F. Supp. 3d 16 (D.D.C. 2019) ........................................................... Passim

*Oglesby v. U.S. Dep't of the Army*,
920 F.2d 57 (D.C. Cir. 1990) .................................................................... Passim

*Paisley v. CIA*,
712 F.2d 686 (D.C. Cir. 1983) ....................................................................... 20

*Parker v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys*,
852 F. Supp. 2d 1 (D.D.C. 2012) ................................................................... 31

*Perry v. Block*,
684 F.2d 121 (D.C. Cir. 1982) ....................................................................... 12

*Pinson v. U.S. Dep't of Just.*,
202 F. Supp. 3d 86 (D.D.C. 2016) .................................................................. 37

*Playboy Enters., Inc. v. Dep't of Just.*,
677 F.2d 931 (D.C. Cir. 1982) ....................................................................... 21

*Pratt v. Webster*,
  673 F.2d 408 (D.C. Cir. 1982).................................................................................... 29

*Privacy Info. Ctr. v. Internal Revenue Serv.*,
  910 F.3d 1232 (D.C. Cir. 2018).................................................................................... 7

*Prop. of the People, Inc. v. Dep't of Just.*,
  405 F. Supp. 3d 99 (D.D.C. 2019)............................................................................... 15

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,
  330 F. Supp. 3d 373 (D.D.C. 2018)............................................................................. 7

*Public Citizen, Inc. v. OMB*,
  598 F.3d 865 (D.C. Cir. 2010)..................................................................................... 24

*Pulliam v. EPA*,
  292 F. Supp. 3d 255 (D.D.C. 2018)............................................................................. 36

*Raher v. Fed. Bureau of Prisons*,
  2011 WL 2014875 (D. Or. May 24, 2011)................................................................... 31

*\*Roseberry-Andrews v. Dep't of Homeland Sec.*,
  299 F. Supp. 3d 9 (D.D.C. 2018)........................................................................... 30, 31

*Rural Hous. All. v. U.S. Dep't of Agric.*,
  498 F.2d 73 (D.C. Cir. 1974)....................................................................................... 31

*Schoenman v. FBI*,
  575 F. Supp. 2d 136 (D.D.C. 2008).............................................................................. 31

*Sea Shepherd Conservation Soc'y v. IRS*,
  208 F. Supp. 3d 58 (D.D.C. 2016)............................................................................... 12

*Senate of Comm. of P.R. v. U.S. Dep't of Just.*,
  823 F.2d 574 (D.C. Cir. 1987)..................................................................................... 20

*\*Shapiro v. Dep't of Just.*,
  205 F. Supp. 3d 68 (D.D.C. 2016)............................................................................... 19

*Sierra Club v. U.S. Fish and Wildlife Serv.*,
  523 F. Supp. 3d 24 (D.D.C. 2021)......................................................................... 28, 38

*Swick v. U.S. Dep't of the Army*,
  471 F. Supp. 3d 246 (D.D.C. 2020)............................................................................. 12

*Transgender Law Ctr. v. Immigr. and Customs Enf't*,
  46 F.4th 771 (9th Cir. 2022).................................................................................. 25, 36

*Trea Senior Citizens League v. U.S. Dep't of State*,
  923 F. Supp. 2d 55 (D.D.C. 2013)............................................................................... 24

*\*Truitt v. Dep't of State*,
  897 F.2d 540 (D.C. Cir. 1990)........................................................................... 7, 12, 15

*\*Urb. Air Initiative, Inc. v. EPA*,
  271 F. Supp. 3d 241 (D.D.C. 2017).................................................................. 10, 11, 13

*Utahamerican Energy, Inc. v. Mine Safety & Health Admin.*,
  725 F. Supp. 2d 78 (D.D.C. 2010)............................................................................... 19

*Valencia-Lucena v. U.S. Coast Guard*,
  180 F.3d 321 (D.C. Cir. 1999)............................................................................... 8, 9, 10

*Vaughn v. Rosen*,
  523 F.2d 1136 (D.C. Cir. 1975)................................................................................... 22

*Vietnam Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*,
  8 F. Supp. 3d 188 (D. Conn. 2014) ....................................................................... 18, 19

*Wildlife v. U.S. Border Patrol*,
  623 F. Supp. 2d 83 (D.D.C 2009) ........................................................... 40

Statutes

5 U.S.C. § 552 ................................................................................................ 1
5 U.S.C. § 552(a)(4)(B) .................................................................................. 7
5 U.S.C. § 552(a)(8)(A)(i)(I) .............................................................. 21, 27, 28
5 U.S.C. § 552(a)(8)(A)(i)(II) ........................................................................ 27
5 U.S.C. § 552(b)(3) ..................................................................................... 18
5 U.S.C. § 552(b)(5) ..................................................................................... 20
5 U.S.C. § 552(b)(7)(E) ..................................................................... 29, 33. 35
5 U.S.C. § 552(b)(9) ..................................................................................... 37

Rules

Fed. R. Civ. P. 56(a) ....................................................................................... 7

## INTRODUCTION

Between April 2018 and October 2021, forty-one individuals died while in U.S. Immigration and Customs Enforcement ("ICE") custody. When a detainee dies while in custody, ICE reviews the circumstances of the individual's death and assesses agency compliance with the ICE national detention standards relevant to the facility where the individual was detained.[1] During the course of these assessments, several categories of reports are completed by or for ICE determining the cause of the detainee's death and evaluating the medical care provided to the detainee. In 2021, Plaintiff American Oversight sought copies of these reports, submitting multiple requests to ICE and the U.S. Department of Homeland Security ("DHS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to help the American public understand more about the circumstances around these deaths of individuals in ICE custody and the standard of medical care provided within ICE detention facilities around the country.

In responding to American Oversight's FOIA requests, Defendants DHS and ICE, like all federal agencies, each have a duty to perform a search for all requested records and release any responsive, non-exempt documents. ICE[2] failed in this duty by improperly limiting the scope of its search and by unlawfully withholding responsive documents. And ICE's justifications fall far below what is required to meet the agency's burden to support its withholdings, making it manifestly clear that the claimed exemptions and privileges do not apply to the withheld materials.

---

[1] There are at least two distinct sets of ICE national detention standards: the National Detention Standards and the Performance-Based National Detention Standards. *See* U.S. Immigration and Customs Enforcement, *ICE Detention Standards* (fact sheet last updated Feb. 24, 2023), https://www.ice.gov/factsheets/facilities-pbnds; Decl. of Taylor Stoneman in Supp. of Pl.'s Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J., filed herewith ("Stoneman Decl."), Ex. D.

[2] As noted in the Background section below, DHS has asserted in this suit that "any responsive records would fall under the purview of ICE." Jan. 19, 2022 Joint Status Report ("JSR") (ECF No. 9), ¶ 2.

For these reasons, as further explained below, Plaintiff American Oversight is entitled to summary judgment.

## BACKGROUND

Plaintiff submitted FOIA requests to Defendants DHS and ICE in March and October 2021, seeking certain reports prepared by or for the agencies after a detained individual dies while in custody. Across seven FOIA requests, Plaintiff requested five categories of reports: (1) "Detainee Death Review" reports; (2) "Healthcare and Security Compliance Analysis" ("HSCA") reports, or equivalent internal procedural compliance analysis; (3) "Event Review," "Root Cause Analysis," or "Action Plan" reports; (4) Independent Autopsies; and (5) "Mortality Review" reports. *See generally* Decl. of Fernando Pineiro in Supp. of Defs.' Mot. for Summ. J. ("Pineiro Decl."), Ex. 2 (ECF No. 21-5).

Plaintiff requested "[c]opies of the 'Detainee Death Review' reports completed by or for ICE Office of Professional Responsibility as part of the detainee death reviews for each of the following individuals who died in [ICE] custody":

1. Gourgen Mirimanian
2. Roberto Rodriguez-Espinoza
3. Roylan Hernandez-Diaz
4. Anthony Oluseye Akinyemi
5. Samuelino Mavinga
6. Ben James Owen
7. Alberto Hernandez-Fundora
8. David Hernandez-Colula
9. Maria Celeste Ochoa-Yoc De Ramirez
10. Orlan Ariel Carcamo-Navarro
11. Ramiro Hernandez-Ibarra
12. Carlos Ernesto Escobar-Mejia
13. Óscar López Acosta
14. Choung Woong Ahn
15. Santiago Baten-Oxlaj
16. Onoval Perez-Montufa
17. Luis Sanchez-Perez
18. James Thomas Hill
19. Kuan Hui Lee
20. Jose Freddy Guillen Vega
21. Fernando Sabonger-Garcia
22. Cipriano Chavez Alvarez
23. Romien Jally
24. Anthony Jones
25. Felipe Montes
26. Jesse Dean
27. Diego Fernando Gallego-Agudelo

*See* Pineiro Decl., Ex. 2 at 1–6 (FOIA Request One); *id.* at 72–77 (FOIA Request Four). Plaintiff requested "[c]opies of the 'Healthcare and Security Compliance Analysis' reports—or equivalent

internal procedural compliance analysis—completed by or for ICE Office of Professional

Responsibility as part of the detainee death reviews for each of the following individuals who died

in [ICE] custody":

1. Gourgen Mirimanian
2. Anthony Oluseye Akinyemi
3. Samuelino Mavinga
4. Ben James Owen
5. Alberto Hernandez-Fundora
6. David Hernandez-Colula
7. Maria Celeste Ochoa-Yoc De Ramirez
8. Orlan Ariel Carcamo-Navarro
9. Ramiro Hernandez-Ibarra
10. Carlos Ernesto Escobar-Mejia
11. Óscar López Acosta
12. Choung Woong Ahn
13. Santiago Baten-Oxlaj
14. Onoval Perez-Montufa
15. Luis Sanchez-Perez
16. James Thomas Hill
17. Kuan Hui Lee
18. Jose Freddy Guillen Vega
19. Fernando Sabonger-Garcia
20. Cipriano Chavez Alvarez
21. Romien Jally
22. Anthony Jones
23. Felipe Montes
24. Jesse Dean
25. Diego Fernando Gallego-Agudelo

*See id.* at 24–29 (FOIA Request Two); *id.* at 95–100 (FOIA Request Five). Plaintiff requested a

"complete copy of any ICE Health Service Corps 'Event Review,' 'Root Cause Analysis,' or

'Action Plan,' completed for each of the following individuals who died in ICE custody":

1. Gourgen Mirimanian
2. Roxsana Hernandez
3. Huy Chi Tran
4. Efraín Romero de la Rosa
5. Augustina Ramirez-Arreola
6. Wilfredo Padron
7. Mergensana Amar
8. Guerman Volkov
9. Abel Reyes-Clemente
10. Simratpal Singh
11. Pedro Arriago-Santoya
12. Roberto Rodriguez-Espinoza
13. Nebane Abienwi
14. Roylan Hernandez-Diaz
15. Anthony Oluseye Akinyemi
16. Samuelino Mavinga
17. Ben James Owen
18. Alberto Hernandez-Fundora
19. David Hernandez-Colula
20. Maria Celeste Ochoa-Yoc De Ramirez
21. Orlan Ariel Carcamo-Navarro
22. Ramiro Hernandez-Ibarra
23. Carlos Ernesto Escobar-Mejia
24. Óscar López Acosta
25. Choung Woong Ahn
26. Santiago Baten-Oxlaj
27. Onoval Perez-Montufa
28. Luis Sanchez-Perez
29. James Thomas Hill
30. Kuan Hui Lee
31. Jose Freddy Guillen Vega
32. Fernando Sabonger-Garcia
33. Cipriano Chavez Alvarez
34. Romien Jally
35. Anthony Jones
36. Felipe Montes
37. Jesse Dean
38. Diego Fernando Gallego-Agudelo

*See id.* at 55–60 (FOIA Request Three). Plaintiff requested a "complete copy of any independent autopsies supplied to DHS or ICE, including those by county or state medical examiners, for each of the following individuals who died in ICE custody":

1. Onoval Perez-Montufa
2. Luis Sanchez-Perez
3. James Thomas Hill
4. Kuan Hui Lee
5. Jose Freddy Guillen Vega
6. Fernando Sabonger-Garcia
7. Cipriano Chavez Alvarez
8. Romien Jally
9. Anthony Jones
10. Felipe Montes
11. Jesse Dean
12. Diego Fernando Gallego-Agudelo

*See id.* at 126–31 (FOIA Request Six). Plaintiff requested a "complete copy of any ICE Health Service Corps 'Mortality Review' reports completed as part of the detainee death reviews for each of the following individuals who died in ICE custody:

1. Onoval Perez-Montufa
2. Luis Sanchez-Perez
3. James Thomas Hill
4. Kuan Hui Lee
5. Jose Freddy Guillen Vega
6. Fernando Sabonger-Garcia
7. Cipriano Chavez Alvarez
8. Romien Jally
9. Anthony Jones
10. Felipe Montes
11. Jesse Dean
12. Diego Fernando Gallego-Agudelo

*See id.* at 168–73 (FOIA Request Seven).

American Oversight filed this lawsuit on November 16, 2021, at which point Plaintiff had received no records responsive to the seven above-described FOIA requests. "For each of the seven requests, DHS assert[ed] that any responsive records would fall under the purview of ICE." Jan. 19, 2022 JSR, ¶ 2. Subsequently, ICE searched for and made ten productions of records to Plaintiff. *See* Stoneman Decl. ¶ 8.

The following table specifies how many of each requested report Plaintiff ultimately received:[3]

**Table 1: Overview of Reports Requested and Received by Plaintiff**

| Category of Report | Number Requested | Number Received |
|---|---|---|
| Detainee Death Review[4] | 27 | 26 |
| Healthcare and Security Compliance Analysis[5] | 25 | 24 |
| Root Cause Analysis[6] | 38 | 6 |
| Independent Autopsies[7] | 12 | 4 |
| Mortality Reviews[8] | 12 | 12 |

---

[3] Because ICE withheld several of these reports in full without providing any identifying information other than the FOIA exemption asserted, Plaintiff was unaware of the total number of each type of report identified by ICE in the agency's search until reviewing the Pineiro Declaration. *See* Stoneman Decl., Ex. G at 2 n.1.

[4] *See* Pineiro Decl. (ECF No. 21-3) ¶¶ 33 n.9, 38 & n.10, 39 & n.11; Stoneman Decl., Ex. G. ICE avers that the one Detainee Death Review report it did not locate—for Óscar López Acosta—"does not exist[] as this detainee died while not in ICE custody." *See* Pineiro Decl. ¶ 33 n.9. However, the fact that Óscar López Acosta died while not in ICE custody does not necessarily mean that ICE would not possess a report, since ICE Directive 11003.5 regarding reporting requirements for detainee deaths applies to all detainee deaths "including but not limited to those occurring . . . post release (when a death occurs within a reasonable time, not to exceed 30 days of release from ICE custody and review is requested by the ICE Director)." *See* Stoneman Decl., Ex. C.

[5] *See* Pineiro Decl. ¶¶ 44 & n.14, 46 n.15; Stoneman Decl., Ex. G. ICE that eight HSCA reports were withheld as drafts. Pineiro Decl. ¶ 46 n.15. However, footnotes 3–24 of ICE's *Vaughn* Index show that twelve HSCA reports were withheld in full. *See Vaughn* Index at 19–20 nn.3–24. ICE avers that the one HSCA report it did not locate—for Óscar López Acosta—"does not exist[] as this detainee died while not in ICE custody." *See* Pineiro Decl. ¶ 44 n.14. However, that fact does not necessarily mean the report would not exist. *See supra* n.4; Stoneman Decl., Ex. C.

[6] *See* Pineiro Decl. ¶ 52 & n.18; Stoneman Decl., Ex. G.

[7] Though ICE's declaration states it located six autopsy reports, *see* Pineiro Decl. ¶ 65 & n.24, Plaintiff received only four autopsy reports from ICE. Plaintiff received independent autopsies for Luis Sanchez-Perez (provided under the name Mauricio Hernandez-Cabrera), Romien Jally, Anthony Jones, and Jesse Dean. *See* Stoneman Decl., Ex. G. Plaintiff also received from ICE a one-page Montgomery County Forensic Services letter describing a review of Fernando Sabonger-Garcia's medical records, a one-page Miami-Dade County Medical Examiner Department "Investigations Report" regarding Kuan Hui Lee's death, and a three-page Palm Beach County Office of the District Medical Examiner report regarding Onoval Perez-Montufa's death. *Id.* However, these three additional reports are not autopsy reports.

[8] *See* Pineiro Decl. ¶¶ 73 & n.27, 76 & n.28; Stoneman Decl., Ex. G.

Stoneman Decl., Ex. G at 2 (Table 1); *see also id.* at 3–6 (Table 2).[9] ICE produced several hundred pages of these records with redactions, and withheld approximately another 450 pages in full, pursuant to claims under FOIA Exemptions 3, 5, 6, 7(C), and 7(E). *See generally* Pineiro Decl., Ex. 1 (ECF No. 21-4) ("*Vaughn* Index").

American Oversight opposes Defendants' motion for summary judgment and cross-moves for summary judgment itself, challenging the Exemption 3, Exemption 5, and Exemption 7(E) withholdings in these records.[10] American Oversight also challenges the adequacy of ICE's search for responsive records, as well as ICE's segregability analysis.

## ARGUMENT

### I. FOIA and Summary Judgment Standards of Review

Defendants are not entitled to summary judgment unless they show that the "search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). In the FOIA context, "[t]his burden does not shift even when," as here, "the requester files a cross-motion

---

[9] Table 2 provides details regarding which of the reports requested by Plaintiff were received for each listed detainee. *See* Stoneman Decl., Ex. G, Table 2.

[10] Without conceding their propriety, Plaintiff is not, in this cross-motion, challenging ICE's redaction of personally identifiable information pursuant to FOIA Exemption 6 and Exemption 7(C). However, several of the assertions under Exemptions 6 and 7(C) appear on fully withheld pages. Plaintiff's understanding is that all of ICE's full-page withholdings are made pursuant to Exemption 5 and attributed to the draft nature of those reports, while subsets of material may have otherwise been redacted on certain pages pursuant to Exemption 3, Exemption 6, Exemption 7(C), and Exemption 7(E). To the extent Defendants argue that Exemption 6 or Exemption 7(C) apply in full to any such page, in addition to Exemption 5, Plaintiff reserves the right to challenge any such full-page withholding under those exemptions, as well as any claims concerning the segregability of non-exempt material in those pages.

for summary judgment." *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 380 (D.D.C. 2018) (internal quotation marks omitted). That is because the agency "has the onus of proving that the documents are exempt from disclosure, while the burden upon the requester is merely to establish the absence of material factual issues." *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a).

As to an agency's burden to demonstrate the adequacy of its search, it must show "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks omitted). The agency must have "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). An agency "cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 326 (internal quotation marks omitted). If "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

With respect to the agencies' withholding of materials as exempt from FOIA, federal courts apply *de novo* review. 5 U.S.C. § 552(a)(4)(B); *see also Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 58, 74 (D.D.C. 2007). "FOIA unambiguously places on an agency the burden of establishing that records are exempt." *Elec. Privacy Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1238 (D.C. Cir. 2018); *accord Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents."). FOIA's exemptions are "explicitly made exclusive," and "must be "narrowly construed." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (citations omitted).

And "even if an agency establishes an exemption, it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Assassination Archives & Rsch. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003); *see also Farrugia v. Exec. Off. for U.S. Att'ys*, No. 04-cv-0294 PLF, 2006 WL 335771, at *8 (D.D.C. Feb. 14, 2006) (if an agency withholds a full record based on its view that nonexempt portions are not reasonably segregable, it must show the "non-exempt portions are inextricably intertwined with exempt portions").

## II.     ICE's Searches Were Inadequate

Because "[t]he fundamental principle animating FOIA is public access to government documents," agencies are required "to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents." *Valencia-Lucena*, 180 F.3d at 325. "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Id.* (quoting *Truitt*, 897 F.2d at 542). An agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68.

The seven FOIA requests at issue in this case ask for five distinct types of reports, each of which are prepared following the death of an individual in ICE custody. For certain types of reports, such as Detainee Death Reviews and Mortality Reviews, ICE produced reports to Plaintiff for almost all of the individuals identified in Plaintiff's request for that respective report category. *See* Pineiro Decl. ¶¶ 33 n.9, 38 & n.10, 39 & n.11, 73 & n.27, 76 & n.28. But for other categories, Plaintiff received very few of the requested reports. For example, Plaintiff sought complete copies of any "Event Review," "Root Cause Analysis," or "Action Plan" for a list of 38 individuals who died in ICE custody, *see* Pineiro Decl., Ex. 2 at 55–60 (FOIA Request Three), and the agency found only six such reports, *see id.* ¶ 54 n.18 (noting that though six reports were located, two were in draft form). *See also Vaughn* Index at 19–21, 24 (draft reports withheld under Exemption

(b)(5)). But it is not solely these fruits—or the lack of them—that raise questions about the adequacy of ICE's search. Because ICE's declaration has failed to demonstrate beyond a material doubt that ICE (i) searched "*all* files likely to contain relevant documents," *see Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 71–73 (D.D.C. 2014) (citation omitted), and (ii) employed search terms "reasonably calculated to lead to responsive documents," *Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015), the Court must deny Defendants' motion for summary judgment and grant Plaintiff's cross-motion.

### A. ICE did not reasonably identify all directorates likely to possess responsive records

ICE has not established that it searched all the ICE program offices likely to maintain records responsive to Plaintiff's FOIA requests. ICE must search all locations likely to have responsive records, not only those most likely to. *See Urb. Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 256 (D.D.C. 2017) ("The Court has additional concerns with the adequacy of [the agency's] search. The declaration asserts that ten custodians were 'reasonably likely to be in possession of responsive records' . . . but it does not aver that no other custodians were likely to possess responsive documents . . . . Without this information, the Court cannot conclude that [the] search was adequate."). Moreover, ICE's FOIA obligations require it to follow up on "obvious leads," *Valencia-Lucena*, 180 F.3d at 325, including when its initial search failed to identify all responsive records.

Upon receiving Plaintiff's FOIA requests, the ICE FOIA Office tasked just two offices, ICE Enforcement and Removal Operations ("ERO") and Office of Professional Responsibility ("OPR"), with conducting searches for records responsive to Plaintiff's FOIA Requests. Pineiro Decl. ¶ 27. ICE's declaration avers that "[n]o other offices were tasked because, based on the subject matter of the FOIA request (i.e., records associated with detainee death reviews), no other

offices were reasonably likely to have responsive records or would reasonably be expected to have responsive records." *Id.* But that statement directly conflicts with agency protocols described elsewhere in the Pineiro Declaration and with public statements ICE has made regarding which agency directorates review detainee deaths. And while it may have been reasonable for ICE to *start* its search with just ERO and OPR, when those offices did not locate all responsive records, the agency's failure to expand its search to other obvious and likely locations is inexcusable.

According to ICE's declaration, when an individual passes away while in ICE custody, OPR and ERO review the health care services provided to the deceased individual to determine whether the care provided complies with the relevant detention standards and generate reports regarding this analysis. Pineiro Decl. ¶ 26. "Upon their completion, the results of these reports are *provided to ICE senior management* and the Department of Homeland Security's Office of Civil Rights and Civil Liberties." *Id.* (emphasis added). Accordingly, a search of the records maintained by ICE leadership would be "likely to turn up the information requested," *Oglesby*, 920 F.2d at 68, and was therefore required when ERO and OPR failed to identify all responsive documents. The agency's failure to do so resulted in an inadequate search. *See Urb. Air Initiative*, 271 F. Supp. 3d at 256 (where agency declarations provide no "explanation as to why no other record system [is] likely to produce responsive records . . . the Court cannot conclude that [the agency's] search was adequate" (quotation omitted)).

Moreover, ICE's search was not "reasonably calculated to uncover all relevant documents," *Oglesby*, 920 F.2d at 68, because it did not include a search of ICE's Office of the Principal Legal Advisor ("OPLA"). When a detainee dies within ICE custody, ICE posts a news release on the agency's public website. *See* ICE.gov, News Releases and Statements, https://www.ice.gov/newsroom (last visited Apr. 6, 2023) (indicating filtering by topic for

"Detainee Death Notifications"); Stoneman Decl. ¶ 2; *see generally* Stoneman Decl., Ex. A. The press releases for 24 out of the 38 individuals listed across Plaintiff's FOIA requests state that a "comprehensive review" of the circumstances of each individual's death "will be conducted by" OPLA.[11] *See* Pl.'s Combined Statement of Material Facts ("Plaintiff's Statement") at 24–25 ¶¶ 3–6; Stoneman Decl., Ex. A. In light of these public statements, Plaintiff asked early on in this litigation that the agency include OPLA among the offices being searched for responsive records. *See* Stoneman Decl., Ex. B. At that time, ICE asserted, without further explanation, that "OPLA is not a proper custodian and has not been searched." *Id.* But given ICE's public acknowledgment of OPLA's involvement in the subject matter of Plaintiff's request, ICE's failure to search OPLA despite the "common-sense inference that [OPLA] would have responsive records" further underscores the inadequacy of the agency's search. *See Am. C.L. Union v. Dep't of Homeland Sec. ("ACLU I")*, No. 20-3204 (RDM), 2023 WL 2733721, at *9 (D.D.C. Mar. 31, 2023) ("Because DHS was unquestionably on notice that OIG likely possessed responsive materials before DHS even started, much less completed, its search, it was required to search OIG's records.").[12]

Despite clear indications that offices beyond ERO and OPR were likely to house responsive records, ICE's declaration offers no reasonable explanation for why neither ICE leadership nor OPLA were searched. Incredibly, ICE's declaration includes no mention of OPLA at all aside from its inclusion in an introductory list of ICE directorates. Instead, the agency simply makes the

---

[11] ICE failed to produce "Event Review," "Root Cause Analysis," or "Action Plan" reports responsive to FOIA Request Three for all 24 of these individuals. *See* Stoneman Decl., Ex. G, Table 2.

[12] In addition to ICE's public acknowledgement in the news releases of OPLA's role, ICE policy also instructs that at least certain of the requested reports be provided to OPLA, among other offices, upon completion. *See* Stoneman Decl., Ex. C ¶ 5.1(7)(b) (ICE Directive 11003.5 regarding Detainee Death Review reports); Plaintiff's Statement at 23 ¶ 2.

generic assertion that "[n]o other offices were tasked because, based on the subject matter of the FOIA request . . . no other offices were reasonably likely to have responsive records or would reasonably be expected to have responsive records." Pineiro Decl. ¶ 27. This claim is both specious and inadequate in light of the clear and specific record evidence to the contrary described above. *See Urb. Air Initiative*, 271 F. Supp. 3d at 253 (D.D.C. 2017) ("[C]onclusory assertions about the agency's thoroughness are insufficient."); *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 69 (D.D.C. 2016) (an agency's declaration "must at least include the agency's rationale for searching certain locations and not others" (quotation omitted)).

The record therefore demonstrates that OPR and ERO are not the "*only* possible place[s] that responsive records are likely to be located." *Oglesby*, 920 F.2d at 68 ("At the very least, [the agency] was required to explain in its affidavit that no other record system was likely to produce responsive documents."). Thus, ICE has not met its burden to "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.*; *see also Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) ("Reliance on affidavits to demonstrate agency compliance with the mandate of the FOIA does not, however, require courts to accept glib government assertions of complete disclosure or retrieval."). Indeed, given the evidence of overlooked materials detailed above, "the record leaves substantial doubt as to the sufficiency of the search," and summary judgment for Defendants is not proper. *See Truitt*, 897 F.2d at 542; *Swick v. U.S. Dep't of the Army*, 471 F. Supp. 3d 246, 252 (D.D.C. 2020) ("inconsistencies concerning material questions . . . provide grounds for denying summary judgment").

**B. ICE did not reasonably identify and search all offices or file systems where records were likely to be found**

Even if OPR and ERO were the only appropriate ICE directorates to be searched, those directorates impermissibly searched only those locations "most likely" to yield responsive records. Defendants argue that the searches conducted by those offices were reasonable because "after receipt of [the] FOIA requests, employees of the ERO and the OPR program offices familiar with the types of records sought in Plaintiff's FOIA requests searched the locations that were most likely to yield records that were responsive to Plaintiff's FOIA requests." Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. (ECF No. 21-2) ("Defs.' Mem.") at 6. Throughout his declaration, Mr. Pineiro avers the same: that ICE searched directorates, offices, and file systems that were "most likely" to contain responsive records. *See generally* Pineiro Decl. ¶¶ 28–76 (describing searches for each requested report category). This is apparently typical procedure:

> Per the ICE FOIA Office's instructions, the individuals and component offices are directed to conduct searches of the file systems (including both paper and electronic files) that, based on their knowledge of the manner in which they routinely keep records, would be the *most likely* systems to contain responsive documents.

*Id.* ¶ 18 (emphasis added). But "'most likely' is not the relevant metric." *DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015); *see also Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 98 (S.D.N.Y. 2012) (rejecting ICE's position and noting that "the government is not required to search only the files of the two custodians who are 'most likely' to have responsive records; it must also search other locations that are reasonably likely to contain records" (citing *Oglesby*, 920 F.2d at 68)). "[T]he agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68; *see also Am. Oversight v. Off. of Mgmt. & Budget*, 613 F. Supp. 3d 219, 229 (D.D.C. 2020) (an agency "must provide adequate justification in its . . . declaration for

limiting its searches to these particular categories of records"); *Am. Oversight v. U.S. Gen. Servs. Admin.*, 486 F. Supp. 3d 306, 316 (D.D.C. 2020) (finding agency's search inadequate where it failed to justify its decision to not search requested categories of records).

ICE's description of ERO's search for records responsive to FOIA Request Three[13]— which asked for an "'Event Review,' 'Root Cause Analysis,' or 'Action Plan,'" for 38 individuals who died in ICE custody, *see* Pineiro Decl., Ex. 2 at 56—reveals the flaws a "most likely" standard injected into many levels of the search process. After the ICE FOIA Office forwarded FOIA Request Three to ERO, the directorate's Information Disclosure Unit tasked ERO's ICE Health Service Corps ("IHSC") with a search for responsive records. Pineiro Decl. ¶ 48. The IHSC program coordinator "reviewed the request to determine which offices within ERO IHSC would *most likely* have records responsive to the request," then "tasked ERO IHSC Medical Quality and Management Unit (MQMU), ERO IHSC Medical Case Management Unit (MCMU), and ERO IHSC Investigations Unit (IIU), as the offices within ERO IHSC *most likely* to have records responsive to the request should they exist." *Id.* ¶ 50 (emphasis added). Those three offices within ERO IHSC searched for records as follows:

- **MQMU:** The MQMU Compliance-Healthcare Risk Management Program Manager "searched the MQMU SharePoint site," finding six reports. Pineiro Decl. ¶ 52 & n.18. The office did not aver that no other locations within MQMU were likely to contain responsive records. *See generally id.* ¶ 52.

- **MCMU:** Regional Field Medical Coordinators ("FMC") within MCMU conducted searches for three separate regions:

---

[13] Plaintiff focuses here on the inadequacies of ICE's search for Root Cause Analysis reports responsive to FOIA Request Three, since the largest proportion of those reports are missing from ICE's production, but ICE's searches for each type of report contain the same flaw: determining offices and file systems *most likely* to contain responsive records, rather than *all likely* locations. *See* Pineiro Decl. ¶¶ 31, 37 (Detainee Death Review Reports); *id.* ¶¶ 43, 46–47 (HSCA Reports); *id.* ¶¶ 65–66, 68 (Independent Autopsies); *id.* ¶¶ 71, 73 (Mortality Reviews).

o The Eastern Regional FMC "determined that the locations *most likely* to contain responsive records, if any, were the Unit's shared drive, as well as his Microsoft Outlook folders[.]" *Id.* ¶ 54 (emphasis added).

o The Central Regional FMC "determined that the locations *most likely* to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders[.]" *Id.* ¶ 55 (emphasis added).

o The Western Regional FMC "determined that the locations *most likely* to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders[.]" *Id.* ¶ 56 (emphasis added).

- **IIU:** Despite being the program office that "investigates allegations of inappropriate healthcare provided to individuals in ICE custody" and "incidents of mortality and significant morbidity involving individuals in ICE custody," IIU did not conduct a search because the office determined that "MQMU would *most likely* have any responsive records[.]" *Id.* ¶¶ 57–58 (emphasis added).

\*        \*        \*

These searches do not meet ICE's burden. ICE must search all offices and file systems likely to have responsive records; it does not suffice for an agency to search only the locations "most likely" responsive documents to be located. *See Prop. of the People, Inc. v. Dep't of Just.*, 405 F. Supp. 3d 99, 121 (D.D.C. 2019) (holding the FBI's averment did "not pass muster" where it stated that the agency "contact[ed] the FBI components *likely* to maintain or have knowledge as to the location of responsive records" (alterations in original)). Because ICE's search descriptions—most notably its search for Root Cause Analysis reports responsive to FOIA Request Three—focus solely on where records "most likely" would be located, ICE's declaration falls short of providing this Court with sufficient information to conclude that the searches were "reasonably calculated to uncover all relevant documents." *See id.*; *Truitt*, 897 F.2d at 542; *see also ACLU I*, 2023 WL 2733721, at \*5 (agency not permitted to "rank[] . . . components 'likely' to maintain records" and "ignore components that are 'likely' to maintain responsive records[] so long as another component is even more 'likely' to have responsive material").

### C. ICE ERO IHSC employed unreasonably limited search terms to identify records responsive to FOIA Request Three

Beyond ICE's insufficient determinations regarding locations to search, ICE ERO IHSC utilized unreasonable search terms to search its file systems for records responsive to FOIA Request Three.

In responding to FOIA requests, agencies have an obligation to craft search terms that are "reasonably tailored to uncover documents responsive to the FOIA request." *New Orleans Workers' Ctr. for Racial Just. v. U.S. Immigr. & Customs Enf't*, 373 F. Supp. 3d 16, 45 (D.D.C. 2019) (quotation omitted). Agencies are entrusted with discretion in designing search terms where they are necessary, "but that discretion is not boundless." *Am. Ctr. for Equitable Treatment, Inc. v. Off. of Mgmt. & Budget*, 281 F. Supp. 3d 144, 151 (D.D.C. 2017). An agency has an obligation to craft search terms that "pass muster under a standard of reasonableness." *Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488, 498 (D.D.C. 2017) (internal quotation omitted).

The search terms employed by ERO IHSC MCMU, one of the three ERO IHSC program offices tasked with a search, were not reasonably tailored to turn up the Event Review, Root Cause Analysis, or Action Plan Reports requested in Plaintiff's FOIA Request Three. MCMU's Eastern Regional FMC used the "search terms CAP and UCAP," Pineiro Decl. ¶ 54; the Central Regional FMC used the "terms detainee death, mortality review, death, and the names of the detainees listed in Request Three who were detained within the central region's area of responsibility," *id.* ¶ 55; and the Western Regional FMC used the "terms mortality review, detainee death, [and] the names of the detainees listed in Request Three who were detained within the central region's area of responsibility," *id.* ¶ 56.[14] No MCMU region used any of the terms "event review," "root cause,"

---

[14] Plaintiff assumes that the Western Regional FMC's search description, for the names of detainees "who were detained within the *central* region's area of responsibility" is a typographical error, *see* Pineiro Decl. ¶ 56 (emphasis added), and that the office actually searched for names of

or "action plan" in their search, but ICE's declaration does not explain why such obvious terms were not included, particularly since the title of the requested report is "ICE Health Service Corps Root Cause Analysis and Action Plan." *See* Pineiro Decl. ¶ 48 n.17. ICE explains what the terms "CAP" and "UCAP" mean, *see id.* ¶ 54 n.19, but does not say why those terms would be sufficient on their own to identify all responsive records, without using obvious alternatives, such as the report titles listed in Plaintiff's request. And the Central and Western Region's use of detainees' names as search terms does not resolve the problem,[15] as ICE does not clarify whether it searched for variations of detainees' names to ensure that responsive results would not be excluded due to choices in the formatting of the term.[16] *See Bagwell v. U.S. Dep't of Just.*, 311 F. Supp. 3d 223, 230 (D.D.C. 2018) ("Because it is likely that emails concerning the investigation would use 'PSU' or 'Penn State' rather than the full name of the University, the Department's search was not reasonably calculated to find all responsive emails.").

As a result, ICE's failure to use search terms reasonably calculated to turn up all responsive documents, including by not using terms that would hit on the title of the requested report, renders the agency's search inadequate. *See Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 11 (D.D.C. 2018) (agreeing that agency "relied on too few keywords and excluded obvious synonyms" which is "sufficient grounds to grant summary judgment in [a requester's] favor and order [an agency] to search its records a second time"); *Vietnam Veterans*

---

detainees detained within the western region. However, to the extent that the Western Regional FMC actually did search only for names of detainees detained outside that region, that would be yet another reason ERO IHSC's search was not reasonably tailored.

[15] Notably, the Eastern Region did not use detainees' names as search terms.

[16] For example, using the full name "Maria Celeste Ochoa-Yoc de Ramirez"—how Plaintiff listed Maria's name in FOIA Request Three—as a search term would not turn up responsive results for reports labeled "Maria Ochoa-Yoc de Ramirez," which is how the Detainee Death Review Plaintiff received for Maria in fact was labeled.

*of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 199,

217 (D. Conn. 2014) (finding that use of the search terms "personality disorder separation" and

"adjustment disorder separation" was "too narrow" to uncover records related to the military's use

of personality disorder discharges to separate Armed Forces members from service, because

"potentially relevant documents may not have been retrieved by the search"); *Utahamerican*

*Energy, Inc. v. Mine Safety & Health Admin.*, 725 F. Supp. 2d 78, 84 (D.D.C. 2010) ("omitting

from the search an alternative name by which the subject of the search is known renders the search

inadequate").

*　　*　　*

In sum, ICE has not conducted adequate searches reasonably calculated to identify the

records sought by Plaintiff's requests. ICE failed to identify and search all directorates, offices,

and file systems likely to have responsive records and ICE's searches relied on unreasonably

limited search terms. The Court should thus deny Defendants' motion for summary judgment,

grant Plaintiff's cross-motion, and order ICE to immediately conduct searches reasonably tailored

to uncover any remaining records responsive to Plaintiff's requests.

## III.   ICE's Withholdings Are Not Supported by Law

### A.  ICE has failed to justify its withholdings under Exemption 3

ICE has offered no meaningful information to support its Exemption 3 withholdings. Under

Exemption 3, an agency may withhold information that is "specifically exempted from disclosure

by [a] statute" other than FOIA. 5 U.S.C. § 552(b)(3). Courts evaluate the invocation of

Exemption 3 using a two-pronged approach. First, the court must consider whether the statute

identified by the agency is a statute of exemption as contemplated by Exemption 3; second, the

court must consider whether the withheld material satisfies the criteria of the statute. *See CIA v.*

*Sims*, 471 U.S. 159, 167 (1985); *Baldrige v. Shapiro*, 455 U.S. 345, 352–53 (1982). As the D.C.

Circuit has observed: "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978); *Ass'n of Retired R.R. Workers v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987) (same).

Here, Defendants have provided no information upon which Plaintiff or the Court could evaluate the Exemption 3 withholdings at issue. ICE has refused to disclose the statute(s) underlying its Exemption 3 claims, let alone provide any justification for how the information at issues satisfies the criteria of any such statute. *See* Pineiro Decl. ¶¶ 80–82. Defendants' summary judgment motion refers to a second declaration they claim cannot be filed on the public docket, but Defendants have since withdrawn their motion for leave to file that declaration *ex parte* and under seal. *See* Defs.' Notice of Withdrawal (ECF No. 23). ICE thus relies solely on the Pineiro Declaration filed publicly with Defendants' motion, and the only explanation provided there is that "Exemption (b)(3) was asserted to immigration information" that bears on "the safety of the survivors" and was "withheld as it is covered by non-disclosure statutes and/regulations that mandate the confidentiality of the information and that survive the death of the non-citizens at issue." Pineiro Decl. ¶ 82. "Such conclusory statements are insufficient to justify withholding a document pursuant to FOIA Exemption 3." *Shapiro v. Dep't of Just.*, 205 F. Supp. 3d 68, 74 (D.D.C. 2016), *aff'd in part, vacated in part on other grounds*, 893 F.3d 796 (D.C. Cir. 2018).

Because Defendants' submitted materials contain insufficient detail for the Court to ascertain the particular bases for ICE's Exemption 3 withholdings, including the very statute(s) supposedly implicated, the Court should grant Plaintiff's cross-motion for summary judgment on this point. *See Brick v. Dep't of Just.*, 293 F. Supp. 3d 9, 12–13 (D.D.C. 2017) (absent agency's

submission of declaration "contain[ing] sufficient detail for the Court to ascertain the particular bases for the government's withholdings, this Court . . . will grant Plaintiff's cross motion for summary judgment").

## B. Exemption 5 does not protect responsive records withheld by ICE

ICE asserts that the deliberative process privilege protects approximately 450 pages in full and seven pages in part from disclosure under Exemption 5 of the FOIA. Defs.' Mem. at 7–9; Pineiro Decl. ¶¶ 83–85. As discussed below, ICE has neither met its burden of establishing that the records are protected by the deliberative process privilege, nor articulated in a focused and concrete way the foreseeable harm that would supposedly occur upon disclosure of the withheld records.

FOIA Exemption 5 permits an agency to withhold "inter-agency or intra-agency" records subject to civil discovery privileges. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); 5 U.S.C. § 552(b)(5). Here specifically, ICE has invoked the deliberative process privilege, and so it must establish that the communications are both (1) predecisional and (2) deliberative. *See, e.g.*, *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). As to the first point, for a document to be predecisional, it must be "antecedent to the adoption of an agency policy." *Jordan v. U.S. Dep't of Just.*, 591 F.2d 753, 774 (D.C. Cir. 1978) (*en banc*), *overruled in part on other grounds*, *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (*en banc*). Critically, the court "must be able 'to pinpoint an agency decision or policy to which the document contributed.'" *Senate of Comm. of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983)). "If there is no definable decisionmaking process that results in a final agency decision, then the documents are not pre-decisional." *Paisley*, 712 F.2d at 698.

As to the second point, deliberative material is that which is a "direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). The agency bears the burden of demonstrating "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980) (citing *Vaughn*, 523 F.2d at 1146). The privilege "does not protect 'purely factual material appearing in . . . documents in a form that is severable without compromising the private remainder of the documents." *Playboy Enters., Inc. v. Dep't of Just.*, 677 F.2d 931, 935 (D.C. Cir. 1982) (quoting *EPA v. Mink*, 410 U.S. 73, 91 (1973)).

Moreover, an agency may not withhold exempt materials unless the agency "reasonably foresees that disclosure would harm an interest protected by" a FOIA exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I). "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation ("Reps. Comm. I")*, 3 F.4th 350, 369–70 (D.C. Cir. 2021) (citing *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020)). "[W]hat is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." *Id.* at 370.

Here, ICE has failed to establish essential elements of the deliberative process and to articulate a reasonably foreseeable harm that would result from the disclosure of the purportedly deliberative portions of these records. The Court should therefore reject ICE's Exemption 5 claims.

i. <u>ICE has not shown that the records withheld under Exemption 5 are connected to a decisionmaking process as required to invoke the deliberative process privilege</u>

Under Exemption 5, ICE fully withheld approximately 450 pages' worth of draft HSCA reports and draft Root Cause Analysis reports, claiming that the deliberative process privilege wholly protects against their disclosure. Defs.' Mem. at 7–9; Pineiro Decl. ¶¶ 85–87; *Vaughn* Index at 19–22.[17] ICE also partially withheld a portion of one page of a final Mortality Review report reflecting "non-final recommendations pertaining to the training of staff." Defs.' Mem. at 8–9; Pineiro Decl. ¶ 88; *Vaughn* Index at 16–17. Finally, ICE partially redacted six pages of certain Root Cause Analysis reports, claiming the withheld information pertains to identified "process vulnerabilities" and "draft" pages of a report. Pineiro Decl. ¶¶ 85, 89; *Vaughn* Index at 22–25. However, despite expending many words in supposed justification of these withholdings and redactions, ICE's declaration and *Vaughn* index do not identify a single decision or policy to which any fully withheld record was allegedly antecedent, a prerequisite for invocation of Exemption 5's deliberative process privilege. *See Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 260 (D.D.C. 2004) ("The most basic requirement of the [deliberative process] privilege is that a document be *antecedent* to the adoption of an agency policy.").

According to ICE, the 450 fully withheld pages and two of the partially withheld pages are drafts containing "opinions, edits, comments, conclusions, and recommendations suggested in unfinalized draft reports; non-final proposed recommendations; non-final summaries of the facts underlying detainee deaths; and non-final recommendations pertaining to the training of staff

---

[17] Justification for all of these full-page withholdings is covered in one "row" at pages 19–22 of ICE's *Vaughn* Index. Though the two different types of reports contained within the withheld pages are identified and defined, the same explanation for the reports' withholding is offered for all 450 fully withheld pages, with no apparent attempt to tailor the narrative to particular documents or portions thereof.

within the mortality review reports." Defs.' Mem. at 8–9 (cleaned up) (citing Pineiro Decl. ¶¶ 85–89) (internal quotations and alterations omitted). ICE's declaration further explains that "[t]he information contained within the draft documents include[s] comment bubbles, edits, questions to analyze and review, as well as follow-up work to be conducted" and "non-final proposed recommendations." Pineiro Decl. ¶ 86. However, "[m]ere classification of a document as a 'draft document' does not end the inquiry; the government must also prove that the document is pre-decisional and related to the deliberative process." *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 241 (D.D.C. 2013) (citation omitted). And the fact that agency officials deliberate does not necessarily warrant application of the deliberative process privilege—unless a pending, authorized agency administrative decision is the subject of their deliberations.

The closest ICE gets to identifying a relevant decisionmaking process is an assertion that "[t]he reports are pre-decisional, as they were generated before the final adoption of the agency's final position as it pertained to the detainee death reviews." *See Vaughn* Index at 20, 23, 25. But the "detainee death reviews"—*i.e.*, the several types of reports that have been withheld—primarily analyze and assess past incidents, not future policy decisions. ICE describes HSCA reports as being "completed . . . *to assess compliance with ICE [Performance-Based National Detention Standards]* governing healthcare and security operations during the course of detainee death investigations."[18] *See, e.g.*, *Vaughn* Index at 19 (emphasis added). Considering these types of reports as predecisional for purposes of the deliberative process privilege would turn the privilege's standard on its head; rather than forward-looking deliberation regarding the crafting of

---

[18] ICE's website, which contains information regarding ICE's national detention standards, shows that the Performance-Based National Detention Standards were last revised in 2016. *See* U.S. Immigration and Customs Enforcement, *ICE Detention Standards* (fact sheet last updated Feb. 24, 2023), https://www.ice.gov/factsheets/facilities-pbnds; Stoneman Decl., Ex. D at 2.

agency policy, these draft reports investigate and establish the circumstances of a detainee's death and analyze those circumstances for agency compliance with already-established policy. "Generally, factual accounts of events do not fall under Exemption 5," *Judicial Watch*, 297 F. Supp. 2d at 261, and "[a] document that does nothing more than explain an existing policy cannot be considered deliberative," *Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 81 (D.D.C. 2018) (citing *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2010)); *Am. Immigr. Council v. U.S. Customs and Border Patrol*, No. CV 19-2965 (RC), 2023 WL 2755412, at *3 (D.D.C. Apr. 3, 2023) (finding document "not predecisional because it merely embodied or explained a policy that the agency adopted" and agency did not "provide[] evidence describing what decision or policy th[e] document was leading towards" (cleaned up)). "[I]t is not enough to say that the documents relate, in some way, to actions 'taken or proposed in response to [an incident].'" *Judicial Watch*, 297 F. Supp. 2d at 264 (citation omitted) (holding that agency "must identify particular decisionmaking processes" for the documents to be recognized as predecisional).

ICE "fail[s] to provide necessary contextual information about the particular decisionmaking processes to which the [draft HSCAs and Root Cause Analysis Reports and Action Plans] contributed, and the role the [drafts] played in those processes." *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (citing *Hinckley v. United States*, 140 F.3d 277, 284 (D.C. Cir. 1998) ("The agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.")). Lacking that critical context, ICE's "broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional." *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013) (finding

agency's declaration "ambiguous regarding which 'decision' the [documents at issue] preceded"). Even if potential recommendations came out of the investigatory process related to a detainee's death, simple relevance to the policy-making process is not sufficient to bring a document within the ambit of Exemption 5. *See Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 158–59 (D.D.C. 2009) (requiring disclosure of records in which "no agency policy is being debated or discussed" even though the "[records] are, in the most general sense, part of an intra-agency discussion relating" to agency's decisionmaking). Instead, ICE "must identify what prospective 'final policy' the documents predate," which it fails to do here.[19] *See Heartland All. for Human Needs & Human Rights*, 291 F. Supp. 3d at 81 ("Although [the agency] repeatedly notes that the [records] are intended to be used to make a final policy decision, it does not provide the necessary detail for the Court to determine the nature of the deliberative process, function and significance of the documents, and the nature of the authority vested in the author and recipient.").

---

[19] At least one other court has reached the same conclusion in a similar case concerning ICE's efforts to withhold these types of records pursuant to Exemption 5. The Ninth Circuit reviewed ICE's assertions of the deliberative process privilege over detainee death review records in *Transgender Law Ctr. v. Immigr. and Customs Enf't*, 46 F.4th 771 (9th Cir. 2022). There, ICE had withheld, among other things, non-final drafts of mortality review and detainee death review reports. *Id.* at 783. The Ninth Circuit rejected ICE's justification for withholding the draft mortality review, noting that ICE's explanation, which "simply stat[ed]" "that '[t]his Preliminary report . . . contains information pertaining to medical care [and] interviews of detention facility personnel,'" "contain[ed] *no* references to any decision to which the document pertains." *Id.* The court held that "ICE failed to meet its burden of demonstrating predecisional status and deliberation" and remanded to the district court "to direct the release of the draft mortality review." *Id.* With respect to the related draft detainee death review, while the Ninth Circuit did not specifically analyze ICE's justifications for withholding that record under the deliberative process privilege, in light of the agency's insufficient justifications for withholding the draft mortality review and certain draft press statements, the circuit court instructed the district court to "also reconsider the [agency's] other assertions of deliberative process privilege." *Id.*

The agency fares no better with respect to its five remaining pages of partial withholdings. Portions of pages 499–502 of ICE's production were withheld because they allegedly "disclose non-final deliberative findings pertaining to process vulnerabilities identified." *Vaughn* Index at 23; *see also* Pineiro Decl. ¶ 89. Not only are these vague "process vulnerabilities" too ambiguous to justify the withholding, but moreover, the only relevant decisionmaking process identified is, again, that the report "pertain[s] to the detainee death reviews." *See Vaughn* Index at 23. For the reasons described above, this is not enough. Finally, ICE also redacted portions of Page 477a "to protect information that discloses non-final recommendations pertaining to the training of staff." Pineiro Decl. ¶ 88; *Vaughn* Index at 16. The agency claims that these portions of the report are predecisional because "they were generated before the final adoption of the agency's final position as it pertained to the implementation [] of any of the recommendations relating to potential training of detention staff." *Id.* This explanation—though marginally more detailed—still misses the mark. "[A]n agency must show that the document was 'generated as part of a *definable* decision-making process.'" *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 151 (D.D.C. 2017) (quoting *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011)). Beyond conveying Page 477a's nebulous relation to the "potential training of detention staff," Pineiro Decl. ¶ 88, ICE has not provided additional required details regarding "the role played by the documents in issue in the course of that process," "the nature of the decisionmaking authority vested in the office or person issuing the disputed document[]," and "the positions in the chain of command of the parties to the documents." *Ctr. for Biological Diversity v. EPA*, 279 F. Supp. 3d 121, 147 (D.D.C. 2017) (citations omitted).

In sum, where there is no decision for the agency to make, the purpose of the deliberative process privilege is absent, and transparency should prevail.

ii. Even if the withheld material was protected by the deliberative process privilege, Defendants have not established any foreseeable harm from its release

Even if the Court were to find that the deliberative process privilege was properly invoked for some of the withheld records, ICE's showing of foreseeable harm associated with the disclosure of the materials falls short, and thus the records may not be withheld. FOIA prohibits an agency from withholding information unless "the agency reasonably foresees that disclosure would harm an interest protected by an exemption" or "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i)(I)–(II). ICE has failed to meet that requirement in this case.

Rather, ICE's description of the purported harm upon release "is wholly generalized and conclusory, just mouthing the generic rationale for the deliberative process privilege itself." *See Reps. Comm. I*, 3 F.4th at 370. The agency relies on the same boilerplate claims of harm for each deliberative process withholding, stating:

> The release of this internal information would likewise discourage the expression of candid opinions and inhibit the free and frank exchange of information and ideas between agency personnel, which would chill intra- and inter-agency communications and adversely impact the quality of internal policy decisions and the development of ICE agency positions. Additionally, disclosure of these draft reports would cause public confusion as the reasons, facts, and rationale contained in the draft reports are non-final and do not represent the agency's final decision. Disclosure of these draft reports would also lead to premature disclosure of agency deliberations before they are actually adopted by the agency.

*See Vaughn* Index at 21, 24, 25; *see also id.* at 16; Pineiro Decl. ¶ 88. Crucially, ICE has provided no "link between the specified harm and the specific information contained in the material withheld," *Reps. Comm. I*, 3 F.4th at 369 (quoting H.R. REP NO. 391, at 9), instead "merely restat[ing] th[e] broad justifications for the privilege" which "undergird[] the privilege in every case," *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot. ("Reps. Comm. II")*,

567 F. Supp. 3d 97, 115 (D.D.C. 2021).[20] Though guarding against public confusion can serve as an interest appropriately justifying foreseeable harm if the agency "provide[s] a situation-specific reason for withholding a nonfinal draft," a vague assertion that a draft report differs from the final version does not carry an agency's burden. *See Ams. for Fair Treatment v. U.S. Postal Serv.*, No. 1:22-CV-1183-RCL, 2023 WL 2610861, at \*12–13 (D.D.C. Mar. 23, 2023); *Sierra Club v. U.S. Fish and Wildlife Serv.*, 523 F. Supp. 3d 24, 38 (D.D.C. 2021) ("The Court remains unpersuaded that a non-specific fear of confusion suffices to meet the agency's burden [of showing foreseeable harm]."). ICE has not, for example, stated that "the differences are substantive in nature" or described "in concrete terms" how precisely the public would be confused by any differences. *See Ams. for Fair Treatment*, 2023 WL 2610861, at \*13.

Accordingly, ICE's generic assertions of harm do not carry its burden of establishing that it is "reasonably foresee[able] that disclosure" of material withheld pursuant to the deliberative process privilege "would harm an interest protected by" that privilege. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see also Reps. Comm. I*, 3 F.4th at 371; *Ams. for Fair Treatment*, 2023 WL 2610861, at \*12–13.

---

[20] The Department of Justice's Office of Information Policy recently reminded agencies that "[a]pplying the 'foreseeable harm' standard is a key element in administering FOIA with a presumption of openness." *See* U.S. Dep't of Just., *OIP Guidance: Applying a Presumption of Openness and the Foreseeable Harm Standard* (last updated Mar. 13, 2023), available at https://www.justice.gov/oip/oip-guidance-applying-presumption-openness-and-foreseeable-harm-standard. OIP further advised that "if the record in question is an internal proposed draft that is subject to editing and deliberation, foreseeable harm cannot be assumed based on a 'boilerplate' assumption that the disclosure of predecisional deliberative materials would likely cause employees to be more circumspect in the future." *Id.*

**C. ICE has failed to satisfy the requirements for withholding under Exemption 7(E)**

Exemption 7(E) authorizes an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent" that production of such records or information "would disclose techniques or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). ICE has failed to show that Exemption 7(E) applies to the withheld records.

      i.   <u>ICE has not provided sufficient facts to show that the records at issue were compiled for a law enforcement purpose</u>

In assessing whether the records of a law enforcement agency were compiled for law enforcement purposes, courts focus on "how and under what circumstances the requested files were compiled, and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Jefferson v. Dep't of Just., Off. of Pro. Resp.*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (citations omitted). "Specifically, a record is compiled for law enforcement purposes so long as there is (1) a rational nexus between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law." *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 56 (cleaned up).

Plaintiff does not quarrel with the fact that ICE is principally a law enforcement agency. *See Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 15 (D.D.C. 2009) ("[T]here is no question that ICE . . . perform[s] law enforcement activities."); Pineiro Decl. ¶¶ 92–98. But despite the deference that status accords the agency in Exemption 7's threshold inquiry, *see Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998), the standard of review is not a "vacuous" one, *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982). "In order to pass the FOIA Exemption 7 threshold, such an agency must establish that its investigatory activities are realistically based on

a legitimate concern that federal laws have been or may be violated or that national security may be breached." *Id.* Claiming that "because [it] is a law enforcement agency, all documents compiled by [it] inherently meet the threshold requirement" is "plainly insufficient." *New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57–58 (citation omitted); *see also Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 30 (D.D.C. 2018) ("[N]ot every document compiled by a law enforcement agency is compiled for a law enforcement purpose." (citation omitted)).

Here, Defendants cursorily assert in their memorandum that "Plaintiff's FOIA requests sought law enforcement records." Defs.' Mem. at 12 (citing Pineiro Decl. ¶¶ 100–14). And, though ICE's declaration provides great detail about the agency's law enforcement responsibilities in general, *see* Pineiro Decl. ¶¶ 92–98, it does not grapple with which law enforcement purpose these specific records implicate. Neither does ICE's *Vaughn* Index shed enough light to meet the requisite standard. ICE states that its HSCA reports assess internal "compliance with ICE Performance-Based National Detention Standards (PBNDS) governing healthcare and security operations," while Detainee Death Review reports include the "findings of independent, objective examinations of the facts and circumstances surrounding the detention and death of an individual in ICE custody to determine whether the agency and detention facility complied with detention standards."[21] *See Vaughn* Index at 2, 4–6, 9, 11, 13–14, 17–19. But these medical, oversight, and

---

[21] These descriptions are in line with the definitions contained in ICE Directive 11003.5 regarding Notification, Review, and Reporting Requirements for Detainee Deaths. *See* Stoneman Decl., Ex. C ¶ 3.5 (defining Detainee Death Review as "[a]n objective examination of the facts and circumstances surrounding the detention and death of an individual in ICE custody or post release . . . to determine whether or not the deceased detainee received treatment in accordance with applicable detention standards on health, safety, and security"); *id.* ¶ 3.3 (defining Mortality Review as "[e]valuation of a deceased detainee's medical history and clinical care provided to the detainee to ascertain both cause of death, and whether changes to ICE policies, procedures, or practices are warranted; to provide recommendations for follow up actions; and to identify issues that require further study").

compliance reviews are "required . . . following the death of a detainee in ICE custody." *See* Stoneman Decl., Ex. C ¶ 2 (ICE Directive 11003.5). Thus, these reports are the result of compulsory administrative reviews of medical incidents at detention facilities, not prompted by "a possible security risk or violation of federal law," *see New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 56 (citation omitted), and are far from what could "fairly be characterized as an enforcement proceeding." *See Jefferson*, 284 F.3d at 176–77 (citation omitted). ICE "neither identifies a particular individual or incident subject to an investigation nor connects a particular individual or incident to a potential violation of law," s*ee Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141, 147 (D.D.C. 2011), instead simply stating that "[t]he law enforcement records at issue pertain to investigations conducted pursuant to ICE's law enforcement authorities." Pineiro Decl. ¶ 99. The Court should not accept this conclusory claim. *See Parker v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys*, 852 F. Supp. 2d 1, 11 (D.D.C. 2012) (explaining that to satisfy threshold agency "must actually provide evidence" that records were compiled for law enforcement purposes); *Schoenman v. FBI*, 575 F. Supp. 2d 136, 162 (D.D.C. 2008) (finding that mere statement that agency document "inherently relates to a law enforcement purpose will not suffice"); *see also Rural Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 82 n.48 (D.C. Cir. 1974) ("[A] court must of course be wary of self-serving declarations of any agency[.]").

Indeed, not all records related to ICE's duties are compiled for law enforcement purposes. *See Roseberry-Andrews*, 299 F. Supp. 3d at 31 n.10 (rejecting "blanket assertion" that "any records created by a program office that provides support to ICE meet the Exemption 7 threshold"); *cf. Raher v. Fed. Bureau of Prisons*, No. CV-09-526-ST, 2011 WL 2014875, at *9 (D. Or. May 24, 2011) (finding that although "disclosure of information pertaining to 'security electronics,' 'security inspection system,' and staffing vulnerabilities raises security concerns with respect to

[BOP's] custodial functions," the agency failed to explain how those documents pertain to law enforcement functions). And the mere fact that these records pertain to detained individuals does not convert reports on healthcare services and standards for clinical care into records "compiled for law enforcement purposes." *See Henderson v. U.S. Dep't of Just.*, 157 F. Supp. 3d 42, 49–50 (D.D.C. 2016) (holding stenographic expense records were not compiled for law enforcement purposes when "the apparent connection between stenographic services and the EOUSA's law enforcement function in prosecuting plaintiff's criminal case" was "highly attenuated"). ICE "cannot merely point to its mission, as a blanket reference to the agency's law enforcement duties does not establish" that the reports at issue were compiled for law enforcement purposes. *See Benavides*, 774 F. Supp. 2d at 146 (cleaned up); *Am. Immigr. Council*, 950 F. Supp. 2d at 245–46 (*Vaughn* Index and associated documentation submitted by DHS and ICE "fall well below the standard set out in *Pratt*" where "their argument appears to rest almost entirely on the premise that, as a law-enforcement agency, ICE's records and documents are necessarily produced for law-enforcement purposes").

Because ICE is not excused "from the requirement of describing its 'justifications for withholding the information with specific detail,'" *Long v. Immigr. & Customs Enf't*, 149 F. Supp. 3d 39, 48 (D.D.C. 2015) (quoting *ACLU v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011)), the Court should find that the agency has not presented sufficient facts to support that the withheld records were all compiled for a law enforcement purpose. *See New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57 ("[T]he Court declines to . . . attempt to discern for itself whether the documents satisfy Exemption 7's threshold requirement.").

On top of failing to demonstrate that the records at issue were compiled for law enforcement purposes, ICE has additionally not shown that disclosure is prohibited under Section 7(E). "By its express terms, [subsection 7(E)] authorizes the withholding of information consisting of, or reflecting, a law enforcement 'technique' or a law enforcement 'procedure' *if* it is 'for law enforcement investigations and prosecutions,' not internal agency policies wholly unrelated to investigations or prosecutions." *Cowsen-El v. U.S. Dep't of Just.*, 826 F. Supp. 532, 534 (D.D.C. 1992). To "meet the specific requirements of Exemption 7(E), . . . the withholdings must be 'techniques and procedures,' and those must relate to 'investigations or prosecutions.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 567 F. Supp. 3d 204, 215 (D.D.C. 2021), *rev'd and remanded on other grounds*, 58 F.4th 1255 (D.C. Cir. 2023); *Hansten v. Drug Enf't Admin.*, No. 21-2043 (RC), 2022 WL 2904151, at *4 (D.D.C. July 22, 2022) ("Exemption 7(E) only protects disclosures that would reveal 'techniques and procedures *for law enforcement investigations or prosecutions*." (citing 5 U.S.C. § 552(b)(7)(E))).

ICE has provided a long summary of the types of information the agency withheld as techniques and/or procedures under Exemption 7(E):

> [D]etails . . . pertaining to the specific internal and external locations of security and surveillance cameras at relevant ICE detention facilities, as well as security vulnerabilities based on the locations of the cameras; staffing numbers, shortages and potential security vulnerabilities deriving from staffing levels at relevant ICE facilities; and the layout of relevant ICE detention facilities, locations of the cells, the layout of all portions of the subject facilities, including descriptions of how facilities are designed, the locations of security observation points, and the locations of guard stations; and the detainee numbers in specific portions of relevant ICE detention facilities.

*See* Defs.' Mem. at 12 (citing Pineiro Decl. ¶¶ 100–14); *see also Vaughn* Index at 2–7, 9–15, 17–22. However, "although the [agency] describes the potential effects that could result from disclosure, it does not establish how these records are investigatory or prosecutorial in nature." *See Am. C.L. Union v. Fed. Bureau of Prisons ("ACLU II")*, No. CV 20-2320 (RBW), 2022 WL 17250300, at *18 (D.D.C. Nov. 28, 2022). ICE notes throughout its *Vaughn* index that the withheld details "represent techniques and/or procedures *pertaining to the detainees*," *Vaughn* Index at 3, 5–6, 10, 12, 15, 22 (emphasis added), but because standard operations associated with ICE's detention of individuals do not necessarily fall within the specific sub-categories of "investigations or prosecutions" covered by Exemption 7(E), that description makes it far from clear whether the techniques and procedures are the type protected from disclosure. *See ACLU II*, 2022 WL 17250300, at *17 (noting that "administration of punishment . . . does not necessarily fall within the specific sub-categories of 'investigations or prosecutions' covered by Exemption 7(E) (citing 5 U.S.C. § (b)(7)(E))); *Citizens for Resp. & Ethics*, 567 F. Supp. 3d at 217 ("The plain meaning of the Exemption 7(E) covers the investigation and prosecution phases of the criminal process but not the punishment phase.").

Rather than explain, for example, how details regarding the transportation of a detainee to the hospital are connected to an investigatory or prosecutorial function, ICE instead writes boilerplate language as the reason for this redaction: "[t]he release of [the redacted information] could reveal techniques and/or procedures for law enforcement investigations or prosecutions or disclose guidelines for law enforcement investigations or prosecutions which could reasonably be expected to risk circumvention of the law." *See Vaughn* Index at 2–4.[22] Indeed, every single

---

[22] By ignoring the "investigations and prosecutions" prong of the exemption, ICE's explanation "fails to grapple with the text of the statute and focuses instead [only] on whether disclosure creates a risk of circumvention of the law and whether the procedures were described with sufficient

category of material withheld under Exemption 7(E) uses a version of this same boilerplate language. *Id.* at 4–5 (locations of security and surveillance cameras), 6–7 (staffing numbers and staffing shortages), 9–11 (internal security and related vulnerabilities), 11–12 (external security and related vulnerabilities), 13–14 (layout of facilities), 15 (detainee numbers), 20–22 (various categories).[23]

Other examples of ICE's Exemption 7(E) withholdings clearly "have nothing to do with 'law enforcement investigations or prosecutions.'" *See ACLU II*, 2022 WL 17250300, at *18 (citation omitted). Page 63a is the first page of the Detainee Death Review for Jose Freddy Guillen-Vega. *See* Stoneman Decl., Ex. E. The first paragraph of the first section, entitled "Healthcare Services," contains 11 redactions bearing a "(b)(7)(E)" label. *See id.* All withheld material appears to reflect the number of medical professionals staffed at the facility, with ICE claiming that the numbers of assistant health service administrators, doctors, advanced practice providers, registered nurses, licensed vocational nurses, mental health professionals, dentists, dental assistants, radiation

---

specificity." *See Citizens for Resp. & Ethics*, F. Supp. 3d at 216–17 (cleaned up)). As the Supreme Court has emphasized when construing the text of another FOIA exemption, when Congress includes multiple requirements for the application of an exemption, each must be given "independent vitality" to give full effect to Congress's chosen text. *See Klamath*, 532 U.S. at 12. Setting aside that flaw, ICE only nominally addresses the remaining elements of Exemption 7(E). For example, ICE claims that how officers transport detainees to the hospital is not only a "technique and/or procedure[]" but also a "guideline[]." *Vaughn* Index at 2–3. No distinction between the categories is indicated, and the same risks and reasoning is described in repetitive detail for both.

[23] The only two redactions with any asserted connection to an investigation or investigatory techniques are: (i) the partial redaction on page 969b, withholding information relating to a pending Homeland Security Investigations case, and (ii) the partial redaction on page 1340a, withholding information relating to how interviews of detainee witnesses should take place during the course of detainee death investigations. *See Vaughn* Index at 17–19. However, the explanations for these withholdings contain the same boilerplate language that appears across the agency's *Vaughn* index. Moreover, as discussed above in Section III.C.i, the investigations into and reports compiled regarding detainee deaths do not have a law enforcement purpose, and therefore methods for interviewing detainee witnesses during such investigations do not meet Exemption 7(E)'s requirement of being "for law enforcement investigations." *See* 5 U.S.C. § 552(b)(7)(E).

technicians, and medical records clerks all meet the standard for withholding under Exemption 7(E). *See id.* ICE's justification in its *Vaughn* index for this page of redactions focuses on the supposed security risks associated with revealing staffing information—notably without distinction between medical staff and security staff—but does not establish any clear nexus between staff numbers and an investigatory or prosecutorial function, as the exemption requires. *See Vaughn* Index at 5–7; *ACLU II*, 2022 WL 17250300, at *18. A similar issue infects the redactions in the second paragraph of Page 063, which appear to conceal information related to the layout of the medical department. *See* Stoneman Decl., Ex. E; *Vaughn* Index at 13–14. Again, without tying that information to an investigatory or prosecutorial function, ICE has not supported that this information—and the rest of the 7(E) categories listed in ICE's *Vaughn* index—are protected from disclosure.[24] *See Advancement Project v. U.S. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 145–46 (D.D.C. 2021) (finding that ICE had failed to support withholding records under Exemption 7(E) where withheld information included "the number of staff and bed space in a detention facility"); *Ecological Rights Found. v. EPA*, No. CV 19-980 (BAH), 2021 WL 535725, at *31 (D.D.C. Feb. 13, 2021) (rejecting agency's argument that 7(E) applies to redacted room

---

[24] Certain of ICE's lifted redactions during the pendency of this suit indicate that ICE withheld information under Exemption 7(E) in an overbroad manner. ICE originally produced the Detainee Death Review report for Alberto Hernandez-Fundora on May 5, 2022. *See* Stoneman Decl. ¶ 11. The initially produced version of page 846 contained two Exemption 7(E) redactions, withholding the bed capacity of the Krome North Service Processing Center ("KNSPC") and the number of detainees housed at KNSPC on the day of Hernandez's death. *Id.*, Ex. F. When ICE re-released page 846a on November 4, 2022, the KNSPC bed capacity had been unredacted. *See id.* Four months later, on March 3, 2023, ICE re-released the same page a second time, lifting all redactions. *See id.* The unredacted version of the page (now labeled 846b) showed that the redacted text had read: "KNSPC . . . has a bed capacity for 611 detainees. On the day of HERNANDEZ's's death, KNSPC housed 660 detainees." *Id.* "Such a redaction suggests that [ICE] may have invoked Exemption 7(E) in an effort to shield prejudicial information." *See Transgender Law Center*, 46 F.4th at 785 n.2 (citing *Pulliam v. EPA*, 292 F. Supp. 3d 255, 260 (D.D.C. 2018)).

locations because "disclosure would pose operational challenges for security"), *opinion vacated in part on reconsideration on other grounds*, 541 F. Supp. 3d 34 (D.D.C. 2021).

*    *    *

Because ICE has not shown that the records at issue have been compiled for a law enforcement purpose nor that the material withheld under Exemption 7(E) relates to law enforcement investigations or prosecutions, the Court should find for Plaintiff on this issue. *See New Orleans Workers' Ctr.*, 373 F. Supp. 3d at 57–58*; Pinson v. U.S. Dep't of Just.*, 202 F. Supp. 3d 86, 104 (D.D.C. 2016) (denying agency's motion for summary judgment on Exemption 7(E) grounds because agency "has not shown how the [record] relates to law enforcement investigations or prosecutions" or "explained the nexus between any [withheld] information . . . and the possible disclosure of investigatory or prosecutorial techniques").

## IV.    ICE Has Not Performed an Adequate Segregability Analysis

"The focus of the FOIA is information, not documents." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) (requiring agency to provide more detailed justification than conclusory assertion that there "were no factual portions . . . which could be reasonably segregated"). ICE is not permitted to withhold entire documents simply because some part of them may be subject to a FOIA Exemption. *See id.* Rather, the agency is expressly required by statute to disclose "reasonably segregable," non-exempt information, after redacting any exempt material. 5 U.S.C. § 552(b)(9); *see also, e.g.*, *Farrugia*, 2006 WL 335771, at *8 ("Under the FOIA, if a record contains information that is exempt from disclosure, any reasonably segregable information must be released after deleting the exempt portions, unless the agency can demonstrate that the non-exempt portions are inextricably intertwined with exempt portions.").

To establish that all reasonably segregable, non-exempt information has been disclosed, an agency must show "with 'reasonable specificity'" that the information that it has withheld cannot

be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–80 (D.C. Cir. 1996) (government permissibly explained on a document-by-document basis "why the document is exempt" as to redacted portion and "why no portion of it" could be further segregated). "In addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent.*, 566 F.2d at 261. Where non-exempt information is "distributed in logically related groupings," the agency bears a high standard of proof to show that "the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information." *Id.* A court "errs if it 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or the lack thereof.'" *Kidder v. FBI*, 517 F. Supp. 2d 17, 32 (D.D.C. 2007) (citation omitted).

Even assuming that the any of the fully withheld pages contain some exempt information, Defendants have not shown that each page consists of entirely exempt, non-segregable material, particularly where the reports at issue are primarily factual assessments and analyses of the circumstances surrounding an individual's death. ICE's unsupported and nonspecific assertion that a "line-by-line review was conducted" and "[a]ll information not exempted from disclosure . . . was correctly segregated," Pineiro Decl. ¶¶ 124–25, adds nothing to the analysis.[25] "That alone will not discharge the agency's 'obligation to carry its evidentiary burden and fully explain its decisions on segregability.'" *Sierra Club*, 523 F. Supp. 3d at 39 (citation omitted); *see also Bloche*

---

[25] ICE incorrectly reduces its burden here, claiming that "the factual information is so *thoroughly* integrated with the deliberative material that its disclosure would expose or cause harm to agency deliberations," Pineiro Decl. ¶ 86 (emphasis added); *see also Vaughn* Index at 21, 23, 25 ("[T]he factual information is *so* integrated with the deliberative material[.]" (emphasis added)). The proper standard is, as stated above, that factual material must be segregated and released unless it is "*inextricably* intertwined" with deliberative material. *See Farrugia*, 2006 WL 335771, at *8.

*v. Dep't of Defense*, 279 F. Supp. 3d 68, 86 (D.D.C. 2017) (where title of report was "Background Paper," indicating "it may contain some discussion of existing policy," defendant "failed to explain why it did not segregate and release such information if it exist[ed]"). "[F]or *each* entry" in its *Vaughn* index, at a minimum, a defendant "is required to 'specify in detail which portions of the document are disclosable and which are allegedly exempt.'" *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 90 (D.D.C 2009) (citation omitted).

Because ICE's *Vaughn* index here fails to explain how any non-exempt information is so inextricably intertwined with exempt information—in particular for the pages of the production that have been fully withheld—such that releasing partially redacted pages would not be feasible, it is insufficient as a matter of law. Thus, Plaintiff is entitled to an order directing ICE to perform an adequate segregability analysis; release all non-exempt, segregable portions of those documents; and describe in sufficient detail the portions of documents that it continues to withhold in an amended *Vaughn* index, both as to the documents that have already been withheld and as to any documents that a proper search uncovers.

## CONCLUSION

For the foregoing reasons, Plaintiff American Oversight respectfully requests that this Court grant its cross-motion for summary judgment, deny Defendants' motion for summary judgment, and require ICE to promptly (i) release non-exempt materials previously withheld in full or in part under Exemption 3, Exemption 5, and Exemption 7(E), and (ii) perform a supplemental search and release all resulting non-exempt, responsive records.

Dated: April 7, 2023                                 Respectfully submitted,

                                                     */s/ Taylor Stoneman*
                                                     Taylor Stoneman
                                                     D.C. Bar No. 888155721

AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 848-1319
taylor.stoneman@americanoversight.org

*Counsel for Plaintiff*