UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN OVERSIGHT | ) CASE NO. 21-cv-03030 |
| | ) |
|     Plaintiff, | ) **SUPPLEMENTAL DECLARATION OF** |
| | ) **FERNANDO PINEIRO IN SUPPORT OF THE U.** |
| v. | ) **S. IMMIGRATION AND CUSTOMS** |
| | ) **ENFORCEMENT'S MOTION FOR SUMMARY** |
| U.S. DEPARTMENT OF HOMELAND | ) **JUDGMENT** |
| SECURITY, et. al. | ) |
| | ) |
|     Defendant. | ) |

## I.  INTRODUCTION

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am the FOIA Director of the U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act Office (the "ICE FOIA Office"). The ICE FOIA Office is responsible for processing and responding to all Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. I have held this position since August 14, 2022, and I am the ICE official immediately responsible for supervising ICE responses to requests for records under the Freedom of Information Act, 5 U.S.C § 552 (the FOIA), the Privacy Act, 5 U.S.C § 552a (the Privacy Act), and other applicable records access statutes and regulations.

2.  Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013, to August 13, 2022.  Prior to that I was the FOIA Officer for three years at the Office of Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS").  The ICE FOIA Office mailing address is 500 12th Street, S.W., STOP 5009, Washington, D.C. 20536-5009.

3. As the FOIA Director, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office regarding the processing of FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE.

4. In connection with my official duties and responsibilities, I am familiar with ICE's procedure for responding to requests for information pursuant to the FOIA and the Privacy Act.

5. I make this declaration in support of ICE's Motion for Summary Judgment in the above-captioned action. The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

6. This declaration supplements and incorporates by reference my previous declaration, dated March 2, 2023, and styled "Declaration of Fernando Pineiro in Support of the United States Immigration and Customs Enforcement's Motion for Summary Judgment," as well as the *Vaughn* index that was Exhibit 1 to the declaration.

7. Additionally, in accordance with the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration provides additional explanation as to the basis for withholding portions of the requested information pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(c), (b)(5), and (b)(7)(E), 5 U.S.C. §§ 552 (b)(3), (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E). **A true and complete copy of the Supplemental *Vaughn* index is attached to this declaration as Exhibit 1.**

8. The purpose of this declaration is to respond to assertions made in Plaintiff's Cross-Motion for Summary Judgement ("Cross-Motion") regarding the sufficiency of my prior declaration and the challenges asserted regarding the withholdings applied to the subject records. While my prior declaration was sufficiently detailed, I provide this supplemental declaration to provide additional clarification to the Court.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

**II.     ICE'S SEARCH FOR RESPONSIVE RECORDS[1]**

    *a.     Requests One: Detainee Death Review Reports (DDRs)*

       *i.     ICE's Search*

9.     Request one sought certain Detainee Death Review Reports.  As explained in my prior declaration, and conceded to by Plaintiff, all but one of the DDRs, that pertaining to non-citizen Lopez-Acosta, were located and produced to the Plaintiff.

10.     As detailed in my prior declaration, a search for the report pertaining to non-citizen Lopez-Acosta was conducted on two occasions.  Prior to the filing of the Complaint, based on the subject matter in Request One, the ICE FOIA Office forwarded Request One to the Office of Professional Responsibility (OPR), instructing them to search for and provide the ICE FOIA Office with all records responsive to the request.  No other divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records[2].

11.     In response to the initial tasking sent by the ICE FOIA Office, OPR conducted a search for records responsive to the request.  Specifically, the OPR FOIA Coordinator tasked the OPR External Reviews and Analysis Unit (ERAU) to search for records responsive to the request.  OPR ERAU,

---

[1] Plaintiff has conceded in its Cross-Motion that it has received certain requested records.  Thus, this supplemental declaration will focus on the search for records that remain in dispute. As Plaintiff has conceded that it has received all of the requested records in FOIA Request Seven, which sought certain Mortality Review Reports, Request Four, which sought certain Detainee Death Review Reports and Request Five, which sought certain Healthcare and Security Analysis Reports, these FOIA Requests are no longer in dispute as it pertains to the adequacy of the search for records responsive to those requests and will therefore not be address in this supplemental declaration. Should the Court require any information on the searches performed regarding these Requests, my initial declaration provides a detailed account. To the extent that these records contain withholdings that remain in dispute, they will be addressed later in this declaration and will be included in the attached supplemental *Vaughn* Index.

[2] Further confirming that OPR would be the unit within ICE most likely to have responsive records should they exist, the DDRs are titled ICE OPR Detainee Death Review.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

among other things, conducts Detainee Death Reviews, which are independent, objective examinations of the facts and circumstances surrounding the detention and death of an individual in ICE custody to determine whether the agency and detention facility complied with detention standards related to the individual's health, safety, and security.  No other divisions or units were tasked within OPR, because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records.

12.     The Section Chief for OPR ERAU conducted a search for responsive records.  The OPR ERAU Section Chief is the first-line supervisor of the staff conducting Detainee Death Reviews and completing DDRs and oversees the completion of substantive work of the section.  No other OPR ERAU employees were tasked to conduct a search because, based on the subject matter of the FOIA request and the way in which OPR ERAU maintains records, the Section Chief would be most likely to have responsive records should they exist.

13.     Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which OPR ERAU maintains files the OPR ERAU Section Chief determined that the locations most likely to contain responsive records, if any, were the ERAU SharePoint site, the Unit's shared drive, as well as his computer and Microsoft Outlook.

14.     Using the names of the detainees listed in Request One, the Section Chief searched the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for any DDRs.  Additionally, the Section Chief searched his Microsoft Outlook and computer utilizing the detainee names listed in Request One.  Pursuant to these searches, the Section Chief located records responsive to Request One and provided them to the OPR FOIA Coordinator, specifically noting that the DDR for non-citizen Lopez-Acosta did not exist as non-citizen Lopez-Acosta died while outside of ICE custody.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

15.     Based on ongoing discussions with Plaintiff to potentially resolve any outstanding issues, a second search for responsive records was conducted by OPR to locate any reports that were not located pursuant to initial search conducted for records responsive to Request One.  Following the same process utilized in the first search, the OPR ERAU Unit Chief conducted a supplemental search of the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for any DDRs. OPR provided two additional reports that were compiled after the initial search was conducted, and again reiterated that the DDR for non-citizen Lopez-Acosta that was requested by the Plaintiff did not exist as non-citizen Lopez-Acosta died while outside of ICE custody.

ii.     *ICE Directive 11003.5*

16.     Plaintiff now cites to ICE Directive 11003.5, which states that a Detainee Death Review **can be** completed even if a non-citizen is no longer in ICE custody, "when a death occurs within a reasonable timeframe, not to exceed 30 days of release from ICE custody and review is requested by the ICE Director." (emphasis added).  To add additional clarification, ICE again reiterates that the subject non-citizen died while outside of ICE custody, thus a Detainee Death Review was not automatically triggered, and no Detainee Death Review pertaining to the death of non-citizen Lopez Acosta was conducted. Thus, no DDR was completed.  Again, as OPR is the ICE office who initiates, conducts, completes and finalizes Detainee Death Reviews and generates the DDR, they are the office within ICE reasonably likely to contain any information as to whether a Detainee Death Review was conducted and maintain any completed DDRs.

17.     Additionally, as Plaintiff points out, ICE routinely places information on detainee deaths on its public-facing website.  To meet congressional requirements, pursuant to the 2018 DHS appropriations bill, ICE is obligated to make public a DDRs within 90 days.  Each detained noncitizen

death, beginning with Fiscal Year 2018, is provided on the ICE public-facing website.[3]  No reports

pertaining to non-citizen Lopez-Acosta, who appears to have died after 2018 are posted.

18.     Thus, ICE's search for the requested DDRs was adequate and reasonably calculated to

uncover all responsive records.

**b.     *Requests Two Healthcare and Security Compliance Analysis Reports***

            *i.      ICE's Search*

19.     Request Two sought certain Healthcare and Security Compliance Analysis Reports.  As

stated in my prior declaration and conceded to by Plaintiff, all but one report was located and produced.

That report pertains to non-citizen Lopez-Acosta.

20.     Two searches for the requested Healthcare and Security Compliance Analysis Reports

were conducted.  Prior to the filing of the Complaint, based on the subject matter in Request Two, the

ICE FOIA Office forwarded Request Two to OPR[4] instructing them to search for and provide the ICE

FOIA Office with all records responsive to the request.   No other divisions or units were tasked

because, based on the subject matter of the FOIA request, no other offices were reasonably expected to

have responsive records, should they exist.

21.     In response to the initial tasking sent by the ICE FOIA Office, OPR[5] conducted a search

for records responsive to the request.  Specifically, OPR ERAU conducted the search.  As part of the

Detainee Death Review process, Healthcare and Security Compliance Analyses are completed by OPR

ERAU and incorporated into the final DDR.  No other divisions or units were tasked within OPR,

---

[3]Detainee Death Reporting | ICE

[4] ICE FOIA also tasked ERO, however as detailed in my prior declaration, ERO deferred to OPR and OPR
located all of the other Healthcare and Security Compliance Analysis Reports, which have been produced to
Plaintiff.

[5] Further confirming that OPR would be the appropriate office within ICE to conduct a search for these records,
the reports at issue state that they cannot be released without the prior approval of ICE OPR.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records.

22.     The Unit Chief for OPR ERAU conducted a search for responsive records. No other OPR ERAU employees were tasked to conduct a search because, based on the subject matter of the FOIA request and the way in which OPR ERAU maintains records, the Unit Chief would be most likely to have access to responsive records, should they exist.  Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which OPR ERAU maintains files the OPR ERAU Unit Chief determined that the locations reasonably likely to contain responsive records, if any, were the Unit's SharePoint site and her Microsoft Outlook.

23.     Using the names of the detainees listed in Request Two, the Unit Chief searched the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for Healthcare and Security Compliance Analysis Reports.  Additionally, the Unit Chief searched her Microsoft Outlook utilizing the names of each detainee listed in Request Two.  Pursuant to these searches, the Unit Chief located records responsive to Request Two and provided them to the OPR FOIA Coordinator, noting that as non-citizen Lopez-Acosta died will outside of ICE custody, no Detainee Death Review was completed and thus, no Healthcare and Security Compliance Analysis Report was completed.

24.     Based on ongoing discussions with Plaintiff to potentially resolve any outstanding issues, a second search was conducted to locate any reports that were previously produced as drafts that may have been finalized since the initial search or any other reports that may have been initiated since the initial search. Following the same process as utilized in the first search, the OPR ERAU Unit Chief conducted a supplemental search of the OPR ERAU SharePoint site, located each detainee's case folder and then searched within those folders for any Healthcare and Security Compliance Analysis Reports.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

Additionally, the Unit Chief searched her Microsoft Outlook archive mailbox pertaining to each detainee.  No additional reports were located, including any final drafts of the draft reports previously located, and OPR again noted that no report for non-citizen Lopez-Acosta existed because he died while outside of ICE custody.

ii.    *ICE Directive 11003.5*

25.    Healthcare and Security Compliance Analysis Reports are completed during the Detainee Death Review process.  Again, Plaintiff cites to ICE Directive 11003.5, which states that a Detainee Death Review **can be** completed even if a non-citizen is no longer in ICE custody, "when a death occurs within a reasonable timeframe, not to exceed 30 days of release from ICE custody and review is requested by the ICE Director." (emphasis added).

26.  As outlined above, no Detainee Death Review was conducted as it pertains to non-citizen Lopez-Acosta. Thus, no Healthcare and Security Compliance Analysis Report was completed.  Again, as OPR is the ICE office who initiates, conducts, completes and finalizes Detainee Death Reviews and generates Healthcare and Security Analysis Reports, they are the office within ICE reasonably likely to maintain any information as to whether a Detainee Death Review was conducted and maintain any Healthcare and Security Compliance Analysis Report that may exist.

27.    Thus, ICE's search for Healthcare and Security Compliance Analysis Reports was adequate and reasonably calculated to uncover all responsive records.

c.    ***Request Three-Root Cause Analysis Reports, Event Reviews, or Action Plans***

i.    *ICE's Search Overview*

28.    Request Three sought certain Root Cause Analysis Reports, Event Reviews or Action Plans (Root Cause Analysis Reports).  As outlined in my prior declaration several offices within ERO IHSC conducted multiple searches for records responsive to Request Three.   On December 8, 2021, the

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

ICE FOIA Office forwarded Request Three to ERO.  Upon receipt and based on the ERO IDU POC's subject matter expertise and the subject matter of Request Three, the ERO IDU POC tasked ERO IHSC with a search for responsive records.  Specifically, ERO IHSC is the program office within ICE which would generate these reports, as part of their responsibilities pertaining to Detainee Death Reviews, should they exist[6].   No other divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records.

29.     As stated in my prior declaration, based on the ERO IHSC program coordinators subject matter expertise and knowledge of program offices' activities within ERO IHSC, the program coordinator tasked the ERO IHSC Medical Quality and Management Unit (MQMU), ERO IHSC Medical Case Management Unit (MCMU), and ERO IHSC Investigations Unit (IIU), as the offices within ERO IHSC most likely to have records responsive to the request should they exist.  No other divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records.

ii.     *ERO IHSC MQMU Search*

30.     ERO IHSC MQMU is responsible for evaluating and reviewing the quality of healthcare delivery to ICE detainees in ICE custody at ICE IHSC facilities.  ERO IHSC MQMU is the office that conducts root cause analysis and completes the Root Cause Analysis Reports for IHSC staffed facilities. As outlined in my prior declaration, ERO IHSC MQMU conducted two searches for records responsive to the request.

31.     During the first search, the Compliance-Healthcare Risk Management Program Manager (HRM) for ERO IHSC MQMU, based on her knowledge of the requested information, her subject

---

[6] Of note, these reports are titled "ICE Health Service Corps Root Cause Analysis and Action Plan."

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

matter expertise, and her knowledge of the manner in which ERO IHSC MQMU maintains files —
searched the MQMU SharePoint site. No other locations within ERO IHSC MQMU were searched
because based on the subject matter in the request, no other locations were reasonably expected to
contain records responsive to the request, should they exist.   The responsibilities of the ERO IHSC
MQMU HRM, among other things, is to coordinate risk management activities, e.g., root cause analysis
of incidents that occurred in the facilities and provide proactive risk reduction strategies.  Given the
responsibilities of the HRM, the HRM would be the individual most likely to have responsive records,
should they exist, as the HRM has access to, reviews and coordinates risk management activities,
including root case analyses.

32.     The HRM conducted a search of every single facility folder, as well as the designated
folders that would contain Root Case Analysis Reports for any root cause analysis that was taking place
at any of the IHSC staffed facilities.  The ERO IHSC MQMU HRM reviewed the detainee names listed
in Request Three and located responsive records.  Additionally, IHSC MQMU stated that IHSC does not
conduct analyses on all mortalities or at non-IHSC staffed facilities.

33.     Based on continuing conversations with the Plaintiff and attempts to resolve any
outstanding issues, an additional search was conducted for any final Root Cause Analysis Reports, as
well as any additional Root Cause Analysis Reports that may have been initiated since the time of the
first search for records was conducted.

34.     A supervisory nurse with ERO IHSC MQMU completed a supplemental search for
records responsive to the Request.  The supervisory nurse serves as a Risk Manager at IHSC
headquarters with oversight of risk management and quality improvement activities at IHSC staffed
sites. The supervisory nurse is responsible for, among other things, assigning and coordinating the
development of risk management activities, e.g. Root Cause and has access to the same materials as the

SUPPLEMENTAL DECLARATION OF FERNANDO PIÑEIRO ISO ICE'S MSJ
21-CV-03030

HRM.   Based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which the ERO IHSC MQMU maintains files — the nurse determined that a search of the cumulative detainee death report spreadsheet, which provides information for each detainee that dies while under ICE care, ought to be conducted.  Included in the information contained in the spreadsheet is the location of last detention.  The supervisory nurse searched each detainee name to determine the location of last detention and did not locate any additional detainees housed at IHSC staffed facilities, for which ERO IHSC MQMU would have completed a Root Cause Analysis Report. As it pertained to detainees who were housed at IHSC staffed facilities, the ERO IHSC MQMU supervisory nurse, following the same process as the HRM, located duplicative records that were previously located and provided to the ICE FOIA Office during the initial search.  No other locations were searched because no other locations were reasonably expected to contain responsive records. ERO IHSC MQMU again reiterated that ERO IHSC MQMU does not conduct or maintain Root Cause Analysis Reports or develop action items for mortalities that occur while a non-citizen is receiving care at a non-IHSC facility and that ERO IHSC MQMU provided reports for those detainees at IHSC staffed facilities for which an action plan or root cause analysis was completed.

      *iii.*     *ERO IHSC MCMU and ERO IHSC IIU Searches.[7]*

35.     Although ERO IHSC MQMU is the IHSC unit that conducts root cause analysis and compiles the Root Cause Analysis Report, additional ERO IHSC offices, ERO IHSC IIU and ERO IHSC MCMU, were also tasked to conduct searches. Neither ERO IHSC IIU nor ERO IHSC MCMU

---

[7] While ERO IHSC MQMU is the office that completes the Root Cause Analysis Report, and thus any additional searches within ERO IHSC would not impact the adequacy of the search for responsive records, given that Plaintiff specifically takes issue with the additionally ERO IHSC searches, I have included additional clarifying information.

initiate or complete the Root Cause Analysis Reports that Plaintiff seeks.   Thus, ERO IHSC MQMU was most likely to have records responsive to the Request, should they exist and ERO IHSC MQMU and ERO IHSC IIU, were not reasonably likely to have the requested reports.

36.     In any event, as outlined in my initial declaration, in response to the tasking, ERO IHSC IIU responded and stated that they conduct mortality reviews, and do not generate Root Cause Analysis Reports and thus did not conduct a search.  Plaintiff, however, takes issue with the fact that ERO IHSC IIU did not conduct a search based on the fact that IIU "investigates allegations of inappropriate healthcare provided to individuals in ICE custody" and "incidents of mortality and significant morbidity involving individuals in ICE custody."  However, as outlined in my prior declaration, ERO IHSC IIU does conduct mortality reviews as part of the Detainee Death Review process and in fact searched for and located all of the mortality reports requested by Plaintiff.  As ERO IHSC IIU is not tasked with completing Root Cause Analysis Reports, IIU was not reasonably likely to have records responsive to Request Three.

37.     Additionally, ERO IHSC MCMU was also tasked with a search and conducted searches for responsive records.  Plaintiff takes issue with the search terms utilized by ERO IHSC MCMU.  As outlined in my prior declaration, ERO IHSC MCMU coordinates continuity of care and ensures health services for individuals in ICE custody are in accordance with the ICE Performance Based National Detention Standards (PBNDS) and ICE National Detention Standards (NDS).  Part of ERO IHSC MCMU responsibilities include site visits at detention facilities, which house ICE detainees for greater than 72 hours and are not staffed by IHSC, to evaluate compliance with the health care section of the ICE NDS/PBNDS, write reports of site visit findings and recommendations and conduct investigations into detainee complaints related to health care.  IHSC MCMU may request a Uniform Corrective Action Plan (UCAP) from detention facilities as a way to address deficiencies found during site visits to the

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

facility.  Additionally, UCAPS may be requested from facilities that house ICE detainees, including, as part of a follow-up to a mortality review.

38.    Given the fact that ERO IHSC MCMU does not compile Root Cause Analysis Reports that Plaintiff seeks, ERO IHSC MCMU utilized terms, based on the subject matter of the FOIA request, including that fact that the records were pertaining to ICE detainee deaths, and the way in which the ERO IHSC MCMU regional offices maintain records, reasonably likely to locate potentially responsive records, should they exist.

39.    Thus, given that UCAPS are potentially utilized as it pertains to mortality reviews, and UCAPS are utilized in conjunction with MCMU responsibilities, the Eastern Regional Field Medical Coordinator (FMC) conducted a search for responsive records. Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which the ERO IHSC MCMU Eastern Region maintains its files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive, as well as his Microsoft Outlook folders, utilizing the search terms CAP[8] and UCAP, to locate any potential records pertaining to mortality reviews conducted on the individuals listed in Request Three that MCMU may have been involved in. No other locations were searched because no other locations were reasonably expected to contain responsive records.  The FMC did not locate any records responsive to the request.

40.    Additionally, the Central Regional FMC conducted a search.  Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which ERO IHSC MCMU Central Region maintains files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders using the

---

[8] CAP stands for Correction Action Plan.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

terms detainee death, mortality review, death, and the names of the detainees listed in Request Three who were detained within the central region's area of responsibility.  No other locations were searched because no other locations were reasonably expected to contain responsive records.   No records responsive to the request were located.

41.     In addition, the Western Regional FMC conducted a search for responsive records. Based on his knowledge of the requested information, his subject matter expertise, and his knowledge of the manner in which the ERO IHSC MCMU Western Region maintains files — determined that the locations most likely to contain responsive records, if any, were the Unit's shared drive and his Microsoft Outlook folders using the terms mortality review, detainee death, as well as the names of the detainees as listed in Request Three who were detained within the western region's area of responsibility.  No other locations were searched because no other locations were reasonably expected to contain responsive records.   No records responsive to the request were located.

42.     Lastly, the ERO IHSC tasking program manager provided a response to the ICE FOIA Office with a summary as it pertained to the request for supplemental searches.  Again, reiterating that ERO IHSC IIU[9] completes and compiles detainee death mortality reviews, not Root Cause Analysis Reports, and thus would not have records responsive to Request Three.  As it pertains to ERO IHSC MCMU, the ERO IHSC tasking program manager reiterated that the Unit does not compile Root Cause Analysis Reports.  The ERO IHSC tasking program manager confirmed that ERO IHSC MQMU does conduct root cause analyses and compiles Root Cause Analysis Reports for IHSC staffed facilities and that the Unit located and provided the available reports.

---

[9] ERO IHSC IIU also provided a separate response to the request for a supplemental search also reiterating that they are responsible for completing mortality reviews and do not complete Root Cause Analysis Reports.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

43.     Thus, ICEs search for the requested Root Cause Analysis Reports was adequate and reasonably calculated to uncover all responsive records.

### d.     Request Six-Independent Autopsies

*i.     ICE's Search*

44.     Request Six sought certain independent autopsies.  As outlined in my prior declaration, multiple searches were conducted for records responsive to Request Six. As stated in my prior declaration and conceded to by Plaintiff, at least four[10] autopsies were produced to Plaintiff.

45.     Following the filing of the suit in the instant action, based on the subject matter of the Request, the ICE FOIA Office forwarded Request Six to OPR and ERO. No other divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records, should they exist.

46.     OPR ERAU conducted a search.  As previously stated, as part of the DDR process, independent autopsies are requested and reviewed by OPR ERAU, incorporated into and attached to the final DDR, when available.  No other divisions or units within OPR were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records.

47.     The OPR ERAU Unit Chief conducted a search for the independent autopsies responsive to Request Six.  The Unit Chief, based on her knowledge of the requested information, her subject matter expertise, and her knowledge of the manner in which OPR ERAU maintains files — determined

---

[10] Plaintiff states that in addition to the four autopsy reports that they acknowledge they received, they also received certain reports for three other detainees, that Plaintiff states are not "autopsy reports."  However, to the extent that these reports are not the reports that Plaintiff seeks, they are records provided by the relevant state medical examiners officers and ICE has produced all of the records located pursuant to the search for records responsive to Request Six.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

that the locations most likely to contain responsive records, if any, was the OPR ERAU SharePoint site.

No other locations were searched because no other locations were reasonably likely to contain

responsive records.   A search of each detainee's case folder for any independent autopsies that ICE may

have possessed for the detainees listed in Request Six was conducted and OPR ERAU located records

responsive to the request.  OPR also suggested that ERO conduct a search to determine whether copies

of autopsies were provided to ERO following the publication of the OPR DDRs and possessed by ERO

IHSC .[11].

48.     ERO IHSC IIU conducted a search for records responsive to Request Six, as ERO IHSC

IIU would be the unit most likely to have responsive records within ERO IHSC, should they exist.  No

other unit within ERO IHSC was tasked to search because no other unit was reasonably likely to

maintain records responsive to the request, should they exist.

49.     During the course of detainee death investigations, ERO IHSC IIU completes a mortality

review.  In conjunction with that review, ERO IHSC IIU may also review any independent autopsies

that have been provided by the relevant medical examiners' offices and incorporate the findings into the

final Mortality Review Report.

50.     An investigator with ERO IHSC IIU was tasked to perform a search for records. ERO

IHSC IIU investigators, among other things, are responsible for investigating allegations of

inappropriate health care provided to individuals in ICE custody and investigating incident of mortality

and significant morbidity involving individuals in ICE custody. Based on her knowledge of the

requested information, her subject matter expertise, and her knowledge of the manner in which ERO

IHSC IIU maintains files, the ERO IHSC IIU investigator determined that the locations most likely to

---

[11] Please note that ICE FOIA had already forwarded the Request to ERO prior to OPR ERAU's response.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

contain responsive records, if any, were the ERO IHSC IIU SharePoint, as well as her Microsoft Outlook.  No other locations were searched because no other locations were reasonably expected to contain responsive records.  A search was conducted using the listed detainee's names. ERO IHSC IIU located duplicative reports of those already provided by OPR ERAU.  With regard to the reports that were not located during the search, ERO IHSC IIU stated that they did not have copies due to the coroner not performing an autopsy or the relevant state not responding to the request for a copy.

51.     Based on continuing conversations with the Plaintiff and attempts to resolve any outstanding issues, ERO was tasked with conducting a supplemental search to determine whether any additional autopsy reports had been provided to ICE since the initial search, given that ERO would be the office to possess any reports that came in following OPR ERAU concluding the DDR.  In response the ERO IDU POC again tasked ERO IHSC IIU with the supplemental search.  An investigator was tasked to perform a search for records and again searched the ERO IHSC IIU SharePoint site and her Microsoft Outlook using the detainee names listed in Request Six.  No additional reports were located. Again, ERO IHSC IIU reiterated that IHSC does not have the requested records due to the coroner not performing an autopsy or the state not responding to the request for a copy of the report.

*ii.    Information in the Detainee Death Review Reports*

52.     In addition, as it pertains to the five detainees for which no medical examiner reports were provided, a review of the subject DDRs, which were produced to Plaintiff, further highlights whether ICE indeed had a copy of any autopsy prior to the finalization of the DDR, and also notes specific cases in which ICE was aware that an autopsy was not performed.  The DDR for non-citizen Montes states in FN 1 that "[a]s of the publication of this report, per ERO, both the death certificate and

autopsy are pending[12].  Additionally, the DDR for non-citizen Hill states in FN 164, "ERAU notes the Certificate of Death indicated that an autopsy would not be performed."  The DDR for non-citizen Gallego-Agudelo states in FN 52 "ERAU notes there was no autopsy performed on Gallego."  For the remaining two non-citizens, Chavez-Alvarez and Guillen-Vega, unlike the DDRs for those non-citizens for which autopsy and other medical examination reports were located and produced to Plaintiff, which list the subject reports as exhibits, the DDRs for the two remaining non-citizens do not make reference to ICE having a copy of or making any autopsy report an exhibit[13].

53.     Thus, ICEs search for Independent Autopsy Reports was adequate and reasonably calculated to uncover all responsive records.

### e.     *OPLA and Director's Office Searches*

54.     In its Cross-Motion, Plaintiff takes issue with the fact that other ICE directorates did not conduct searches for responsive records and cites to ICE Directive 1103.5.  Specifically, Plaintiff questions why the ICE Office of Principal Legal Advisor (OPLA) and the Directors Office did not conduct searches and states that the lack of these searches renders ICE's search for responsive records inadequate.   However, ERO and OPR are the two ICE offices most likely to have records should they exist.  Neither OPLA nor the Directors Office would reasonably be expected to have the reports that Plaintiff seeks, should they exist.

---

[12] As stated above, ERO IHSC IIU conducted a supplemental search to locate any autopsy reports that were not in ERO's possession at the time of the publication of the DDRs, or that were subsequently provided to ERO following the initial search for responsive records and did not locate any additional records responsive to the request.

[13] ICE again notes that the independent autopsy reports do not originate with the agency.  Instead, they are conducted and originated by state or local medical examiners offices.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

55.     The Directive makes clear that ERO and OPR are the two main offices involved in the Detainee Death Review process, who initiate, generate and archive reports pertaining to detainee death reviews.  The Directive[14] provides the responsibilities of certain directorates.  Specifically, ERO IHSC is responsible for completing mortality reviews, which are the "[e]valuation of a deceased detainee's medical history and clinical care provided to the detainee to ascertain both cause of death, and whether changes to ICE policies, procedures, or practices are warranted; to provide recommendations for follow up actions; and to identify issues that require further study."  The Directive goes on to state that IHSC is responsible for among other things "[i]nitiating, completing, and archiving the IHSC Mortality Review."  Additionally, as outlined above, ERO IHSC, pursuant to the detainee death review process completes Root Cause Analysis Reports for certain detainee deaths for detainees housed in IHSC facilities.  In addition, the Directive states that IHSC is responsible for "distributing autopsy and toxicology results as appropriate."

56.     ICE OPR is responsible for completing a detainee death review, which is "[a]n objective examination of the facts and circumstances surrounding the detention and death of an individual in ICE custody or post release(when a death occurs within a reasonable time, not to exceed 30 days of release from ICE custody and review is requested by the ICE Director), to determine whether or not the deceased detainee received treatment in accordance with applicable detention standards on health, safety, and security."  The Directive also states that OPR is responsible for among other things "[i]nitiating, completing, and archiving the OPR Detainee Death Review." As previously stated, as part of the Detainee Death Review process,

---

[14] The Directive includes the roles and responsibilities of different ICE directorates as it pertains to the Detainee Death Review Process.  Included are the Office of Congressional Relations (OCR), which is responsible for providing notice to committees of jurisdiction of the posting of any interim detainee death and/or Detainee Death Report on ICE's public-facing website; Office of Public Affairs (OPA), which is responsible for the timely posting of a detainee death or Detainee Death Report on the ICE public-facing website;  and the Office of Information Governance and Policy (IGP), which is responsible for reviewing and clearing the public release of information regarding the detainee death. None of these directorates initiate, draft, compile or finalize any of the reports requested by the Plaintiff.  Additionally, absent from the list of directorates with direct responsibility over the process are OPLA and the Director's Office.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

Healthcare and Security Compliance Analyses are completed by OPR ERAU and incorporated into the final DDR.

57.     While OPLA and the Director's Office, among others are referenced in the directives, as it pertains to receiving notifications of deaths and receiving records and reports pertaining to a detainee death review, neither OPLA, nor the Director's Office, are responsible for initiating, generating, compiling or finalizing any of the reports that Plaintiff seeks.  As outlined in the Plaintiff's FOIA request, which also attached copies of the types of reports that Plaintiff was seeking, Plaintiff only sought certain reports, not any other categories of records that pertain to the detainee review process.

58.     The reports that Plaintiff seeks are initiated drafted, generated, finalized, and archived by ERO and OPR, and not by any other ICE directorates.    Thus, ICE's search for responsive records as it pertains to all of the requests outlined above, were adequate and reasonably calculated to uncover all responsive records.

## III.    ICE'S APPLICATION OF FOIA EXEMPTIONS[15]

### A.    Organization of ICE's Vaughn Index and Description of Records[16]

59.     Pursuant to the requirements set forth in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), a *Vaughn* index accompanies this supplemental declaration.[17]

---

[15] Please note that ICE asserted Exemption (b)(3) together with Exemptions (b)(6) and (b)(7)(C) to certain portions of the records.  ICE is no longer asserting Exemption (b)(3).  Additionally, in its Cross-Motion, Plaintiff stated that they are not challenging any Exemption (b)(6) and (b)(7)(C) withholdings.  Thus, ICE is not including these withholdings in this supplemental Declaration and *Vaughn* index as the pages are no longer in dispute.

[16] Please note that ICE, without conceding that the asserted withholdings were inappropriate, is making a discretionary re-release of certain records to Plaintiff that were previously withheld under Exemption (b)(7)(E). Thus, only the pages outlined in the supplemental *Vaughn* index, and this declaration remain at issue.

[17] Given the arguments made in Plaintiff's Cross-Motion, the supplemental Vaughn focuses on the nexus pertaining to information withheld under Exemption (7)(E) and requisite law enforcement activities, as well as additional information to further clarify the deliberative and predecisional nature of certain records, as well as the segregation of information to records withheld in full under Exemption (b)(5).  My prior *Vaughn* index provides in sufficient detail, the categories of information that have been withheld, a page-by-page accounting of said

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

60.     The *Vaughn* index is in a table format.  The first row contains the titles of four (4) columns that provide a brief description of the information contained within the corresponding columns below.  The heading titles, from the left to the right side of the page, are: Document and Page Number, Withholding: Full/Partial, Description of Records and Redactions, and Exemption(s) Applied.

61.     The first heading, Document and Page Number, refers to the document at issue and page number on each of the responsive documents.  The second heading, Full/Partial Withholding, refers to the level of withholdings taken on the documents.  The information below the third heading, Description of Records and Redactions, and Reasons for Redactions, describes the redacted information and the justification for redaction.  The fourth heading, Exemption(s) Applied, describes the exemptions applied to the redactions in the documents.

**B.     FOIA Exemption 5 U.S.C. § 552(b)(5)** [18]

62.     ICE applied Exemption (b)(5) to portions of certain records, as well as to certain pages in full, as outlined in my prior declaration.  Plaintiff argues that ICE has not shown that the information is pre-decisional nor deliberative.  Although my first declaration was sufficiently detailed, I seek to clarify how the records at issue are both pre-decisional and deliberative.

63.     Exemption (b)(5) was applied to portions of pages 477a, 499-502, 557 and 596, and to pages 001-051, 107-305, 312-317, 337-366, 558-560, 561, 562-565, 566-571, 572, 597-623, 1238-1269, 1344-1389, 1445-1488 in full. Specifically, Exemption (b)(5) was applied to draft Healthcare and Security Compliance Analysis Reports, as well as Draft Root Cause Analysis and Action Plan Reports in full in pages 001-051, 107-305, 312-317, 337-366, 558-560, 561, 562-565, 566-571, 572, 597-623,

information, as well as the harm that would result should the information be released.

[18] Please note that ICE is no longer asserting Exemption (b)(7)(E) to these pages.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

1238-1269, 1344-1389, and 1445-1488.[19], as well as to portions of pages 477a[20] to protect information that discloses non-final recommendations pertaining to the training of staff within the Mortality Review Reports and pages 499-502 to protect non-final deliberative information as it pertains to potential process vulnerabilities identified during the course of Root Case Analyses and included in the Root Cause Analysis Reports.

64.     Exemption 5 of the FOIA allows the withholding of inter- or intra-agency records that are normally privileged in the civil discovery context.  ICE applied FOIA Exemption (b)(5) to protect from disclosure documentation subject to the deliberative process privilege.

65.     The deliberative process privilege protects from disclosure pre-decisional and deliberative information.  The information withheld in these pages was prepared to assist the agency in determining whether a deceased detainee received treatment in accordance with applicable detention standards on health, safety, and security, as well as to evaluate a deceased detainees medical history and clinical care to ascertain the cause of death and whether changes to ICE policies, procedures or practices are warranted; to provide recommendations for follow-up actions; and to identify issues that require further study. The documents at issue are non-finalized drafts, evaluating this information, and are used in finalizing the agency's evaluation, recommendations, and potential policy changes, as it pertains to the detention of non-citizens, pursuant to ICE's immigration enforcement authorities.  The documents at issue are part of the agency's consultative process and reflect draft and non-final opinions, recommendations, and edits of various ICE employees, prior to review by ICE superiors and any final

_____

[19] Please note that pages 557 and 596 were withheld in part and are the first pages of two of the draft Healthcare and Security Analysis Reports.

[20] As Plaintiff's Cross-Motion appears to focus on the records that were withheld in full, this supplemental declaration will focus on these records.  My prior declaration outlines the information withheld, rationale for the withholding, as well as the harm should the information be released for pages 477a, 499-502, as well as 557 and 596. Additional

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

agency opinions as to the evaluation of the subject detainee deaths, as well as whether any changes in policy need to occur.

66.     This information was withheld to protect the integrity of the deliberative or decision-making processes within the agency by exempting from disclosure the opinions, edits, comments, conclusions, and recommendations suggested in the unfinalized draft reports. This information does not reflect final agency actions or policy; instead, it is a reflection of an issue the author has determined to be, in his/her judgment, worthy of discussion or consideration by colleagues or superiors, and its release would only serve to confuse the public. Disclosure of the documents would degrade the quality of agency decisions by depriving decision-makers of fully explored options developed from agency debates.  This privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm.  Here disclosure of the information would harm agency deliberations by providing a road map of the agency's thinking on policy determinations.

67.     Additionally, this information was withheld to avoid public confusion generated by rationales or decisions that ICE did not ultimately adopt.  Specifically, any confusion on ICE's non-final determinations as it pertains to the evaluation of detainee deaths, potential causes, potential recommendations and potential policy changes, as well as the agency's reasoning, as it pertains to the detention of non-citizens pursuant to ICE immigration enforcement responsibilities.  The disclosure of the draft materials would confuse the issues and mislead the public by dissemination of documents suggesting reasons and rationales for a course of action, which were not in fact the ultimate reasons for the agency's final determinations and any subsequent actions.

68.     The information contained within the draft documents include non-final agency information, comment bubbles, edits, questions to analyze and review, as well as follow-up work to be conducted.  The information contained within the documents includes not only factual information, but

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

also non-final proposed recommendations.  With regard to the factual information contained within the documents, those sections are non-final and subject to change, and also contain edits and comments and non-final summaries of the facts underlying the detainee death.  The records contain non-final comments and edits to factual sections of the documents identifying specific facts to focus on, review, and conduct follow-up work on, out of a larger group of facts.  Additionally, the factual information is so thoroughly integrated with the deliberative material that its disclosure would expose or cause harm to agency deliberations.

69.     Additionally, as it pertains to the Healthcare and Security Compliance Analysis Reports, these documents predate the final DDRs in which the final agency position and recommendations from the draft reports were included.  The draft healthcare and security compliance analysis reports differ substantively from the final DDRs produced to Plaintiff and do not represent the agency's final review and analysis of the subject detainee deaths.  ICE OPR ERAU reviews and uses the contractor's Healthcare and Security Compliance Analysis (which may or may not be separated into two separate documents) in the drafting of its own DDRs.  ICE OPR ERAU frequently asks clarifying questions of the contractor subject matter experts, resulting in changes to the analysis.  Often, the contractor's report is left in "draft" form because, ultimately, ICE OPR ERAU's DDR report, once signed by OPR's Associate Director, is considered the final product.  Therefore, several of the Compliance Analyses provided remain in draft format. The final DDRs, which incorporate final agency positions as it pertains to the draft material included in the draft Healthcare and Security Compliance Analysis Reports have been produced to the Plaintiff.

70.     In addition, as it pertains to the information contained in pages 499-502 and 477a, non-final deliberative findings pertaining to process vulnerabilities identified, as well as, comments, including indications and follow-up pertaining to the review of current policies and notes to include

additional information.  Additionally, page 477a includes non-final recommendations as to the potential training of staff.  These recommendations were not the agency's final determination on the issues and represent non-final recommendations of potential future actions.

71.     Thus, Exemption (b)(5) was properly asserted to the pages outlined above as they are covered by the deliberative process privilege.

**D.     FOIA Exemption 5 U.S.C. § 552(b)(7) Threshold**

72.     5 U.S.C. § 552(b)(7) establishes a threshold requirement that, in order to withhold information on the basis of any of its subparts, the records or information must be compiled for law enforcement purposes.  My prior declaration outlines the law enforcement authorities and responsibilities granted to ICE in great detail and sufficiently outlined how the records at issue pertain to ICE's law enforcement functions.  However, in its Cross-Motion Plaintiff takes issue with that explanation and states that ICE has not addressed how the particular records at issue pertain to any law enforcement activities.

73.     As previously stated, pursuant to the Immigration and Nationality Act, codified under Title 8 of the U.S. Code, the Secretary of Homeland Security is charged with the administration and enforcement of laws relating to the immigration and naturalization of aliens, subject to certain exceptions.  See 8 U.S.C. § 1103.  The records and information at issue in this matter pertain to ICE's obligation to enforce the immigration laws of the United States by investigating non-U.S. individuals who may be present in the United States illegally.

74.     Part of ICE's obligation to enforce the immigration laws of the United States includes the detention of non-citizens pursuant to the INA §§ 235, 236, and 241 and 8 U.S.C. §§ 1225, 1226, and 1231, to issue and execute detainers and warrants of arrest or removal, detain aliens, released aliens on bond and other appropriate conditions as provided by law and remove non-citizens from the United

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

States, among other authorities, which deal with the apprehension and detention of non-citizens.  ICE uses its immigration detention authority to effectuate its mission by securing individuals in custody while they await the outcome of their immigration proceedings and/or removal from the United States. Pursuant to those authorities, once a noncitizen is transferred to ICE custody, the agency makes a custody determination. ICE uses its limited detention resources to detain noncitizens to secure their presence for immigration proceedings or removal from the United States — as well as those that are subject to mandatory detention, as outlined by the Immigration and Nationality Act, or those that ICE determines are a public safety or flight risk during the custody determination process.

75.     Pursuant to these statutory responsibilities, ERO among other things, manages all aspects of the immigration enforcement process, including detention and removal of noncitizens ordered removed from the U.S. to more than 150 countries around the world. The records at issue specifically include information on the detention of non-citizens in the course of immigration enforcement activities and immigration court proceedings. The records at issue not only directly pertain to ICE's detention of non-citizens, but the records specifically discuss and include techniques, procedures and/or guidelines utilized in the detention facilities housing non-citizens, pursuant to ICE immigration enforcement responsibilities.

76.     In addition, pursuant to the Homeland Security Act of 2002, authority was vested in the Secretary of Homeland Security to investigate potential misconduct of officers, agents, or employees of DHS.  This authority was further delegated and vested in the ICE by the Secretary of DHS[21] and then delegated to OPR.[22] Under the direction of the Assistant Secretary, ICE is charged with among other things, enforcing immigration and customs laws.  Critical to this mission is the need for an effective

---

[21] See DHS Delegation Number: 7030.2.

[22] See ICE Directive 6-1.0.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

internal program to measure compliance with policies and procedures and investigate allegations of

misconduct.  Thus, OPR is charged with protecting the overall integrity of ICE.  OPR is responsible for

investigating allegations of employee misconduct, prepare timely and comprehensive reports of

investigation for judicial or management action, inspect and review ICE offices, operations and

processed in order to provide management with an independent review of the agency's organizational

health and assesses the overall effectiveness and efficiency of ICE.  OPR is also responsible for the

administration of the Personnel Security program.  Thus, OPRs authority to conduct detainee death

investigations, is derived from the Homeland Security Act of 2002. Additionally, pursuant to

congressional requirements, ICE is required to conduct oversight of detention facilities and also conduct

detainee death reviews and reporting,[23] as part of ICE immigration enforcement activities.

77.     Thus, the law enforcement records at issue pertain to the detention of non-citizens

pursuant to ICE's law enforcement authorities and contain specifics on detention facilities housing non-

citizens. Additionally, the records were also compiled pursuant to OPR investigations, authorized under

the Homeland Security Act of 2002.  ICE is also required by Congress to conduct oversight of detention

facilities and review detainee deaths as they occur during the course of ICE's enforcement of the

nation's immigration laws. Therefore, all of the ICE records responsive to Plaintiff's FOIA request were

compiled for law enforcement purposes and meet the threshold requirement of FOIA Exemption (b)(7).

**E.     FOIA Exemption 5 U.S.C. § 552(b)(7)(E)**

78.     As outlined in my prior declaration, ICE asserted Exemption (b)(7)(E) to portions of

pages 1338b.[24] and 885.

---

[23] House Report 116-80 to accompany H.R. 3931, Department of Homeland Security Appropriations Act 2020 (July 24, 2019) and Senate Report 116-125, to accompany s.2582, Department of Homeland Security Appropriations Bill, 2020 (September 26, 2019), which are also listed in ICE Directive 1103.5 cited by Plaintiff.

[24] This page was previously bates-stamped 1338a, and pursuant to the recent discretionary re-release is now

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

79.     FOIA Exemption (b)(7)(E) protects from disclosure records complied for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

80.     In its Cross-Motion, Plaintiff asserts that my prior declaration did not sufficiently outline how the records are investigative or prosecutorial in nature and states that while ICE has provided information on the types of information withheld and the potential harm associated with its release, ICE has failed to provide a nexus between the withheld information and any investigatory or prosecutorial function, as it pertains to techniques and procedures. While my initial declaration was sufficiently detailed, I seek to add additional information for clarity[25].

81.     As stated above, the detention of non-citizens is directly part of ICE's statutory and regulatory immigration law enforcement activities.  Part of those immigration enforcement responsibilities is the removal of non-citizens.  ICE uses its immigration detention authority to effectuate this mission by securing individuals in custody while they await the outcome of their immigration proceedings and/or removal from the United States.  Thus, the detention of non-citizens is directly part of ongoing immigration enforcement proceedings and potential removal of non-citizens from the United

---

bates-stamped 1338b.

[25] As Plaintiff's argument as it pertains to the Exemption (7)(E) withholdings focuses on the purported lack of a nexus and makes reference to the fact that my initial declaration both described the potential harm and effects that could result from disclosure of the information, as well as provided a "lengthy" summary of the information withheld, this supplemental declaration focuses only on the purported lack of nexus.  Should the Court need additional information as to the categories of information withheld, or the associated harm should the information be released, that is outlined in my initial declaration.

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

States.  The security of the detention facilities directly impacts ICE's ability to comply with its statutory immigration enforcement and detention responsibilities.

82.     In addition, the records at issue were also compiled and generated during the course of detainee death investigations, pursuant to statutory authority, as well as congressional mandates, and portions of the records also contain specific law enforcement techniques, methods and guidelines associated with conducting those investigations.

83.     Thus, ICE's assertion of Exemption (b)(7)(E) to the pages at issue was proper.

**SEGREGABILITY**

84.     A line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied.  Plaintiff takes issue with ICE's assertion that no additional segregable information can be produced to plaintiff as it pertains to records withheld in full.

85.     As outlined in my prior declaration and above, the records withheld in full pertain to draft, pre-decisional, and deliberative documents.  As stated, the records are non-final drafts, which also contain, edits, comments, and comment bubbles to the information included in the records, and also follow-up requests, questions, and potential considerations.  Additionally, the information contained represents non-final agency deliberations, subject to change, which were not approved, signed off on or vetted by ICE decision makers.  Significant time and resources would be necessary to separate out disjointed words, phrases and sentences which taken separately or together have minimal or no informational content.  Thus, any non-exempt information is inextricably intertwined with the non-exempt information, such that it cannot be reasonably segregated.

86.     As it pertains to the factual information contained within the draft records, the information is dispersed throughout the records and again was not finalized. The factual information was

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030

also subject to ICE comments and edits and represent a non-final recitation of the facts and

circumstances pertaining to the subject detainee deaths that are the subject of this litigation.

Additionally, the information contained represents non-final agency deliberations, subject to change,

which were not approved, signed off on or vetted by ICE decision makers.   Lastly, as stated above and

in my prior declaration, as it pertains to the deliberative nature of the records, including any factual

portions, the factual information is so thoroughly integrated[26] with the non-factual material that

disclosure would expose or cause harm to the agency's deliberations.  Thus, ICE withheld the draft

documents, including any factual information in full, and that information cannot be segregated out and

released.

87.     Thus, all information not exempted from disclosure pursuant to the FOIA exemptions

specified above was correctly segregated and non-exempt portions were released.

I declare under penalty of perjury that the forgoing is true and correct to the best of my

knowledge and belief.  Signed this day of May 2023.

_____

Fernando Pineiro, FOIA Officer
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009

---

[26] Plaintiff takes issue with the term "so thoroughly integrated," however that term was and is used in the context
of whether under (b)(5) any factual information could also be withheld as deliberative. ICE has explained why the
factual information within the deliberative materials can also be withheld as deliberative and Plaintiff made no
arguments pertaining to this issue in its Cross-Motion as it pertains to (b)(5).

SUPPLEMENTAL DECLARATION OF FERNANDO PINEIRO ISO ICE'S MSJ
21-CV-03030