**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-3030 (TNM) |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, *et al.,* | ) | |
| | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

I. DEFENDANTS HAVE FAILED TO JUSTIFY ICE'S EXEMPTION 3
WITHHOLDINGS AND HAVE INJECTED UNNECESSARY CONFUSION
INTO THIS MOTION PRACTICE................................................................... 2

A. ICE's new assertion that all Exemption 3 withholdings are also covered by
Exemptions 6 and 7(C) is unsupported by the record................................. 2

B. Defendants have not justified the Exemption 6 and 7(C) withholdings at
issue.............................................................................................................. 5

II. DEFENDANTS HAVE FAILED TO SUPPORT THE FULL EXTENT OF ICE'S
EXEMPTION 5 WITHHOLDINGS.................................................................. 6

III. DEFENDANTS HAVE NOT DEMONSTRATED THAT ICE PERFORMED
AN ADEQUATE SEARCH. .......................................................................... 12

A. ICE failed to search all directorates likely to possess responsive records. 12

B. ICE's search was tainted by looking only where records were "most
likely" to be found and by using inadequate search terms........................ 14

C. Absent a clear assertion that no reports were created for Óscar López
Acosta, ICE is still obligated to perform a search for such records.......... 16

CONCLUSION.................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**             Page(s)

*Am. C.L. Union v. Dep't of Homeland Sec.*,
No. 20-3204 (RDM), 2023 WL 2733721 (D.D.C. Mar. 31, 2023) ......................................... 15

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*,
21 F. Supp. 3d 60 (D.D.C. 2014) .................................................................................... 13

*Am. Immigr. Laws. Ass'n v. U.S. Dep't of Homeland Sec.*,
852 F. Supp. 2d 66 (D.D.C. 2012) ............................................................................ 10, 11

*Ams. for Fair Treatment v. U.S. Postal Serv.*,
No. 1:22-CV-1183-RCL, 2023 WL 2610861 (D.D.C. Mar. 23, 2023) .................................... 12

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ........................................................................................ 10

*Crooker v. State Dep't*,
628 F.2d 9 (D.C. Cir. 1980) ........................................................................................... 14

*Ctr. for Biological Diversity v. Off. of Mgmt. and Budget*,
No. C 07-4997 MHP, 2008 WL 5129417 (N.D. Cal. Dec. 4, 2008) ...................................... 11

*Defenders of Wildlife v. Dep't of Interior*,
314 F. Supp. 2d 1 (D.D.C. 2004) .................................................................................... 14

*DiBacco v. U.S. Army*,
795 F.3d 178 (D.C. Cir. 2015) ........................................................................................ 14

*First Am. Corp. v. Al-Nahyan*,
2 F. Supp. 2d 58 (D.D.C. 1998) ....................................................................................... 5

*Elec. Frontier Found. v. U.S. Dep't of Just.*,
826 F. Supp. 2d 157 (D.D.C. 2011) ......................................................................... 7, 8, 10

*Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
762 F. Supp. 2d 123 (D.D.C. 2011) ................................................................................ 8, 9

*Hall & Assocs. v. U.S. Env't Prot. Agency*,
No. 18-1749 (RDM), 2021 WL 1226668 (D.D.C. Mar. 31, 2021) .......................................... 8

*Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec.*,
291 F. Supp. 3d 69 (D.D.C. 2018) .................................................................................... 8

*Jett v. FBI*,
  139 F. Supp. 3d 352 (D.D.C. 2015) ........................................................... 13, 14

*Oglesby v. U.S. Dep't of the Army*,
  920 F.2d 57 (D.C. Cir. 1990) ........................................................................ 13

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
  976 F.2d 1429 (D.C. Cir. 1992) ..................................................................... 10

*Playboy Enter., Inc. v. Dep't of Just.*,
  677 F.2d 931 (D.C. Cir. 1982) ....................................................................... 10

*Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
  3 F.4th 350 (D.C. Cir. 2021) ......................................................................... 11

*Transgender Law Ctr. v. Immigr. and Customs Enf't*,
  46 F.4th 771 (9th Cir. 2022) ........................................................................... 8

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*,
  775 F.3d 128 (2d Cir. 2014) ............................................................................ 5

*Urb. Air Initiative, Inc. v. Env't Prot. Agency*,
  271 F. Supp. 3d 241 (D.D.C. 2017) ............................................................... 14

*Valencia–Lucena v. U.S. Coast Guard*,
  180 F.3d 321 (D.C. Cir. 1999) ....................................................................... 13

# INTRODUCTION

Defendants' opposition to Plaintiff's cross-motion for summary judgment, ICE's supplemental declaration, and ICE's supplemental *Vaughn* Index each fail to add support for the propriety of ICE's withholdings or the adequacy of ICE's search. What Defendants' filing does, however, is muddy the waters regarding ICE's Exemption 3 withholdings, asserting new Exemption 6 and 7(C) exemptions and arguments over that material that were not present in ICE's production or Defendants' own motion for summary judgment, and mischaracterizing Plaintiff's prior agreement not to challenge redactions made under those privacy exemptions. Defendants have adequately supported neither these new Exemption 6 and 7(C) withholdings nor those previously asserted pursuant to Exemptions 3 and 5. Further, they have improperly limited the scope of their search for responsive records. Accordingly, Plaintiff is entitled to summary judgment.[1]

_____

[1] In its supplemental declaration and supplemental *Vaughn* Index, ICE withdrew partial assertions of Exemption 7(E) on 78 pages of records. *See* Suppl. Decl. of Fernando Pineiro in Supp. of the U.S. Immigr. and Customs Enf't's Mot. for Summ. J. ("Suppl. Pineiro Decl.") at 20 n.16 (ECF No. 28-2); *see generally* U.S. Immigr. and Customs Enf't's Suppl. *Vaughn* Index ("Suppl. *Vaughn* Index") (ECF No. 28-3). The agency re-released those records to Plaintiff, lifting all challenged Exemption 7(E) redactions on those pages, one week after Defendants filed their opposition. ICE has further withdrawn all Exemption 7(E) assertions previously asserted as to the agency's full-page withholdings, though ICE continues to withhold those pages under Exemption 5. *See* Suppl. Pineiro Decl. at 21 n.18; Suppl. Decl. of Taylor Stoneman in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Suppl. Stoneman Decl.") ¶ 4. ICE maintains redactions under Exemption 7(E) on only two pages. *See* Suppl. *Vaughn* Index at 2–3. Without conceding their propriety, Plaintiff withdraws its challenge to those remaining assertions of Exemption 7(E).

# I. DEFENDANTS HAVE FAILED TO JUSTIFY ICE'S EXEMPTION 3 WITHHOLDINGS AND HAVE INJECTED UNNECESSARY CONFUSION INTO THIS MOTION PRACTICE.

## A. ICE's new assertion that all Exemption 3 withholdings are also covered by Exemptions 6 and 7(C) is unsupported by the record.

Directly contradicting the face of the records produced to Plaintiff—as well as their opening brief and original *Vaughn* index—Defendants now claim in their opposition that each and every Exemption 3 withholding is also covered simultaneously by Exemptions 6 and 7(C).[2] Furthermore, observing that "Plaintiff has not challenged ICE's Exemption 6 and 7(C) withholdings," Defs.' Reply in Supp. of Its Mot. for Summ. J. and Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Defs.' Opp'n") at 1 n.1 (ECF No. 28), Defendants purport now to have retracted their Exemption 3 assertions,[3] misleadingly suggesting that these pages are now altogether outside the scope of the parties' dispute. That is not the case. Defendants' brief in opposition reflects a fundamentally new position on their Exemption 3 withholdings, which Plaintiff has challenged and continues to challenge. Because Defendants have justified neither these withholdings nor their newly asserted claims of Exemptions 6 and 7(C) over the relevant material, Plaintiff is entitled to summary judgment and immediate release of the material covered by these redactions.

Plaintiff's prior agreement not to challenge any Exemption 6 and 7(C) withholdings was based on the redactions as they appeared on the face of the records produced by ICE. Those records

---

[2] As described in more detail below, one week before filing their opposition, Defendants informed Plaintiff of their new position. Plaintiff promptly responded that Defendants' claim was not supported by the record and that Plaintiff intended to challenge any such newly asserted exemptions. *See infra* Section I.B; Suppl. Stoneman Decl., Ex. I.

[3] Plaintiff assumes for purposes of this brief that ICE continues to claim that Exemption 3 applies to the redacted material, though their submissions are unclear. In their brief, Defendants write that they "will not brief [their] Exemption 3 withholdings for the purposes of the instant filing." Defs.' Opp'n at 1 n.1. But in the Supplemental Pineiro Declaration, ICE states that it "is no longer asserting Exemption (b)(3)" over the records, appearing to instead now rely wholly on Exemptions 6 and 7(C). *See* Suppl. Pineiro Decl. at 20 n.15.

contained redactions bearing one or more labels reflecting each FOIA exemption ICE asserted over that redaction. On 15 pages, at least one redaction was labeled "(b)(3): Unspecified Statute," with the majority bearing *only* an Exemption 3 label and reflecting no other exemption. *See* Suppl. Stoneman Decl. ¶ 2; *see generally id.*, Ex. H (compiled document of all production pages bearing Exemption 3 labels). Other redactions were labeled "(b)(6); (b)(7)(C)," with no reference to Exemption 3 at all. *See e.g.*, *id.*, Ex. H at 3 (bates page 627). A small handful reflected all three exemptions. *Id.* at 7 (top of bates page 648), 11 (middle of bates page 813), 15 (passim bates page 970a).[4] Plaintiff's straightforward agreement not to challenge Exemption 6 and 7(C) withholdings applied only to the redactions actually bearing those labels in the records.[5] No reasonable interpretation of this agreement would extend it to redactions labeled with Exemption 3 alone.

Defendants claim now in their opposition that, "[i]n Defendants' Motion, ICE's Exemption 3 withholdings were simultaneously asserted with its Exemption 6 and 7(C) withholdings." Opp'n at 1 n.1 (citing Decl. of Fernando Pineiro in Supp. of the U.S. Immigr. and Customs Enf't's Mot. for Summ. J. ("Pineiro Decl.") ¶¶ 80, 116 (ECF No. 21-3); U.S. Immigr. and Customs Enf't *Vaughn* Index ("*Vaughn* Index") at 8–9 (ECF No. 21-4)). But their briefing materials are vague at best. Indeed, in making this claim about what their Motion supposedly says, Defendants do not even cite to that document—because they cannot. Nowhere does their opening

---

[4] On one page, several lines of redactions were labeled with both "(b)(3)" and "(b)(7)(E)" redactions. *See* Suppl. Stoneman Decl., Ex. H at 14 (bottom of bates page 969b). Though Defendants originally defended those Exemption 7(E) withholdings they have since withdrawn them. *See* Suppl. Pineiro Decl. at 20 n.16; *see generally* Suppl. *Vaughn* Index; *see also supra* at 1 n.1.

[5] Plaintiff does not challenge the few redactions—appearing on only three pages—that have been labeled with all three exemptions since the time ICE first produced them. *See* Suppl. Stoneman Decl., Ex. H at 7 (top of bates page 648), 11 (middle of bates page 813), 15 (passim bates page 970a).

brief unambiguously suggest an intention to assert FOIA Exemption 3, Exemption 6, *and* Exemption 7(C) over all the same material.[6]

ICE's original *Vaughn* Index similarly fails to support Defendants' new position that they intended to assert all three exemptions for each and every redaction on all listed pages. In the index, ICE lists fifteen pages on which Exemption 3 redactions appear.[7] In the column of the *Vaughn* Index labeled "Exemption(s) Applied," the agency listed (b)(3), (b)(6), and (b)(7)(C), but its index does not clearly state that *all three* of those exemptions applied to every individual redaction on each listed page. Relying on the redactions as they appear in ICE's production, Plaintiff reasonably interpreted the index to mean that *one or more* of the listed exemptions was

---

[6] Defendants' opening brief contains a section discussing ICE's Exemption 3 withholdings, with no mention of the two privacy-related exemptions. *See* Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 7 (ECF No. 21-2). And in the section of the brief discussing Exemption 7(C), Defendants reference Exemptions 6 and 7(C) as covering the same material, generally, *see id.* at 10–11, but they never claim these exemptions overlap with each specific Exemption 3 redaction. Neither do the documents cited in footnote one of their opposition suggest that they meant to simultaneously assert all three exemptions over the material. The Pineiro Declaration lists the pages on which Exemption 3 withholdings are being asserted, *see* Pineiro Decl. ¶ 80, and the pages on which Exemptions 6 and 7(C) are being asserted, *see id.* ¶ 116. But though the pages listed for both are the same, the descriptions do not clarify for exactly which portions of those pages each exemption is being asserted—a clarification necessary because, as described above, the redactions on most of those pages contain many Exemption 6 and Exemption 7(C) labels in addition to and without reference to Exemption 3, and vice versa. *See, e.g.*, Suppl. Stoneman Decl., Ex. H at 5 (bates page 632).

Plaintiff acknowledges that upon closer inspection, three of the 15 listed pages over which ICE asserts Exemptions 6 and 7(C), Pineiro Decl. ¶ 116, do not have any redactions bearing (b)(6) or (b)(7)(C) labels, suggesting that ICE may have meant to assert additional exemptions in briefing that didn't appear in the records themselves. But this minute detail, buried in ICE's declaration, does virtually nothing to overcome the overall confusion Defendants have created, and Plaintiff maintains that Defendants have not adequately explained which portions of which pages are exempt under which exemption, nor have they adequately justified those claimed exemptions.

[7] After Defendants filed their Motion for Summary Judgment, they re-released certain records, lifting some previous (b)(3), (b)(5), and (b)(7)(E) redactions. Exemption 3 redactions were removed from five of the twenty pages on which they had originally appeared.

being asserted on the page listed in the row.[8] Since Plaintiff clearly indicated its intention to challenge ICE's Exemption 3 withholdings, it remains Defendants' burden to justify at least the redactions reflecting only that exemption within the production. Despite awareness of Plaintiff's challenge and ample opportunity to address it, Defendants have failed to do so, and Plaintiff is entitled to summary judgment on this issue.

### B. Defendants have not justified the Exemption 6 and 7(C) withholdings at issue.

To the extent the Court considers Defendants' new assertion that Exemptions 6 and 7(C) prevent releasing information covered by Exemption 3-labeled redactions, Plaintiff challenges those withholdings.[9] Plaintiff has been consistently transparent about the withholdings it sought to challenge through this briefing, and yet Defendants have failed to carry their burden to justify them. The week before filing their opposition, Defendants informed Plaintiff for the first time—inconsistent with their productions and opening brief—that they intended to simultaneously assert Exemptions 6 and 7(C) over the Exemption 3 material. *See* Suppl. Stoneman Decl., Ex. I. Plaintiff responded that the record did not justify assertions of additional exemptions to the material labeled only as (b)(3), and that Plaintiff intended to challenge such additional withholdings, which were inconsistent with the understanding underlying its agreement not to challenge the Exemption 6 and

---

[8] ICE's use of parentheses around the plural "s" in "Exemption(s)" supports this conclusion.

[9] Because Plaintiff's prior agreement not to challenge Defendants' Exemption 6 and 7(C) withholdings was not made with full knowledge or understanding of Defendants' newly-asserted position as to the scope of the exemptions' applications to the records at issue, it does not amount to a voluntary and intentional waiver and should not be enforced as such, should Defendants argue otherwise. *See First Am. Corp. v. Al-Nahyan*, 2 F. Supp. 2d 58, 64 n.7 (D.D.C. 1998) ("[A] waiver is a voluntary and intentional abandonment or relinquishment of a known right." (quoting 28 Am. Jur., Estoppel & Waiver, § 30)); *see also U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 136 (2d Cir. 2014) ("We will infer a waiver only where the parties were aware of their rights and made the conscious choice, for whatever reason, to waive them.") (internal quotation marks omitted).

Exemption 7(C) claims. *Id.* As a result, Defendants had more than a week's notice of Plaintiff's position yet failed to further justify the disputed withholdings—indeed, inexplicably ignoring Plaintiff's response entirely.

While Defendants' opening brief purports to justify ICE's Exemption 7(C) withholdings, *see* Defs.' Mem. at 9–11, both the brief and supporting declaration provide only boilerplate support not adequately tied to specific redactions or material. And for the reasons discussed above in Section I.A, the record remains unclear that Defendants intended for such arguments to apply to the redactions that bear only an Exemption 3 label. Indeed, the sections in Defendants' filings regarding Exemption 7(C) and Exemption 3 are entirely divorced from one another, with no suggestion that the underlying redacted material at issue overlaps in any way. This confusion is enough for Defendants' Exemption 7(C) arguments to fail.

Accordingly, the Court should find that Defendants have not met their burden of justifying the withholding of the redacted material under any one of the three asserted exemptions.[10]

## II. DEFENDANTS HAVE FAILED TO SUPPORT THE FULL EXTENT OF ICE'S EXEMPTION 5 WITHHOLDINGS.

Defendants still have not justified their reliance on the deliberative process privilege for withholding, in full, 450 pages of records pursuant to Exemption 5. Their attempt to invoke this exemption falls short in three ways: (1) Defendants have provided only a single, generic *Vaughn* description covering the purportedly deliberative and predecisional nature of dozens of withheld reports; (2) their determination that none of these 450 pages can be segregated and released rests on inadequate boilerplate and is belied by the records they have produced; and (3) Defendants have

---

[10] Since Defendants have not adequately justified these withholdings, summary judgment in Plaintiff's favor is appropriate at this time. However, should the Court entertain further argument from Defendants on this issue, Plaintiff reserves the right to seek the Court's leave to respond.

offered no particularized detail demonstrating the foreseeable harm of disclosing specific material from the records at issue.

First, ICE's description of the "recommendations[] and potential policy changes" purportedly deliberated in the fully and partially withheld pages, *see* Suppl. *Vaughn* Index at 5, is too generic to pass muster.[11] *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 168–70 (D.D.C. 2011) (finding "vague references" to the "matters" or "deliberations" at issue inadequate). Defendants have listed all 450 fully withheld pages in one row, or category, in their *Vaughn* Indexes. Defendants assert that each document comprising these pages is one of two different types of reports—a Healthcare and Security Compliance Analysis ("HSCA") report or a Root Cause Analysis and Action Plan ("Root Cause Analysis") report—and so they claim the deliberative processes involved are the same for all fully withheld pages. But the withheld reports correspond to at least a dozen deceased individuals who died over the course of almost a year, and each report likely contains different proportions of policy recommendations and factual matter based on a variety of factors, including the circumstances of the individual's death, the medical care provided to that specific individual, the detention facility that individual was housed within, and so on. Defendants cannot simply rest on their descriptions of the generic purposes and contents

---

[11] ICE's supplemental declaration claims that "Plaintiff's Cross-Motion appears to focus on the records that were withheld in full," *see* Suppl. Pineiro Decl. ¶ 63 n.20, but that is not the case. Plaintiff challenges ICE's partial withholdings under Exemption 5 as well. *See* Mem. of P. & A. in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Mem.") at 26 (ECF No. 25-1). And Plaintiff maintains those arguments here: ICE's description of deliberative processes is too vague with respect to *both* the fully withheld pages—which ICE claims contain policy recommendations relating "to the evaluation of the subject detainee deaths, as well as whether any changes in policy need to occur"—*and* the partially withheld pages—which purportedly contain "non-final deliberative findings pertaining to process vulnerabilities identified . . . [and] non-final recommendations as to the potential training of staff." *See* Suppl. *Vaughn* Index at 4–7 & 4 n.1 (index row for fully withheld pages and for pages 557 and 596, which are identified in footnote 1 as partially withheld); *id.* at 7–9 (index row for partially withheld pages 499–502 and 477a). *See also* Defs.' Opp'n at 10–11; Suppl. Pineiro Decl. ¶¶ 63–70; Pineiro Decl. ¶¶ 85–89.

of these reports; they must provide support for withholding any deliberative material the pages actually contain, including how a particular proposed policy change or piece of factual information factored into the agency's deliberative process related to a particular report or document. *See Elec. Frontier Found.*, 826 F. Supp. 2d at 169 n.5 ("While the OIP's supporting declaration adequately explains the *general* role of e-mail in the DOJ's decisionmaking processes, . . . the Court needs to know how the *particular* withheld emails factored into the agency's deliberative process."); *Hall & Assocs. v. U.S. Env't Prot. Agency*, No. 18-1749 (RDM), 2021 WL 1226668, at *5 (D.D.C. Mar. 31, 2021) ("When invoking the privilege, therefore, an agency must establish what deliberative process is involved, and the role played by the documents in issue in the course of that process.") (internal quotation marks and citation omitted); *Transgender Law Ctr. v. Immigr. and Customs Enf't*, 46 F.4th 771, 783 (9th Cir. 2022).

Moreover, even when the deliberation involved is the agency's "evaluat[ion of] their own processes and policies," as Defendants claim here, the document still must be "'generated as part of a definable decision-making process'" to be considered predecisional. *Heartland All. for Human Needs & Human Rights v. U.S. Dep't of Homeland Sec.*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018) (quoting *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011)). Defendants rely heavily on the fact that these reports are drafts containing edits of ICE employees and non-final recommendations regarding policy changes, and that the information contained therein "does not reflect final agency actions or policy." *See* Suppl. Pineiro Decl. ¶¶ 65–66. But "[t]he fact that the documents are drafts and contain edits does not, alone, qualify them for protection under the deliberative process privilege: they must be part of an articulated decision-making process." *Heartland All.*, 291 F. Supp. 3d at 80 (finding description inadequate where "DHS describe[d] the process involved in the creation

of the draft statistical reports as 'a process of identifying and examining issues and developing recommendations relating to [an immigration enforcement program administered by ICE]'").

Second, Defendants' segregability analysis falls short and is belied by the records produced. Even if some portions of the withheld material contain draft policy recommendations or intertwined factual material, Defendants have not clearly established that such exempt material appears on every single fully withheld page.[12] ICE states that the factual information in these reports constitutes "non-final summaries of the facts underlying the detainee['s] death" and that such information is "so thoroughly integrated with the deliberative material that its disclosure would expose or cause harm to agency deliberations." Suppl. *Vaughn* Index at 6; Suppl. Pineiro Decl. ¶ 68. However, the final HSCA reports ICE produced to Plaintiff undermine this claim. *See, e.g.,* Suppl. Stoneman Decl., Ex. J (excerpted copy of final HSCA report for Samuelino Mavinga).

The bulk of the HSCA report for Mr. Mavinga contains a straightforward recitation of events that occurred after Mr. Mavinga was detained on November 12, 2019. *Id.* at 1. Conclusions regarding facilities' compliance deficiencies and other observations and areas of concern regarding Mr. Mavinga's care are limited to the final five pages of the 34-page report. *See id.* at 29–33. The rest of the report contains factual information, such as the healthcare services available at the detention facilities, the times Mr. Mavinga was transferred between locations, health statistics such as his blood pressure and weight, the results of his initial health assessment, and other details reported within medical observation forms and logs. *See generally id.* Even in draft form, the

---

[12] Defendants rely upon *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.* as support for withholding records reflecting a "continuing process of examining [the agency's] policies" even if those "recommendations . . . do not ripen into agency decisions." Defs.' Opp'n at 12–13 (citing *Gold Anti-Trust Action Comm.*, 762 F. Supp. 2d at 135–36). But even in that case, the agency's segregability review "resulted in the release in part of 19 out of 20 documents," *see Gold Anti-Trust Action Comm.*, 762 F. Supp. 2d at 140. Here, in contrast, Defendants have withheld in full approximately 450 pages.

"objective tenor" of such material removes it from the sphere of the deliberate process privilege, *cf. Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1438 (D.C. Cir. 1992), requiring its segregation and release. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C. Cir. 1980) ("[T]here is little to be frank or honest about when explaining on what date a transaction occurs[.]"); *Playboy Enter., Inc. v. Dep't of Just.*, 677 F.2d 931, 935 (D.C. Cir. 1982) (holding that a report did not reveal deliberative process where mission was "to investigate the facts surrounding certain events") (internal quotation marks omitted).

The agency avoids these issues, providing only boilerplate information about its efforts to segregate nonexempt from exempt information. ICE wrote in its original declaration simply that "[a] line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied." Pineiro Decl. ¶ 124.[13] In its supplemental declaration, ICE adds that "[s]ignificant time and resources would be necessary to separate out disjointed words, phrases and sentences which taken separately or together have minimal or no informational content." Suppl. Pineiro Decl. ¶ 85. But without more, ICE's "description of its segregation efforts is too categorical for the Court to evaluate whether any factual material in the documents withheld in full is inextricably intertwined with the deliberative material such that the agency can permissibly withhold the documents in their entirety." *Elec. Frontier Found.*, 826 F. Supp. 2d at 174 (internal quotation marks omitted) (where agency withheld 387 pages in full, requiring agency to "provide a more comprehensive description as to the various documents withheld in full," for example, "describ[ing] what proportion of the

---

[13] *Am. Immigr. Laws. Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 80–81 (D.D.C. 2012) (finding agency's description of segregability review as "line-by-line review" fell short of the specificity required).

information in the documents, if any, is non-exempt and how that material is dispersed throughout the documents") (internal quotations, alternations and citations omitted).

Instead of describing the proportional distribution of non-deliberative information, or "specify[ing] the relationship between any exempt and nonexempt information in the documents," *Am. Immigr. Laws. Ass'n*, 852 F. Supp. 2d at 81, ICE makes the sweeping claim that, for all 450 pages, "any non-exempt information is inextricably intertwined with the non-exempt [sic] information, such that it cannot be reasonably segregated," *see* Suppl. Pineiro Decl. ¶¶ 84–87. Such "boilerplate segregability language" lacks a "detailed justification" for withholding so many pages in full and denies Plaintiff and the Court the "opportunity to consider the reasonableness of the withholding[s]." *Ctr. for Biological Diversity v. Off. of Mgmt. and Budget*, No. C 07-4997 MHP, 2008 WL 5129417, at *9 (N.D. Cal. Dec. 4, 2008) (internal quotation marks omitted) (disapproving of the agency's *Vaughn* index, stating that "Defendant simply states in its index entries that facts and opinions are 'intertwined' without providing any particularized information to so prove'").

Finally, ICE's supplemental declaration fails to overcome the inadequacy of its foreseeable harm analysis. ICE repeats from its original declaration that disclosing "policy-related considerations and discussions" would "stifle candid internal discussions," Defs.' Opp'n at 14 (citing Suppl. Pineiro Decl. ¶¶ 65–66), but that simply parrots the basic justification for the deliberative process privilege. It provides no detail about any supposed harm that might come from releasing these specific documents. *See Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 370 (D.C. Cir. 2021). Nor does ICE demonstrate that release of these draft reports would confuse the public. The agency offers only the conclusory claim that disclosure would "confuse the issues and mislead the public by dissemination of documents suggesting

reasons and rationales for a course of action, which were not in fact the ultimate reasons for the agency's final determinations and any subsequent actions." Suppl. Pineiro Decl. ¶ 67. This is insufficient to carry ICE's burden. "If stating simply that a draft version 'differ[s] from the final version' of a policy or statement . . . were enough to show reasonably foreseeable harm, agencies would never need to provide a situation-specific reason for withholding a nonfinal draft." *Ams. for Fair Treatment v. U.S. Postal Serv.*, No. 1:22-CV-1183-RCL, 2023 WL 2610861, at *12–13 (D.D.C. Mar. 23, 2023).

In sum, Defendants have neither supported their assertion of the deliberative process privilege over 450 pages of records in full pursuant to Exemption 5, nor provided a sufficiently detailed explanation of the foreseeable harm associated with disclosure of such information. As a result, the Court should reject ICE's Exemption 5 claims.

### III. DEFENDANTS HAVE NOT DEMONSTRATED THAT ICE PERFORMED AN ADEQUATE SEARCH.

#### A. ICE failed to search all directorates likely to possess responsive records.

Defendants' opposition misses the point of Plaintiff's search argument by focusing on the ICE directorates responsible for *generating or compiling* the relevant reports and discounting the import of credible evidence of other directorates likely to *possess* them. Because Defendants failed to locate in the former category all of the records requested by Plaintiff, it was unreasonable for ICE to refuse to search the latter.

Emphasizing that the Office of Professional Responsibility ("OPR") and Enforcement and Removal Operations ("ERO") are the only ICE directorates that initiate, draft, generate, compile, finalize, produce and/or archive the relevant reports, ICE argues it need not search other offices— even those that may hold copies. Defs.' Opp'n at 3–4. ICE's laser focus on which directorate is responsible for *generating* the reports sidesteps the relevant standard: the agency must search "*all*

files likely to contain relevant documents," *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 71–73 (D.D.C. 2014) (quotation marks omitted), especially where, as here, the initial search did not turn up all responsive records.

Plaintiff has provided direct evidence of two potential locations—the Office of the Principal Legal Advisor ("OPLA") and ICE leadership offices—in which there is a strong likelihood that records requested by Plaintiff exist.[14] *See Valencia–Lucena v. U.S. Coast Guard,* 180 F.3d 321, 327 (D.C. Cir. 1999) ("It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden."); *Jett v. FBI*, 139 F. Supp. 3d 352, 368 (D.D.C. 2015) ("[T]he FBI could not put its head in the sand and ignore an obvious source for the requested material."). ICE does not meaningfully dispute this evidence, indeed admitting that "OPLA and the Director's Office . . . receiv[e] records and reports pertaining to a detainee death review . . . ." Suppl. Pineiro Decl. ¶ 57.[15] ICE thus must search those offices for responsive records, since it would "likely to turn up the information requested," *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)—particularly the information that is still missing.

Instead of addressing this argument, Defendants continue to miss the point, claiming that searching ICE's Director's Office or OPLA is not required because it would identify only duplicative records. *See* Defs.' Opp'n at 4. But Plaintiff is not asking for duplicative reports—just

---

[14] Contrary to Defendants' representation, *see* Defs.' Opp'n at 2–3 (claiming Plaintiff "cite[d] to an ICE press release" about an OPLA review of 24 of the deaths), Plaintiff in fact cited 24 separate ICE press releases issued over the course of over two years, each one confirming that OPLA is involved in the "comprehensive review" of each respective detainee's death, *see* Pl.'s Mem. at 10–11; Decl. of Taylor Stoneman in Supp. of Pl.'s Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. ("Stoneman Decl."), Ex. A (ECF No. 25-3).

[15] This admission belies ICE's conclusory claim, just three paragraphs prior, that "[n]either OPLA nor the Director['s] Office would reasonably be expected to have the reports that Plaintiff seeks, should they exist." *See* Supp. Pineiro Decl. ¶ 54.

those that ICE has yet to find or produce in the first instance. For that reason, the cases Defendants cite on this point—in each of which the defendant agency had actually produced the records requested—are readily distinguishable. *See Jett*, 139 F. Supp. 3d at 364 ("The purpose of FOIA is satisfied when an agency produces the requested pages."); *Crooker v. State Dep't*, 628 F.2d 9, 10–11 (D.C. Cir. 1980) (substance of controversy "moot" because "appellant ha[d] already received" the records); *Defenders of Wildlife v. Dep't of Interior*, 314 F. Supp. 2d 1, 9–10 (D.D.C. 2004) (discussing the withholding of "repetitive documents"). Here, by contrast, ICE has produced some, but not all, of the reports Plaintiff requested, and it is those missing records that remain at issue.

Defendants have provided nothing more than conclusory reasons for not searching the additional locations Plaintiff has identified for the missing documents. As Defendants admit, only if "a FOIA defendant can show that all locations reasonably likely to yield responsive records were searched" can the agency's search "be deemed to have been adequate." *See* Defs.' Opp'n at 5 (citing *DiBacco v. U.S. Army*, 795 F.3d 178, 190 (D.C. Cir. 2015)). As a result, ICE's search was inadequate. *See Urb. Air Initiative, Inc. v. Env't Prot. Agency*, 271 F. Supp. 3d 241, 256 (D.D.C. 2017).

> **B. ICE's search was tainted by looking only where records were "most likely" to be found and by using inadequate search terms.**

Defendants' response to Plaintiff's arguments concerning relevant offices, file systems, and search terms similarly misses the mark. Though ICE supplements its declaration with added verbiage, the new statements are infected by ICE's misunderstanding of the relevant bar for determining where records may likely exist. ICE repeatedly states that "[n]o other divisions or units were tasked because, based on the subject matter of the FOIA request, no other offices were reasonably expected to have responsive records." *See e.g.*, Suppl. Pineiro Decl. ¶ 29. As with the ICE directorates included in the search, *see supra* Section III.A, ICE continues to look only to the

office responsible for generating a report and to no other office, custodian, or file that might have had possession or control of the record after it was created and circulated. Specifically, ICE first claims that because "ERO [ICE Health Service Corps ("IHSC") Medical Quality and Management Unit ("MQMU")] is the office that *completes* the Root Cause Analysis Report, . . . any additional searches within ERO IHSC would not impact the adequacy of the search for responsive records . . . ." Suppl. Pineiro Decl. at 11 n.7 (emphasis added). And furthermore, in response to Plaintiff's argument regarding the search terms employed by the ERO IHSC Medical Case Management Unit ("MCMU"), Defendants claim that because MCMU "is not involved in the *production* of Root Cause Analysis reports," "the search terms that unit employed—whether adequate or not—do not undermine the adequacy of ICE's search." Defs.' Opp'n at 7 (emphasis added).

These points make little sense and contradict other statements made in ICE's declarations. The ERO IHSC program coordinators determined that not only ERO IHSC MQMU, but also ERO IHSC MCMU and ERO IHSC Investigations Unit ("IIU"), were "the offices within ERO IHSC most likely to have records responsive to the request . . . ." Suppl. Pineiro Decl. ¶ 29. Just because MCMU and IIU did not *initiate or complete* the reports does not mean they might not *possess* the reports, and thus the thoroughness with which ICE searched those offices indeed would impact the adequacy of ICE's search overall. *See Am. C.L. Union v. Dep't of Homeland Sec.*, No. 20-3204 (RDM), 2023 WL 2733721, at *5 (D.D.C. Mar. 31, 2023) (agency not permitted to "rank[] . . . components 'likely' to maintain records" and "ignore components that are 'likely' to maintain responsive records[] so long as another component is even more 'likely' to have responsive material").

### C. Absent a clear assertion that no reports were created for Óscar López Acosta, ICE is still obligated to perform a search for such records.

Finally, ICE claims that Plaintiff received "all of the requested" Mortality Review, Detainee Death Review, and HSCA Reports. *See* Suppl. Pineiro Decl. at 3 n.1. This is only partially true. Plaintiff agrees that it has received all requested Mortality Review reports. But Plaintiff is still missing both the Detainee Death Review and HSCA reports for Óscar López Acosta.[16] *See* Stoneman Decl., Ex. G. To the extent ICE now purports to confirm that no such records were created for Mr. Acosta, *see* Suppl. Pineiro Decl. ¶¶ 16, 26; Defs.' Opp'n at 3 n.2, Plaintiff accepts that the requested records may not exist. However, ICE is unclear on this point, and elsewhere in its filing ICE seems to argue that no reports exist for Mr. Acosta *because* he died outside of ICE custody, *rather than because* the agency has knowledge that such reports were not created in the first place. *See e.g.*, Suppl. Pineiro Decl. ¶¶ 14–15, 23. As Plaintiff has pointed out, the fact that Mr. Acosta died outside ICE custody, standing alone, does not necessarily mean that ICE would not possess a report. *See* Pl.'s Mem. at 5 n.4; Stoneman Decl., Ex. C. Thus, to the extent that ICE is not basing its conclusion on affirmative knowledge that such reports were not created for Mr. Acosta, any search for such records (or lack thereof) is subject to the same adequacy of the search arguments made with respect to the other missing reports. *See* Pl.'s Mem. at 8–18; *supra* Sections III.A–B.

\*     \*     \*

---

[16] And, as discussed above, though ICE has located all requested HSCA reports other than Mr. Acosta's, the agency is withholding twelve such reports, as well as two Root Cause Analysis reports, in full pursuant to Exemption 5. *See supra* Section II; *Vaughn* Index at 19–20 nn.3–24; Pineiro Decl. ¶ 52 n.18. Plaintiff technically "received" those bates-numbered pages from ICE, but they are fully redacted. Thus, Plaintiff has not received the substance of those pages.

Because ICE did not search all directorates, offices, and file systems likely to possess responsive records and relied on unreasonably limited search terms, the Court should grant Plaintiff's cross-motion and order ICE to immediately conduct searches reasonably calculated to identify any remaining records responsive to Plaintiff's requests. [17]

## **<u>CONCLUSION</u>**

Plaintiff respectfully requests that this Court grant Plaintiff's motion for summary judgment and order ICE to release all non-exempt materials and conduct an adequate search for responsive records.

Dated: May 25, 2023

Respectfully submitted,

*/s/ Taylor Stoneman*
Taylor Stoneman
D.C. Bar No. 888155721
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
(202) 848-1319
taylor.stoneman@americanoversight.org

*Counsel for Plaintiff*

---

[17] Specifically, ICE has failed to locate and produce to Plaintiff 32 out of 38 requested Root Cause Analysis reports; eight out of 12 requested independent autopsy reports; one HSCA report, and one Detainee Death Review. *See* Stoneman Decl., Ex. G.